UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————X

WILLIAM McCAFFREY

2011 CV 1636 (RJS)

Plaintiff,

– against –

**FIRST AMENDED
COMPLAINT**
(Jury Trial Demanded)

THE CITY OF NEW YORK; DAVID DIAZ, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY AS A DETECTIVE
OF THE NEW YORK CITY POLICE DEPARTMENT;
ROBERT ARBUISO, INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS A DETECTIVE OF THE NEW YORK CITY
POLICE DEPARTMENT; OFFICERS JOHN/JANE DOE NOS.
1 THROUGH 10, BEING UNKNOWN OFFICERS OF THE NEW
YORK CITY POLICE DEPARTMENT, IN THEIR INDIVIDUAL
AND OFFICIAL CAPACITIES; ROBERT M. MORGENTHAU,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS FORMER
DISTRICT ATTORNEY OF NEW YORK COUNTY; NANCY RYAN,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS ASSISTANT
DISTRICT ATTORNEY OF NEW YORK COUNTY; SHANDA STRAIN,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS
ASSISTANT DISTRICT ATTORNEY OF NEW YORK COUNTY;
EVAN KRUTOY, INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS ASSISTANT DISTRICT ATTORNEY OF NEW
YORK COUNTY; JOHN/JANE DOE NOS. 11 THROUGH 20,
BEING UNKNOWN ASSISTANT DISTRICT ATTORNEYS
OF NEW YORK COUNTY, INDIVIDUALLY AND IN THEIR
OFFICIAL CAPACITIES.

Defendants.
————————————————————————X

Plaintiff WILLIAM McCAFFREY, by his attorneys, IRVING COHEN and GLENN A.

GARBER, P.C., as and for his complaint, alleges upon information and belief as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff WILLIAM McCAFFREY (hereinafter "McCAFFREY") is, and was at

all times relevant to this action, a natural person residing in the County of the Bronx, City and

State of New York.

2.     Defendant CITY OF NEW YORK (hereinafter "CITY") is, and was at all times relevant to this action, a municipal corporation existing under and by virtue of the laws of the State of New York, and having the powers and duties imposed by law thereon, situated in the Southern District of New York.

3.     At all times referred to herein, Defendant ROBERT M. MORGENTHAU (hereinafter referred to personally and in his official capacity as "MORGENTHAU") was the elected District Attorney of New York County and chief policy maker for the Office of the District Attorney of New York County (hereinafter "D.A.N.Y."); Defendant NANCY RYAN (hereinafter referred to a "A.D.A. RYAN" or "RYAN") was an Assistant District Attorney, Chief of the Trial Division, and a policy maker for the D.A.N.Y.; Defendant SHANDA STRAIN (hereinafter referred to as "A.D.A. STRAIN" or "STRAIN"), Defendant EVAN KRUTOY (hereinafter referred to as "A.D.A. KRUTOY" or "KRUTOY"), and Defendants JOHN/JANE DOE NOS. 11 THROUGH 20 are/were employees of Defendant CITY in the D.A.N.Y.

4.     Defendant DAVID DIAZ is and was at all times relevant to this lawsuit a detective and officer of the New York City Police Department (hereinafter "N.Y.P.D.") employed by Defendant CITY, having the powers and duties imposed by law thereon.

5.     Defendant ROBERT ARBUISO is, and was at all times relevant to this lawsuit, a detective and officer of N.Y.P.D. employed by Defendant CITY, having the powers and duties imposed by law thereon.

6.     Defendants JOHN/JANE DOE NOS. 1 THROUGH 10 are, and were at all times relevant to this lawsuit, officers of N.Y.P.D. employed by Defendant CITY, having the powers and duties imposed by law thereon, whose identities are not presently known to plaintiff but who

participated in the unlawful and/or unconstitutional acts alleged herein.

7.      At all times relevant to this lawsuit, defendants MORGENTHAU, RYAN

STRAIN, KRUTOY and JOHN/JANE DOE NOS. 11 through 20 were acting in the course and

scope of their employment and were acting under color of New York State law.

8.      At all times mentioned herein, Defendant CITY OF NEW YORK, by its agents,

servants, and employees was responsible for the operation, maintenance, and control of

D.A.N.Y. and the selection, training, supervision, evaluation and disciplining of Assistant

District Attorneys and other employees.

9.      At all times mentioned herein, MORGENTHAU was the responsible policy

maker for Defendant CITY OF NEW YORK with respect to the management of D.A.N.Y..

10.      At all times mentioned herein, MORGENTHAU, A.D.A.s RYAN, STRAIN and

KRUTOY, and JOHN/JANE DOE NOS. 11 through 20 acted on behalf of Defendant CITY as

municipal policymakers with final authority to decide the timing and extent of disclosure of

exculpatory information and records during the prosecution of individuals suspected and/or

accused of  crimes; to determine the evidence and testimony presented at grand jury proceedings,

hearings and trials; to provide and receive proper training and direction with respect to their duty

to insure that criminal investigations are conducted diligently and properly, that evidence is not

withheld or falsified, that witnesses in criminal prosecutions do not commit perjury or give

misleading, inaccurate, or false testimony; to insure that A.D.A.s at all times act ethically and

within the law; to only make arguments to juries and courts that have a basis in fact; to conduct

proper and thorough investigations prior to indictment; not to obtain indictments in bad faith; to

act in accordance with the Constitution of the United States and the Constitution and laws of the

State of New York; and to insure that innocent people are not convicted of crimes, in accordance

3

with their obligations as quasi-judicial officers.  References to D.A.N.Y. in this Complaint variously refer to the Office itself and the individually named defendants.

11.     At all times mentioned herein, the CITY and N.Y.P.D. through its employees, including Detectives DIAZ and ARBUISO, were responsible for the investigation of crimes, apprehension of suspects, provision of information to D.A.N.Y. and other prosecutorial authorities for use in criminal prosecutions, and other functions including giving truthful testimony, providing all relevant evidence, revealing exculpatory evidence, refraining from withholding or falsifying evidence, making further inquiry when reasonable to do so, and following accepted practices, all in accord with their obligations to conform their conduct to the Constitution of the United States and the Constitution and rules of the State of New York, and to insure that innocent people are not arrested, prosecuted, or convicted of crimes.  References to N.Y.P.D. in this Complaint variously refer to the Department itself, and the individually named defendants.

12.     This is an action under Title 42, Section 1983 of the United States Code in which the Plaintiff alleges that he was deprived under color of law of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States by reason of the police perjury, prosecutorial misconduct, fabrication of evidence and/or failure to investigate and disclose exculpatory evidence that resulted in Plaintiff being incarcerated for a crime he did not commit.  Plaintiff also brings claims under New York State law for false imprisonment, malicious prosecution, negligence, and intentional infliction of emotional distress predicated upon the same acts and transactions as the aforesaid Federal Constitutional claims.

13.     This Court has jurisdiction over the Federal claims pursuant to 28 U.S.C. § 1331 and over the related state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) in that Defendant CITY OF NEW YORK is a municipality whose principal office is in this District; and the individual Defendants are employees of N.Y.P.D. and D.A.N.Y. with offices in this District.

## NOTICE OF CLAIM

15.  Written Notice of Claim was filed with Defendant CITY OF NEW YORK on February 24, 2010.  More than thirty days have elapsed since the filing of said Notice of Claim and these matters have not been settled nor otherwise disposed of.

## JURY DEMAND

16.     Plaintiff McCAFFREY demands trial by jury of all issues raised herein.

## OVERVIEW

17.     McCAFFREY was falsely imprisoned pursuant to an indictment and convictions for the crimes of Rape in the First Degree (three counts), Kidnapping in the Second Degree, Unlawful Imprisonment in the First Degree, Assault in the Second Degree and Criminal Possession of a Weapon in the Third Degree, all arising from one alleged incident.

18.     The judgment of conviction was rendered, after a jury trial upon indictment number 5086/2005 in the Supreme Court of the State of New York, County of New York, by Acting Supreme Court Justice Richard D. Carruthers.

19.     On October 20, 2006, McCAFFREY was sentenced to concurrent, determinate terms of twenty years imprisonment on each rape charge, eighteen years for the kidnapping charge, and seven years for the assault charge.  He was also sentenced to indeterminate terms of one and one-third to four years on the charge of unlawful imprisonment, and two and one-third to seven years for criminal possession of a weapon.  All sentences were imposed concurrently,

resulting in an aggregate sentence of twenty years imprisonment.  McCAFFREY commenced service of this sentence immediately.

20.     On December 10, 2009, Justice Carruthers, with the consent of D.A.N.Y., vacated the conviction and dismissed the indictment.

21.     Prior to the dismissal, on September 1, 2009, McCAFFREY was released from the custody of the State of New York pursuant to an order granting bail pending the resolution of the post-conviction proceedings.

22.     McCAFFREY had, by that time, served approximately four years in custody, including three years in maximum security state prisons.

23.     The case concerned charges that on September 18, 2005, McCAFFREY and two other men kidnapped Biurny Peguero in upper Manhattan, took her to a secluded place in the Bronx, and raped her at knifepoint.

24.     McCAFFREY was convicted after a jury trial at which the prosecution presented evidence primarily consisting of Ms. Peguero's testimony.

25.     After a delayed and inordinately lengthy post-conviction reinvestigation of the case by D.A.N.Y., the prosecution joined McCAFFREY's motion to vacate the conviction and dismiss the indictment.

26.     McCAFFREY's post-conviction motion relied upon the grounds of newly discovered evidence and actual innocence.

27.     The new evidence consisted of Ms. Peguero's recantation, first made to a priest and then to D.A.N.Y., wherein she maintained that she was not raped, that McCAFFREY was innocent of the charges of which he was convicted, and that she had committed perjury at his trial; post-conviction DNA testing establishing that bite marks on Ms. Peguero, that she testified

were inflicted by McCAFFREY during the alleged rape, were not caused by him, but by a female friend of Ms. Peguero's – as contended by the defense at trial; and an admission by Ms. Peguero's friend, Aurora Pujols, that she fought with Ms. Peguero the morning of the alleged offense and likely inflicted the bite marks.

28.     In granting the motion to vacate the conviction and dismissing the indictment, Justice Carruthers apologized to McCAFFREY in open court for the grave injustice that occurred.

29.     In a written Decision and Order, Justice Carruthers stated:

> The only reasonable conclusion to draw from Ms. Peguero's recantation, the DNA results, and the statements of witnesses after the recantation is that McCAFFREY did not commit the crimes of which he was convicted.

> * * *

> Simply put[,] the rape that [Ms. Peguero] described in her testimony never occurred.

(Decision and Order is attached as Exhibit A and is made part of this Complaint).

30.     McCAFFREY was arrested on September 24, 2005 based on accusations that he committed a terrible crime – kidnapping and gang raping a young woman at knifepoint.  He was then tried before a Manhattan jury and convicted.

31.     It is beyond dispute that the crimes of which he was convicted never occurred. Rather, the underlying allegations were manufactured by the purported victim, Biurny Peguero.

32.     It is also clear that the investigating detectives were aware of evidence that Ms. Peguero's injuries – and particularly bite marks on her arm and shoulder – were caused by one or more of her female friends and not McCAFFREY.

33.     Yet, the detectives had these witnesses hide these facts from the grand jury and the petit jury.

34.     Moreover, the prosecution knew, or should have known, that the injuries inflicted upon Ms. Peguero were <u>not</u> caused by McCAFFREY.

35.     However, A.D.A. STRAIN impugned truthful evidence put before the grand jury and the petit jury by the defense showing that Ms. Peguero's female friends had an altercation with her and likely bit her, and A.D.A. STRAIN advanced untruthful evidence before the grand jury and the petit jury, falsely asserting to the petit jury that McCAFFREY had bitten Ms. Peguero, and argued that the bite marks corroborated Ms. Peguero's testimony and proved that she was raped.

36.     In a reversal of events, over three years later, Ms. Peguero admitted that she lied under oath, and she was prosecuted for perjury by D.A.N.Y., the same office that prosecuted McCAFFREY for crimes that never occurred, and bitterly defended this wrongful conviction even in the face of clear evidence of his innocence.

37.     Ms. Peguero pled guilty to perjury and on February 23, 2010, she was sentenced to one to three years in state prison.

38.     D.A.N.Y. became aware of Ms. Peguero's recantation, which was first made by Ms. Peguero to her priest, in March 2009, two months before D.A.N.Y. revealed this obvious <u>Brady</u> material to the defense.

39.     D.A.N.Y. then continued to oppose McCAFFREY's release pending final resolution of the matter, despite corroboration of Ms. Peguero's recantation from eyewitnesses Aurora Pujols and Maria Sosa and DNA evidence, all of which demonstrated that there had been a physical fight among the women and that the bite mark on Ms. Peguero was caused by Ms. Pujols, and not McCAFFREY.

40.     As a result of these actions by D.A.N.Y., including the violation of <u>Brady</u>,

McCAFFREY served at least five additional months in prison, before he was finally released on September 1, 2009, three months before the 440.10 motion was ultimately granted and the indictment dismissed.

41.     The circumstances leading up to these tragic events are as follows.

### The Underlying Conviction

42.     Biurny Peguero, the purported "victim," went out drinking and clubbing in upper Manhattan on the evening of September 17, 2005 with a small group of friends that included Aurora Pujols and Maria Sosa.

43.     In the early morning hours of September 18, 2005, the group double parked their car in front of a restaurant to buy some food and use the bathroom before returning to New Jersey where they resided.

44.     The car they were driving was owned by Aurora Pujols.

45.     Ms. Peguero, who was admittedly drunk, waited in the car with Ms. Pujols while the others went into the restaurant.

46.     McCAFFREY, who was driving around the area with several male friends, pulled over and struck up a conversation with the women.

47.     He then got into the front passenger seat of Pujols's car and continued to talk to Ms. Peguero about going to an after-hours club.

48.     Put off by McCAFFREY, Ms. Pujols exited the vehicle.

49.     Ms. Peguero, who was apparently willing to accompany McCAFFREY, climbed over from the backseat into the driver's seat and started to drive away with McCAFFREY in the passenger seat.

50.    After driving a short distance, it became apparent that Ms. Peguero was too intoxicated to drive.

51.    The versions of events presented at trial by the prosecution and defense differed significantly after this point.

52.    According to Ms. Peguero's testimony, a friend of McCAFFREY's from another vehicle entered the car and took over the wheel. They drove to a nearby parking garage and parked Ms. Pujols's vehicle.

53.    Ms. Peguero testified that she thought that they were going to wait in the parking garage for her friends to rejoin her, while the defense asserted that she willingly accompanied the men, in their vehicle, to try to find an after-hours club.

54.    Ms. Peguero testified that she was driven over a bridge and taken to a secluded area where she was threatened with a knife and repeatedly raped by McCAFFREY and two of his friends.

55.    However, McCAFFREY testified that no sex took place, and that Ms. Peguero was never abused or harmed in any way.

56.    It was uncontested that Ms. Peguero was returned to the same parking garage where the men and Ms. Peguero had previously left Ms. Pujols's car.

57.    It was also not disputed that during the time that Ms. Peguero was in the van with the men, numerous cell phone calls occurred between Ms. Peguero and her friends.

58.    Maria Sosa, one of Ms. Peguero's friends who testified at trial, described a distraught and hysterical Ms. Peguero during the calls.  However McCAFFREY and Ramon Uribe, one of McCAFFREY's male friends in the van and a defense witness at trial, testified that

she was arguing with and cursing at her friends, and was not complaining that she was taken against her will.

59.     Of particular significance at the trial was the testimony about what occurred at the parking garage after Ms. Peguero was dropped off by McCAFFREY and his friends.

60.     The prosecution called Police Officer James Gilson, who testified that he responded to a call to the garage, and that when he arrived Ms. Peguero was in the backseat of a car with three or four females and was drunk and hysterical.

61.     He also said that she was distraught, angry, and was yelling at her friends.

62.     Moreover, no complaint was made to the police that Ms. Peguero had been raped or abused.

63.     Maria Sosa and Aurora Pujols testified for the prosecution that Ms. Peguero first disclosed to them in the car on the way back to New Jersey that she had been raped.

64.     They also stated that her clothes were disheveled and that she had bruises on her arms and shoulders.

65.     Ms. Peguero was taken by her friends to a hospital in New Jersey where she was examined by Farkhanda Farooqi, a Sexual Assault Nurse Examiner, who collected samples in a "rape kit."

66.     Although the rape kit revealed no semen or other evidence indicative of sexual contact, Farooqi testified that Ms. Peguero had visible injuries including scratches, bruises, and bite marks on her arm and shoulder, photographs of which were shown to the jury.

67.     Farooqi also testified that Ms. Peguero told her that the bite marks were inflicted by one of the rapists while he was raping her.

68.     Ms. Peguero testified at trial that it was McCAFFREY who bit her during the sexual assault.

69.     Testimony was offered by a forensic biologist, Lisa Misner, from the Office of the Chief Medical Examiner of the City of New York ("OCME").

70.     Ms. Misner stated that samples of dried secretions found on the bite marks on Ms. Peguero contained amylase, biological material present in saliva, but that there was insufficient DNA present in the sample to generate a profile for comparison.

71.     At trial, the defense called a parking garage attendant Pelagio Delacruz, who testified that he argued with McCAFFREY after Ms. Peguero was dropped off at the garage, because McCAFFREY did not want Mr. Delacruz to give the car keys to Ms. Peguero because she was too drunk to drive.

72.     Mr. Delacruz also said that when Ms. Peguero's friends arrived, they got into their car and started arguing, hitting each other, and screaming.

73.     On cross-examination, Mr. Delacruz acknowledged that he had spoken to the police shortly after the incident. Mr. Delacruz denied failing to tell the police about the fight between the women in the car.

74.     Mr. Delacruz's testimony, which provided an alternate explanation for the injuries sustained by Ms. Peguero, was met with a rebuttal case by the prosecution.

75.     Detective David Diaz testified that he had previously interviewed Mr. Delacruz, and that Mr. Delacruz failed to say anything about Ms. Peguero getting into a fight with her friends in the parking garage.

76.     McCAFFREY testified in his own defense and denied any wrongdoing.

77.    McCAFFREY stated that Ms. Peguero agreed to accompany him and his friends to an after-hours club; when they discovered that the club was closed, they dropped one of the men at his home, and then drove Ms. Peguero back to the garage.

78.    Six days later, McCAFFREY was contacted by the police because he was sought for questioning.

79.    He voluntarily came to the precinct, freely admitted that he had been with Ms. Peguero on September 18, 2005, and denied any wrongdoing.

80.    McCAFFREY was arrested and charged with rape and related offenses.

81.    McCAFFREY testified before the grand jury and reiterated his claim that he was innocent.

82.    An indictment was nevertheless returned against him.

83.    The heinous nature of the alleged offense led to a sentence of twenty years in jail.

84.    Labeled a convicted sex offender, McCAFFREY served approximately three years in maximum security state prisons until his exoneration.

### THE SUPPRESION OF EVIDENCE AND
### PERJURY REGARDING THE CAUSE OF BIURNY PEGUERO'S
### <u>PHYSICAL INJURIES</u>

85.    The initial violations committed by the police and the prosecution concern the suppression of the true cause of the physical injuries sustained by Biurny Peguero which was central to the case against McCAFFREY.

86.    Ms. Peguero claimed that her injuries – including the bite marks on her arm and shoulder – were inflicted by McCAFFREY during the alleged rape.

87.    However, the police knew from an early stage of the investigation, after speaking to Ms. Peguero and her friends, that there had been a physical altercation between her and her

female friends on the morning of September 18, 2005.

88.     Aware that this fact would provide an alternate explanation for the cause of Ms. Peguero's injuries, and thus undermine the claim of rape, Defendants ARBUISO and POLICE OFFICERS JOHN/JANE DOE Nos. 1 through 10 told the young women that the true nature of their fight was insignificant and instructed them not to mention it.

89.     There can be no doubt about the significance of the fight between the women, and the resulting injuries to Ms. Peguero, to the prosecution's case against McCAFFREY.

90.     Ms. Peguero was grossly intoxicated during the time of the alleged offenses, making corroboration of her account with physical evidence extremely important.

91.     However, the rape kit provided no evidence that any sexual assault occurred; much less that McCAFFREY was a perpetrator.

92.     Police Officer James Gilson interviewed Ms. Peguero in the parking lot shortly after she was dropped off, and she failed to report that she had been raped or that any crime occurred.

93.     Under the circumstances, whether it was McCAFFREY or Ms. Peguero's female friends who caused Peguero's injuries, including the bite marks, was of critical importance. Knowing this, the police took deliberate efforts to suppress evidence of the physical fight among the young women and the true cause of Ms. Peguero's injuries.

94.     Moreover, Defendant DIAZ had interviewed Pelagio Delacruz, an attendant at the parking garage, and was informed that a fight had occurred between the women at the garage. Nevertheless, he suppressed this fact.

95.     The suppression of exculpatory evidence during the investigation continued through the trial, and was exacerbated by perjured testimony by DIAZ. At trial, DIAZ falsely

testified that Mr. Delacruz did not tell him about any fight between the women occurring at the parking garage.

96.     The truth was finally revealed, years after the trial, when the defense succeeded in obtaining post-conviction DNA testing of the dried secretions taken from the bite marks. The resulting DNA evidence definitively excluded McCAFFREY as the person who bit Ms. Peguero, and established that she was bitten by a female, and specifically Aurora Pujols. The DNA evidence corroborated Aurora Pujols's statement to defense investigator Joseph Dwyer that she and the other women had gotten into a verbal and physical fight with Ms. Peguero, and that in the course of that altercation Pujols assaulted Peguero and likely bit her.

97.     Importantly, Ms. Pujols told Mr. Dwyer that although she and others had informed the police of this physical altercation, the police told her and Maria Sosa, and possibly others, that this fact was "unimportant" and not bring it up.  Mr. Dwyer also overheard a telephone conversation between Ms. Pujols and Maria Sosa, made in his presence, wherein Sosa acknowledged this cover-up.

98.     Notably, no mention is made in any police report, or DD-5, of this statement by Ms. Pujols or any other young woman who was interviewed by the police about the physical fight in which Ms. Peguero was injured by her female friends.

99.     Upon information and belief, A.D.A. STRAIN, as part of her investigation spoke with the police, Ms. Peguero and Ms. Peguero's companions and became aware of a physical altercation between Ms. Peguero and her companions.

100.    While discovery will reveal exactly what A.D.A. STRAIN knew regarding this physical altercation among the women prior to the institution of criminal charges against McCAFFREY, it is without question that no mention of it was brought out by the prosecution in

its direct case.

101.   Indeed, the record reveals an intentional strategy to avoid any notion that Ms. Peguero's friends were hostile toward her from the time they first met up with her at the parking lot until the time she told them – falsely – that she had been raped.

102.   A.D.A. STRAIN, despite eliciting a detailed chronology of events from Ms. Peguero, Ms. Pujols and Ms. Sosa, left a void in the direct-examinations about the events at the parking garage and, through leading questions, steered the witnesses away from this topic.

103.   This trial strategy reflects that A.D.A. STRAIN likely knew from her pre-arrest investigation that the women had a physical altercation which could have been the source of Ms. Peguero's injuries.

104.   Only through discovery will it be learned whether any of the witnesses – despite the warnings from the police – told D.A.N.Y., A.D.A. STRAIN and/or other prosecutors about the physical altercation and the injuries inflicted on Ms. Peguero by her friends.

105.  Obviously, the suppression of this information – which would have corroborated the alternative, truthful cause of Ms. Peguero's injuries argued by the defense at trial – is an unassailable Brady violation.

### THE PEGUERO CONFESSION TO HER PRIEST AND RECANTATION TO THE DISTRICT ATTORNEY

106.   Years later, when it became clear that McCAFFREY was in fact innocent, D.A.N.Y. took no steps to expedite his release from prison.  Instead, they intentionally withheld exculpatory information and delayed McCAFFREY's release.

107.   After Biurny Peguero confessed to her priest that she had lied and caused an innocent man to be imprisoned, she retained an attorney to negotiate a disposition of her criminal

offense with D.A.N.Y..

108.    That attorney, Mr. Paul Callan, also conducted his own investigation and concluded that McCAFFREY was innocent.

109.    Mr. Callan arranged for Ms. Peguero to meet with D.A.N.Y., and Ms. Peguero repeated to D.A.N.Y. her recantation and confessed to perjuring herself at McCAFFREY's trial.

110.    This meeting occurred in March or early April 2009. At that time, Mr. Callan requested D.A.N.Y. to seek the immediate release of Plaintiff.

111.    When Ms. Peguero and her attorney made these revelations to D.A.N.Y., Ms. Peguero was fully aware that she would face perjury charges, prison, and as a resident alien, likely deportation, due to the fact she had lied at McCAFFREY's trial.

112.    Despite these serious consequences, Ms. Peguero maintained to D.A.N.Y. on numerous occasions, with her lawyer present, that McCAFFREY had not raped, kidnapped or assaulted her, and that he was an innocent man.

113.    Given the circumstances of her recantation, there was absolutely no basis to suggest that Ms. Peguero had been threatened, pressured, or paid to provide this information to D.A.N.Y.

114.    Moreover, Ms. Peguero's account was consistent with the forensic evidence, including the exculpatory results of the post-trial DNA testing, and moreover was consistent with the version of events testified to by McCAFFREY and Pelagio Delacruz.

115.    However, D.A.N.Y. did not reveal this obvious <u>Brady</u> material to McCAFFREY, despite D.A.N.Y.'s awareness that McCAFFREY had new counsel, Glenn A.  Garber, who was conducting a reinvestigation of the case.

116.    Indeed, a year before Ms. Peguero's recantation, Mr. Garber litigated against

D.A.N.Y. for months to obtain post-conviction DNA testing.  After the results of the DNA testing were finally obtained in October, 2008, Mr. Garber attempted – unsuccessfully – to persuade D.A.N.Y. to dismiss the case or consent to a retrial, based on the exculpatory DNA evidence that excluded McCAFFREY as the person who bit Ms. Peguero and established that she was bitten by a female.

117.     On or about May 15, 2009, Mr.  Garber went to D.A.N.Y.'s office to discuss the additional fact that Aurora Pujols had given a statement to a defense investigator on April 16, 2009, in which Ms. Pujols admitted that she engaged in a violent altercation with Ms. Peguero in the parking garage on September 18, 2005, and that she possibly bit Ms. Peguero in the course of the fight.  Present and in charge of that meeting for D.A.N.Y. was A.D.A. KRUTOY.  A.D.A. STRAIN was also present at that meeting.

118.     Notably, D.A.N.Y. was already aware of the fight between the women – which further corroborated Ms. Peguero's recantation – weeks before the May 15, 2009 meeting with Mr. Garber.  D.A.N.Y. was explicitly informed about the fight by Ms. Pujols and Ms. Sosa during interviews conducted by D.A.N.Y. as part of its "reinvestigation" of the case after Ms. Peguero's recantation.

119.     Upon information and belief, A.D.A. KRUTOY and A.D.A. STRAIN were involved in this "reinvestigation" at or around the time Ms. Peguero came forward and recanted.

120.     At this period in time, no motion had been pending pursuant to C.P.L. § 440.10 to vacate the conviction; nor was a motion pending pursuant to C.P.L. § 440.30, as the DNA testing sought by McCAFFREY was completed, and that litigation had been concluded and was resolved in McCAFFREY's favor.

121.     Upon information and belief, A.D.A. RYAN, as Chief of the Trial Division, was

supervising and being consulted during the "reinvestigation."

122.     However, it was not until the meeting on May 15, 2009, that D.A.N.Y. chose to reveal to Plaintiff's attorney that Ms. Peguero had fully recanted her trial testimony – approximately two months earlier.  Even then, D.A.N.Y., and A.D.A.s RYAN, STRAIN and KRUTOY gave no details about the recantation, how she could be reached, her counsel's name or contact information, requiring Plaintiff's attorney to further investigate to obtain more substantive information so it could be used to move to vacate McCAFFREY's conviction and obtain his release.

123.     D.A.N.Y.'s failure to reveal Ms. Peguero's recantation soon after D.A.N.Y. first learned of it and D.A.N.Y's failure to provide details about it delayed McCAFFREY's eventual release from prison.

124.     Moreover, in spite of Ms. Peguero's recantation, the exculpatory DNA results, and the statements by Ms. Pujols and Ms. Sosa regarding the true nature of the fight between the women and the cause of Ms. Peguero's injuries, D.A.N.Y. refused to consent to vacate the conviction or release McCAFFREY.

125.     D.A.N.Y.'s unyielding opposition to vacating such an obviously unjust conviction or, at minimum, agreeing to McCAFFREY'S release pending further "investigation" by D.A.N.Y., compelled defense counsel to file a motion to vacate the conviction pursuant to New York Criminal Procedure Law § 440.10 on or about July 28, 2009.  (This motion and its accompanying affirmation are attached hereto as Exhibit B and made a part this Complaint).

126.     After filing the motion, Mr. Garber spoke to A.D.A. RYAN, who was supervising A.D.A. KRUTOY and A.D.A. STRAIN in regard to the investigation which had commenced before the filing of the motion and was continuing.  During this call it was urged that A.D.A.

RYAN consent to vacate the conviction or promptly release McCAFFREY.

127.    The intransigence on the part of D.A.N.Y. caused additional, unnecessary months of delay before McCAFFREY was finally released from prison.

128.    While, in the end, D.A.N.Y. consented to McCAFFREY's release on bail, and ultimately joined the defense's motion to vacate the conviction and dismiss the indictment, there is no rational explanation for D.A.N.Y.'s actions, which directly caused the continued incarceration and suffering of McCAFFFREY, in light of the overwhelming exonerating evidence.

129.    Indeed, based upon information and belief, D.A.N.Y. decided early in the process that a viable perjury prosecution existed against Ms. Peguero, and was negotiating with Ms. Peguero's counsel regarding a guilty plea to a perjury charge.  Despite this decision, which was irreconcilable with McCAFFREY's guilt, D.A.N.Y. callously permitted McCAFFREY to continue to languish in jail.

130.    Even before Ms. Peguero's recantation, D.A.N.Y. was hostile and resistant to the defense's requests for post-conviction DNA testing, and this resistance delayed by nearly a year the discovery that it was Ms. Pujols's DNA, and not McCAFFREY's, on the bite mark – a factor which, ironically, D.A.N.Y. pointed to in its eventual request to the court to dismiss the charges against McCAFFREY.

131.    Thus, throughout these proceedings, before and after Ms. Peguero's recantation, D.A.N.Y. engaged in a continuing pattern of behavior of hostility and opposition toward correcting wrongful convictions, maintaining convictions on its record at all costs, and abdicating is obligation to ensure that justice is done.

**AS AND FOR A FIRST CAUSE OF ACTION: 42 U.S.C. § 1983 (DEFENDANTS DAVID DIAZ, ROBERT ARBUISO AND JOHN/JANE DOE NOS. 1 THROUGH 10)**

132.    The allegations in paragraphs 1 through 125 of the complaint are repeated and

realleged as if fully set forth herein.

133.    Defendants DIAZ, ARBUISO and JOHN/JANE DOE Nos. 1 through 10 deprived

McCAFFREY of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to

the Constitution of the United States by manner and means including but not limited to the

following:

(a)  Suppressing exculpatory evidence;

(b)  Influencing witnesses to hide the truth;

(c)  Giving perjured testimony;

(d)  Failing to investigate, obtain and/or follow up on exculpatory evidence of which they

knew or should have known, and which would have proved McCAFFREY's total innocence.

134.    In effecting each of the above deprivations, defendants DIAZ, ARBUISO

and JOHN/JANE DOE NOS. 1 through 10 acted under color of New York State law.

135.    In effecting each of the above deprivations, defendants DIAZ, ARBUISO

and JOHN/JANE DOE NOS. 1 through 10 were deliberately indifferent to the constitutional

rights of McCAFFREY.

136.    Because McCAFFREY's conviction was obtained through the suppression of and

failure to turn over exculpatory evidence, fraud, perjury and/or the willful failure to investigate

exculpatory evidence, any probable cause that may arguably have existed at the time of the arrest

was vitiated by the time of indictment, trial and/or conviction.

137.    Because McCAFFREY's arrest and conviction were obtained through the

suppression of and failure to turn over exculpatory evidence, fraud, perjury and/or the willful

failure to investigate exculpatory evidence, no presumption of regularity attaches to any act of the Defendants.

138.    McCAFFREY's injuries were proximately caused by the aforesaid constitutional deprivations and conduct of the Defendants.

139.    By reason of the foregoing, defendants DIAZ, ARBUISO and  JOHN/JANE DOE NOS. 1 through 10 are liable to McCAFFREY pursuant to 42 U.S.C. § 1983 for damages in an amount to be determined at trial.

### AS AND FOR A SECOND CAUSE OF ACTION: 42 U.S.C. § 1983 (DEFENDANTS MORGENTHAU, STRAIN, KRUTOY, AND JOHN/JANE DOE NOS. 11 THROUGH 20)

140.  Plaintiff repeats, reiterates, and realleges each and every allegation contained in the complaint in paragraph 1 through 133 inclusive, with the same force and effect as if set forth at length herein.

141.    Defendants, MORGENTHAU, A.D.A. RYAN, A.D.A. STRAIN, A.D.A. KRUTOY and the various John and Jane Does are personally liable for damages because of their unwarranted, unreasonable and unconstitutional acts including but not limited to: (a) ignoring evidence of McCAFFREY's innocence; (b) failing and delaying to reveal to the defense exculpatory evidence; (c) misrepresentation of evidence; and (d) failing to investigate and follow up on leads that indicated McCAFFREY's innocence.

142.    Because MCCAFFREY's conviction was obtained through the suppression of and delay in disclosing and/or failure and to disclose exculpatory evidence, fraud, ignoring evidence of Plaintiff's innocence, misrepresentation of evidence, perjury, and/or the willful failure to investigate exculpatory evidence, any probable cause that may arguably have existed at the time of the arrest was vitiated by the time of indictment, trial and/or conviction.

143.    Because McCAFFREY's arrest and conviction was obtained through the suppression of and delay in disclosing and/or failure and to disclose exculpatory evidence, fraud, ignoring evidence of Plaintiff's innocence, misrepresentation of evidence, perjury, and/or the willful failure to investigate exculpatory evidence, no presumption of regularity attaches to any act of the Defendants.

144.    Defendants' unconstitutional actions and inactions were taken in connection with their investigative function.

145.    McCAFFREY's injuries were proximately caused by the aforesaid constitutional deprivations and conduct of the Defendants.

146.    By reason of the foregoing, Defendants MORGENTHAU, A.D.A. RYAN, A.D.A. STRAIN, A.D.A KRUTOY and JOHN/JANE DOE NOS.11 through 20 are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for damages in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION: 42 U.S.C. § 1983 (DEFENDANT CITY OF NEW YORK – MONELL CLAIMS REGARDING D.A.N.Y. AND N.Y.P.D. DEFENDANTS)

147.    The allegations in paragraphs 1 through 140 of the complaint are repeated and realleged as if fully set forth herein.

148.    The aforesaid constitutional violations were proximately caused by one or more policies, practices and/or customs of Defendant CITY OF NEW YORK, including but not limited to suppressing exculpatory evidence, delaying the disclosure of exculpatory evidence, fabricating and misrepresenting evidence, perjury, and failure to investigate exculpatory evidence.

149.    It was the policy, practice and/or custom of Defendant CITY OF NEW YORK to fail to train, discipline and/or supervise police officers and Assistant District Attorneys so as to

prevent them from suppressing, delaying the disclosure of, and/or failing to disclose exculpatory evidence; fabricating and misrepresenting evidence; allowing and advancing perjured testimony at the grand jury and trial; and failing to investigate exculpatory evidence.

150.    Defendant CITY OF NEW YORK knew to a moral certainty that its police officers and Assistant District Attorneys would confront situations conducive to suppressing, failing to disclose, and delaying the disclosure of exculpatory evidence, fabrication and misrepresentation of evidence, perjury, and/or failure to investigate exculpatory evidence.

### D.A.N.Y. Defendants

151.  The acts of D.A.N.Y., MORGENTHAU, A.D.A.s RYAN, STRAIN, KRUTOY, and JOHN AND JANE DOE NOS. 11-20 were committed under their authority as D.A.N.Y. and as Assistant District Attorneys and employees vested under and by virtue of the laws of the State of New York, and were, therefore, committed under the color of the state law.

152.    Defendant CITY OF NEW YORK knew of the need for additional screening, training, supervising and disciplining of Assistant District Attorneys and employees of D.A.N.Y. to: (a) refrain from ignoring evidence of a criminal defendant's innocence; (b) refrain from misrepresenting, withholding or falsifying evidence;  (c) exercise care and thoroughness in the investigation and prosecution of violent crimes including rape involving no other evidence besides the allegations of the supposed victim; (d) accurately identify and handle exculpatory material; and (e) accurately identify and utilize forensic evidence.

153.    Through intentional and deliberate indifference, Defendant CITY OF NEW YORK failed to adequately provide for screening, training, supervising, and disciplining of Assistant District Attorneys serving in D.A.N.Y. with respect to misrepresenting, withholding and falsifying evidence, conducting proper investigation, disclosing exculpatory evidence to the

defense without delay, following up on leads indicating innocence, accurately handling and identifying forensic evidence, and proper identification and handling of exculpatory material. These and other types of intentional misconduct and deliberate indifference are evidenced by decisions of the courts of the State of New York – some as recent as 2010 – reporting that employees of D.A.N.Y. engaged in various acts of prosecutorial misconduct and constitutional violations, including withholding exculpatory evidence from accused individuals, engaging in improper, disingenuous and factually unsupported arguments, acting in a manner to obtain a conviction at all costs rather than seeking truth and justice and, generally failing to act appropriately in a quasi-judicial capacity, including but not limited to:

People v. Colas, 206 A.D.2d 183 (1st Dept. 1994)

People v. Norton, 164 A.D.2d 343 (1st Dept. 1990)

People v. Jones, 128 A.D.2d 405 (1st Dept. 1987)

People v. Hansen, 141 A.D.2d 417 (1st Dept. 1988)

People v. Bendell, 111 A.D.2d 87 (1st Dept. 1985)

People v. Jimenez, 102 A.D.2d 439 (1st Dept. 1984)

People v. Vann, 54 A.D.2d 356 (1st Dept. 1976)

People v. Arrocho, 85 Misc.2d 116 (Sup. Ct., NY Co. 1976)

People v. Dowdell, 88 A.D.2d 239 (1st Dept. 1982)

People v. Ortiz, 51 A.D.2d 710 (1st Dept. 1976)

People v. Abdul-Malik, 61 A.D.2d 657 (1st Dept. 1978)

People v. Taylor, 160 A.D.2d 556 (1st Dept. 1990)

People v. Jarrells, 190 A.D.2d 120 (1st Dept. 1993)

People v. Ortiz, 33 A.D.3d 432 (1st Dept. 2006)

People v. Williams, 7 N.Y.3d 15 (2006)

People v. Jackson, 237 A.D. 2d 179 (1st Dept. 1997)

People v. Burton, 256 A.D. 2d 42 (1st Dept. 1998)

People v. Tolbert, 198 A.D.2d 132 (1st Dept. 1993)

People v. D'Alessandro, 184 A.D.2d 114 (1st Dept. 1992)

People v. Norton, 164 A.D.2d 343 (1st Dept. 1990)

People v. Coates, 74 N.Y.2d 244 (1989)

People v. Wallert, 98 A.D. 2d 47 (1st Dept. 1983)

People v. Davis, 81 N.Y.2d 281 (1993)

People v. Ramos, 141 Misc.2d 930 (Sup. Ct., N.Y. Co. 1988)

People v. Hansen, 141 A.D.2d 417 (1st Dept. 1988)

People v. Bolden, 82 A.D.2d 757 (1st Dept. 1981)

People v. Rivera, 75 A.D.2d 544 (1st Dept. 1980)

People v. Bermudez, 2009 WL 382327 (Sup. Ct., N.Y. Co. 2009)

People v. Hidalgo and Lemus, Ind. Nos. 674/91, 12833/91 (Sup. Ct., N.Y. Co. Oct. 19, 2005)

People v. Sinha, 2011WL1312099 (1st Dept., April 11, 2011)

154.    Defendant MORGENTHAU, as the District Attorney of New York County,
personally and/or through his authorized delegates, at all times relevant to this Complaint had
final, discretionary authority to promulgate and implement policies and procedures, including
policies and procedures as to personnel training and supervision, with respect to D.A.N.Y.'s
performance of its duties.  Defendant MORGENTHAU as the District Attorney of New York
County, and/or his authorized delegates, constituted a City and County "policy maker" for
Defendant CITY OF NEW YORK, and acted with intentional and deliberate indifference to the

constitutional rights of persons coming into contact with D.A.N.Y. in the manner set forth above.

155.    Upon information and belief, prosecutors have not been disciplined by Defendant CITY OF NEW YORK or D.A.N.Y. for their misconduct, despite repeated judicial findings that a D.A.N.Y. prosecutor engaged in misconduct.  Such failure to discipline constitutes deliberate indifference toward the constitutional rights of the accused, and such uncorrected misconduct constitutes a practice, pattern and custom of engaging in prosecutorial misconduct, including but not limited to withholding exculpatory evidence from the accused, that exists among the prosecutorial personnel within D.A.N.Y..

156.    By virtue of the decisions referred to above and other information and court decisions, Defendant MORGENTHAU knew that the need for adequate screening, training, supervising, and disciplining of Assistant District Attorneys was and is compelling because it was the evident overriding credo of A.D.A.s RYAN, STRAIN, KRUTOY, and other prosecutors in D.A.N.Y., named and unnamed, to obtain convictions at all costs, with deliberate and total disregard for the truth and for the constitutional rights of the accused.

157.    Rather than responding with appropriate scrutiny and improving supervision and training to address this problem, D.A.N.Y. instead fostered an institutional culture and climate that encouraged this misconduct.  Supervisory personnel, such as A.D.A. RYAN and others were apparently directly involved, and became aware of but ignored the compelling evidence that McCAFFREY was innocent.

158.    In addition, during the post-conviction proceedings, A.D.A.s RYAN, STRAIN and KRUTOY and D.A.N.Y. did not disclose, and delayed the disclosure of, exculpatory evidence that clearly demonstrated that McCAFFREY was innocent.

159.    Nor did D.A.N.Y. on its own – even in the face of overwhelming evidence of

innocence – take any steps whatsoever to have McCAFFREY released from custody.

160.     But for the CITY OF NEW YORK's deliberate indifference in failing to adequately provide screening, training, supervision, and discipline of Assistant District Attorneys serving in D.A.N.Y., and its affirmative acts, the innocent Plaintiff would not have been prosecuted or convicted for the crimes with which he was charged, nor would he have continued to suffer a wrongful incarceration that was further protracted as a result of D.A.N.Y.'s failure to reveal, and delay in revealing, exculpatory evidence that proved his innocence.

161.     Moreover, A.D.A. RYAN, as Chief of the Trial Division, acted as a policymaker; therefore her supervision and decisions by themselves constitute – and were manifestations of – a policy of D.A.N.Y. and the CITY OF NEW YORK to withhold and delay the disclosure of totally exculpatory and exonerating material to a defendant in the post-conviction context.

162.     This policy of withholding and delaying the disclosure of exculpatory material will result – as it did here – in the serious violation of constitutional rights.

### N.Y.P.D. Defendants

163.     Defendants DIAZ and ARBUISO and the other N.Y.P.D. defendants' actions were part of a pattern, practice and policy of the N.Y.P.D. to ignore and violate the constitutional rights of the people with whom they come in contact.

164.     The acts of Detectives DIAZ and ARBUISO, and the various JOHN AND JANE DOE Nos. 1 through 10 were committed under their authority as police officers of N.Y.P.D. vested under and by virtue of the laws of the State of New York, and were, therefore, committed under the color of state law.

165.     Defendant CITY OF NEW YORK knew of the need for additional screening, training, supervising and disciplining of police officers to: (a) refrain from ignoring evidence of a

criminal defendant's factual innocence; (b) refrain from misrepresenting, withholding, or falsifying evidence; (c) exercise care and thoroughness in the investigation of violent crimes including rape involving no evidence other than allegations of the purported victim; (d) accurately identify and handle exculpatory material; (e) refrain from making arrests or instigating prosecutions in bad faith and without probable cause; (f) refrain from giving false testimony; and (g) accurately identify and utilize forensic evidence.

166.   Through intentional and deliberate indifference, the CITY OF NEW YORK failed to adequately provide for screening, training, supervising, and disciplining of police officers with respect to the above mentioned issues.  This type of intentional misconduct and deliberate indifference is evidenced by decisions of the courts of the State of New York finding that the N.Y.P.D. and its employees engaged in various acts of misconduct including but not limited to the falsification of evidence, withholding evidence of innocence, giving false testimony, and generally failing to act in a reasonable, professional and honest capacity. These decisions include but are not limited to:

Riddick v. City of New York, 4 A.D.3d 242 (1st Dept. 2004)

Bonefant v. Kelly, 306 A.D.2d 108 (1st Dept. 2003)

Wagner v. Kerik, 298 A.D.2d 322 (1st Dept. 2002)

Seligson v. Kerik, 295 A.D. 2d 262 (1st Dept. 2002)

Foy v. Safir, 277 A.D. 2d 169 (1st Dept. 2000)

Titone v. Safir, 277 A.D. 2d 161 (1st Dept. 2000)

Castro v. Safir, 277 A.D. 2d 123 (1st Dept. 2000)

Mieles v. Safir, 272 A.D. 199 (1st Dept. 2000)

Sannuti v. Safir, 261 A.D.2d 153 (1st Dept. 1999)

Brovakos v. Bratton, 254 A.D. 2d 32 (1st Dept. 1998)

Ranalli v. Safir, 250 A.D. 2d 507 (1st Dept. 1998)

Vasquez v. Safir, 250 A.D. 2d 448 (1st Dept. 1998)

People v. Kenrick, 162 Misc.2d 75 (Crim. Ct., N.Y. Co. 1994)

Hickey v. Ward, 161 A.D. 495 (1st Dept. 1990)

People v. Bermudez, 2009 WL 382327 (Sup. Ct., NY Co. 2009)

People v. Hidalgo and Lemus, Ind. Nos. 674/91, 12833/91 (Sup. Ct., N.Y. Co. Oct. 19, 2005)

167.    Upon information and belief, police officers have not been disciplined by the Defendant CITY OF NEW YORK or N.Y.P.D. for their misconduct, despite repeated judicial findings that N.Y.P.D. police officers engaged in misconduct. Such failure to respond to and take corrective action with respect to wrongdoing by members of the N.Y.P.D. constitutes deliberate indifference toward the constitutional rights of the accused, and such misconduct constitutes a practice, pattern and custom of engaging in police misconduct including, but not limited to withholding exculpatory evidence, giving false testimony, and making arrests without probable cause.

168.    By virtue of the judicial decisions referred to above, and other information and court decisions, N.Y.P.D. and the CITY OF NEW YORK knew that the need for adequate screening, training, supervising, and disciplining of its employees was and is compelling because of the overriding course of action of those police personnel including DETECTIVES DIAZ and ARBUISO, and the other N.Y.P.D. defendants to make arrests and "clear cases" quickly and at all costs, with deliberate and total disregard for the truth and for the constitutional rights of the accused.

169.    Defendant CITY OF NEW YORK knew that DIAZ and ARBUISO and other

N.Y.P.D. defendants were ill-equipped and not up to the task, but nonetheless would do anything to make an arrest and seek a conviction in this case.

170.   But for the CITY OF NEW YORK's deliberate indifference in failing to adequately provide screening, training, supervision, and discipline of police officers and its affirmative acts, the innocent Plaintiff would not have been arrested, prosecuted, or convicted for the crimes with which he was charged.

171.   As to these "Monell" claims regarding D.A.N.Y. and N.Y.P.D., the aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well-established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and the rights established by the Constitution of the State of New York, including Plaintiff's right to be free from bad-faith prosecutions, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.  Such misconduct by D.A.N.Y. and N.Y.P.D. also directly and proximately caused Plaintiff's arrest, indictment, conviction, sentence, and incarceration for approximately four years.

172.   The foregoing violations of Plaintiff's Constitutional rights, his wrongful conviction, sentence, and incarceration, and the resulting and continuing injuries to plaintiff were further directly and proximately caused by Defendant CITY OF NEW YORK's deliberate indifference to the Constitutional rights of persons coming into contact with N.Y.P.D. and D.A.N.Y..

173.   With respect to all of the wrongful actions and omissions alleged above, Defendant CITY OF NEW YORK knew to a moral certainty that its employees would confront such situations, that adequate screening, training, equipment, supervision, and discipline would have

made the CITY's employees' choices less difficult, and there is a clear history of employees

mishandling such situations, and that wrong choices by the defendant CITY's employees

frequently result in deprivations of citizens' Constitutional rights.

174.  The foregoing violations of Plaintiff's Constitutional rights comprised

Constitutional torts and were affected by actions undertaken under color of law, statutes and

regulations of the State of New York.

175.   The individually named defendants are responsible personally and in their official

capacities for the violation of said rights.

176.   By reason of the foregoing, Defendant CITY OF NEW YORK is liable to

Plaintiff pursuant to 42 U.S.C. § 1983 for damages in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION

177.  The allegations in Paragraphs 1 through 168 of the complaint are repeated and

realleged as if fully set forth herein.

178.  Plaintiff's civil rights under 42 U.S.C. §§ 1983 and 1985 and the Constitutions of

the United States and the State of New York have been violated by all of the defendants' actions.

179.   Plaintiff was denied his constitutional rights to be free from his seizure, arrest and

imprisonment without probable cause and due process of law.

180.   The individual Defendants are responsible in their official capacities for the

violation of said rights, and the individual Defendants are also responsible personally for the

violation of said rights.

## AS AND FOR A FIFTH CAUSE OF ACTION: FALSE IMPRISONMENT

181.   The allegations in paragraphs 1 through 172 of the complaint are repeated and

realleged as if fully set forth herein.

182.    By reason of the foregoing, Defendants are liable to Plaintiff for false imprisonment in an amount to be determined at trial.

### AS AND FOR A SIXTH CAUSE OF ACTION: MALICIOUS PROSECUTION

183.    The allegations in paragraphs 1 through 174 of the complaint are repeated and realleged as if fully set forth herein.

184.    By reason of the foregoing, Defendants, except for D.A.N.Y., MORGENTHAU, A.D.A.s RYAN, STRAIN and KRUTOY, are liable to Plaintiff for malicious prosecution in an amount to be determined at trial.

### AS AND FOR A SEVENTH CAUSE OF ACTION: NEGLIGENCE

185.    The allegations in paragraphs 1 through 176 of the complaint are repeated and realleged as if fully set forth herein.

186.    Defendants, their employees, agents and/or servants were careless, reckless and/or negligent in failing to investigate exculpatory evidence of which they knew or should have known; failing to implement policies, practices and/or procedures to ensure that evidence would not be fabricated against criminal defendants; failing to implement policies, practices and/or procedures to ensure that police officers would not perjure themselves at criminal trials; and in otherwise being careless, reckless and/or negligent.

187.    By reason of the foregoing, Defendants are liable to Plaintiff for negligence in an amount to be determined at trial.

### AS AND FOR AN EIGHTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

188.    The allegations in paragraphs 1 through 179 of the complaint are repeated and realleged as if fully set forth herein.

189.    Defendants' conduct occurred in public and was so outrageous as to exceed the

bounds of all common and civilized decency.

190.    As a proximate result of the Defendants' conduct, Plaintiff suffered and continues to suffer severe emotional distress.

191.    By reason of the foregoing, Defendants are liable to Plaintiff for intentional infliction of emotional distress in an amount to be determined at trial.

**ATTORNEYS' FEES**

192.    Pursuant to 42 U.S.C. § 1988, in the event that he prevails in this action, Plaintiff is entitled to attorneys' fees in an amount to be determined by this Court.

**WHEREFORE,** plaintiff demands JUDGEMENT against defendants as follows:

I.    For compensatory damages in the amount of twenty million dollars ($20,000,000.00);

II.    For punitive damages in the amount of ten million dollars ($10,000,000.00);

III.    For reasonable attorneys' fees, together with costs and disbursements pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court;

IV.    For pre-judgment interest, as allowed by law; and

V.    For such other and further relief as this Court may deem just and proper.

Dated: New York, NY
      April 27, 2011

IRVING COHEN, ESQ.
233 Broadway, Suite 2701
New York, NY 10279
(212) 964-2544

GLENN A. GARBER, P.C.
350 Broadway, Suite 1207
New York, NY 10013
(212) 965-9370

Attorneys for Plaintiff
WILLIAM McCAFFREY

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY:   CRIMINAL TERM: PART 81
----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

Ind. No.
5086/2005
Decision
-against-                                  and
Order

WILLIAM McCAFFREY,

                    Defendant.

----------------------------------------X

RICHARD D. CARRUTHERS, J.:

On September 25, 2006, a trial jury found William McCaffrey guilty of rape in the first degree (three counts), kidnaping in the second degree, assault in the second degree, unlawful imprisonment in the first degree, and criminal possession of a weapon in the third degree. On October 20, 2006, this Court sentenced him to serve determinate terms of imprisonment of twenty years on each rape charge to be followed by five years under post-release supervision; eighteen years on the kidnaping charge to be followed by five years under post-release supervision; and seven years on the assault charge to be followed by three years under post-release supervision. The Court also sentenced him to serve indeterminate terms of imprisonment of from one and one-third to four years on the unlawful imprisonment charge and from two and one-third to seven years on the weapon charge. The Court ordered that the sentences run concurrently.

1

Mr. McCaffrey is now represented by Glenn Garber, principal counsel to the Exoneration Initiative.  Mr. Garber was not trial counsel.  Mr. Garber has filed a motion, pursuant to CPL §440.10(1)(g), for an order vacating the conviction on the ground that there is newly discovered evidence which, if known at the time of the trial, would have resulted in verdicts favorable to the defendant.  He further moves, pursuant to CPL §440.10(1)(h), for an order dismissing the indictment on the ground that Mr. McCaffrey is actually innocent of the charges, and that the judgment was obtained in violation of his rights under the Constitutions of the State of New York and the United States. Mr. Garber's motion is based upon the fact that the complainant has recanted her testimony, and has acknowledged that Mr. McCaffrey did not rape her or commit any other crime against her.

Assistant District Evan Krutoy, who did not try the case, has filed a response on behalf of the People.  Mr. Krutoy reports that a thorough investigation conducted by his office confirms that the complainant's recantation is genuine.  The Court finds the motion should be granted on each of the grounds urged by the defense.

## I. *Pertinent Trial Evidence*

The primary evidence supporting the jury's guilty verdicts was the testimony of Biurny Peguero, the purported victim.  At trial, Peguero testified that she had spent the evening of

2

September 17, 2005 drinking with a group of woman friends.  She
acknowledged that she was intoxicated.  According to her sworn
account at trial, at about 5:00 a.m. on September 18, she and one
of her friends, Aurora Pujols, became separated from the rest of
their group outside a restaurant, and were accosted by McCaffrey
and his companions.  Peguero and Pujols did not know any of the
men.  Pujols walked away, and entered the restaurant to join the
other women.  Peguero testified that McCaffrey drove her to a
secluded street, where he and two others purportedly raped her at
knife point.  She claimed that McCaffrey bit her on the shoulder
and injured her leg during his assault.  When the men were done
with her, she said, they left her in a parking garage where she
was eventually reunited with her friends.  She testified that she
was hysterical when she saw her friends again, but that during
the drive home she was able to tell them about the rape.  She
testified that her friends took her to a hospital, where she told
medical personnel that she was the victim of a sexual attack, an
allegation that she repeated to the police.

   During the trial, Peguero's friends testified about her
disheveled and hysterical condition when they saw her after the
purported rape, and verified that she told them about the attack.
Additional trial evidence confirmed that Peguero complained about
the purported rape to physicians at the hospital.  A sexual
assault nurse examiner noted that there were bite marks on her

3

shoulder and bruises on her thigh.  There was also testimony
about the preparation of a sexual assault kit.  The jury was
informed that analysis of its contents showed that semen was not
found in any of the materials taken from her body.  However, this
was consistent Peguero's statement that she did not believe that
the assailants had ejaculated after penetrating her.  DNA samples
were recovered from the bite marks, but were insufficient in cell
quantity to permit testing under the regimen then in use.  A
surveillance video of the parking garage eventually led to
McCaffrey's identification and arrest.

McCaffrey testified at trial.  He acknowledged meeting
Peguero in the early morning hours of September 18, 2005 in front
of a restaurant.  He had never seen her before, but nonetheless
struck up a conversation.  She seemed to be drunk.  McCaffrey
stated that she accepted his invitation to go with him and his
friends to a party.  A friend of McCaffrey, Ramon Uribe,
testified that he was present when McCaffrey invited her to go
with him.  Uribe said that Peguero went voluntarily in the car to
go to the party.  Uribe testified that he was one of the men in
the car with McCaffrey, but was dropped off at his home within a
short time.  He said that nothing unusual had occurred.

McCaffrey testified that during the drive to the party,
Peguero became visibly upset by a telephone call from her
friends.  She demanded to be driven to them.  McCaffrey testified

4

that he and his companions immediately drove her to a garage
where she said she was to meet her friends.  McCaffrey left her
at the garage, after alerting the garage attendant of her
intoxicated condition.  The garage attendant testified that
Peguero's friends arrived shortly after McCaffrey left.  He said
that the women began to shout at one another, and became
embroiled in a physical fight.

## II. *The DNA Analysis and Peguero's Recantation*

As noted, Mr. Garber became Mr. McCaffrey's attorney well
after sentence had been imposed.  After conducting a preliminary
investigation of the case, Mr. Garber moved that the Court order
DNA testing of the biological material that had been retrieved
from the bite marks on Ms. Peguero's body.  Scientific procedures
developed after the trial indicated that DNA testing on such
small amounts of residue might be possible.  Mr. Garber
recommended that testing be done at a private laboratory.
Although the District Attorney consented to the testing of the
substance, he opposed the employment of the private laboratory.
Both parties eventually agreed that the Office of the Chief
Medical Examiner test the samples.  The result of the testing was
that the DNA could only have come from a female.  Thus, Mr.
McCaffrey and his companions were excluded as the sources of the
DNA recovered from Ms. Peguero's wounds.

While issues pertaining to DNA testing were being resolved,

5

Ms. Peguero apparently was undergoing anguish attributable to a guilty conscience. Simply put, the rape that she described in her testimony never occurred. Ms. Peguero confessed to Father Zeljko Gurberovic, a priest of the Roman Catholic Church, that she had testified falsely at the trial. At Father Gurberovic's suggestion, Ms. Peguero saw an attorney, Paul Callan, Esq., to begin the process of correcting what she had done. Through him, she contacted the District Attorney's Office to declare that Mr. McCaffrey had not committed any crime against her. During subsequent interviews with Mr. Krutoy and other prosecutors, Ms. Peguero remained firm in her statement that she had not been raped, and that her testimony inculpating Mr. McCaffrey was false. She acknowledged that an apparently brutal physical fight erupted between her and her friends after the men had dropped her off at the garage. In all probability, given the results of the DNA testing, that struggle resulted in the injuries that she sustained that night.

Following an initial inquiry, the District Attorney's office informed Mr. Garber of the recantation. At about this time, Mr. Krutoy was assigned to the case, and commenced a more thorough investigation concerning Ms. Peguero and her recantation. Mr. Garber retained a private detective, and conducted his own investigation of Ms. Peguero's conduct. Each attorney separately interviewed witnesses and examined relevant physical evidence.

6

The details of their efforts are contained in their submissions
to the Court in connection with the motion and will not be
recounted here.

### III. *Discussion*

CPL §440.10(1)(g) provides that a court may vacate a
judgment of conviction upon the ground that there is newly
discovered evidence.  The evidence must be of a kind that "will
probably change the result if a new trial is granted." *People* v.
*Priori*, 164 N.Y. 459, 472 (1900). *See, People* v. *Salemi*, 309
N.Y. 208, 216 (1955).  The evidence must have been discovered
since the trial, and must not have been discoverable before
trial. *Priori,* 164 N.Y. at 472.  Furthermore, the evidence must
be material and not cumulative.  Finally, the evidence "must not
be merely impeaching or contradicting the former evidence." *Id*.
Concerning this last requirement, the Court of Appeals
recognized, in *People* v. *Shilitano,* 218 N.Y. 161 (1916), that a
witness's recantation may warrant vacatur of conviction where the
recantation goes beyond merely impeaching or discrediting trial
evidence, and actually "destroy[s] the basis upon which the
judgment of conviction rests * * * ." *Id*. at 170.

Although recantation may qualify as newly discovered
evidence and thus afford relief to the person convicted, the
Court of Appeals cautioned circumspection in crediting a
witness's renunciation of prior sworn testimony.  After all,

7

"witnesses to crimes of violence * * * after they have given

their testimony * * * are sometimes influenced by bribery and

other improper considerations" or by intimidation. *Shilitano*,

218 N.Y. at 169.  However, the Court is convinced, on the basis

of the submissions of both parties, that Ms. Peguero's sole

motive in recanting was to undo the harm that she caused in

falsely accusing an innocent man of having committed a horrendous

crime.  The Court cannot provide a better summary for the reasons

for this conclusion than the following statement contained in Mr.

Krutoy's response to the motion:

> The fact that the recantation originated within
> the confines of a church confessional is compelling,
> and goes far toward allaying concerns about possible
> third party influence.  These concerns are further
> allayed by the fact that it was the priest to whom she
> confessed, and not Peguero herself, who insisted that
> she contact an attorney to begin the process of freeing
> the defendant.  In fact, Ms. Peguero has stated that
> had she known she was pregnant at the time she
> confessed, she might well have either delayed revealing
> that she had perjured herself or not done so at all.
> Although incarcerated criminals can wield influence
> beyond the walls of state correctional facilities, the
> reluctant journey of this recantation from the confines
> of a confessional in a Union City Church to the New
> York County District Attorney's Office is one which is,
> by any reasonable assessment, devoid of any untoward
> influence by the defendant or an individual acting on
> his behalf.
>
> As to the allegation of forcible rape, Peguero's
> recantation gains further credibility from the
> conversations she had with friends, her attorney, and
> her former husband following the revelation that she
> perjured herself.  Ms. Peguero was repeatedly
> confronted with the possible consequences of her
> actions: incarceration, deportation, a possible civil
> law suit.  Nonetheless, she has maintained that she was

not raped.

Krutoy Affirmation of November 23, 2009 at 68.

The only reasonable conclusion to draw from Peguero's recantation, the DNA results, and the statements of witnesses made after the recantation is that Mr. McCaffrey did not commit the crimes of which he was convicted.  A wrongful conviction is not simply an injustice.  It is also a catastrophe both for the injured party and for the criminal justice system.  *See, Ramos* v. *City of New York,* 285 A.D.2d 284 (1st Dept. 2001).  Mr. McCaffrey has served four years of imprisonment for a crime that never occurred.  The Court cannot restore lost time.  However, the Court will do what it is capable of doing to ameliorate the injustice by vacating the judgment and dismissing the indictment. In doing so, the Court wishes to express its gratitude to Mr. Garber and Mr. Krutoy for the high degree of professionalism that they demonstrated throughout this proceeding.

## IV. *Conclusion*

The motion to vacate the judgment of conviction and to dismiss the indictment is granted on each of the grounds urged by the defense.

The forgoing constitutes the decision and order of the Court.  The clerk is directed to provide copies hereof to counsel for each of the parties.

Dated: New York, N.Y.
       December 10, 2010

PT. 81  DEC 1 0 2009

Richard D. Carruthers,
Acting Justice

HON. RICHARD D. CARRUTHERS

10

# EXHIBIT B

350 Broadway, Suite 1207, New York, NY 10013          Tel: 212-965-9335  Fax: 212-965-9375

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART **81**          PT.81   JUL 2 9 2009
-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

**NOTICE OF MOTION**

-against-          **IND. NO.: 5086/05**

WILLIAM McCAFFREY,

DEFENDANT
-------------------------------------------------------------------X

PLEASE TAKE NOTICE, that GLENN A. GARBER, admitted to the bar of the State of

New York, will move this Court on August 10, 2009, or thereafter for Orders vacating Mr.

McCaffrey's conviction pursuant to CPL § 440.10(1)(g) based on newly discovered evidence,

CPL § 440.10(1)(h) and the New York State and United States Constitutions based on actual

innocence, and in the interest of justice; dismissing the indictment or granting a new trial, and

releasing Mr. McCaffrey; alternatively, for a hearing on these claims, producing defendant at

such hearing, and to supplement this motion.

DATED: July 28, 2009
      NEW YORK, NEW YORK          YOURS, etc,

      GLENN A. GARBER,

      EXONERATION INITIATIVE
      Attorneys for Defendant
      350 Broadway, Suite 1207
      New York, New York 10013
      212-965-9335

TO:    ROBERT M. MORGENTHAU
      District Attorney, New York County
      Attn: ADA Evan Krutoy

      CLERK OF THE SUPREME COURT
      New York County

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 53
--------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                                                     **AFFIRMATION**

      -against-                                       **IND. NO.: 5086/05**

WILLIAM McCAFFREY,
                        DEFENDANT
--------------------------------------------------------------------X

STATE OF NEW YORK    )
                         ) ss:
COUNTY OF NEW YORK  )

      I, Glenn A. Garber, an attorney authorized to practice law in the state of New York,

hereby affirm to the following under penalty of perjury:

     1.      I represent the defendant William McCaffrey.

     2.      This Affirmation is submitted on behalf of Mr. McCaffrey in support of his

motion, brought pursuant to CPL § 440.10(1)(g) based on newly discovered evidence, CPL §

440.10(1)(h) and the New York State and United States Constitutions based on actual innocence,

and in the interest of justice, for an Order vacating the conviction, dismissing the indictment or

granting a new trial, and releasing Mr. McCaffrey; alternatively, for a hearing on these claims,

producing defendant at such hearing, and to supplement this motion.

     3.      William McCaffrey was convicted in this Court on October 4, 2006, after a jury

trial, of three counts of rape in the first degree, and one count each of kidnapping in the second

degree, assault in the second degree, unlawful imprisonment in the first degree, and criminal

possession of a weapon in the third degree.  He was sentenced to concurrent, determinate terms

of twenty years for each rape charge, eighteen years for the kidnapping charge, and seven years

for the assault charge.  He was also sentenced to indeterminate terms of one and one-third to four

years for unlawful imprisonment, and two and one-third to seven years for criminal possession of

a weapon.  All sentences were imposed concurrently, resulting in an aggregate sentence of 20

years imprisonment.

        4.      The case was premised on the claim by a single witness, Biurny Peguero, that Mr.

McCaffrey and his friends abducted, raped, and assaulted her during the early morning hours of

September 18, 2005.  Ms. Peguero admitted that she was drunk and voluntarily drove off with

Mr. McCaffrey.  No semen or other forensic evidence was found which could corroborate the

sexual assault and other charges.  The only physical evidence that arguably supported Ms.

Peguero's allegations consisted of bite marks on her left arm and left shoulder, and scrapes and

bruises on other parts of her body, which she claimed were inflicted by Mr. McCaffrey.

Biological evidence was collected from these bite marks, including four samples of dried

secretions, during an examination at the hospital hours after the alleged crimes.  The samples

contained very small quantities of DNA.  The technology available at the time of the trial was

not sophisticated enough to determine the source of the DNA.

        5.      After trial and sentencing, new developments in laboratory analysis enabled

further testing on the DNA recovered from the bite marks.  The results of these new tests

establish that the DNA present on the bite marks came from a female other than Ms. Peguero,

and that Mr. McCaffrey is excluded as a potential donor.  Office of the Chief Medical Examiner

("OCME") Laboratory Report dated October 17, 2008 ("Oct. 17, 2008 OCME Report"), attached

hereto as Exhibit 1; OCME Laboratory Report dated September  30, 2008 ("Sept. 30, 2008

OCME Report"), attached hereto as Exhibit 2; OCME Laboratory Report dated January 11, 2006

("Jan. 11, 2006 OCME Report"), attached hereto as Exhibit 3; OCME Laboratory Report dated

December 29, 2005 ("Dec. 29, 2005 OCME Report"), attached hereto as Exhibit 4.

6.       Also after trial and sentencing, Aurora Pujols, a prosecution witness who

described a distraught Ms. Peguero after she was dropped off at a parking garage in upper

Manhattan by Mr. McCaffrey and his friends, now admits that she attacked Ms. Peguero in the

garage, and may have bit her and caused her other injuries. Ms. Pujols states that she and

possibly another female friend were involved in this fight, and that the fight became so violent

that at some point the heel of one of the women's shoes smashed against a car window, breaking

it. Affidavit of Joseph Dwyer, dated July 23, 2009 ("Dwyer Aff."), attached hereto as Exhibit 5.

7.       In addition, Biurny Peguero has now recanted her trial testimony. She recanted

first to a priest, and then to the District Attorney's office, despite being warned that she could be

prosecuted for perjury and face jail time. She states that none of the crimes she alleged ever

occurred, and that she fabricated her allegations, apparently to deflect the attack by her female

friends. The lie she told her friends she then reiterated and elaborated upon to the nurse who

examined her at the hospital, to police officers, to the prosecutor, and to the jury at trial.

8.       The new DNA evidence and Ms. Pujols's admissions, independently and

collectively, fatally undermine the case. The prosecution relied heavily upon the physical

injuries to Ms. Peguero, and especially the bite marks. This was the only evidence that in any

way supported Peguero's claim that she was attacked. Without it, the prosecution's case rested

only on the uncorroborated word of Ms. Peguero, which was highly suspect due to her admitted

drunkenness at the time, and the inextricable absence of any physical evidence of a rape. Ms.

Peguero's recantation completely unravels the prosecution's case, even apart from the DNA and

3

Ms. Pujols's admission. Taken together, the evidence of Mr. McCaffrey's innocence is overwhelming.

9.     If this evidence is presented at a retrial, there is more than a probability that the result would be more favorable to Mr. McCaffrey, as this new evidence proves his actual innocence by at least clear and convincing evidence. Thus, pursuant to C.P.L. § 440.10, the State and Federal Constitutions, and in the interests of justice, this Court must vacate the conviction and dismiss the indictment or order a new trial, or order a hearing on the claims raised.

### THE TRIAL EVIDENCE

10.     On the morning of September 18, 2005, Biurny Peguero appeared at Christ Hospital in Jersey City, New Jersey. Trial Transcript (hereinafter "Tr.")[1] 213-21; 370-88; 389-421. She was visibly distraught. Tr. 372. In response to her claim that she had been raped by three men, Ms. Peguero was seen by a specialist nurse, a sexual assault nurse examiner or SANE, who examined Ms. Peguero using a "rape kit." Tr. 220, 375, 394 *et seq.* There was abundant evidence that Ms. Peguero had been involved in a physical struggle. Tr. 214-20, 372-75. However, the nurse saw no physical evidence that Ms. Peguero had been raped. The rape kit ultimately did not provide any DNA evidence for use at trial. Tr. 323.

11.     The trial against Mr. McCaffrey commenced on September 28, 2006 in New York County Supreme Court before the Honorable Richard Carruthers.

12.     The prosecution and the defense portrayed two widely varying versions of the events that took place in the early morning of September 18, 2005 prior to Ms. Peguero's appearance at Christ Hospital.

---

[1]     The Trial Transcripts are provided on disk with this motion.

4

## The Defense Case

13.     Mr. McCaffrey testified that he and his friends Carlos "Cupa" Vargas, Peter "Jay" Adorno, and Ramon "Polo" Uribe spent the evening of September 17, 2005, at an establishment called the X Bar. Tr. 520. They left the bar and drove to the area of Dyckman Street in upper Manhattan at approximately 4:45 in the morning on September 18, 2005. Tr. 520.

14.     Mr. McCaffrey first met Ms. Peguero as she was sitting with her friend Aurora Pujols in a car parked near the intersection of Broadway and Dyckman Street, in front of the International Restaurant. Tr. 521. Mr. McCaffrey struck up a conversation with the women, and got into the car in which they were sitting. Tr. 521. Mr. McCaffrey extended an invitation to an after-hours event, and Ms. Peguero started driving, following Mr. McCaffrey's friends in their Mercedes. Tr. 522. However, Ms. Peguero was clearly too intoxicated to drive, so Mr. McCaffrey took over at the steering wheel. At the same time, Ms. Pujols exited the car. Tr. 522-23.

15.     Mr. McCaffrey, Ms. Peguero, and Mr. McCaffrey's friends went to a nearby parking garage in order to store the car that Ms. Peguero had been driving. Tr. 523-24. They then entered a van belonging to Mr. Vargas, Tr. 433-35, and drove to an after-hours event that they discovered was closed. Tr. 525. They then continued across the Harlem River into the Bronx to drop off two of Mr. McCaffrey's friends. Tr. 525.

16.     At some point thereafter, Ms. Peguero began to receive calls on her cell phone from her friends, who were still at the International Restaurant and had discovered that Ms. Peguero had left with the car. Tr. 524-27. According to Mr. McCaffrey, Ms. Peguero became increasingly upset as a result of what was being said to her by her friends over the phone. Tr.

5

526-28.  It became clear that she wanted to go back, so the men told her that they were returning to the garage, and told her friends over the phone the location of the garage.  Tr. 526-28.

17.     After arriving at the garage, Mr. McCaffrey argued with the parking attendant who was then on duty, Pelagio Delacruz.  Tr. 529-30.  The argument arose because Mr. McCaffrey thought Ms. Peguero was too intoxicated to drive, but the attendant believed that she was capable of driving, and that her keys should be returned to her.  Tr. 529-30.  Eventually, Mr. McCaffrey relented and went home for the night, leaving Ms. Peguero at the garage, drunk but unharmed.

18.     Mr. McCaffrey's friend Ramon Uribe testified for the defense.  Tr. 427 *et seq.* His account corroborates Mr. McCaffrey's on every significant point regarding the hours they were together on the night of September 17 and morning of September 18, 2005.  Most significantly, Mr. Uribe's description of the initial meeting between Mr. McCaffrey and the women included an invitation to the after-hours event.  Tr. 432-33.

19.     Parking garage attendant Pelagio Delaruz also testified on Mr. McCaffrey's behalf.  Tr. 486 *et seq.*  With only minor discrepancies, he corroborated the comings and goings of the vehicles, and the fact that he and Mr. McCaffrey argued about whether Ms. Peguero was capable of driving.  Tr. 491-95.  He also attested to the fact that, when the men left Ms. Peguero, she was crying and went to sit in her friend's car, where she was joined by her friends after they arrived by taxi.  Tr. 492-94.  Mr. Delacruz later observed all of the friends sitting inside the parked car, some were "yelling and hitting each other," and one of them said "why you leave me?"  Tr. 496-98, 511.

### Attempts to Undermine the Defense

20.     During the cross-examination of these defense witnesses, the prosecution made

several inappropriate statements in an attempt to undermine the witnesses.  When cross-

examining Mr. Uribe, the prosecutor repeatedly implied that Mr. Uribe falsified his testimony in

collaboration with his friend Peter Adorno, asking if he had met with Mr. Adorno and spoken

"about your story."  Tr. 450.  The prosecution repeatedly asked Mr. Uribe about coordinating his

testimony with Mr. Adorno, questioning whether "you got your stories together?"  Tr. 451.  The

Court finally told the prosecutor at a sidebar not to use the term "story."  Tr. 452.  The

prosecution also attempted to undermine Mr. Uribe's testimony, which was entirely consistent,

by mischaracterizing it as inconsistent.[2]

21.     During the cross examination of Mr. Delacruz, the prosecution repeatedly asked

the witness whether he had ever talked to detectives.  Tr. 499.  Despite the fact that he

continually stated that he had never spoken with the detectives, the prosecutor asked, again and

again, what he told the detectives.  Tr. 499-505.  After Mr. Delacruz finished testifying, defense

counsel complained that the prosecutor had badgered the witness.  Tr. 514.  The court asked

defense counsel, "What to do you want me to do?"  Tr. 514.  The issue was dropped.  Tr. 515.

22.     The prosecution made more egregious attempts to undermine Mr. McCaffrey's

testimony.  During cross-examination, the prosecutor asked Mr. McCaffrey whether his friends

---

[2]     For example, Mr. Uribe testified on direct examination that before they met Ms. Peguero, he
was seated in the back seat of his car with Mr. Adorno, Mr. Vargas was driving, and Mr.
McCaffrey was in the front passenger seat.  Tr. 443.  Mr. Uribe testified that he got into the
front seat when Mr. McCaffrey got out of the car to talk to Ms. Peguero.  Tr. 432-33.  During
cross-examination, the prosecutor asked Mr. Uribe who was driving his car, and Mr. Uribe
stated that Mr. Vargas was driving.  Tr. 462.  The prosecutor then stated: "Did you not just
testify on direct testimony: I got out, I got into the driver's side of the car, I parked my car?
Did you not just testify ten, fifteen minutes ago that you actually got into the driver's seat of
your car?"  Tr. 462.  The Court finally instructed the prosecutor to move on.  Tr. 484.

tried to stop him from talking to Ms. Peguero. Tr. 563. When Mr. McCaffrey said no, the prosecutor asked, "In fact, they didn't do any of those things because you had discussed your plan before you got out of the car, isn't that correct?" Tr. 563. She continued, "your plan was to find a drunk girl that you could dupe into coming with you, isn't that true?... Your plan was to find someone who might not be able to fend you off, isn't that correct?" Tr. 563.

     23.    Defense counsel never objected. The prosecutor stopped this abusive line of improper questions when the Court told her at a sidebar, "you're going over the top here. You are asking a lot of argumentative questions. Let's get to it." Tr. 564.

**The Prosecution's Case**

     24.    The prosecutor's opening statement repeatedly focused on the allegation that Mr. McCaffrey bit Ms. Peguero during the alleged rape. The prosecutor stated that Mr. McCaffrey "slapped her, punched her, bit her, scratched her in order to get what he wanted," Tr. 38, and "although the defendant didn't leave any semen or DNA behind, he certainly left his mark." Tr. 40. She told the jury, "you will be able to see for yourselves the bruises, the scratches, the bite marks that were left at the hands of the defendant." Tr. 40.

     25.    The prosecution introduced the testimony of the alleged victim, Biurny Peguero, who related her account of the events of the evening of September 17 and morning of September 18, 2005. Ms. Peguero admitted to being intoxicated as a result of drinking four or five Blue Hawaiians before she met Mr. McCaffrey. Tr. 243. When she was first asked to describe the man whom she later claimed was the defendant, she referred to him as a white Hispanic. Tr. 116 (account from Ms. Pujols); 410-11 (as described to SANE nurse Farooqi). Ms. Peguero could not remember exactly what Mr. McCaffrey said when he first got into the car with her and her friend, Ms. Pujols. Tr. 179-82.

26.     Ms. Peguero explained that she chose to drive the car away and leave her friends behind the restaurant because she "wanted to park somewhere else." Tr. 182. She provided no explanation for why she was motivated to do this, or why Ms. Pujols exited the car and did nothing to stop Ms. Peguero from driving away with strangers, drunk and without meaningful purpose. Tr. 182. Ms. Peguero recalled that around the same time that Ms. Pujols got out of the car, Ms. Peguero gave up driving due to her drunken condition, Mr. McCaffrey took over at the wheel, and Mr. McCaffrey's friend also got into the car. Tr. 182-86.

27.     Ms. Peguero claimed that her friends called her on her cell phone after she and the men left the garage, and as they were crossing a bridge. Tr. 190-92. Ms. Peguero testified that, at that point, Mr. McCaffrey supposedly took out a knife and made Ms. Peguero tell her friends that they would be back in five minutes. Tr. 191-92. They then proceeded to a dark street, where the three men took turns raping her. Tr. 195 *et seq.*

28.     Ms. Peguero claimed that the first rapist, who she said was the defendant, was alone with her in the back seat of the car, and he began removing her clothes. Tr. 195-200. She claimed that she fought with him, and he slapped her in the face one or more times, grabbed her hands and her arms above the elbows, bit her shoulder, and bruised her leg. Tr. 196-99. Ms. Peguero testified that he caused the bite marks and bruises depicted in the photographs taken at the hospital, Tr. 217-18, and that these injuries occurred while he was raping her. Tr. 224-25. She stated that the other two men penetrated her, one after the other, but did not physically abuse her in any other way. Tr. 200-03.

29.     Ms. Peguero testified that, on the night of the incident, she did not immediately tell her friends what had happened to her, because she was embarrassed to do so in front of Orlando Betasce, a male friend whom she did not know well. Tr. 210. However, in the car on

their way back to New Jersey, Ms. Peguero's friend Heliana Garcia saw that she was crying, and

asked her directly if "they" raped her, and Ms. Peguero told Garcia that the three men had raped

her.  Tr. 211.  Ms. Peguero testified that she told this to Ms. Garcia in confidence, without telling

the other people in the vehicle, Tr. 211, but that Ms. Garcia then took it upon herself to inform

the others and told them "everything."  Tr. 212.

       30.     There is a discrepancy between Ms. Peguero's description and that of Maria Sosa,

who also testified for the prosecution.  According to Ms. Sosa's account, she and the other

friends did not hear anything about the alleged rape until the return trip to New Jersey.  Tr. 89.

However, contrary to Ms. Peguero's testimony, Ms. Sosa further testified that Heliana Garcia

was not present in the vehicle when Ms. Peguero was describing the rape.  Tr. 89.  Instead, she

testified that it was Ms. Peguero herself who told them about the rape, Tr. 89, 93, and said that

the three men had taken her in a car.  Tr. 98.

       31.     Ms. Sosa's testimony also differed from Ms. Peguero's account of the rape.  Ms.

Sosa testified:

> A.     No one told me the three men raped her.
>
> Q.     Well did – Was there any time during the evening when she herself was back in your car where she said it herself?
>
> A.     Three men did take her in the car.
>
> Q.     Right.
>
> A.     But *she emphasized* that two of them, one holding her and the other one raped her.
>
> Q.     But there were three men.
>
> A.     Right.  The other one she said did not touch her.  There was one of the three men did not touch her.  *That's what she told myself.* [sic]

Tr. 98-99 (emphasis added); *see also* Tr. 89 (testifying to the same fact on direct examination).

32.      Aurora Pujols testified after Ms. Sosa.  Ms. Pujols stated that she was in the car with Ms. Peguero when Mr. McCaffrey approached the car.  Tr. 115-16.  Ms. Pujols did not relate whether or not Ms. Garcia was involved in revealing the account of the rape during the return trip to New Jersey.  Ms. Pujols stated that Ms. Peguero told her friends that she was raped by three men, Tr. 127, one of whom was "[t]he guy who had gone in the car and drove off with her." Tr. 126.

33.      Lisa Misner, a criminalist employed by the Department of Forensic Biology of the New York City Office of the Chief Medical Examiner, also testified for the prosecution.  Misner described her efforts to recover DNA evidence from the sexual assault kit that she received from the staff at Christ Hospital.  Tr. 308.  The kit included underwear, a sanitary pad, swabs from bite marks on the left arm and left shoulder, fingernail scrapings, oral swabs, a buccal swab, head hair combings, vaginal cervical swabs, rectal swabs, and an external genital specimen.  Tr. 308. There was no semen present on any of the objects collected.  Tr. 311.

34.      Ms. Misner testified that the only biological material found was in samples taken from bite marks on the left arm and shoulder.  However, there were too few cells present in the samples to perform a DNA test.  Tr. 309-10.

35.      She stated that none of her forensic evidence findings related to Mr. McCaffrey. Tr. 323.

36.      Several police officers also testified for the prosecution.  Police Officer James Gilson testified that he responded to the parking garage with his partner at around 6:20 a.m. on September 18, 2005.  Tr. 47.  He found four females in a car.  One was crying, Tr. 48, and her

friends were trying to calm her down but "she was angry with them" and "yelling at them." Tr. 53. Because the girl was hysterical, and her friends were not calming her down, no statement was taken from her. Tr. 53. Officer Gilson instructed her friends to call 911 if she calmed down and needed to talk to the police, and he then left the parking garage. Tr. 49.

37.    Detective David Diaz testified about arresting Mr. McCaffrey, and assisting with the line-up identification procedure involving Ms. Peguero. Detective Robert Arbuiso testified about his investigation and Mr. McCaffrey's cooperation with the police. Tr. 335. Detective Arbuiso stated that he asked Mr. McCaffrey to come to the precinct regarding a missing cell phone, Tr. 338-39, and that Mr. McCaffrey came willingly to the station. Tr. 354-55. The detective testified that Mr. McCaffrey told him that on the night in question, Mr. McCaffrey and his friends took Ms. Peguero to the Bronx, and that her phone was ringing, and she wanted to go back. Tr. 343. Mr. McCaffrey told him that no one had laid a hand on Ms. Peguero. Tr. 343.

38.    Detective Joanna Rak testified that she went to the hospital to gather evidence from Ms. Peguero. Tr. 371. She took photographs and collected the sexual assault kit that was later turned over to Detective Arbuiso. Tr. 373-76.

39.    Farkhanda Farooqi, a sexual assault nurse examiner, or SANE nurse, at Christ Hospital in Jersey City, testified about the examination she performed on Ms. Peguero on September 18, 2005. She testified that Ms. Peguero told her that three men sexually assaulted her. Tr. 396. Ms. Peguero told her that "she's assaulted in New York, somewhere in the parking lot. She came out of [a] bar around, like, four-thirty in the morning, and she was attacked by three unknown male[s]." Tr. 396.

40.    Ms. Farooqi also described Ms. Peguero injuries, including abrasions, bruises, and a bite mark on her left shoulder. Tr. 398, 400-06. Ms. Peguero told her that one male bit her,

12

and that the male that bit her also raped her, Tr. 396, and that she received the bite mark while trying to fight back.  Tr. 401.

## The Prosecutor's Summation

41.     The prosecutor's summation repeatedly focused the jury's attention on the bite marks.  She stated, "[t]here's photographic proof, Ladies and Gentlemen, which clearly shows the force.  The defense can't explain away these injuries.  The defense can't explain away that that night she was wearing a tube top, her friends saw her before, she was fine, but after the defendants take her, she has this bite mark on her shoulder?"  Tr. 678.

42.     The prosecutor continued, "[t]his is not the injuries [*sic*] of a woman who is just hanging out with her friends for the night.  Her friends didn't beat her up.  She has bite marks, bruises, scratches, all over her body."  Tr. 678.  She showed the jury the photographs of the bite marks taken at the hospital.  "The close-up, it's a mouth.  This is the close-up of her shoulder. It's a mouth.  And the nurse examiner testified and told you that she was able to observe teeth marks, bite marks, bruises and abrasions."  Tr. 679.  "Ladies and Gentlemen, this evidence speaks volumes. You cannot explain away her injuries. . . . Bites on her shoulder and her arm from the defendant biting her."  Tr. 680.

43.     However, despite her emphasis on the bite marks, the prosecutor acknowledged the case ultimately depended on witness credibility, stating, "at the end of the day the case comes down to credibility: Who do you believe?"  Tr. 670.

44.     The prosecutor also made several statements that were so prejudicial that the Court was required to intervene and explain the error to the jury.

45.     The prosecutor began the summation by stating, "[w]hat the defense has failed to explain, what they cannot explain away, is all of the objective evidence that shows that the

13

defendant is guilty." Tr. 669. After the summation, the Court brought both attorneys into a side bar and stated, "I didn't want to interrupt at the very beginning of your summation, but you did start off with the fact that the defense didn't explain away certain things." The prosecutor responded, "Right." The Court then informed her, "[t]hat's really not appropriate comment." Again, she responded, "Right." The Court then stated, "I will tell the jury that the whole burden is upon the prosecution." Tr. 701-02. The Court then reminded the jury that the prosecution had the burden of proof. Tr. 704.

46.     The prosecutor also made improper comments regarding the testimony of Pelagio Delacruz. Although Mr. Delacruz testified that he never spoke with the police, during summation the prosecutor told the jury, "yeah, well, he did speak to the police." Tr. 692. Defense counsel objected, to which the prosecutor responded, in front of the jury, "He did speak to the police." Tr. 692. The Court then told the jury, "[t]here's some testimony as to what the witness actually said for these matters. Consider the matters for yourself and make your own determination." Tr. 692-93. Upon resuming her summation, despite defense counsel's objection and the Court's warning, the prosecutor again told the jury, "[h]e did speak to the police[.]" Tr. 693.

47.     The prosecutor defended the absence of biological evidence, stating, "Ladies and Gentlemen, the evidence is overwhelming. The Judge will never instruct you that I have to give you DNA in order for you to find the defendant guilty. In fact, if the Judge tells you that, if he reads –" Tr. 699. At the point the Court interrupted and told the prosecutor not to "get into . . . what the instructions might be." Tr. 699.

48.     The prosecutor also asserted that "the defense concedes ninety percent of this case which makes your job as jurors much easier." Tr. 687. Defense counsel successfully objected.

49.     After the summations, the Court charged the jury, and they retired to deliberate. Tr. 705-55.  During deliberations, the jury returned a note asking: "What does the law mean by requiring the People to prove guilt beyond a reasonable doubt?"  Tr. 759.  The Court recharged the jury on reasonable doubt.  Tr. 759-64.

50.     The jury found Mr. McCaffrey guilty on all charges.  Tr. 766-68.

## SENTENCING

51.     At sentencing, Mr. McCaffrey addressed the Court, despite defense counsel's statement on the record that he should not.  Transcript of Sentencing, October 20, 2006, attached hereto as Exhibit 6 (hereinafter "Sentencing Tr."), at 15.  Mr. McCaffrey pointed out inconsistencies in Ms. Peguero's testimony, and described all of the mistakes he felt that defense counsel made, including the failure to have a cast impression made of his teeth to show that the bite mark did not match his teeth, and the lack of DNA evidence.  Sentencing Tr. 16-17.  Mr. McCaffrey also stated that defense counsel did not address the lack of evidence at trial, including the fact that the charges included a weapon that was never recovered.  Sentencing Tr. 17-18.

52.     The Court made a statement prior to sentencing Mr. McCaffrey, noting that, concerning the issues raised by defense counsel regarding identification, there was "no identification issue in the case."  Sentencing Tr. 20.  The Court also referred to the allegations several times as "horrific." Sentencing Tr. 21, 23.

53.     The Court sentenced Mr. McCaffrey to 20 years in prison.  He has now served nearly four years in jail and is currently incarcerated at Greenhaven Correctional Facility, a maximum security prison.

## CASE REVIEW AND INVESTIGATION

54.     Glenn A. Garber, P.C., was initially retained to represent Mr. McCaffrey in March 2007.

55.     The file was assembled and reviewed.  Parts of the file were missing, and requests were made of the District Attorney office in August, 2007 for certain items.  The trial transcripts were read and digested.  The file collection, file review and transcript review process took approximately six months.

56.     During this time period, interviews were conducted with Mr. McCaffrey, his family members, his prior counsel Ronald Veneziano and private investigator Ronald Carelli, who worked on the case prior to conviction, among others.

57.     A private investigator was also hired, and efforts were made to locate trial witnesses.  In the fall of 2007, Aurora Pujols, the only witness who could be found at the time, was interviewed.  She was hostile and did not want to be interviewed.  Shortly after this interview, ADA Shanda Strain called the undersigned and stated that Ms. Pujols had complained to her about being approached.

58.     A review of the OCME's pre-trial forensic report dated January 11, 2006, noted the presence of amylase, an enzyme found in saliva, in two of the samples of dried secretions taken from the bite mark on Ms. Peguero's left arm; however, the report stated that the "samples had an insufficient amount of DNA" to develop a profile.  (Ex. 3, Jan. 11, 2006 OCME Report).

59.     In the fall of 2007, Orchid Cellmark, an accredited private laboratory that does forensic DNA testing, was consulted regarding analysis of samples that contain very small quantities of DNA, called low copy or low level samples, and scientific advances since January

2006 that might allow the recovery of more usable genetic material from the samples. Extensive
internet research was also done on the topic.

60.     It was learned that significant developments had been made in the field of
forensic DNA analysis, and that miniscule amounts of DNA that could not previously be tested
can now yield valuable information, and possibly even a full DNA profile. In particular, a new
kit, the MiniFiler PCR Amplification Kit manufactured by Applied Biosystems, became
commercially available in October 2007. This kit was specially designed for low copy samples
containing only a few cells, and thus a very small amount of DNA.

61.     ADA Shanda Strain was contacted in the fall of 2007, and a request was made to
release the dried secretion samples 1B1, 1B2, 1B3, and 1B4, taken from the bite marks on Ms.
Pegeuro's left arm and shoulder, that were referenced in the Medical Examiner's January 11,
2006 Report. Telephone conversations ensued between the undersigned and ADA Strain and
ADA Nancy Ryan concerning the release of the evidence. Requests for disclosure were
reiterated in writing in October and November of 2007, and a number of telephone messages
were left with the District Attorney's Office.

62.     The District Attorney refused to consent to additional DNA testing or release the
samples.

63.     On February 1, 2008, a motion was filed pursuant to CPL § 440.30 (1-a) seeking a
judicial order to release the samples to a lab that was accredited to use the new MiniFiler kit for
DNA testing. The prosecution responded on March 21, 2008. The District Attorney's office
took the position that it would not oppose testing conducted by the OCME, but opposed the
defense's request to release the samples to a private laboratory such as Orchid Cellmark. Unlike
Orchid Cellmark, the OCME at that time was not accredited to use the MiniFiler kit. The OCME

17

was, however, equipped to conduct its own method of low copy DNA testing, called High Sensitivity PCR. This issue of which lab should conduct the testing, and consequently which method would be used, was litigated for several months.

64.    In May 2008, a partial agreement was reached between the parties that the OCME would conduct the first step of testing, called quantification, on the two samples known to contain small amounts of DNA. Quantification is used to estimate how many DNA molecules are present in a sample, and would determine whether there was enough DNA in the samples to conduct one or more tests.

65.    The OCME conducted the quantification on May 29, 2008. It was determined that samples 1B3 and 1B4 contained enough DNA to conduct one test. It was then learned that only a portion of the original swabs from the rape kit had been used to create these samples, and that the rest of the swabs were still available. The parties agreed, by stipulation dated July 28, 2008, to have the OCME extract the biological material from the remainder of the swabs and conduct quantification on the newly created samples. The OCME conducted the extraction and quantification in late July and early August, and determined that the new samples, which were designated DS1B3 and DS1B4, also contained enough DNA to conduct at least one test.

66.    The parties then agreed, in August 2008, that the OCME would conduct High Sensitivity PCR, its method of low copy testing, on the new samples, DS1B3 and DS1B4, and would reserve the original samples 1B3 and 1B4 for possible future testing.

67.    The OCME conducted the High Sensitivity PCR testing during September and October of 2008. The results were disclosed in a preliminary report dated September 30, 2008 and a final report dated October 17, 2008. (Ex. 1, Oct. 17, 2008 OCME Report; Ex. 2, Sept. 30, 2008 OCME Report).

68.     The results show that the samples contain DNA from two individuals, neither of whom is Biurny Peguero.  The major contributor is an unknown female, designated by the OCME as Female Donor A.  The OCME was able to create a full profile for this unknown female (12 out of 13 loci).  The profile contains no Y chromosome, and therefore could not have come from a male, excluding Mr. McCaffrey and his friends as potential donors.  (Ex. 2, Sept. 30, 2008 OCME Report).

69.     The OCME was able to create a partial profile for the second person, who was the minor contributor of the DNA in the sample.  A partial profile is "suitable for direct comparison" to known exemplars, and thus can be used to exclude an individual as a potential contributor.  (Ex. 2, Sept. 30, 2008 OCME Report).

70.     Because Aurora Pujols, Maria Sosa, and Heliana Garcia have not provided exemplars for comparison, their DNA profiles cannot be compared to Female Donor A or the partial profile for the minor contributor.

71.     The partial profile was compared to the profile of Mr. McCaffrey, and he was definitively excluded as a potential donor.  (Ex. 1, Oct. 17, 2008 OCME Report; Ex. 4, Dec. 29, 2005 OCME Report).  The partial profile was also compared to two unidentified male profiles, designated Male Donor A and Male Donor B, that were previously developed from DNA found inside the car, and presumably belong to Mr. McCaffrey's friends.  (Ex. 3, Jan. 11, 2006 OCME Report).  Both Male Donor A and Male Donor B were excluded as contributors to the DNA from the bite marks.  (Ex. 2, Sept. 30, 2008 OCME Report).

72.     In October 2008, the District Attorney's Office was approached regarding the new information discovered by the OCME, and a request was made for a joint application to vacate Mr. McCaffrey's conviction and to dismiss the indictment.  The District Attorney refused, and

made this position formally known at an appearance before this Court on October 29, 2008, shortly after the final DNA Report was disclosed.  During that appearance, ADA Strain argued that the new DNA evidence was irrelevant, because it could have come from the tears of Ms. Peguero's friends as they consoled her after she was dropped off at the parking garage.

73.     The Court did not appear receptive to Mr. McCaffrey's position during this appearance.

74.     It was determined that further investigation should be conducted to address the ADA's hypothesis.  However, Mr. McCaffrey's family ran out of funds to conduct the necessary investigation and to continue to pay for the services of private counsel to finalize the 440.10 motion.

75.     The case was accepted by the Exoneration Initiative (EXI), a not-for-profit organization that specializes in post-conviction litigation and partners with law firms committed to pro bono representation.

76.     EXI achieved its tax-exempt status on March 19, 2009, and thereafter funds became available with which to support additional investigation.[3]

77.     Due to the efforts of Private Investigator Joseph Dwyer, Aurora Pujols was located and interviewed on April 16, 2009.  She admitted that she and possibly another woman fought with Ms. Peguero in the parking garage on the morning of September 18, 2005.  (Joseph Dwyer Affidavit, dated July 23, 2009 ("Dwyer Aff.), attached hereto as Exhibit 5).

---

[3]     EXI was founded by the undersigned in April 2008 as a pro bono project.  It receives hundreds of letters annually from inmates with requests to evaluate their cases.  It only selects those cases with compelling claims of factual innocence, primarily cases that lack DNA evidence. It was incorporated as a not-for-profit in December 2008.

78.     Ms. Pujols told Mr. Dwyer that she and the other friends she was with that morning took a livery cab to a parking garage to meet Ms. Peguero, after she was dropped off there by Mr. McCaffrey and his friends.  (Ex. 5, Dwyer Aff. ¶ 3).

79.     When Ms. Pujols and the others arrived, Ms. Peguero was sitting in Ms. Pujols's car, which was parked in the garage.  (Ex. 5, Dwyer Aff. ¶ 3).

80.     An argument occurred in the car between Ms. Pujols and Ms. Peguero that escalated into a physical altercation.  Maria Sosa had to separate them.  Heliana Garcia, another friend, may have also been involved in the scuffle.  (Ex. 5, Dwyer Aff. ¶ 4).

81.     The fight got so violent that at one point one of the women kicked a window of the car with her heel and cracked the window.  (Ex. 5, Dwyer Aff. ¶ 4).

82.     Ms. Pujols stated that it is possible she struck Ms. Peguero during the fight.  Ms. Pujols did not recall biting Ms. Peguero, but admits she may have done that as well to get Ms. Peguero off of her.  Ms. Pujols said that Ms. Garcia may also have bitten Ms. Peguero during the altercation.  Ms. Pujols also stated that she may have bruised Ms. Peguero when she pushed her.  (Ex. 5, Dwyer Aff. ¶ 5).

83.     During the interview with Mr. Dwyer, Ms. Pujols said that she never denied the fight to the police and recalls that she and Maria Sosa told the detectives about it, but that they were informed that it was unimportant in the greater scheme of things.  (Ex. 5, Dwyer Aff. ¶ 6).

84.     Also during this interview with Mr. Dwyer, Ms. Pujols said that she was planning to meet with the District Attorney the next day.  Ms. Pujols also received a call from Maria Sosa during the interview with Mr. Dwyer.  Mr. Dwyer could only hear one side of the conversation, but could conclude that Ms. Sosa told Ms. Pujols that Ms. Sosa had met with the District Attorney earlier that day, and that she had acknowledged to the District Attorney that a fight

involving the women took place in the car.  Mr. Dwyer could also glean from the conversation that Ms. Sosa told Ms. Pujols that she also recalled informing the police about the fight during the pre-trial investigation.  (Ex. 5, Dwyer Aff. ¶¶ 7-8).

85.     Mr. Dwyer spoke to Ms. Pujols by telephone on April 27, 2009.  Ms. Pujols confirmed that she had met with the District Attorney and told them what she had previously told Mr. Dwyer on April 16.  However, during this April 27 conversation Ms. Pujols backed away from her earlier statement that she had told the police about the fight, and instead expressed uncertainty about whether the police had been informed about the fight in the vehicle.  (Ex. 5, Dwyer Aff. ¶ 9).

86.     It was learned that ADA Evan Krutoy was assigned to handle the case for the District Attorney's Office.  A meeting was scheduled for May 15, 2009 between representatives of the DA's Office and the Exoneration Initiative.

87.     At the May 15 meeting, Ms. Pujols's admissions regarding the fight were revealed, and another request was made for a joint motion by the DA's Office and the defense to vacate the conviction, this time based upon both the DNA and the Pujols evidence.

88.     At this meeting, Mr. Krutoy disclosed to the defense for the first time that Biurny Peguero had recanted her trial testimony, and that the District Attorney had learned about the recantation in early March, 2009.  When pressed on the details, Mr. Krutoy stated that Ms. Peguero said that "no crime occurred."  Mr. Krutoy did not elaborate and would not place the substance or fact of this recantation in writing.  A request was again made for a concession to vacate the conviction, and the response was that the District Attorney's investigation was ongoing.

89.     At this meeting, it was also discussed that Biurny Peguero, Aurora Pujols, Maria Sosa and Heliana Garcia had all been re-interviewed by the District Attorney.  Although Mr. Krutoy did not reveal much about his Office's investigation, it was implicit that all of the witnesses admitted that there was a fight between the women in the parking garage.

90.     After the May 15, 2009 meeting, Mr. Dwyer was instructed to contact Ms. Pujols again and request that she sign an affidavit.  Mr. Dwyer spoke to her by telephone on June 3, 2009.  Ms. Pujols expressed reluctance to speak with or meet with Mr. Dwyer again, and refused to sign an affidavit.  She did, however, tell him that Ms. Peguero was represented by Paul Callan, Esq.  She also stated that she was aware that Ms. Peguero had recanted, and that the recantation was first made to a priest.  (Ex. 5, Dwyer Aff. ¶¶ 10-12).

91.     Mr. Callan was contacted by the undersigned in early June 2009, and had a number of conversations with the undersigned.  Mr. Callan acknowledged that he represented Ms. Peguero, and that she had requested an opportunity to be re-interviewed by the New York County District Attorney's Office regarding the facts and circumstances pertaining to the case against Mr. McCaffrey.

92.     Mr. Callan confirmed that his investigation of this case caused him to believe that Mr. McCaffrey was innocent and should be released from prison forthwith.  Mr. Callan also advised that his client, Ms. Peguero was adamantly seeking the release of Mr. McCaffrey.

93.     Mr. Callan stated that, after concluding his investigation, and at the explicit request of Ms. Peguero, he had consulted with New York County District Attorney Bureau Chief John Irwin and ADA Evan Krutoy seeking the immediate release of Mr. McCaffrey on the grounds of his actual innocence.  Mr. Callan also stated that while he had no objection to the involvement of the trial prosecutor, ADA Shanda Strain, in the investigation, it was his firm

belief that a fresh look at the case should be undertaken by independent members of the District Attorney's staff who had no personal involvement in the original trial.

94.     Mr. Callan was advised by the undersigned that ADA Krutoy stated that Ms. Peguero had recanted her trial testimony and was now indicating that no crime had occurred. Mr. Callan did not dispute this statement and admitted that Ms. Peguero met with attorneys from the District Attorney's Office on multiple occasions and was questioned extensively, and maintained that Mr. McCaffrey should be released from jail immediately.

95.     Mr. Callan indicated that he was in a difficult position because he had negotiated a limited immunity agreement with the District Attorney to enable Ms. Peguero to only tell her story to the District Attorney without facing criminal charges.  Accordingly, while never disputing the recantation or the actual innocence of Mr. McCaffrey, Callan indicated that he was constrained by the attorney-client privilege from providing details concerning Ms. Peguero's new statements to the District Attorney for fear that those details might be used against his client.

96.     When he was advised of the details noted above regarding new statements made by Ms. Peguero's friends that her injuries were sustained in a fight with them on the morning of the alleged rape, Mr. Callan did not dispute any of these claims.

97.     Mr. Callan was also advised that a Catholic priest stated that Ms. Peguero had recanted her testimony regarding the alleged rape, both in and out of the confessional booth. Once again, Mr. Callan did not dispute this assertion.

98.     Mr. Callan stated that the District Attorney was threatening a felony perjury indictment of his client, with a recommendation of a state prison sentence.  While Mr. Callan was attempting to negotiate a misdemeanor with probation for his pregnant client, the District Attorney was insisting on a prison sentence, thus constraining Mr. Callan from allowing Ms.

Peguero to sign an affidavit supporting Mr. McCaffrey's claims at this time. Since the District Attorney's office is continuing to evaluate the matter, Mr. Callan has advised the undersigned that he will revisit the issue of a direct affidavit from Ms. Peguero when he completes his negotiations with the District Attorney.

99.     Mr. Callan advised the undersigned that should an evidentiary hearing occur and the circumstances with the District Attorney's Office remain the same, he will invoke his client's privilege against self incrimination.

100.     Mr. Callan stated that Ms. Peguero is aware that a recantation is against her penal interest. He also stated that Ms. Peguero is a Dominican national with alien status and subject to deportation, and that it is known to his client that deportation is a likely consequence of pleading guilty to a perjury charge.

101.     According to Mr. Callan, Ms. Peguero has had no contact with Mr. McCaffrey or anyone associated with him. Nor, was she offered any payment, or pressured or threatened by Mr. McCaffrey or anyone associated with him to recant her trial testimony.

102.     Mr. Callan also provided the name of a priest at St. Anthony's Church in Union City, New Jersey.

103.     Father Zeljko from St. Anthony's Church was contacted by the undersigned and he verified that Ms. Peguero recanted to him both during and outside of confession. He was sympathetic to Mr. McCaffrey's situation. However, he was instructed by legal counsel for the Church not to sign an affidavit or cooperate with the defense.

104.     A dialogue is still ongoing between the District Attorney's Office and the defense. The prosecution has represented that it will not contend that Mr. McCaffrey failed to exercise due diligence, in light of the parties ongoing discussions subsequent to Ms. Peguero's recantation.

105.   Although it was expected that the prosecution would have decided by now that it would move this Court to vacate the conviction and release Mr. McCaffrey from jail, it is uncertain when such decision will be made and when the District Attorney's investigation will be completed.

## CONCLUSION

WHEREFORE based on the instant Affirmation, the Exhibits submitted herewith, the Trial and Sentencing Transcripts, and the accompanying Memorandum of Law, pursuant to C.P.L. § 440.10 and the New York State and United States Constitutions this Court should dismiss the indictment, or order a new trial and immediately release Mr. McCaffrey, or order a hearing on the claims raised and produce Mr. McCaffrey for such hearing, permit supplementation of this motion, and grant any other relief it deems to be just and proper.

Dated: July 28, 2009
         New York, New York

                                        Respectfully submitted,


                                        Glenn A. Garber, Esq.

                                        EXONERATION INITIATIVE
                                        Attorneys for Defendant
                                        350 Broadway, Suite 1207
                                        New York, NY 10013
                                        (212) 965-9335



cc:          District Attorney, New York County
             Attn:   Evan Krutoy, Esq.


26