E4h9mccc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    WILLIAM McCAFFREY,

4              Plaintiff,

5          v.                          11 CV 1636 (RJS)

6    THE CITY OF NEW YORK, ET AL.,

7              Defendants.

8    ------------------------------x
                                      New York, N.Y.
9                                     April 17, 2014
                                      10:50 a.m.
10
     Before:
11
                     HON. RICHARD J. SULLIVAN
12
                                           District Judge
13
                          APPEARANCES
14
     GLENN A. GARBER
15   IRVING COHEN
          Attorneys for Plaintiff
16
     NEW YORK CITY LAW DEPARTMENT
17        Attorneys for Defendants
     BY:  ARTHUR G. LARKIN, III
18        VICKI B. ZGODNY

19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

E4h9mccc

1          (In open court; case called)

2          MR. GARBER:  Glenn Garber and Irving Cohen for William

3    McCaffrey.  Good morning.

4          THE COURT:  Mr. Garber, Mr. Cohen, good morning.  And

5    this is Mr. McCaffrey here.  Good morning Mr. McCaffrey.  Just

6    I'm moving because the giant head of my law clerk is blocking

7    my view.

8          For the defendants.

9          MR. LARKIN:  Good morning.  Arthur Larkin.  City Law

10   Department.  With me is Vicki Zgodny.

11         MS. ZGODNY:  Good morning, your Honor.

12         THE COURT:  Good morning, Ms. Zgodny.  And Mr. Larkin,

13   good morning.  And I will just state for the record my law

14   clerk does not have an enormous head.  He's got great hair

15   though.  The envy of all who sit behind him.

16         All right.  We're here -- I don't mean to make light

17   too much but we're here for a pretrial conference on this

18   matter which is headed for trial a week from Monday.  So there

19   are a number of motions in limine which I propose to go

20   through.  There are a number of objections to exhibits which

21   I'm not sure we're going to have time to go through today in

22   total.  There is also then the voir dire and requested charge,

23   some of which there are disputes; I think more with the latter

24   than the former.  So what I propose to do is to see how far we

25   can go today; and if there's a need to then schedule something

E4h9mccc

1    for next week, we may need to do that as well.

2              With respect to the exhibits.  I don't have the

3    exhibits, so it's difficult for me to rule on objections on

4    exhibits where I don't have them, particularly where the

5    objections are in many cases just one or two lines or a

6    reference to a rule number.  So I may -- I think I'm probably

7    going to ask you to send me the exhibits to which there are

8    objections or maybe all the exhibits just on a disk and then to

9    elaborate a little bit on the objections, the basis for the

10   objections, but we'll come back to that.

11             The first -- I have the motions in limine of the

12   parties.  I have the joint pretrial order and I also have some

13   letters that followed.  So they've all been docketed so I don't

14   think I need to go through them now.  There were some late

15   editions that came in just yesterday and we'll talk about

16   those.  I was surprised at some of the facts that were revealed

17   in the late letters.

18             Let's starts with the motions in limine.  The first

19   motion is a defendants' motion to bifurcate the fair trial

20   claim.  I think that has since been altered in light of the

21   concession that prejudice does go to the jury.

22             MR. LARKIN:  Yes, your Honor.

23             THE COURT:  So I'm going to deny that motion and I

24   don't think there's any dispute.  It's not really a motion

25   anymore.

E4h9mccc

1          Next is the defendants' -- I'm going through the

2     defendants' motions in limine.  The defendants make a motion

3     with respect to whether state of mind is a requirement and

4     therefore requires evidence to demonstrate deliberate decisions

5     by the defendants as opposed to more than just simply

6     negligence.  I think that this is correct as a matter of law.

7     I think that this will go then to jury instructions.  But I

8     think that there has to be a showing of intent and a showing of

9     more than just simple mistake for the Brady violations.  So I

10    think -- I'm inclined to grant, but I think the devil's in the

11    details and that's going to turn on what the jury instruction

12    is going to look like and I will send you my draft of the jury

13    instructions on that and some other issues about which there

14    are disputes.

15          Qualified immunity is obviously an issue for the

16    Court.  I think that there clearly need to be special -- a

17    special verdict form, special interrogatories that go to the

18    jury.  The devil, again, is in the details on what those look

19    like I think is the key.  I think I'm going to, at the same

20    time I send to you my draft, my pretty much final draft of the

21    voir dire and requests to charge I'll also include my version

22    of the final verdict form.  Maybe I'll get some input from you

23    but that's -- I don't think there's any disagreement that it's

24    for me to decide qualified immunity.  I think the issue is how

25    do we tee up the factual disputes that need to be resolved that

E4h9mccc

```
1    will be relevant to my determination of qualified immunity.

2            The next is the defendants' motion with respect to

3    Aurora Pujols and how her testimony should be elicited at

4    trial.  I think for purposes of trial it should at least begin

5    with nonleading questions.  If it turns out during the course

6    of those questions that she can fairly be considered a hostile

7    witness, then I think leading questions will be appropriate.

8    But I think at least initially she's not a party and I think

9    the witnesses should be -- questions should begin as nonleading

10   questions.  Okay.  She can, of course, be impeached along the

11   way and I expect that there will be a fair amount of that,

12   depending on what her answers are on direct.

13           MR. GARBER:  Just to give you some insight.  I'm not

14   going to have -- or we're not going to have access to her

15   before she testifies.  So certainly we will do what we would do

16   in a typical direct.  But we're not going to be able to prepare

17   her.  Whether or not she then turns hostile is something that

18   will happen, if it does, right in front of our eyes.

19           THE COURT:  She's been deposed.

20           MR. GARBER:  Yes.

21           THE COURT:  You've had access to her in the past.

22   Look, I think we're in agreement.  You know what you're doing.

23   And so I think the questioning should begin in a nonleading way

24   as direct examination ordinarily would.  And if her responses

25   or her demeanor reflect that, okay, we've got to change this
```

E4h9mccc

1    up, then you can ask.  And if we need a sidebar, we can talk

2    about it.  But I think it will be pretty obvious to me whether

3    she has crossed the line into being a hostile witness.

4              MR. GARBER:  Very good.

5              THE COURT:  Good.

6              There then is also a motion with respect to the audio

7    recording of Pujols's statements.  I think this really is going

8    to turn on how -- what she says on the stand.  So to the extent

9    that she says things on the stand that are inconsistent with

10   prior statements, she can be impeached with those prior

11   statements and I don't -- and perhaps including the recording

12   itself.  I think it really is going to turn on what she says on

13   the stand.  I think it's certainly a good possibility that to

14   the extent she testifies and says either I never said that or I

15   said that but I didn't mean it, I mean I think she certainly

16   can be impeached and I think the recording might then be

17   admissible because that's going to go to the fundamental issue

18   for the jury to decide which is which version is true.

19             So, I think -- I'm going to reserve but I think

20   there's at least a good chance that that's going to come in as

21   she is impeached on testimony given here in court.

22             Mr. Larkin.

23             MR. LARKIN:  I'm sorry, your Honor.  Just so that

24   we're clear.

25             So the Court may allow the recording to be played for

E4h9mccc

1    the jury and then the questions will be put to the witness.

2    Was that --

3              THE COURT:  No.

4              MR. LARKIN:  Was that your voice?  Did you make those

5    statements?

6              THE COURT:  The witness is first going to be asked --

7    well she's going to be asked what --

8              MR. LARKIN:  What happened?

9              THE COURT:  What happened.  What the defendants said

10   to her and what she said to them.  And then I think, depending

11   on what she answers, she can be crossed:  Well, didn't on a

12   prior occasion you tell Mr. Dwyer or somebody else something

13   different?  And then she has to be confronted with her prior

14   statement, given a chance to explain or contradict.  And I

15   think the tape itself at that point might, in fact, be very

16   relevant.

17             MR. LARKIN:  I guess if she's asked:  Isn't it true --

18   did you on a prior occasion tell Mr. Dwyer X, Y and Z and she

19   says:  Yes, I did, at that point she's admitted the prior

20   statement.  So I guess it's hard to script all of this in

21   advance.  I'm just trying to play out in my mind how it would

22   go.

23             THE COURT:  Well, if she says that, then my hunch is

24   that either on cross, I guess you'd be crossing her in a

25   sense -- you know, if at some point she is trying to explain

why she said it which is:  Oh, I was intimidated or I was

harassed, I didn't mean it, but I had to say something to get

this joker off my back, then I think -- this goes to the next

motion in limine -- then I think Mr. Dwyer would be allowed to

testify about whether or not he ever asked her what her

demeanor was, what his demeanor was.  And then I think also the

tape, the recording would be relevant because it would show

didn't seem like she was being harassed or, yeah, this guy was

really being difficult, I can understand what she was saying.

So I think under those circumstances it would probably be

coming in.  And I think that's probably where we're headed.

          MR. LARKIN:  I understand.  Thank you.

          THE COURT:  So I think that gets to the Dwyer point.

So I think he certainly can be called to testify to impeach the

testimony of Pujols particularly on something like whether he

was harassing her.  Because that seems like that's what's going

to be the explanation for the prior statement that's

inconsistent with what I expect will be her trial testimony.

          Related to that, there is a question as to whether the

memorandum that was prepared by plaintiff's counsel and

provided to Mr. Dwyer in advance of the interview should be

turned over and should be fair game for cross.  I guess I would

like to see that.  Have I teed that up right?

          MR. LARKIN:  Yes, your Honor.  That would be my

concern is whether we could use that memorandum to

E4h9mccc

1    cross-examine Mr. Dwyer if he testifies.

2           THE COURT:  So I guess it's a little premature but I

3    think, assuming that that's where this goes, and I think that's

4    not -- I wouldn't bet against it going that way -- it seems to

5    me it certainly would be relevant to Mr. Dwyer's state of mind

6    and I think that would be relevant in assessing his

7    credibility, in assessing Pujols's credibility, and it would

8    enable the jury or assist the jury in deciding what happened.

9    So I think it would be relevant.  I guess I'd have to see

10   what's in it to make my determination to weigh -- to engage in

11   the analysis that I am required to make for something that is

12   work product.  It's not an absolute bar.  It obviously can come

13   in.  But there's a standard the Second Circuit has set forth

14   and I think I need to see it to assess it.

15          MR. GARBER:  Sure.

16          I have been trying to find a hard copy of it.  But I

17   think I might have a version on my computer also as to

18   Mr. Dwyer.  So, I have not seen it in a while.  It was

19   something I prepared and gave to him to assist his

20   investigation.  So I will find a version of it.  Hopefully I

21   have the hard copy that I gave him or a version that, you know,

22   content, and I'll get it to you shortly.

23          MR. LARKIN:  I was going to say at the deposition

24   Mr. Garber had a hard copy and I did request that it be kept.

25          MR. GARBER:  So I should have one.

E4h9mccc

1          MR. LARKIN:  Specifically for this purpose.  So I

2     would assume that there is a copy somewhere.

3          THE COURT:  I assume it will turn up.  So send that to

4     me, I guess, ASAP.  Might as well send it to me now so I can

5     start looking at it.

6          You have no objection to that, right, Mr. Garber?

7          MR. GARBER:  No.

8          THE COURT:  The next of the defendants' motions in

9     limine is with respect to the testimony and report of

10    Dr. Pearson.  I think I've already ruled on that.

11         MR. LARKIN:  Yes.

12         THE COURT:  And then Ms. Salgado and Ms. Muncey.  And

13    I've already ruled on that.  So I'm not going to change my

14    ruling.

15         Then there is the issue of the Pujols interview which

16    I think I've now just ruled on.  So that's -- I think I've

17    already discussed that.  I already said that there are

18    certainly circumstances under which it would be coming in.

19         MR. LARKIN:  May I just ask one question, your Honor?

20         THE COURT:  Sure.

21         MR. LARKIN:  Would it be helpful for the court and for

22    the jury to have a transcript of the interview?

23         THE COURT:  Oh, it couldn't hurt.  I assume -- to the

24    extent she's going to be impeached, I would think that it's --

25    probably both sides have an interest in having a transcript and

E4h9mccc

1    the actual recording handy.  And I assume those are going to be

2    on your exhibit lists, right, those already are on the exhibit

3    lists.

4           MR. LARKIN:  The recording certainly I believe is on

5    plaintiff's exhibit list.  We have a copy.  They have a copy.

6    And I think we submitted the transcript or portions of it as

7    part of our motions in limine.  So I will forward our version

8    of the transcript which our word processing people created.

9    And hopefully we can stipulate to it.  And we'll have something

10   we can use.  It will make it easy for everybody to read along

11   if the recording is played.

12          THE COURT:  If you've got it, list it, turn it over to

13   Mr. Garber and Mr. Cohen.  And then I'd like a full set of all

14   of the exhibits by Monday, if I can, just so I've got them all.

15   Okay?

16          MR. LARKIN:  Yes, your Honor.

17          THE COURT:  All right.  The next --

18          MR. GARBER:  Can we change it to Tuesday because -- is

19   that okay?  Is Tuesday okay for all the exhibits just

20   because --

21          THE COURT:  Just because?

22          MR. GARBER:  Just because.

23          THE COURT:  What's the because?

24          MR. GARBER:  We have a lot of work to do and I think

25   there was one threshold question that was raised in my letter

E4h9mccc

1   which is the use of the trial transcripts because that's going

2   to dictate -- if we can bring a trial transcript --

3            THE COURT:  We'll get there.

4            MR. GARBER:  It's going to dictate what exhibits we

5   think we're going to want to use.

6            THE COURT:  Well let's come back to the timing, but

7   I'll want them certainly sooner rather than later.

8            The next motion in limine from the defendants is

9   whether the plaintiff can -- is I guess the proximate cause

10  argument.  There is an issue in my mind as to what exactly the

11  plaintiff is going to introduce here.  So to the extent there

12  are individual assaults in prison, I don't think that the

13  defendants are responsible for the assaults.  I think a fact of

14  prison, and it's sort of a general -- general testimony about

15  that prison stinks is I think fair game.  But individual

16  incidents of inmates doing brutal things I don't think that

17  that's -- I don't think that can be attributed to the defendant

18  and so I think that would be a proximate cause problem and I'm

19  not going to allow that.  Is that where you're planning to go?

20           MR. GARBER:  Not exactly.

21           The point of the assault in prison was he went in as a

22  rapist, which made his row to hoe much harder than a typical

23  inmate.  And he had been targeted by guards and by inmates.  He

24  had been outed by the guards as somebody who had been a rapist.

25  When he was in the yard essentially he would essentially keep

his back up against the wall and wasn't socializing with other
inmates.  He didn't get certain jobs like kitchen duty and so
forth because of his charge.  There was ridicule.  And there
was an inmate who threw hot water on him.  And it's -- his
understanding, it was because he had been outed as a rapist.

        And so we're not saying that defendants caused that.
But what we are saying is that going in as a rapist, there are
a number of things that go along with that label when you're
incarcerated and this was a byproduct of it.

        THE COURT:  If the defendants didn't cause it, then
why is it relevant and why should it be part of this trial?  It
seems to me if you want to sue the guards who outed him and you
want to sue the inmates what assaulted him or the guards who
allowed assaults to happen, that's a fair lawsuit.  I see
lawsuits like that all the time.

        But I'm not sure that -- this is a trial for a Brady
violation.  But I don't see why the defendants are responsible
for or should be found responsible for everything that happened
to Mr. McCaffrey while he's in jail or in prison, I should say.

        MR. GARBER:  I think causing someone to be wrongfully
convicted of a rape, okay, and maybe when I say they weren't
the cause, maybe I'm wrong and that's not the right way to
phrase it.  I guess they are the cause of him going in as a
rapist and things happening to him because he's a rapist, like
getting hot water thrown on you by an inmate.  And I think it

E4h9mccc

1    goes to damages and how he suffered in jail.  There may be --

2    maybe there should be a curative charge that there's not an

3    independent claim that the defendants directed or instructed

4    anybody to attack him in this manner, but you should have a

5    clear picture of his incarceratory experience.

6         THE COURT:  I think the law is pretty clear.  It

7    requires reasonable foreseeability on the part of the

8    defendants that their tort would contribute to a later

9    independent action that would harm the plaintiff.  If that's

10   the case, then the chain of causation is intact.  But I think

11   what you've described in terms of throwing hot water on him, it

12   seems to me that that's a stretch in terms of the chain of

13   causation and the reasonable foreseeability.  Unless you've got

14   some evidence that the defendants could or should have

15   reasonably foreseen this, I don't think you're going to be able

16   to meet the requirements for causation and I'm going to keep it

17   out.  So is there any evidence that the defendants themselves

18   understood that this was going to happen?

19        MR. GARBER:  I think it's common sense if you're going

20   in as a rapist you're going to be targeted by other inmates and

21   you're going to be treated differently than if you went in as

22   somebody who committed a homicide, for example.

23        I think that's obvious, especially in the criminal

24   justice world that the bullies live in.  I just think that it's

25   an obvious byproduct of going in as a rapist.  What about being

E4h9mccc

```
1   able to establish that he was ridiculed, that he was verbally

2   abused for being a rapist and how he had to behave to

3   essentially get through his day.  I think that that's certainly

4   fair game.  Because it goes to his damages and what happened to

5   his brain and his way of living and his emotional state.  So, I

6   would assume that's okay.

7             THE COURT:  Well I wouldn't assume anything.  I think

8   the issue is -- I do think causation has to be established.  I

9   don't think there's any dispute on that with respect to the

10  law.  And so I think you have to think about what evidence

11  there is to establish a causal chain.

12            MR. GARBER:  Okay.

13            THE COURT:  I think we probably do need to flesh this

14  out.  This is coming in through Mr. McCaffrey, presumably

15  right?

16            MR. GARBER:  He would testify about his past

17  experience.

18            THE COURT:  He's going to be one of the early

19  witnesses?

20            MR. GARBER:  Probably.

21            THE COURT:  I think sort of throwing water, hot water,

22  I think that is -- seems to me to be beyond the chain of

23  causation that would be reasonably -- could be reasonably

24  demonstrated here.  So I think that's out.

25            So the conditions of being in prison I think -- I
```

E4h9mccc

 1     think that's fair game to a certain extent.  The jury gets the

 2     fact that being deprived of your liberty and put in jail for a

 3     period of years is pretty bad and harmful.  But I don't think

 4     it should turn into a trial about prison conditions because the

 5     defendants here are not responsible for the prison conditions,

 6     don't work as part of the prison system, and I don't think it's

 7     fair or desirable that we then end up having a trial about the

 8     department of corrections.

 9             So a little latitude I think I could give but not much

10     more than that.  So I'd like you to articulate before

11     Mr. McCaffrey takes the stand just exactly what it is you're

12     going to ask him and what you're going to elicit from him

13     about, you know, what he experienced in jail so that we can

14     have that vetted very closely before the jury hears it.

15             MR. GARBER:  I'll be prepping him this coming week.

16     So I'll have a clear picture of what that's going to be and I

17     will heed what you're saying about blaming prison -- going

18     overboard.  I'll heed the warning.

19             THE COURT:  I think we're going to need to come back

20     next week so you can flesh this out next week or certainly

21     before Mr. McCaffrey testifies, and I don't want you to open on

22     any of that stuff if we haven't resolved it.  Okay.  Good.

23             The next defense motion is a motion to preclude

24     evidence of the defendant's disciplinary history or involvement

25     in other civil rights actions.  I mean the fact that they were

E4h9mccc

1    named as defendants in civil rights actions, the fact that they

2    were accused of some wrongdoing that was never substantiated

3    or, in fact, was disproven or at least a fact finder found that

4    the conduct was -- didn't occur, it seems to me that this

5    shouldn't be coming in.  So I'm inclined to grant this unless

6    there's something else I'm missing, Mr. Garber.

7          You just want to elicit from the defendants on cross

8    that they have previously been named in lawsuits and previously

9    named in CCRB complaints?

10         I think that that's -- I don't think there's enough

11   there to justify that.  There is no finding of the actual

12   conduct, and the mere acquisition is not enough.  So I'm going

13   to grant that motion.

14         The next motion is the defendants' motion to permit

15   the defendants to cross-examine the plaintiff regarding his

16   prior arrest history and time spent incarcerated.

17         This seems to me to be only relevant if the plaintiff

18   intends to elaborate on his experience in jail in ways that

19   seems to have come up at the deposition.  So I guess I'm going

20   to reserve on this one to see exactly what comes out on

21   Mr. McCaffrey's direct.  I think this is all going to be coming

22   in through Mr. McCaffrey as to his experiences in jail.  But if

23   in essence he says:  This is shocking I've never experienced

24   anything like it, this was the worst experience in my life, I

25   think that may be opening the door to show well, this was a

E4h9mccc

second home and not exactly unfamiliar territory for you.

Now, I don't think I'm going to allow any discussion about what he was convicted for. That's a -- we're going to come back to this in a moment. But it seemed to me that the defense was simply hoping to show the periods of incarceration and prearraignment or pretrial detention to show that he's familiar with what it's like in jail; and assertions of this being shocking, new, and totally unchartered territory are false or overstated. I think it kind of depends on what Mr. McCaffrey is going to say about that. And maybe he's not going to say anything about that and it's not coming in.

Mr. Larkin.

MR. LARKIN: One question. The way we read the case is if the plaintiff is seeking damages for incarceration, in and of itself that would be enough, I think --

THE COURT: Wait a minute. So your view is that a person who is wrongly convicted should get less damages if he's been there before than a person who has never been there before, per se?

MR. LARKIN: That's a cold way to put it, very cold way to put it. But I think the cases recognize that, don't they; that if you are in prison and you are seeking damages for denial of liberty and you have been in prison on other occasions, and even if the time period that you're in for and you're seeking damages for is just 48 hours or 72 hours, the

E4h9mccc

1      courts generally allow some cross-examination just as to

2      periods of incarceration.

3              THE COURT:  I think I want to reserve on this to hear

4      what the direct is like.  And if we have to then have a quick

5      sidebar to talk about the parameters of cross, we can.  But I

6      think -- I think the mere fact that somebody has been in jail

7      before doesn't mean that their damages should per se be less

8      than a novice.

9              MR. LARKIN:  On an intuitive level, I hear what the

10     Court is saying.  The cases though --

11             THE COURT:  Well, the cases give me a whole lot of

12     discretion to decide what's prejudicial --

13             MR. LARKIN:  Yes.

14             THE COURT:  -- what's probative.  So I'm not too

15     worried about my ability to rule on this.  And I guess what I'm

16     saying is that if it's relevant, I'm going to allow it.  But

17     it's not clear to me why it's really relevant.  If it's just

18     really being offered to show that he's a bad guy who has been

19     in jail before and so:  No harm, no foul; if he didn't commit

20     this one, he must have committed something else that was

21     probably just as bad.

22             MR. LARKIN:  That won't be the argument.

23             THE COURT:  Well it won't have to be the argument.  I

24     think the concern is that that will be what the jury will infer

25     or surmise as the point, and I don't want to go there.  So if

E4h9mccc

1    they open the door to the horrors of prison and what it's like

2    for a person being there, bring out the violins, then I think

3    it might be fair game at that point to say:  Wait a minute

4    here.  This was not quite as dramatic as you portray it because

5    you've been there before, and you've been there since, and this

6    is sort of camp for you.  Maybe.  I think it's going to really

7    turn on what Mr. McCaffrey says on the stand.

8              MR. LARKIN:  Would that be true even given the extent

9    of Mr. McCaffrey's prior arrest history.  We've got 18 or 20

10   arrests.  We've got multiple stints in jail, in prison.

11             THE COURT:  What is the argument there?  The argument

12   is that people with long criminal histories can be wrongly

13   convicted --

14             MR. LARKIN:  No.

15             THE COURT:  -- for crimes they didn't commit.

16             MR. LARKIN:  Absolutely not.

17             THE COURT:  And if they are, certainly the price is a

18   lot lower than for people who previously had law-abiding

19   existences?

20             MR. LARKIN:  As to the first part, of course the

21   answer is no.  Of course not.  If somebody was wrongfully

22   convicted and should not be in prison, there is no question

23   about that.

24             But in terms of sizing up the damages.  If you have

25   John Smith who has never been arrested in his life and he's

E4h9mccc

1    arrested and charged with a crime, a felony, and is found

2    guilty, and he didn't do it, and he goes to prison, and this is

3    his first time in custody.  And you have Bill Smith who has

4    been arrested 20 times and who has been in jail or prison for

5    periods of seven months, four months, ninety days, five days,

6    ten days, and now currently, as we just found out, I think the

7    damages -- the damages, just the damages; not liability but

8    just the damages; liability depends on a whole different set of

9    arguments -- but just the damages are lower.  I think most of

10   the courts come down that way.  Although of course, as your

11   Honor says, it's a matter of discretion.

12            THE COURT:  I think there's a real concern and I

13   have -- I have this concern and I think Mr. Garber and

14   Mr. Cohen do as well, that the takeaway from this is not going

15   to be that the damages are lower because it was less traumatic

16   for him than it might have been for some first-time convict,

17   but that:  No harm, no foul because this guy is a bad guy and

18   so don't worry about it.  If he was wrongly convicted on this

19   one, it just -- the law of averages would make this not a big

20   deal.

21            MR. LARKIN:  Well, we would never make that argument.

22            THE COURT:  I know you're not going to make that

23   argument.  That's the concern.  That's the prejudice that may

24   flow.

25            MR. LARKIN:  I understand.

E4h9mccc

```
 1            THE COURT:  So I want to be very, very careful about
 2     that.  So I'm going to reserve until I've heard what the direct
 3     is on this.  And then I think we'll have to revisit, probably
 4     before the cross, or before you introduce this other evidence.
 5     So don't open on it.
 6            MR. LARKIN:  Understood.  Thank you.
 7            THE COURT:  Okay.
 8            The next one is a motion to preclude plaintiff from
 9     referring to the city of New York or referring to defense
10     counsel as the city attorneys or attorneys for the city and any
11     reference to indemnification by the city.
12            I think that's fair.  The city is no longer a
13     defendant.  They are just going to be defense counsel, counsel
14     for the defendants.
15            The next motion is a defense motion to permit the
16     defendants' witnesses to testify about statements made by
17     Pujols and Sosa on other occasions about what the witnesses
18     said on the night of the crime or later.
19            I'm still scratching my head and trying to figure out
20     why this is relevant.  What are you trying to introduce here?
21     You're trying to introduce out-of-court statements to show
22     what?
23            MR. LARKIN:  This is actually before the recent
24     discussion --
25            THE COURT:  So you're not looking to do this anymore?
```

E4h9mccc

1          MR. LARKIN:  If the witnesses admit that on prior

2     occasions they have told -- told others that they either had

3     conversations among themselves not to discuss the fight or they

4     had a conversation with detectives, one or more detectives not

5     to discuss the fight but they couldn't remember which one, then

6     I may not need the testimony of Mr. Krutoy to talk about that.

7     I think Shanda Strain is different because she's going to

8     testify about a very specific lie that the girls -- the women

9     told, demonstrating that, in fact, they decided amongst

10    themselves not to say anything about this fight, your Honor.

11    And that relates to the note that's in the file concerning the

12    alleged carjacking.  And so that -- I think that's very

13    important to show.

14          THE COURT:  These witnesses are going to testify,

15    right?  Certainly Pujols is going to testify.

16          MR. LARKIN:  Pujols is going to testify.

17          THE COURT:  So why shouldn't she be crossed on her

18    prior inconsistent statements?

19          MR. LARKIN:  She will be.

20          THE COURT:  So depending on what she says, the fact of

21    a prior statement through another witness might be introduced

22    because it's not collateral and it's germane, but --

23          MR. LARKIN:  Or it might not be.  It might not need to

24    be at all.

25          THE COURT:  It seems to me it's hard to imagine why it

E4h9mccc

1    will be necessary to call these witnesses when Pujols and Sosa

2    themselves are going to be taking the stand.

3             MR. LARKIN:  They are.  But I think with respect to

4    ADA Strain, that one very specific issue is very important,

5    your Honor.  Because here's the chain of events.  The women --

6    they go out that night.  Ms. Peguero, the victim, meets

7    Mr. McCaffrey.

8             THE COURT:  Right.

9             MR. LARKIN:  They drive around in the van.  The women

10   meet up again with Ms. Peguero.  She tells them -- she's

11   disheveled.  Her belt buckle is undone.  Her mascara is a mess.

12   She is crying.  She tells them she was raped.

13            They get into this -- they get into some kind of

14   altercation in the car where, according to Maria Sosa, somebody

15   broke the windshield during that altercation.  They go to

16   New Jersey.  And on the way to New Jersey, Ms. Peguero says she

17   was raped.

18            My God.  The women are shocked and they go to a

19   hospital.  They take her to the hospital.  And the detective is

20   there.  And Ms. Peguero and/or one of the other women told this

21   detective that there had been a carjacking.

22            THE COURT:  Peguero or Pujols?

23            MR. LARKIN:  It was probably Peguero.  But the

24   information we have is that our detectives, the New York

25   detectives, Detective Diaz got a phonecall from Detective Rak.

E4h9mccc

1    Detective Rak told him:  There was a crime in your

2    jurisdiction.  Here's what happened.  There was a carjacking.

3    Three Hispanic men, one of them broke the windshield of the

4    car.

5           So Detective Rak is relaying a story to the New York

6    detectives about how the windshield got broken that she got

7    from these -- from these women who had told her this story

8    about how the windshield got broken.  So they were trying to

9    cover up the fight from the very beginning before they even

10   spoke to the New York detective.

11          They decided, your Honor, amongst themselves -- and it

12   was probably Ms. Peguero who did it -- that they were not going

13   to say anything about this fight.  And it's clear from the

14   get-go.  Because they were making up stories to explain the

15   broken windshield, even though they knew that the fight had --

16   that the fight itself is what caused that broken windshield.

17          So they gave false information to the New Jersey

18   detective, which was in turn relayed to the New York detective.

19   And it's a note in the file about the broken windshield.

20   Supposedly being caused by a carjacking.  It wasn't caused by a

21   carjacking.  Ms. Sosa admitted at her deposition that the fight

22   in the car caused the broken windshield.

23          So they themselves decided that they were going --

24   that they were going to not say anything about this fight.

25   This is what I think happened.

E4h9mccc

1           THE COURT:  I'm not sure why you need these extra

2     witnesses.  So presumably -- the witnesses who made the false

3     statements are going to be on the stand and are going to be --

4           MR. LARKIN:  Right.

5           THE COURT:  Not Peguero but -- right?  Peguero is not

6     going to be testifying?

7           MR. LARKIN:  No, no.

8           THE COURT:  But the others are going to be here.

9     They're going to be examined.  They're going to be crossed.

10    They are then going to be confronted with these prior

11    statements, false statements.  They'll admit or they'll deny.

12          MR. LARKIN:  Right.

13          THE COURT:  The defendant, Diaz, is going to testify

14    and he's going to say what he learned and what he did as a

15    result of what he learned.

16          MR. LARKIN:  Exactly.

17          THE COURT:  So --

18          MR. LARKIN:  The only reason that Shanda Strain is

19    relevant is because after the investigation is concluded and

20    they're preparing for trial, Ms. Strain spoke to the women

21    about this note in the file.  And they again said at that time

22    to her the -- there was a carjacking and that's what caused the

23    broken windshield.  So, she couldn't remember -- Shanda could

24    not remember which of the three told her that.  But she

25    specifically testified at deposition that when she saw the note

1    in the file she followed up on it with the women.  And after

2    the -- they had met the detectives, after the detectives are

3    finished with their investigation and turned over the case to

4    the D.A.'s office now the women are continuing to advance the

5    story about this carjacking causing the broken windshield.

6             THE COURT:  But I think all of this turns on what

7    these witnesses say on the stand.  And so if these are

8    statements that are prior inconsistent statements, then I think

9    they might be coming in.

10            If they are prior consistent statements, then they

11   would only be coming in for -- if other conditions are met.

12            MR. LARKIN:  That's right.  That's right.

13            They're not for their truth, though.  They're for the

14   fact of the lies being told and demonstrating the chronology,

15   showing that it's independent of any involvement by these --

16            THE COURT:  Well the fact of the statement is what

17   you're saying.  Whether it's a lie or it's the truth is

18   ultimately I guess for the jury to decide.  But unless there's

19   a dispute about the fact of the statement being made, I don't

20   see why we need to have third parties in here to do that.

21            MR. LARKIN:  So if the -- I'm sorry if I'm belaboring

22   this, your Honor.  But if Pujols and Sosa are on the witness

23   stand and they're asked questions about what they said

24   concerning the carjacking and they both deny it, would we then

25   be permitted to call Shanda Strain to testify --

E4h9mccc

1          THE COURT:  Well you'd certainly permitted to cross

2     them on prior statements, right?

3          MR. LARKIN:  That's right.  I'd cross them on the

4     prior statements.  Did you ever tell --

5          THE COURT:  Confront them with the prior statement to

6     Strain.  Allow them an opportunity to deny, admit or explain.

7     And then depending on how they do that, then maybe you'll be

8     able to call this other witness to establish the fact of a

9     statement which wouldn't be offered for the truth.

10          MR. LARKIN:  Right.

11          THE COURT:  Unless it's collateral.

12          Now, it doesn't sound to me like it's collateral.  And

13     I'm not sure what the plaintiff's view on this is, but we're

14     sort of playing a chess match three steps ahead and it's not

15     clear to me what the moves before this are going to be.

16          MR. LARKIN:  I'm sorry.  I don't mean to belabor it,

17     your Honor. I'm just trying to think ahead as to what might

18     happen at trial.  That's why I'm raising it.

19          THE COURT:  Mr. Garber, Mr. Cohen, do you want to

20     respond.

21          MR. GARBER:  I think this is going to turn on how

22     their testimony is going to come out, Pujols an Sosa, and

23     whether or not Strain would be relevant to prove up something.

24     But it's kind of a double-edged sword.  If they told Strain,

25     look, you know, we buried this, you know --

E4h9mccc

1          MR. LARKIN:  That's not what they said to Strain.

2     What they said to Strain is there was a carjacking.

3          THE COURT:  Your point is that what was said to Rak

4     and passed on to the defendants is the same as what was said to

5     Strain.

6          MR. LARKIN:  Yes.

7          THE COURT:  Years later.

8          MR. LARKIN:  Correct.  Exactly.

9          THE COURT:  Which reflects then that there was never a

10    revelation.  There was always a coverup.  And it wasn't -- the

11    revelation didn't occur until well after the trial.  That's

12    your point.  I get that.

13         MR. LARKIN:  Yes.

14         THE COURT:  Not clear to me though that it comes in

15    automatically.  I think we've got to see what their testimony

16    is on the stand.  If they admit that they never told a soul

17    about the coverup until after the trial, then I assume you

18    don't need to call these other people, right?

19         MR. LARKIN:  Yeah.  It depends on how -- on what they

20    say.

21         THE COURT:  Well I think it depends on what they say.

22    I agree with that.

23         MR. GARBER:  We'll see how this plays out.  This may

24    tie into though the failure-to-investigate issue.

25         THE COURT:  We'll get there.

E4h9mccc

1          MR. GARBER:  Yes.

2          THE COURT:  So, I think -- we'll have to see how this

3    plays out.

4          So I think that's all of your motions in limine,

5    Mr. Larkin, right?

6          MR. LARKIN:  I believe so.

7          THE COURT:  Other than your letter, other than your

8    most recent letter.

9          MR. LARKIN:  That is correct, your Honor.

10          THE COURT:  So then we go to plaintiff's motions in

11    limine.  Plaintiffs look to preclude the defendants from

12    introducing plaintiff's prior criminal convictions.  This is

13    the convictions themselves.  There are a lot of them.  I think

14    the rule is very clear that really old and convictions that are

15    not for felonies and have nothing to do with truthfulness and

16    veracity shouldn't be coming in.  So that takes care of most of

17    them.  So maybe I should ask Mr. Larkin which ones are you

18    trying to get in.

19          MR. LARKIN:  Well this would come in for two reasons

20    in our view.  First of all, the most recent one for criminal

21    possession, I think, of a weapon which we raised in our letter

22    would go to credibility.

23          THE COURT:  That's the current --

24          MR. LARKIN:  Yes.

25          THE COURT:  The conviction that is -- 2013, I guess,

E4h9mccc

1   right?

2           MR. LARKIN:  Yes.  July of 2013, your Honor.

3           THE COURT:  Let's start there.  Seems to me that meets

4   all of the requirements under the rule.  I think that one's

5   coming in, Mr. Garber.  Do you disagree?

6           MR. GARBER:  I don't know -- it's a weapon possession

7   charge.  There is no deceit associated.

8           THE COURT:  Doesn't need to be.  If it's a felony

9   conviction of recent vintage that a jury can consider in

10  assessing a witness's credibility, that's the nature of

11  felonies.  I think that's -- that's the law.

12          MR. GARBER:  My position --

13          THE COURT:  You're arguing 403?  Are you arguing

14  something else?

15          MR. GARBER:  My understanding was that it doesn't go

16  to deceitfulness -- maybe I'm wrong on this, okay -- it doesn't

17  come in.  You're saying if it's a felony the law is clear that

18  it comes in.

19          THE COURT:  This is a civil -- remember, this a civil

20  trial.  He's not a criminal defendant in this case.  He's a

21  witness in this case.  And so his credibility is at issue.  And

22  the fact of the conviction is -- is fair game under certain

23  circumstances.  It seems to me the circumstances have been met.

24          MR. GARBER:  I guess what I should say is that if it's

25  coming in, it should just be regarded as a felony; saying have

E4h9mccc

1   you been convicted of a felony and the nature of it.  I mean

2   that it's a weapons possession charge shouldn't come out

3   because it's going to be -- it's prejudicial under Rule 403.  I

4   think it's going to cause a jury to speculate about violent

5   nature and I don't think that that's appropriate because it's a

6   credibility -- he's been convicted of a felony.  That's really

7   all they should hear.

8          THE COURT:  What's your response?  Why do they need to

9   know that it was a weapons charge?

10         MR. LARKIN:  I think the rule says, and the way the

11  circuit has interpreted the rule, your Honor, is that if it's a

12  felony conviction what usually comes in is the statutory -- the

13  nature of the crime, the description of the crime, the date of

14  the conviction, and the sentence.

15         THE COURT:  Date and sentence are clearly relevant.  I

16  guess the issue is does the nature of the crime pose issues of

17  prejudice.  Does it make the jury to say:  If he's running

18  around with guns, I don't care whether he's been wrongly

19  convicted of rape.

20         MR. LARKIN:  The Courts look at the four-factor test,

21  your Honor.  And I believe we laid that out in our letter but

22  I'll just briefly, if the Court will just bear with me.  If the

23  crime -- the way the courts seem to analyze prejudice is, is if

24  a crime is of the same type or --

25         THE COURT:  No, I know.

E4h9mccc

```
 1              MR. LARKIN:  Similar conduct related at issue.  I
 2   think it has nothing to do with the claim at issue here.  So
 3   there is no concern that the jury might see a propensity in the
 4   sense that they would -- if this were an excessive force case
 5   for instance and if it was --
 6              THE COURT:  It's not a propensity issue, I think.
 7              MR. LARKIN:  It's not.
 8              THE COURT:  I agree with you.  The cases typically are
 9   focused on propensity, and that's an impermissible basis for
10   introducing things and so that has to be guarded against
11   carefully.
12              But I think the separate inquiry is whether the crime
13   itself is sufficiently heinous as to get a jury worked up and
14   that they would be prejudiced against the witness for reasons
15   that would be beyond what would be permissible, right?
16              The concern is that they will just say:  Enough.  I
17   don't care whether this guy was wrongly convicted.  I think he
18   was wrongly convicted but I'm going to rule against him because
19   I don't like people who have guns.
20              MR. LARKIN:  Obviously, again, I appreciate what the
21   Court is saying, that that could be an unintentional takeaway
22   although it's never -- that's certainly not an argument we
23   would ever make.
24              THE COURT:  I wouldn't let you make it, but the
25   concern is that the jury will get there on its own.  So usually
```

E4h9mccc

1       a limiting instruction is what would fix these, and I think

2       juries are generally pretty good at following limiting

3       instructions.  So I think I will at the least give a limiting

4       instruction saying you've heard testimony that Mr. McCaffrey

5       has a conviction, a felony conviction.  You may consider it for

6       the following reasons.  But you may not use that information

7       for this reason.  Or you may not draw this inference from it.

8                MR. LARKIN:  There's two -- I'm sorry, your Honor.

9                THE COURT:  Go ahead.

10               MR. LARKIN:  If I may.

11               We had -- the circuit, I believe, states that the

12      presumption is that all felonies are somewhat probative and

13      that in general the presumption is the nature or the statutory

14      name of each offense, the date and the sentence imposed is

15      presumptively required by the rules subject to the balancing

16      test.

17               THE COURT:  I'm talking about the balancing test.

18               MR. LARKIN:  In Estrada I think the court emphasized

19      that it's important for the jury to know what the crime is in

20      order to assess its relevance for credibility purposes.  And I

21      think in this case, if I can just move to, I guess, subpart (b)

22      of my letter, your Honor.  And forgive me for sending it in

23      yesterday, but we only learned about this a short time ago.

24               THE COURT:  Let's stop.  Why was this not revealed

25      sooner, Mr. Garber?  I'm puzzled by this.  This would seem to

E4h9mccc

1    be part of your continuing obligation to disclose these things.

2         I mean I just learned about it.  I mean I knew that

3    your client was in custody.  It wasn't clear to me what for --

4    because I writted him over here.  But I was surprised that

5    Mr. Larkin wasn't aware of this and that you hadn't disclosed

6    it to him.

7         MR. GARBER:  I was surprised.  We gave a release.  And

8    in my December letter I said he landed back in jail.  When

9    Mr. Larkin sent me an e-mail last week saying, you know, well

10   what's going on, when we put the order to produce in, I called

11   and left two messages for him.  We have not been communicating.

12   So I guess I should have turned it over sooner.  But I mean I

13   have.  He's got it.  So, I didn't realize I had an obligation

14   to say hey, by the way, my client is now in jail and this is

15   what it's for.  I just assumed he would be doing his work.

16   He's got the NYS and he's got the release.

17        MR. LARKIN:  What's strange is that Mr. Garber went

18   through every other conviction in his motion papers, knowing

19   that his client had just been convicted of a felony, and argued

20   why all of these other convictions were not admissible.  Never

21   told us about --

22        THE COURT:  I was puzzled.

23        MR. LARKIN:  I found that to be of some concern.

24        MR. GARBER:  I was responding to the documents that he

25   had in the JPTO, so.

E4h9mccc

```
 1              THE COURT:  This is clearly coming in.  It seems to me
 2    a weapon possession charge is not as inflammatory as some other
 3    charges.  So I think the name of offense is not going to cause
 4    the jury to lose its mind, and I will certainly consider a
 5    limiting instruction if you want to propose one, Mr. Garber.
 6              MR. GARBER:  Okay.
 7              THE COURT:  But I intend to give that instruction
 8    generally as to what the jury can use prior convictions for
 9    which I think will have built into it a limiting instruction.
10    So that's what I intend to use.  Okay.
11              Now there are other convictions.  So what other
12    convictions are you seeking to introduce?
13              MR. LARKIN:  Before we get to that, your Honor, may I
14    just address the statements that we learned about?
15              THE COURT:  No.  I want -- we'll get to those next,
16    because I don't think that's the same thing.
17              So right now I'm really dealing with their motions in
18    limine to preclude the introduction of evidence about prior
19    convictions.  I'm allowing the 2013 conviction in.
20              What other prior convictions are you seeking to
21    introduce?
22              MR. LARKIN:  None of the others will fit within the
23    criteria for credibility.  We agree with that, your Honor.
24              But I think it will depend on damages and the kind of
25    testimony that would come in about damages.  I think that some
```

E4h9mccc

1    of the prior convictions -- we've got the time of incarceration

2    which we've discussed with the Court and also the nature of the

3    crimes.  If Mr. McCaffrey presents himself as a meek -- I don't

4    want to -- I mean --

5            THE COURT:  Meek, what?

6            MR. LARKIN:  I've heard some suggestion that he may

7    testify that as a -- as a person convicted of rape he was

8    forced to stand -- he couldn't do certain jobs, he was forced

9    to sort of keep to himself.  He was intimidated, in other

10    words, by the prison environment.  Some of these other

11    convictions tend to cast doubt on that kind of presentation, if

12    you will.

13            THE COURT:  Let's reserve on that.  Because I think

14    that really goes to the point we talked about before.

15            MR. LARKIN:  Yes.  I would agree.

16            THE COURT:  And Mr. Garber is going to flesh out what

17    he intends to elicit from his client which will make it easier

18    I think to resolve these issues.

19            MR. LARKIN:  Yes, your Honor.

20            THE COURT:  So the 2013 conviction though is coming in

21    and you're not seeking to introduce any other convictions.

22    What you're talking about really is introducing other jail

23    stints and I guess other --

24            MR. LARKIN:  Other acts.

25            THE COURT:  Other conduct, other acts that would belie

E4h9mccc

1    testimony about him being a meek wallflower.

2              I don't know.  I think it's unlikely that I'm going to

3    allow those in.

4              MR. LARKIN:  It would depend on how Mr. McCaffrey

5    testifies about his experiences in prison.  He's going to lead

6    the jury to believe that he was victimized in certain ways that

7    may or may not be -- that may open the door, I submit

8    respectfully, with respect to some of his prior conduct.

9              THE COURT:  Let's hold off on this.

10             MR. LARKIN:  That's my concern.

11             THE COURT:  No other convictions are you seeking to

12   introduce for purposes of 609?

13             MR. LARKIN:  Correct.  There's only the one

14   conviction.  No other convictions.

15             THE COURT:  All right.  So the next motion --

16             MR. GARBER:  Let me just raise something.

17             THE COURT:  Go ahead.

18             MR. GARBER:  I guess I wasn't sure or clear about my

19   continuing obligation.  He also was convicted of an assault in

20   the second degree.

21             THE COURT:  When?

22             MR. GARBER:  This is the same time that he pled on the

23   criminal possession of a weapon charge.

24             MR. LARKIN:  I have the certificate of disposition for

25   a criminal possession of a weapon.

E4h9mccc

1            THE COURT:  Let him finish.

2            MR. LARKIN:  I also saw another docket number -- and I

3     think I dropped a footnote, your Honor -- when I reviewed the

4     file, I saw another docket number of another case and I

5     requested that file as well.  I don't have that allocution.

6            If Mr. Garber has the allocution and he can send it to

7     us, it might solve some of these issues because my

8     understanding is it's a CPW in the second degree, which is a C

9     felony.  And I have one certificate of disposition for that

10    crime.  And the plea was July 30, 2013.  I don't have a

11    certificate for an assault.

12            MR. GARBER:  Let me help him out though.  I can tell

13    you.

14            It's that.  And the certificate of disposition is

15    wrong.  It's actually three-and-a-half years, not three years.

16    And it's kind of weird that it says three.

17            And there was an assault charge also that he pled to;

18    got a year on it, which merged with it; and an aggravated

19    unlicensed driving.  So he actually wrapped up three cases at

20    the same time.

21            And you can call me I'll share with you what I have.

22            THE COURT:  So let's do that.

23            MR. GARBER:  Okay.

24            THE COURT:  It seems to me you have an obligation at

25    this point to let them know about prior convictions and it

E4h9mccc

```
 1    seems to me that Mr. Larkin has an obligation to let you know
 2    about his client's CCRB complaints that have been substantiated
 3    and so if there are any then you should let him know those.
 4              MR. LARKIN:  We absolutely will and there's -- I mean
 5    these guys are very clean; 20, 25 years, nothing.
 6              THE COURT:  In any event those are -- I think those
 7    are the running rules.  So, talk.  Make sure that there's
 8    nothing that hasn't been shared and that may then affect what
 9    you're seeking to introduce on cross.
10              So certainly the gun possession I think is coming in.
11    The other charges sounds like they were part of the same
12    conviction basically.
13              MR. GARBER:  Yes.
14              THE COURT:  I think they're probably coming in as
15    well.  But talk and see whether that's what you want to do,
16    Mr. Larkin, and whether there's an objection to some but not
17    others of the convictions in 2013.  All right?
18              MR. LARKIN:  Thank you, your Honor.
19              MR. GARBER:  The assault was a different incident.
20    But it was wrapped up the same time at sentencing.
21              THE COURT:  I assume Mr. Larkin is going to want to
22    get them in.  If he is going to want to get them in and you
23    have an objection to one but not the other.
24              MR. GARBER:  And also same on prejudice, which is that
25    the name of the conviction, obviously, shouldn't come in;
```

E4h9mccc

1    which, the weapons possession charge you were teetering on

2    that, so.

3              THE COURT:  But, again, it's a different standard in a

4    civil case.  And so think about it.  Think about whether you're

5    asking for a limiting instruction; and if so, what sort of

6    limiting instruction you're asking for.  All right.

7              The next defense motion is to preclude the defendants

8    from calling Rak and Farkhanda Farooqui, Lisa Miner, Evan

9    Krutoy, Carlos Vargas, and Shanda Strain.

10             So I guess we've really probably covered this.  I

11   think it turns on the testimony of Pujols and Sosa.  But is

12   this different -- is this just the flip side of Mr. Larkin's

13   motion or is there more to it?

14             MR. GARBER:  I guess this goes back to the threshold

15   question I was grappling with in the beginning here is for our

16   presentation we believe we're entitled to use the trial

17   transcripts because the jury has to measure the alleged Brady

18   violation against what happened at this trial.  So we don't

19   think any of the trial transcripts are inadmissible.

20             THE COURT:  I'm not there yet.  That's your next

21   motion.

22             MR. GARBER:  That's, I guess, why I'm objecting to Rak

23   and Farooqui.  Because I think what Mr. Larkin is saying is

24   that we will prove up what happened at that trial through live

25   witnesses.

42

E4h9mccc

| | |
|---|---|
| 1 | THE COURT:  I don't think that's what you're saying. |
| 2 | Is that what you're saying? |
| 3 | MR. LARKIN:  Your Honor, since the Poventud decision |
| 4 | came down, and I've sort of had to rethink how we would wind up |
| 5 | presenting the case, I think as long as we can put in the trial |
| 6 | testimony of those witnesses, we won't need to call them live |
| 7 | to testify. |
| 8 | THE COURT:  Put it in for what purpose? |
| 9 | MR. LARKIN:  It would be to demonstrate the evidence |
| 10 | that was before the jury the first time. |
| 11 | THE COURT:  With respect to prejudice, you mean? |
| 12 | MR. LARKIN:  With respect to prejudice.  So that this |
| 13 | jury could assess whether there was any prejudice in the first |
| 14 | trial by reason of the omission. |
| 15 | THE COURT:  Let's then hold off on this one, this |
| 16 | motion and get to, I guess -- it's not really your motion in |
| 17 | your motions in limine.  This came up in your letter, |
| 18 | Mr. Garber.  I don't think you made -- you made a motion in |
| 19 | limine to include in transcripts and grand jury testimony until |
| 20 | your April 16 letter, right? |
| 21 | MR. GARBER:  No.  In my motion in limine I did address |
| 22 | the issue of using trial transcripts for our presentation.  And |
| 23 | I raised it again because there was no ruling on it.  That's |
| 24 | why it's in my letter of yesterday. |
| 25 | THE COURT:  There was no ruling -- I mean I haven't |

E4h9mccc

1    ruled on any of the motions.

2            MR. GARBER:  Well there were some rulings that you had

3    made.  It was just an outstanding issue that I -- I reraised I

4    think a little bit more specifically in my letter of yesterday.

5            But it's on the table now and I guess it's, you

6    know -- let me just back up a bit.  On the preclusion, have

7    you -- are you basically going to wait and see how it goes with

8    Pujols and Sosa before you decide whether or not Krutoy, you

9    know -- I guess Strain we talked about -- but Krutoy, Carlos

10   Vargas and Rak and Farooqui come in?  Is that how you left it?

11   I just want to make sure.

12           THE COURT:  The defense motion didn't include all of

13   those names.  It included some of them.  And it seems to me

14   that most of it turns on what the testimony of Pujols and Sosa

15   is because to the extent that they acknowledge that they never

16   told anybody about something, it's unclear to me why it's

17   relevant to have other people say, yeah, they never told me

18   about that, unless it's been put in issue.  So that's why I

19   think we can hold off on that.

20           MR. GARBER:  Okay.

21           THE COURT:  So, I think that we've got that covered.

22           Now the issue that came up in your April 16 letter is

23   the admissibility and use of transcripts from the criminal

24   trial as well as the Peguero perjury testimony, the testimony

25   in the perjury grand jury from Peguero.  I'm trying to figure

E4h9mccc

1    out what exactly the parties contemplate is going to go to the

2    jury on this.  Because one of the other issues that is raised

3    in your letter is that plaintiffs should be allowed to prove --

4    plaintiffs should be allowed to prove that he was exonerated

5    based upon actual innocence.  And so I guess I'm a little

6    confused as to what -- what's going to be offered to the jury

7    as a stipulated fact.

8             It seems to me the stipulated facts are that he was

9    arrested, charged and convicted and sentenced for a rape; that

10   the complaining witness recanted, acknowledged that it was

11   false, that the defendant -- the plaintiff never raped her;

12   that the conviction was overturned; and, I guess for good

13   measure, that the complaining witness pled guilty to perjury.

14   Right?  I mean that's -- it seems to me those are stipulated

15   facts.

16            MR. LARKIN:  No dispute.

17            THE COURT:  So I'm not sure what more the jury needs

18   from the initial trial than that.  But the issue, I guess, of

19   prejudice does sort of raise an issue again as to -- they have

20   to assess the impact of the Brady violation.  If they find the

21   Brady violation happened, they still are asked to find out well

22   whether it would have made a difference.  So then I think it

23   gets a little tricky.

24            Are we giving them the whole trial transcript?  Are we

25   going to ask them to just wallow through the trial and figure

E4h9mccc

| | |
|---|---|
| 1 | out whether the conduct of the defendants, if it happened -- |
| 2 | MR. LARKIN:  No. |
| 3 | THE COURT:  -- was prejudicial? |
| 4 | MR. COHEN:  Your Honor -- |
| 5 | THE COURT:  Let's give Cohen a chance.  I haven't |
| 6 | heard from him.  I miss him. |
| 7 | MR. GARBER:  I'm going to step out. |
| 8 | Let's take a break for a minute. |
| 9 | MR. COHEN:  Your Honor, also I ought to let you know, |
| 10 | I have another matter I have to be at in the other building at |
| 11 | noon.  I can get there a few minutes late.  I'd like to address |
| 12 | this point. |
| 13 | THE COURT:  Before -- address this point and then |
| 14 | we'll take a break. |
| 15 | MR. COHEN:  I just want to make it clear what our |
| 16 | position is with respect to what we have -- what the |
| 17 | constitutional violation is and the result that we think would |
| 18 | adhere because of it. |
| 19 | If, in fact, the jury determines -- I mean it's a |
| 20 | given that they were state actors so that's not a problem -- |
| 21 | but if, in fact, the detectives -- if they find that the |
| 22 | detectives did suppress the Brady -- suppress evidence which |
| 23 | you've said was Brady material, then we've proven that there |
| 24 | was an unfair trial regardless of what the jury at the criminal |
| 25 | trial may, in fact, have done with the evidence if they had |

E4h9mccc

received it; that is, whether there would have been an

acquittal, whether it would have been a hung jury, whether

there still would have been a conviction.  Because it would

have been an unfair trial.  That is a trial in which you don't

have confidence in.  The verdict would not be competent.  But

they may have heard the evidence and come up still a

conviction.  It's quite possible.  There's still the violation.

The jury would then be -- I don't know, we believe that your

Honor should instruct them that if they find that the

detectives did what -- did not do what we said or did violate

his constitutional -- Mr. McCaffrey's constitutional rights,

the trial was not fair and they find for the plaintiff.

        The next issue is if, in fact, the jury determines,

based upon the evidence at the trial that, in fact, the

suppression of this evidence actually resulted in a conviction

when it might not have -- when it shouldn't have been a

conviction, then we're talking about something beyond just, as

the cases say, nominal damages for a violation of your right to

a fair trial.  And then we're talking about significant damages

based upon the fact that their actions caused him to spend

years in prison.  So, I don't think it's a situation where even

if the jury thinks:  Well, I don't -- we're not sure if it

would have affected the criminal trial jury, they still could

find that his right to a fair trial was violated and the

verdict should be for the plaintiff.

E4h9mccc

1          THE COURT:  I'm just trying to figure out what the

2     parties are looking to introduce from the trial record in the

3     criminal case.

4          MR. COHEN:  It seems to me, your Honor, I think the

5     jury, once the jury determines that, in fact, it was an unfair

6     trial, their next issue is what are the damages.  And the only

7     way to assess that is to determine if the constitutional

8     violation which they have already found would have resulted

9     in -- caused him to spend years in prison.  And the only way

10    they can determine that is by seeing what the other evidence

11    was at the trial.

12         THE COURT:  What does that mean?  So we're going to

13    give them the entire trial transcript?  We're going to give

14    them all the exhibits?

15         MR. COHEN:  We're not sure of that yet.  We're going

16    to go through it all and see.  But this certainly can't be done

17    in a vacuum.

18         THE COURT:  We're a week away from the trial.

19         MR. COHEN:  That decision has to be informed by what

20    at least some of the other evidence was.

21         MR. GARBER:  They have to --

22         THE COURT:  That still doesn't tell me what it is

23    you're trying to introduce.

24         MR. GARBER:  Okay.  The jury is going to be called

25    upon to say, look, if you believe that the --

48

E4h9mccc

1          THE COURT:  I get what the jury is going to be called

2     on to do.

3          What are you trying to introduce?  What do you want to

4     introduce?  Just this whopping big transcript?

5          MR. GARBER:  No, no.  In fact, I've said in my filings

6     that's exactly -- we don't want to do that.

7          THE COURT:  What do you want?

8          MR. GARBER:  We want excerpts.  So we want them to

9     know what this trial was about.  We want them to know how weak

10    the evidence of guilt was in this case.

11         THE COURT:  So you're going to call a witness who is

12    going to tell them that the evidence was weak?

13         MR. GARBER:  No.  No.  No.

14         THE COURT:  What are we talking about?

15         MR. GARBER:  The testimony of -- portions of the

16    testimony of Peguero; what witnesses testified to; the

17    significance of the bite mark to the jury at that first trial.

18    It was argued on summation by both parties.  And that's really

19    where the case came to a head.  And they should understand --

20         THE COURT:  But this sounds like a summation, I mean.

21    So I'm asking:  What are you trying to introduce?

22         MR. GARBER:  I think that there will be excerpts.

23         MR. LARKIN:  Plaintiff has not told us which portions

24    of the trial they want to rely on.  I have a pretty good idea

25    of what we would want to rely on.  I think we would want to

49

E4h9mccc

1    introduce, for example, the portions of Peguero's testimony

2    where she described the bite mark; most of her direct

3    examination, which the jury found compelling.  I think we would

4    want to introduce Delacruz who was the garage attendant.

5         THE COURT:  Let me stop you just because all of that

6    makes sense.  But it seems to me you folks have got to huddle

7    up and figure out --

8         MR. LARKIN:  Exactly.

9         THE COURT:  -- what it is you agree should be coming

10   in and how it ought to be coming in, and what you don't agree

11   on, and then I'm going to have to resolve that.

12        MR. GARBER:  That's fine.

13        THE COURT:  Clearly the jury is going to have to hear

14   something about what happened at this trial and what the trial

15   was about to assess whether there was a Brady violation which

16   includes prejudice; and if they find that, then to assess

17   damages.  Seems to me that they're going to have to have

18   something about the trial.

19        Now I guess there are ways you can do it where you

20   just say they can have it all, jury instructions and

21   everything.  But I don't think that's a real efficient way to

22   do it.

23        MR. GARBER:  But why -- I'm not sure why the Court

24   thinks we want to do that.

25        THE COURT:  I'm not sure.

E4h9mccc

1          MR. GARBER:  We want to streamline this.

2          THE COURT:  My point is I don't know what the hell you

3     want to do.  All right.  You've told me you want to do a

4     PowerPoint and whistles and songs.  I don't care.  I need to

5     know what it's going to be.  He needs to know what it's going

6     to be.  So you guys have got to huddle up and let me know what

7     it is.

8          MR. GARBER:  That's fine.  No problem.

9          THE COURT:  That's my point.

10         MR. LARKIN:  Can I make a request, your Honor.  If

11    plaintiffs can get us by Monday the portions of the trial they

12    want to designate we can get there -- we can get designations

13    to them by Wednesday or even by Tuesday.  And we can then

14    figure out what it is.

15         THE COURT:  That's what you're going to have to do.

16    We have a trial that starts a week from Monday.

17         MR. LARKIN:  We can do that.  Perhaps -- I believe

18    your Honor anticipated having us back in.

19         THE COURT:  Yes.

20         MR. LARKIN:  We could address that issue at that point

21    and then we'll all be set.  We'll be copacetic and we'll know

22    what's coming in and what's not coming in.

23         THE COURT:  It may not be copacetic because there

24    might be a lot of disagreement.  But obviously everybody has

25    got to give a lot of serious thought as to what exactly is the

E4h9mccc

1     jury going to know about that prior trial and what are they

2     going to have to take with them in the jury room on this.  So,

3     I do want that by Tuesday.  Okay.

4              All right.  Do you want to take a quick bathroom break

5     and you can leave if you have to?

6              MR. COHEN:  I do.  I'm sorry.

7              THE COURT:  But Mr. Garber can hold up your end.

8              MR. COHEN:  He's done very well so far.

9              Before you I leave, though.  Your Honor is going to

10    have another conference next week, I believe.  So I'd like to

11    be part of that discussion so I can make it.

12             THE COURT:  What days were we saying?

13             MR. COHEN:  Wednesday is a good day.

14             THE COURT:  You gave me a list or something.

15    Wednesday is the 23rd.  We could do it 2:00.

16             MR. COHEN:  That's fine.

17             MR. GARBER:  That's fine.  Okay.  All right.

18             THE COURT:  2:00 Wednesday.  And then what I'd like by

19    Tuesday at the latest is the exhibits and a more fleshed-out

20    set of objections to the exhibits and, you know, make sure it's

21    really only ones that you really object to and have a

22    snowball's chance in hell of getting -- being sustained on, and

23    then this trial stuff.  Okay.  So let's take a quick break and

24    then we'll resume but I have another matter at 12:15 anyway so

25    we're going to have to cut this relatively short.

E4h9mccc

1          Mr. Cohen I'll see you soon.  So we'll come back here

2     in about five minutes.

3          (Recess)

4          THE COURT:  Where we had left off was with your

5     letter.  So the trial, the criminal trial you're going to get

6     back to me on by Tuesday.  Is there something you wanted to

7     say?

8          MR. GARBER:  I've been talking to Mr. Larkin about it.

9     We're in agreement it should be a streamlined thing, just to

10    give the jury a baseline.  But the bells -- I'm not a

11    PowerPoint guy.  But the question --

12         THE COURT:  I'm not accusing you of anything.  All I

13    want to know with specificity what it's going to be.

14         MR. GARBER:  This is the question though on that.

15    Because I'm going to start really digging in this weekend on

16    how it should be presented.  Are you adverse to a PowerPoint as

17    opposed to binders?  I just want it to be something the jury

18    can see or read and get an understanding.  And we'll discuss

19    amongst ourselves what we think is relevant.  There's going --

20         THE COURT:  I'm not adverse to a PowerPoint.

21         MR. GARBER:  Okay.  Fine.

22         THE COURT:  It seems to me this ought to be a

23    stipulation as to what key facts are relevant about that trial.

24         MR. GARBER:  We think that's going to happen.

25         THE COURT:  So they can take a variety of forms.  Just

E4h9mccc

1    read a stipulation or hand in a written stipulation which is an

2    exhibit that they can take back to the jury room.  A PowerPoint

3    is fine if the parties can agree to it.  My concern is that

4    there is going to be less agreement than appears today to be

5    the case and if there's a disagreement we need to resolve it

6    pretty quick.  So by Tuesday you'll tell me what you've agreed

7    on, what you disagree on.

8              MR. LARKIN:  Yes, your Honor.

9              THE COURT:  So, I think the rest of the issues that

10   are teed up in your letter from yesterday Mr. Garber, I want to

11   give Mr. Larkin a chance to respond to, and he hasn't had that

12   chance yet.  And that includes failure to investigate

13   information received from Rak, whether that's relevant to this

14   case and this trial.  The next is the false information

15   forwarded by defendants to the prosecutor and Diaz's alleged

16   perjury.  I think that is relevant.  Of course it's hotly

17   disputed as to whether that happened, I assume.  So I'm not

18   sure -- I'm not sure what exactly you intend to introduce but I

19   want to give Mr. Larkin a chance to respond.  And then the next

20   thing is that plaintiffs should be allowed to prove that he was

21   exonerated based upon actual innocence.  I've already teed this

22   up and talked about this and what it means.  I think this

23   really goes to what the jury is going to be allowed to hear

24   about the underlying trial.  If there's more to it than that,

25   then talk to Mr. Larkin so he knows what he's responding to.

E4h9mccc

1    But, for example, the fact that there is a DNA test that

2    corroborated the recantation of Peguero.  I mean that might be

3    relevant, but I don't know if that opens then the door to a

4    witness who is going to say that this DNA test wasn't available

5    at the time that the trial took place and the detectives were

6    investigating it.  So I think -- I want to give Mr. Larkin a

7    chance to respond.

8            So, Mr. Larkin, I'd like you to respond no later than

9    Tuesday, sooner if you can, so that we'll tee that up then for

10   the Wednesday conference as well.

11           MR. LARKIN:  Thank you, your Honor.

12           THE COURT:  Now your letter raised two points,

13   Mr. Larkin, your letter from yesterday.  I've already ruled on

14   the 609 issue for the 2013 conviction.  I guess I'm going to

15   hear a little more about whether there are other convictions

16   that also you're going to seek to introduce.  So you're going

17   to let me know that by Tuesday.

18           MR. LARKIN:  Yes, your Honor.

19           THE COURT:  The last bit, though, of your letter

20   relates to the admissibility of the plaintiff's statements when

21   he was arrested.  And Mr. Garber hasn't had a chance to respond

22   to that.  But I'll tell you candidly I can't imagine any

23   scenario under which I'm going to let that in.  It's only a 32.

24   I meant allegedly.  I mean it seems to me that's all

25   principally designed to show that Mr. McCaffrey is a bad guy

E4h9mccc

1   and kind of a thug, and I don't think that's really relevant to

2   any of the issues at this trial.  So, I don't see that coming

3   in.  So don't expect on getting that.  Okay.

4          So let's just recap where we -- what we need to do.

5   What I would like by Tuesday are copies of the exhibits and if

6   there are objections to the exhibits, a submission explaining

7   in more than a word or two what the objection is so that I can

8   be in a position to rule on those on Wednesday.

9          I'd also like the final joint requested charge.  I

10  mean Mr. Larkin -- excuse me Mr. Garber you had talked about

11  that you guys were still working on some things and tailoring a

12  couple of instructions.  I'd like to have the final joint

13  requested charge no later than Tuesday.  Where there are

14  disagreements, lay out your respective positions so it's clear

15  to me where you disagree.  You've done that to some extent

16  already but it doesn't seem like it's final.

17         MR. LARKIN:  Not quite.  That should be submitted in

18  Word format, your Honor?

19         THE COURT:  Yes.  So I can cut, paste, and edit

20  quickly.

21         MR. LARKIN:  Understood.

22         THE COURT:  I'd like your agreed-upon and, if there

23  are disagreements, the respective portions of the trial

24  testimony from the criminal case that you intend to introduce.

25         And then I also would like a summary of what

E4h9mccc

1    Mr. Garber intends to elicit from Mr. McCaffrey regarding his

2    experience in jail so I can rule on the outstanding issues.

3            So I think that's what I need.  I'll issue a short

4    order that memorializes these requests but I want those by

5    Tuesday so I can be prepared on Wednesday.

6            So let's say Tuesday at -- by 2:00 I'd like them so I

7    can then have the evening of Tuesday to prepare for a Wednesday

8    conference.  Good.

9            MR. LARKIN:  Yes, your Honor.

10           THE COURT:  All right.  Anything else we should cover

11   before I cut you loose?  Plenty to do between now and next week

12   and of course plenty to do between now and a week from Monday

13   when the trial begins.

14           Jury selection will be pretty straightforward.  I

15   think we'll have eight jurors is my contemplation.  Is that

16   good with everybody?

17           MR. LARKIN:  Yes, your Honor.

18           THE COURT:  They'll all deliberate.  I'll send out the

19   final voir dire next week so you know what I'm planning to do;

20   and if you have objections, you can tell me on Wednesday.  But

21   I generally don't make too many changes to what I've put in my

22   final draft.

23           I think the whole thing shouldn't take too long.

24           Think about whether Mr. McCaffrey wants to be present

25   if we have sidebars of things.  I mean it makes it logistically

57

E4h9mccc

 1   tricky.  Think about clothing for Mr. McCaffrey.

 2            MR. GARBER:  Absolutely.

 3            THE COURT:  The marshals are going to be here.  They

 4   will be here discretely.  So it creates some logistical issues,

 5   much like it would in a criminal trial.  It's not quite the

 6   same problem because a defendant in a criminal trial has

 7   different rights than a plaintiff in a civil trial.  But I

 8   think we should do everything we can to avoid highlighting the

 9   fact that Mr. McCaffrey is currently in custody.  It may come

10   out on cross.  But, I don't think we should highlight it during

11   jury selection, certainly.  So, think about that.

12            Mr. Garber, how you want to do sidebars and things in

13   light of the fact that it's hard for Mr. McCaffrey to move

14   around the courtroom.  Often it's the case that the clients

15   don't generally want to participate in the sidebars very much

16   but it's his call if he wants to be there.

17            MR. GARBER:  Okay.

18            THE COURT:  Anything else?

19            MR. LARKIN:  Just briefly, your Honor.  The two

20   statements that I had addressed in my letter of yesterday's

21   date.  I suspect that depending on what the testimony is on

22   direct about his experience in jail might not -- might that not

23   open up the door?

24            THE COURT:  The fact that he made some smart ass

25   comments to a cop about the gun and the charge?

E4h9mccc

1          MR. LARKIN:  The reason being, he's going to talk

2     about the experience of being in prison and how difficult it

3     was for him, is what I suspect, and how traumatizing it was and

4     how difficult it is for him to deal with law enforcement.  I

5     think that is going to be implicit or explicit in his

6     testimony.  And I think that the statements clearly reflect a

7     very different outlook on things.  I think it's much fairer

8     that the jury hears those statements than that the jury is left

9     with the impression -- with the contrary impression.

10          THE COURT:  What is the contrary -- because he mouths

11     off to the cops, they can infer that his time in jail for a

12     crime he didn't commit was a piece of cake, not such a big

13     deal, sort of like a day at the Y for you and me?  It's not

14     coming in.

15          MR. LARKIN:  No, of course not.

16          THE COURT:  In any event, I've ruled.  So that's not

17     going to come in.

18          Now if after he testifies you want me to revisit it,

19     you can always raise it.  I never refuse to ever revisit

20     anything, but I think it's going to take an awful lot to get me

21     to change my mind.  And I've ruled for now.  Okay.

22          MR. LARKIN:  Thank you, your Honor.

23          THE COURT:  Mr. Garber, anything else?  You get the

24     last word.

25          MR. GARBER:  No.  I don't need that.

E4h9mccc

1          THE COURT:  So get me all that stuff in a timely

2    manner so that I can be prepared on Wednesday.

3          MR. GARBER:  Very good.

4          THE COURT:  Let me thank the court reporter and if

5    anyone needs a copy of the transcript you can, of course, take

6    that up with her but do that later because we've got another

7    civil matter.

8          Let me thank the marshals for their time as well.

9          (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25