E4NAAMCCC                    Conference

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   WILLIAM MCCAFFREY,
4                   Plaintiff,
5             v.                            11 CV 1636 (RJS)
6   CITY OF NEW YORK, ET AL.,
7                   Defendants.
8   ------------------------------x
                                           New York, N.Y.
9                                          April 23, 2014
                                           2:15 p.m.
10
    Before:
11
                      HON. RICHARD J. SULLIVAN,
12
                                           District Judge
13
                            APPEARANCES
14
    IRVING COHEN
15       Attorney for Plaintiff McCaffrey
16   GLENN GARBER
         Attorney for Plaintiff McCaffrey
17
    NEW YORK CITY LAW DEPARTMENT
18       Attorneys for Defendants NYC, et al.
    BY:  ARTHUR G. LARKIN, III
19   VICKI B. ZGODNY
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1        THE COURT:  Have a seat.

2        (Case called).

3        MR. GARBER:  Glen Garber, for William McCaffrey.

4   Good afternoon

5        MR. COHEN:  Irving Cohen.

6        THE COURT:  Good afternoon.  For the defense?

7        MR. LARKIN:  Arthur Larkin, City Law Department.

8        MS. ZGODNY:  Vicki Zgodny, for the defendants.

9        THE COURT:  All right.  Good afternoon.

10        First of all, I mean I had ordered a number of things

11   to be produced to me at our conference last week and so I

12   thought I was pretty clear.  Page 55 of the transcript on the

13   record:  What I would like by Tuesday are copies of the

14   exhibits and if there are objections to the exhibits a

15   submission explaining in more than a word or two what the

16   objection is so that I can be in a position to rule on those on

17   Wednesday.  So that's what I asked for and then I issued an

18   order, a written order memorializing that request.  The parties

19   shall produce the proposed exhibits, provide detailed

20   objections to those exhibits and then other things as well.

21        So, I was quite surprised yesterday, Mr. Garber, when

22   I didn't get those things from you.  You seemed to express

23   surprise to my law clerk as to what we were asking for and why

24   we were calling you and then didn't get anything at all with

25   respect to your objections and didn't get the exhibits in until

1    today.  So, what's up?

2              MR. GARBER:  My apologies.  My apologies.  I did not

3    have them together.  And then I thought that the exhibit list

4    which we had sent, OK, was going to be sufficient.  We were

5    putting binders together and it took me more time than I

6    thought.  And I conferred with Mr. Cohen and I said, I think

7    we're supposed to -- he wasn't here at the end.

8              THE COURT:  There was an order.  I issued an order.

9              MR. GARBER:  Not only that you said at the end on the

10   record, OK, so it was just -- look, small staff.  I was pulling

11   it together and I didn't get it in time and my apologies for

12   submitting it this morning.

13             THE COURT:  You didn't submit any of the objections,

14   right?

15             MR. GARBER:  Well, I thought, OK, that they were going

16   to give us another set of exhibits but it was the JPTO that

17   they told us about this morning that's when we put in our

18   exhibits.  So, all I could tell you is that my objections on

19   April 16 to the grand jury testimony from Peguero was raised

20   substantively and the other things are just documents.  I think

21   hearsay is very straightforward on that.  I could amplify that

22   more if you want on the record but --

23             THE COURT:  I did want that.  I did want you to do

24   that.  So going forward you'd better comply with court orders.

25   You don't get to sort of pick and choose and comply to some and

E4NAAMCCC                        Conference

1  not others, OK.  I shouldn't have to tell you that.

2          So, I did get the defendants' submission.  So, I guess

3  there are a number of things that I will have to rule on.  I

4  want to start first with the memo to Mr. Dwyer that I've

5  reviewed in-camera.  There's a work product privilege that's

6  being asserted.  It's not an ironclad privilege.  It could be

7  overcome.  But having reviewed the memo I don't think that

8  there's any need to produce that to the defendants.  I don't

9  think it really contains much that would be relevant to a

10  cross-examination of Mr. Dwyer and I'll docket it under "seal".

11  So if there is ever an issue for an appeal, if there is one

12  that the circuit -- regular to but that's my ruling.  So that,

13  the work product privilege has not been overcome.  I am going

14  to keep that from the defense unless something happens at trial

15  that causes me to revisit that, OK.

16          MR. LARKIN:  Thank you, your Honor.

17          THE COURT:  All right.  So there were a number of

18  issues that were raised last time including issues that were

19  put forth in the plaintiff's April 16 letter the defendants did

20  not have an opportunity to respond to.

21          I think that the first relates to the admissibility

22  and use of transcripts from the criminal trial.  Defendants I

23  think acknowledged that that issue is now mooted since the

24  parties have now come to an agreement as to how they wish, what

25  they wish to present to the jury concerning the criminal trial.

1   I am still candidly fuzzy as to what's going to the jury and

2   how this is going to be teed up for the jury, whether it's

3   going to come in through witnesses or stipulations or something

4   else.  So, perhaps, you can all enlighten me on that but it

5   doesn't sound like there is a live objection.

6           MR. GARBER:  OK.  I submitted this today.  This was

7   late.

8           THE COURT:  Well, that's a bunch of stuff.

9           MR. GARBER:  What it is, it's excerpts from the trial

10  that we believe are relevant excerpts that we wanted to read in

11  to the jury which I think it's probably about two hours.  I pay

12  pare it down more but those are the relevant excerpts of the

13  trial from the plaintiff's perspective.

14          THE COURT:  And you are going to present it how?

15          MR. GARBER:  I was going to read it.

16          THE COURT:  You were just going to read it?

17          MR. GARBER:  And we would give them binders.

18          THE COURT:  And the defendants are onboard with that?

19          MR. LARKIN:  Your Honor, our position is we have no

20  objection to any designation of testimony that plaintiff wants

21  to read to the jury.  We were going to propose having all the

22  trial testimony in one binder, not to read it all to the jury

23  but because in case one side or the other wants to refer to

24  some of it in summation and I guess the rationale would be if

25  your Honor or any judge were deciding a Brady issue, they would

1    have the record of the criminal case in front of them and they

2    would be able to refer to any part of it to make that decision.

3    And so with the exception of things like colloquy and

4    objections that were sustained, what we would propose doing is

5    having a binder with the entire testimony, all the testimony

6    and we were going to then read only the portions of the

7    complaining witness' direct examination and the

8    direct-examination of one of the witnesses, Ms. Peguero, who is

9    the examiner who examined her and other than that we were not

10   going to read anything to the jury.  So some of what we would

11   read would overlap what Mr. Garber wants to read and that would

12   be our proposal.

13           THE COURT:  So, there is a difference then between the

14   parties.  Mr. Garber is proposing excerpts from the trial.  You

15   are proposing basically the entire trial transcript minus a few

16   extraneous things that the jury shouldn't see for whatever

17   reason.  You are not planning to read it all but you are

18   planning to offer, is that right?

19           MR. LARKIN:  Offer it as in a binder for the jury's

20   reference and then in summation it would be, we might refer to

21   some or different portions depending on what comes if and how

22   we want to present our arguments.  But I just think it makes

23   sense to do it that way.  I suggest, your Honor --

24           THE COURT:  Well, I just thought you folks had come to

25   an agreement on this.  Am I wrong about that?

1          MR. GARBER:  No.  You are right about the whole

2     transcript.  We don't have an agreement on that.

3          THE COURT:  All right.

4          MR. LARKIN:  I haven't gotten any objections to our

5     designations note from your plaintiff but -- so, if there are

6     specific parts plaintiff objects to we would need to know what

7     they are and, perhaps, first thing Monday morning before we

8     even start we could, your Honor could rule on what there are

9     disputes about.

10         MR. GARBER:  This is a fundamental question I think.

11    I mean, what we submitted in our binder was stuff that really

12    both side type stuff to give a narrative of what's going on and

13    I was over inclusive but they have some other things that they

14    submitted in a index of excerpts they want.  I thought that's

15    how we were preceding.  We just learned they want to put the

16    whole trial transcript in.  And the concern I have about that

17    is that there may be then this mini trial, essentially, during

18    deliberations.  And I just think that it's going to be overly

19    burdensome for the jury if they're given this whole transcript.

20    It's over 700 pages.  And it's just going to add to the delay

21    and possible confusion and I think that's problematic.  So I do

22    think streamlining it in the way that we talked about at the

23    last pretrial conference is the right way to go and just leave

24    us to our excerpts.  We don't have to read all of a our

25    excerpts but at least we have a smaller universe to avoid the

1    problem that I was discussing.

2          MR. LARKIN:  If the plaintiff has no objection to our

3    excerpts then that's fine with us.  Put our excerpts in and

4    they put theirs in and that's OK.

5          THE COURT:  Fine with me.  Mr. Garber, have you

6    reviewed Mr. Larkin's excerpts?

7          MR. GARBER:  Yes.

8          THE COURT:  Do you have any objections?

9          MR. GARBER:  There are -- can I confer with my

10   co-counsel for a moment?

11         THE COURT:  Yes.

12         (Pause)

13         MR. GARBER:  I just want to present something to the

14   Court because it will be give us guidance on this.  The types

15   of things that we would object to.  And I'll just give you an

16   example.  Ramon Ribe was a defense witness and he gave a

17   narrative that's consistent with what Mr. McCaffrey testified

18   to.  When we submitted our part we streamlined it just like his

19   account of what happened.  But there's a whole other layer to

20   it which is that he is cross-examined about his prior criminal

21   history and things of that nature.  We took that stuff out from

22   all of our presentations in our binder.  I think they are going

23   to want that in.  Now, there's an argument to be made that that

24   just distracted because we really want the content here.  So I

25   don't know, you know so I would object on that ground to that

1    type of testimony, impeachment type testimony with prior

2    criminal histories, for example.  McCaffrey was impeached with

3    his prior criminal history.  I think he might be different than

4    a fact witness like Aribe for this trial because it would have

5    prejudicial effect but that's another area I would object to.

6    So, I am giving you, simply page by page I am giving you the

7    areas that we would object to in their transcripts.  I think

8    that that does distract and that would be a 403 problem for

9    this jury.

10             MR. LARKIN:  Your Honor, all of that would be relevant

11    because the jury, the first jury heard it.  And the arguments

12    going to be that assuming that these statements that were

13    allegedly made were actually suppressed by the police

14    detectives, they would have had no impact on the outcome of the

15    trial in the first place any way.  That would be our position.

16    And then we would be permitted to argue to the jury why we

17    think that's the case.  And one of the many arguments we would

18    have is that the first jury had an opportunity to assess the

19    credibility of a defense witnesses based on the stories they

20    gave and the information, all the information that they had.

21    So that's why we designated those portions.  Again, I don't

22    know that we read them to the jury.  I think that that might

23    just consume time.  That done need to be consumed by that.  But

24    I do think it's relevant for our defense.

25             THE COURT:  Well, if might well be relevant.  It's

1    kind of why I wanted to have this teed up and ready to go to

2    today.  That's why we put over the pretrial conference from

3    last week to today so that you could either stipulate or agree

4    to the portions that are coming in or if there were

5    disagreements you could articulate what the disagreements are

6    and then I could resolve them.  But right now I am told that

7    there might well be things that you disagree about and I am not

8    sure when I'm supposed to rule on those but it kind of defeats

9    the purpose of having a conference today.

10          MR. LARKIN:  Again, any designations plaintiff has we

11   do not object to.  I don't have -- I gave the plaintiff all my

12   destinations, page and line, yesterday.  I didn't have any

13   objections yesterday.  If they have objections maybe the best

14   thing to do is to have a submission by tomorrow at some time

15   and we'll replay on same business day.  I will do that, your

16   Honor.

17          MR. GARBER:  But to advance the ball here I mean

18   because going through page by page, OK, is a laborious process

19   which we can do and we will do tonight or whatever if we have

20   to but there's areas and I think that just like what I said

21   impeachment material --

22          THE COURT:  So areas you mean I'll get to go through

23   it page by page and decide?

24          MR. GARBER:  No.  No.

25          THE COURT:  They want to get in the whole transcript

1   or virtually the entire transcript.  To the extent that you are

2   objecting then I think you have to -- articulate what the

3   objections are and those have to be tethered to the specific

4   portion of the transcripts.  I don't know how else to do this.

5   If you can all agree as to what was coming in then that

6   wouldn't be hard but it seems like there's tremendous

7   disagreement but just no specifics.  So, I guess, I mean

8   assuming that they are going to come in unless there are

9   objections and unless I have time to deal with the objections.

10  But this is not the way it's supposed to work and certainly not

11  the way I anticipated this is how it is going to work in light

12  of pretty explicit instructions last week.  So I am still

13  scratching my head about this.

14          MR. GARBER:  OK.  So, I would raise you know that and

15  just isolating my client's testimony.  He is impeached about

16  his prior criminal records and that's a run around the order

17  that you issued or at least the preliminary order that you

18  issued last time which is that they can question him about the

19  gun possession and in a limited fashion that you were convicted

20  of possession of a weapon and I believe it's a felony.  I think

21  that was the extent of it.  But there's other things that came

22  up during his testimony at the trial which would then run

23  around, OK, the ruling.  I am concerned about that.  I don't

24  know if you want me to articulate that in the letter.

25          THE COURT:  Yeah.

1          MR. GARBER:  In addition to all the other specific

2     objections or you want to address that now because that seems

3     to me to be a very discrete issue.

4          THE COURT:  That requires me to have the pages of the

5     transcript that you are referring to and to consider what is

6     actually in the transcript and then to hear argument as to what

7     is the basis for an objection and whether there's authority

8     that supports it.  I don't think it's -- I mean it is going to

9     require a fairly specific discussion of why you are rejecting

10    what you are objecting to and give Mr. Larkin an opportunity to

11    respond.  So, yeah, I'll want those by tomorrow.

12         MR. GARBER:  OK.

13         MR. LARKIN:  If we reply within 24 hours, your

14    Honor -- in any event longer than 24 hours --

15         THE COURT:  All right.  The next issue that was to be

16    addressed to the defendant's failure to investigate information

17    received from Detective Rack, plaintiff's argument that it's

18    relevant to their fair trial claim.  Defendants, I guess,

19    disagree but concede that the plaintiffs can ask questions

20    about the investigation.  Defendants are, nonetheless,

21    suggesting and arguing that the Court should instruct the jury

22    that there is no independent duty to investigate no claim

23    failure to investigate.  I think that's accurate.  I think I'll

24    need to instruct the jury about that what I think the failure

25    to investigate is relevant to a number of things including the

1    intent and knowledge of the defendants and, potentially, the

2    damages as well.  So I think that that's fair ground for cross

3    but I think a limiting instruction is appropriate.  So, I'll

4    take any proposals of limiting instruction but I think it's

5    fair game for cross.

6            MR. LARKIN:  I think, your Honor, we did submit a

7    proposed instruction for the Court on the failure to

8    investigate for your Honor's considering.

9            THE COURT:  That says part of the final --

10           MR. LARKIN:  Yes.  And we did have the authorities.

11           THE COURT:  OK.

12           MR. GARBER:  Just so the Court is aware, we then in a

13   footnote in that section we said if the Court is inclined to

14   give that charge there's some additional language that we ask

15   which is essentially can we utilize for them to decide other

16   issues in the case.  But I have a general objection which is I

17   don't think you need to give a charge on failure to investigate

18   because there's only one claim going to this jury which is fair

19   trial claim.

20           THE COURT:  Right.  I am just going to remind them.

21           MR. GARBER:  The reason I object is to make clear we

22   are lawyers and we're looking at from summary judgment

23   perspective reading appellate law, so we understand based on

24   your decision that a failure to investigate cannot be an

25   independent claim.  But that's way beyond the jury.  So they

don't need to understand the legal details surrounding that.  I
don't see why it tends to minimize the significance in my
opinion of the failure to investigate and how it can impact
their decision making.  It's not a claim.  So why do they need
to be told it is not a claim?

        THE COURT:  Because I don't want them to be confused
into thinking that a legitimate claim and that if they find a
failure to investigate that he can find liability.

        MR. GARBER:  OK.

        THE COURT:  Potential damages that they want limiting
instructions therefore to avoid confusion.  So I expect I will
give a limiting instruction but I think I'll probably give a
limiting instruction at the time the -- comes in as well but
we'll talk about that before.

        All right.  Next issue is with respect to the alleged
false information forwarded by defendant to the prosecutor and
Diaz's alleged perjury.  I think there is no independent claim
about these things but I think they're relevant with respect to
cause of action that exists.  I think there is going to be a
lot of argument as to whether there was a perjury and knowledge
and bad faith and I think that the cross is going to be allowed
to explore that.

        MR. LARKIN:  May I?

        THE COURT:  Sure.

        MR. LARKIN:  There is of course immunity for all

1   witnesses and could we submit a very short instruction

2   requesting instruction on immunity for witnesses?  Forgive me.

3   I don't have the charges right in front of me and I don't

4   remember if we put one in.  But it would be more no more than a

5   paragraph.  Perhaps, if there is going to be cross-examination

6   about false testimony or the same reason that you had a limited

7   charge on failure to investigate, the charge might be something

8   like:  The jury cannot find liability based solely on that but

9   you may consider it for state of mind or other purposes.

10          THE COURT:  Do you want to submit a limiting

11   instruction and I'll a take a look at it.

12          MR. LARKIN:  Thank you very much.

13          THE COURT:  All right.

14          MR. GARBER:  I would likely have the same objection.

15          THE COURT:  Let's see what the instruction is and you

16   can object or propose something else.

17          The next issue is with respect to whether plaintiffs

18   should be allowed to prove plaintiff was exonerated based on

19   actual innocence.  I don't think there is any disagreement as

20   to what the facts are here, right?  It's not a question of

21   finances.  Although, there were some irregularities he was

22   still guilty.

23          MR. LARKIN:  We're not arguing that, your Honor, no.

24          THE COURT:  So, I am not sure why it's relevant to get

25   deep into other evidence that shows that the defendant was,

E4NAAMCCC                  Conference

1    that the plaintiff, the defendant in the criminal case was

2    innocent and not guilty of the charges that he was convicted

3    of.  I think that's clear upfront.  It's a stipulated fact,

4    right?

5            MR. LARKIN:  We can -- it's just a very short

6    stipulation.  I'll even state it on the record if the Court

7    wants.  The complaining witness admitted she lied when she

8    testified in grand jury and when she testified at trial

9    McCaffrey raped her.  She admitted it.  She pled guilty to

10   perjury and she was deported.  Those facts are not going to

11   be --

12           MS. ZGODNY:  Just one moment, your Honor?

13           (Pause)

14           MR. LARKIN:  We're not going to dispute those facts,

15   your Honor.

16           THE COURT:  Candidly, I would like to when I'm doing

17   the voir dire, give the jury a little more detail about what

18   the case is about and what is currently in the proposed voir

19   dire that basically says that he was charged and tried and

20   convicted and sentenced for rape.  And subsequent to that the

21   complaining witness came forward, recanted and the defendant's

22   conviction was overturned.  He's now here bringing claims, and

23   explain what the claims are.  And that is sort of the starting

24   point for the trial.  I think it tees up what the case is

25   about.  What are the stipulated facts?  And I think it will

1   give the jury a much better idea of where we're going and what

2   this case is about.  So, if the parties want to huddle up and

3   get together on a paragraph or so that I can present to the

4   jury when describing the case initially, I think that would go

5   a long way towards clearing up any confusion and streamlining

6   the case.

7           MR. GARBER:  No problem.

8           MR. LARKIN:  No problem.

9           MR. GARBER:  But I do want to address the concern I

10  have about explaining his innocence being found exclusively on

11  Ms. Peguero's recantation.  That's not the truth.  The truth is

12  that it was a three-pronged basis.  It was not only Peguero's

13  recantation.  It was the DNA evidence and it was the statements

14  that came forward about the fight that is in Judge Carruther's

15  decision.

16          THE COURT:  Why does that matter?  If there is no

17  dispute that the plaintiff is innocent of the charges that he

18  was convicted on, why does it matter that there were other

19  factors that the Court considered in reversing, in overturning

20  the conviction?

21          MR. GARBER:  The concern I have about it is that I

22  anticipate the defense is going to argue that really Peguero's

23  to blame for all this and the police, the defendant, didn't do

24  anything wrong and she's the fall guy, OK.  She came in here

25  and she lied.  And at the of the day, ladies and gentlemen,

1   that's what it's about, you know.  And but that's not what this

2   was just about because --

3       THE COURT:  Well, you'll be free too argue that and

4   they will be free to argue that but I am not sure why it

5   matters what the basis for overturning the conviction was.

6   It's basically asking the jury to adopt Justice Carruther's

7   view or somebody else's view and I think the sole issue for the

8   jury is to decide whether the defendants deprived the plaintiff

9   of a fair trial.

10      MR. GARBER:  Well, I think if the jury's deliberating

11  and they say, you know, what was this guy exonerated on anyway,

12  and they go, well, the judge told us it's only the recantation

13  of Peguero, you know, and but it wasn't.  There was evidence

14  also that surfaced which was DNA and the true stories from Sosa

15  and Pujols.  I just don't want them to be able to use your

16  words, OK, to tie into an argument by the defense which is that

17  this really was about, OK, Peguero exclusively and it's not,

18  OK.  It was a multifaceted basis for that exoneration.

19      And I am not saying guild the lily on this but I am

20  just saying since you are going to give a narrative and this is

21  the truth this should just say he was exonerated based on these

22  three things, end of story.  I just think it's fairer and it

23  won't cause them to go off on the tangent that I am afraid they

24  are going to go off on which would give the defense an unfair

25  advantage.

1          MS. ZGODNY:  If I could just make two quick points.

2     First of all, the defendants would agree with the Court that

3     the narrative that the Court just gave in terms of the

4     plaintiff was convicted of rape and later the victim recanted

5     and Mr. McCaffrey was exonerated.  And nothing beyond that, I

6     don't think, the jury needs to know that she was prosecuted for

7     perjury and she spent time incarcerated and deported.  But the

8     defendants need to work that out and we'll work that out with

9     the plaintiff, your Honor.

10          THE COURT:  Well, see what you can stipulate to.  My

11     goal is not to endorse one narrative or another.  My goal is to

12     be able to provide the jury with what are effectively

13     stipulated facts that gives them context.  That's really the

14     only thing I had in mind.  There are a lot of arguments as to

15     what went on at trial and what mattered at the trial and I am

16     not looking to preclude people from making argument.  I am

17     trying to give the jury some context and to avoid the need to

18     get into things like the DNA issue and why that is a relevant

19     issue in this case.

20          MS. ZGODNY:  Your Honor, if I may just add, we also

21     feel that the defendants would be prejudiced by the fact that

22     the DNA testing that was done at the time with Mr. McCaffrey's

23     conviction or arrest was not as advanced as it was years latter

24     when retesting was done.  So --

25          THE COURT:  If any testing would have come in about

1   the DNA test being part of the basis for the exoneration I

2   think it would only be fair to allow you to elicit testimony

3   that this test wasn't available at the time of the

4   investigation and the trial.  But I am not sure why we need to

5   get into any of this because that's not what the trial is

6   about.

7           MR. LARKIN:  -- makes it clear that the right -- go

8   back, look back at the trial and see what was known at that

9   time.  The question is, did the defendant receive a fair trial

10  in the absence of evidence that suppressed?

11          MR. GARBER:  Just to be clear, I don't think it's the

12  intent of the Court but I am just concerned about the takeaway

13  they may have.  And just so my objection is clear, and

14  appreciate the streamlining and making it clear that he was

15  innocent and his conviction was vacated based on innocence.

16  That is the most important thing.  I am not just afraid of the

17  tangent that they may go off on which would be their own thing,

18  OK, and they may take that away.

19          THE COURT:  So huddle up.  See if you can agree on

20  language.  If you can't, then indicate where you can disagree

21  and then I can resolve those hopefully smaller areas of

22  disagreement.  I am not talking about a multipage recitation.

23  I am talking about a couple paragraphs that just tee up what

24  that case is about in the voir dire, all right.

25          The next issue is plaintiff's anticipated testimony.

1   I did receive from plaintiffs a summary of the testimony they

2   intend to elicit from Mr. McCaffrey.

3           MR. GARBER:  Your Honor, on the DNA there's another

4   facet to it.  In addition to proving the exoneration, the

5   grounds for exoneration I think we've just exhausted, the

6   significance of the fight is very, very important to this trial

7   and I anticipate that the defense is going to argue that it

8   wasn't that big of a deal and that's why they may not have told

9   the police about it.  But this was a significant event in which

10  Pujols bit Peguero in the article and attacked her and caused

11  all sorts of other physical injuries to her and we should be

12  able to prove that up.

13          THE COURT:  Prove what?

14          MR. GARBER:  How significant this fight was to impeach

15  or combat their claim if it comes out that oh, it wasn't that

16  big of a deal.  We were more concerned about the rape.  And the

17  fight was not something that was paramount in our minds.  This

18  was an amazing altercation, where not only was the windshield

19  kicked in of the vehicle but Peguero was bitten and bite marks

20  had significant showing at the time of the sexual assault

21  examination and the DNA shows that Pujols' saliva or DNA was on

22  bite mark.  So, I just don't want them to be able to soft pedal

23  without us being able to show, hey, this was a big deal.  In

24  fact, other DNA is on that bite mark.

25          THE COURT:  But it wasn't at the time of trial, right?

1   If they, the Brady failure was the failure of disclosure that

2   Pujols' DNA was on the bite mark, this would be a very

3   different trial but you are not arguing that.  You are not

4   going to get to argue that.  So why is it relevant to know that

5   oh, several years later the DNA revealed that it wasn't?

6           MR. GARBER:  I am not saying that at all.

7           THE COURT:  So why is it relevant?

8           MR. GARBER:  What this trial is about in many ways is

9   what happened in that room with the police when they were being

10  interviewed, OK.  This is in the beginning part of the

11  investigation and what they're saying right now in real time

12  about that conversation and whether or not they told the police

13  about the fight or not.  One of their explanations and this

14  came out during --

15          THE COURT:  Who is the "their"?

16          MR. GARBER:  Pujols, Sosa and I believe the

17  defendants, OK, is that it wasn't that important what happened

18  in that car between the women was not that significant of an

19  event and therefore we now may not have told --

20          THE COURT:  That's fine.  But why do you rebut that

21  argument by saying three years later that it was a DNA test

22  that proved that it was Pujols' saliva?

23          MR. GARBER:  Because what they're going to say is

24  that, well, I don't remember if I bit her or I didn't.  It

25  wasn't that big of a deal, you know.  And we should be able to

1   show that physical evidence through objective physical evidence

2   that's scientifically sound that it was a big deal and in fact,

3   OK.

4            THE COURT:  The scientific evidence shows it was a big

5   deal?

6            MR. GARBER:  No.  It was a big deal, in fact you bit

7   her and your DNA is on the bite mark on her arm.  So when you

8   come in here in this civil trial --

9            THE COURT:  Why does the DNA show it was a big deal?

10           MR. GARBER:  Cause it shows that Peguero was bitten by

11   Pujols.  It's a big deal.  I think that that makes it more than

12   just a little mini altercation, pushing around and hey, you

13   know what?  You left the car and you left us in the lurch and

14   we're angry at you but we love you because we are worried about

15   you.  That's not what happened.  What happened was they freaked

16   out when she came back.  They kicked the living crap out of

17   her.  They bit her, kicked a car window in.  And then when we

18   come in here in this civil trial and make it seem like this is

19   just a benign everyday walk in the park, we had a little

20   argument and maybe it got a little physical but it was no big

21   deal.  The reason we didn't tell the police is because it was

22   no big deal.  It is a big deal because she bit her -- and

23   there's physical evidence to show that and why can't we, it's

24   just to impeach.  Now, they might know that route.  But if they

25   do we should be able to show your testimony here about this

1  being no big deal.  It's not true and we have the right to tell

2  the jury why it's not true because you bit her.

3          THE COURT:  I don't think the DNA rebuts or disproves

4  the argument that it was no big deal.  I think if the witness

5  says, I didn't bite anybody or I don't remember if I bit

6  anybody then -- impeach her with the fact that her DNA was

7  found.

8          MR. GARBER:  That's it then.  That's my point.

9          THE COURT:  You can impeach her.  I don't know if she

10 knows whether DNA was found.  But I think that's different than

11 what you at least originally intended to do with the DNA

12 evidence, seems to me.

13         MR. GARBER:  Well, if the position of the Court on

14 this is that and if she denies that she bit her or she doesn't

15 know and then that would open the door, then fine, I don't have

16 to elicit it on my direct case.

17         THE COURT:  OK.

18         MR. LARKIN:  We oppose admission of the test results

19 or any certified documentation proving test results.

20         THE COURT:  Well, the issue is if the witness takes

21 the stand and says I didn't bite anybody or I don't remember

22 bitting anybody, well, can they cross her and say, you don't

23 remember biting anybody?  Do you remember giving a DNA sample?

24 And do you remember learning about a DNA test?  Does that

25 refresh your recollection?  Do you think that's a fair

1    impeachment?

2              MR. LARKIN:  That's fair.  I don't have any objection

3    to that.  And the victim gave the story the rapist bit her on

4    the shoulder and it's a pretty clear it's a story that didn't

5    happen that way.  So we are not going to take the position that

6    her statement about the bite mark on the shoulder is truthful.

7    It wasn't.

8              MR. GARBER:  I would then just ask that the -- vault

9    be opened up.

10             THE COURT:  The what?

11             MR. GARBER:  -- so that I could have it.  Mr. Larkin

12   served my subpoena on them and at least have somebody available

13   in any event that we need --

14             THE COURT:  Hold on.

15             MR. GARBER:  I don't know if you would but --

16             THE COURT:  I think this is only going to be relevant

17   if it depends on what the witness says.  And then there is an

18   issue as to whether extrinsic evidence is admissible for this

19   point or whether it's collateral.  We can deal with that I

20   think later if we have to but I think the first door that has

21   to be gone through is whether or not there's any need to

22   impeach the witness with this.

23             MR. GARBER:  I just don't want to be in a situation

24   where we're Tuesday or Wednesday in and I'm blamed because I am

25   not you know, I can't talk to them.  So I just want Mr. Larkin,

E4NAAMCCC                    Conference

 1  who is their counsel, OK, to make them available in the event

 2  that it goes to that.

 3          THE COURT:  All right.  So Mr. Larkin make sure

 4  they're available and I don't know if it's ever going to come

 5  to that since it's going to be a fast moving trial let's not

 6  get caught flatfooted, all right?

 7          OK.  Now let's talk about the anticipated testimony

 8  from Mr. McCaffrey.  So I think this is fair.  I think that

 9  this is a fair set of topics for the plaintiff to get into on

10  direct.  The real issue I guess as to what does that open the

11  door to, if anything, concerning prior time in jail?  And so

12  now that I've seen Mr. McCaffrey's anticipated testimony and

13  rereviewed the cases cited more generically last week, I think

14  I will allow the defense to get into the fact that

15  Mr. McCaffrey had served time in jail before but not get into

16  the underlying charges and not get into the underlying facts of

17  the arrest, just the fact that he had spent the time in jail

18  before which I think is relevant to the damages and relevant to

19  the garden variety psychological harm that comes from being

20  locked up.  So I think I am going to allow that for the same

21  reasons that Judge Swain and others in the Eastern District

22  have allowed it because I think it's relevant to damages given

23  what testimony Mr. McCaffrey is intending to introduce.

24          MR. COHEN:  Just on that point, the difference however

25  it that Mr. McCaffrey is serving time on a felony charge and

1    rape charge whereas, the prior time that he served was time --

2              THE COURT:  Yes.  I think --

3              MR. COHEN:  That was low level charges not in the

4    state prison.  So --

5              THE COURT:  I think that's fair.  And I think that you

6    get to get into that either on redirect or on direct but I

7    think that is fair.  He is going to get to say, well, the

8    experience was very different because for a variety of factors

9    where he was housed and what he had been convicted of.

10             MR. COHEN:  I think it's really too broad.  Your

11   Honor's ruling is too broad.  I think it's a qualitative

12   difference between you going to Rikers Island for whatever it

13   may be.

14             MR. LARKIN:  Seven months.

15             MR. COHEN:  And there was the seven months.  I think

16   it opens up an area that doesn't need to be gone into.  But --

17   so I don't think there should be any reference at all.  I

18   understand where your Honor is coming from and I think we'll

19   try to resolve it.

20             MR. LARKIN:  Your Honor, if I can just briefly so I

21   understand the Court's ruling so we can get into the date of a

22   conviction, not anything with respect to what it was for and

23   the duration of the sentence.  So, in June of 2000 you were

24   convicted of a crime and you spent seven months on Rikers

25   Island.

E4NAAMCCC                    Conference

1          THE COURT:  I just want to get into the time.  In June

2     of 2000 you were at Rikers Island.  You were there from June 1

3     to July 23.  You then were in Bronx House of Detention from

4     here to here.

5          MR. LARKIN:  And the question would be, could we ask

6     limited questions about the condition, the fact that there was

7     lack of privacy, the fact that they were strip searched several

8     times a day, the fact that you eat when you are told to eat and

9     so on and so forth because the condition was generally the

10    same?

11         THE COURT:  You can bring that up.

12         MR. LARKIN:  We are.  And then with respect to his

13    current period of incarceration, he is currently incarcerated.

14    I believe it all leans also in state prison he's going to be

15    there for another two and a half years I believe and it will be

16    the same general lines of questions.

17         THE COURT:  Well, look, I think that the current

18    conviction is coming in because it goes to credibility under a

19    different rule.  I am allowing the prior time in jail because I

20    think it's relevant to damages.  I am not sure the post rape

21    conviction time in jail has anything to do, I don't think

22    that's relevant at all to his, the psychological harm that he

23    endured while he was wrongly convicted on the rape charge.  Do

24    you?

25         MR. LARKIN:  I would think that any period of time

1    spent in prison would be relevant to --

2            THE COURT:  Well, I mean you cited me a series of

3    cases including cases from Eastern District and a case from

4    Judge Swain and Judge Francis in which in a false arrest claim

5    which is quite -- prior sealed arrests may be relevant to

6    emotional damages because a person who has previously been

7    incarcerated may suffer less damage as a result of subsequent

8    wrongful incarceration.  You would be arguing that person

9    suffers less damage as a result of subsequent wrongful

10   incarceration based on conduct based on time-served after that.

11   I don't think that makes any sense.

12           MR. LARKIN:  I believe he is claiming current harm.

13   He is currently claiming ongoing harm by reason of prior

14   incarceration, so I think that the current incarceration would

15   be relevant to that.  Any period of imprisonment would be

16   relevant to the claim like that it seems to me, your Honor.

17           THE COURT:  Well, to the extent that the witness --

18   and I don't think this was in your submission, Mr. Garber --

19   that he is saying that's still sort of his flashbacks of his

20   harm currently, then that might, I think, open the door to his

21   current incarceration.  But that's not clear to me that you

22   were introducing that.  Are you?

23           MR. GARBER:  Well --

24           THE COURT:  I mean, I have your submissions.

25           MR. GARBER:  No, no, no.  But I believe we were

1   instructed to say how his experience during his incarceration

2   during the rape and that's what we limited it to.  I am

3   assuming he is going to say this messed me up, OK.  I got out.

4   And I had all sorts of family problems.  I had alcohol

5   problems.  And I am assuming he can say that.  That was a very,

6   very difficult thing for me and I am still grappling with it.

7           THE COURT:  To the extent he is saying that it would

8   seem to me the present incarceration would be relevant to that,

9   a person who is grappling with these problems on the outside is

10  different from somebody who is grappling with these problems

11  while in another prison.  If you a grappling with these

12  problems sort of at home it's different than grappling with

13  these problems while you are serving a three-year sentence for

14  a crime you didn't commit.

15          MR. GARBER:  I am not sure I get the logical

16  connection.  I mean, you are suffering and if you are suffering

17  in a cell or you are suffering --

18          THE COURT:  Because, well, certain things you would

19  not be suffering so if affects your ability to be intimate with

20  one's spouse if you are precluded from having such moments

21  because you are incarcerated, I think that would be relevant.

22          MR. GARBER:  If he says that.

23          THE COURT:  Well, I don't know what he is going to

24  say.  So, look, I don't know what he is going to say.  My point

25  to Mr. Larkin is that if the defendant talks about ongoing

1    psychological harm I think it may well open the door to the

2    suggested current, the fact that he is currently incarcerated.

3        MR. LARKIN:  Your Honor, if I may?  Your Honor, if he

4    is going to testify about alcohol trouble, grappling with

5    family issues, general difficulties adjusting in society, the

6    period prior to his arrest and conviction in this case does

7    become relevant I submit to the Court and you have got multiple

8    assaults with knives, more than one, a series of about 20 to 25

9    arrests as an adult.  These are just the facts.  If

10   Mr. McCaffrey is going to blame all of his current

11   circumstances or many of them --

12       THE COURT:  He is going to blame the fact that he is

13   currently in jail for a different crime based on his experience

14   for the wrongful conviction then that might open the door to

15   that but it's not what I received from plaintiff is much more

16   generic.

17       MR. LARKIN:  OK.  Mr --

18       THE COURT:  So it may be before we get into this line

19   of cross we'll have a quick sidebar to see what door has been

20   opened but I am just telling Mr. Garber and Mr. Cohen be care

21   after about what doors you open.

22       MR. LARKIN:  In that vein, your Honor, we did obtain

23   the certificate of business issued -- of July 30, 2013.  In

24   addition, criminal possession of a weapon that was also a

25   conviction for assault two, we submitted that certificate of

1    disposition in our binder as one of the many multiple

2    certificates that we submitted, your Honor, and that's a D

3    felony.  So, I believe that that conviction would be admissible

4    on the same ground as the criminal possession of a weapon.

5    It's a different indictment in a different incident but he's

6    sentenced concurrently.

7            THE COURT:  I think for the reasons I was going to

8    allow the first conviction I think the second one also comes in

9    as a conviction.

10           MR. COHEN:  My concern is that the jury is going to

11   speculate.  When they hear about that they are going to hear.

12           THE COURT:  They are not going to hear about the prior

13   convictions until you open the door to it.  They are going to

14   hear about the fact that Mr. McCaffrey was in jail before in

15   respect as to why he was in jail, misdemeanors or felonies

16   arrests that didn't result in convictions.  But I assume he'd

17   rather me not.  Let me get into what caused him to be there.

18           MR. COHEN:  Well, one of the convictions he served

19   seven months --

20           MR. GARBER:  Actually, it's four but we'll work it

21   out.

22           MR. COHEN:  I can't help but think that the jury is

23   going to think that he committed some crime.  And if they start

24   to speculate and think about it I would least like them to know

25   it wasn't a felony charge, that it was a misdemeanor because I

 1     think if they start to speculate it's very prejudicially

 2     especially when they hear about apparently --

 3               THE COURT:  Well --

 4               MR. LARKIN:  That he had post rape convictions.

 5               THE COURT:  Well, look, I don't mind a limiting

 6     instruction.  Look, it's being offered to show it's relevant to

 7     damages and whether or not the time spent in jail for a crime

 8     he didn't commit caused him harm and you may consider whether

 9     the fact that he had been in jail before made that harm less

10     severe than might have been the case --

11               MR. COHEN:  Albeit for a misdemeanor.

12               THE COURT:  I just don't want them speculating as to

13     whether he has misdemeanor felonies.  I just think the sheer

14     number of arrests and sheer numbers convictions which one was

15     felonies and which one was misdemeanors are something I am

16     allowed to get into.  I think it is a purpose that is allowed

17     under the law and is fair in light of the testimony that is

18     going to be elicited on direct.

19               MR. COHEN:  I am only talking about that pre, the rape

20     conviction.

21               THE COURT:  Are you talking about the rape conviction?

22               MR. COHEN:  "Pre".  There's no dispute that there were

23     no felony convictions before that.

24               MR. LARKIN:  There were two misdemeanor assaults,

25     about 15 arrests, couple shorter stints in jail, periods of

```
 1    detention.  There were two to three day periods of detention
 2    one in which he got five days.  So we would ask about the
 3    arrests, the dates.  Well, he was in custody on a certain date
 4    and time for in some cases 48 hours.
 5         THE COURT:  I get that.  I am going to let you get
 6    into when he was in jail.  Mr. Cohen wants to know what he
 7    could elicit.
 8         MR. LARKIN:  If he wants to elicit that misdemeanor
 9    now you are tilting the sort of even line.  You are tilting it
10    in a different direction because the fact that misdemeanors
11    involve assault with knives I continue to think that that's
12    what misdemeanor assaults at a minimum.
13         THE COURT:  I don't want the jury speculating about
14    what was it for.  And the fact that no sentence is more than a
15    year would lead a sophisticated juror to believe it is.  I
16    don't want to get into it.  I'll give a limiting instruction.
17    If anybody wants me to, think about what it should say.  But it
18    is only be being allowed for a limited --
19         MR. COHEN:  One last point.  The issue as I understand
20    it is that he is not a person coming into the jail or prison
21    system as a virgin, that he didn't.  He'd spent time in prison
22    so he had some experience of being in a cell has nothing to do
23    with what his convictions were about before.  I am just
24    concerned that the jury is going to hold it against him if they
25    think that it might have been a felony conviction, a much more
```

1    serious crime.  That's all.

2           THE COURT:  I'll tell them not to speculate as what it

3    was about.

4           MS. ZGODNY:  Your Honor, just for clarification, so we

5    are not, until plaintiff testifies and we hear what he says, we

6    are not allowed to bring out that he is currently incarcerated;

7    is that what your ruling is?

8           THE COURT:  He's going to take the stand, so if he

9    takes the stand he can be crossed on his felony conviction.

10   So, I don't think there's any question about that, right?

11   There is no question that your client take stand, right?

12          MR. GARBER:  Correct.

13          THE COURT:  It's not like a criminal trial where the

14   defendant has an absolute right to testify.  It seems to me the

15   fact that he has a prior can be -- you are asking can you refer

16   to it in your opening?

17          MS. ZGODNY:  Sure.

18          THE COURT:  Only with respect to credibility.  That's

19   the only reason I am allowing it in.  So I think that the

20   reference is limited to that, then I think that that's not

21   improper.  That's reason it's going to be allowed in in the

22   first place.

23          MR. GARBER:  I think what she asked is also can they

24   raise his current incarceration.  And my understanding is that

25   unless we open the door that doesn't come in.  The fact that he

1    has been convicted --

2              THE COURT:  I think that's -- we should wait and see

3    because I just don't know how it's going to come in.  And I

4    think, I don't want to have something the defense says in an

5    opening to force the hand of the plaintiff in terms of

6    testimony that he made decide he doesn't want to get into some

7    of those things.  So, lets hold off on that.

8              MR. GARBER:  Now, just on the issue of damages and if

9    he says that he's still grappling with what happened to him

10   going into jail as a convicted rapist but doesn't say, look,

11   you know currently I am not having relations with family, I

12   mean, it would seem to me it's only logical that there would be

13   some lasting effect of this that wouldn't open the door to the

14   fact that he's currently incarcerated.  His life has changed

15   dramatically.  He struggles with a lot of emotional problems,

16   things that would be occurring in someone's life on the

17   outside.  It would seem to me that wouldn't open the door.  I

18   want to prep him in a way that is appropriate but I don't want

19   to lose the fact that look, well, there was a cutoff.  All of a

20   sudden when he went back to jail -- I went back two years ago

21   and -- I don't think that's fair.

22             THE COURT:  Well, all that is argument really about

23   what the damages are and whether they're less or greater as a

24   result of the fact that he is now in custody again.  I think

25   it's fair argument.  His damages now are something the jury is

1    going to assess and they might be greater or less and what

2    those damages are.  I don't know what he is going to say.  So,

3    I think you'd better think about it.  If you want to get an

4    instruction from me as to what it means to open the door then

5    let's tee this up before he testifies.  But right now I only

6    have what you've submitted to me and doesn't get into any post

7    release harm or damages.

8              MR. COHEN:  One moment.

9              (Pause)

10             MR. GARBER:  So just to pull the bandaid fully off of

11   this wound, if he testifies and he says going in as a rapist

12   was a terrible thing and when I got out I had serious alcohol

13   problems.  I destructive family relations and I became crazed.

14   And the gun possession charge and assault charge was part of my

15   like bend on going back as a non rapist, you know I wanted to

16   go back behind the wall but I didn't want to go back behind as

17   a rapist.  Now if he says that and I understand that that would

18   open the door to his current incarceration no question.  But

19   the question then becomes does that then open the door to every

20   prior arrest he has?

21             THE COURT:  I think clearly does.  If the argument is

22   going to be that there's a causal relationship between

23   subsequent conduct and the rape conviction then I think the

24   defense gets to rebut that by showing he is doing the same

25   stuff before.

E4NAAMCCC                     Conference

1          MR. GARBER:  But he wasn't.

2          THE COURT:  Goes to causation.

3          MR. GARBER:  That's helpful.

4          THE COURT:  But I do think it's worth giving me more

5     as to what he is exactly going to say about the post

6     exoneration damages.

7          OK.  If you want guidance --

8          MR. GARBER:  No.  We do.

9          THE COURT:  OK.  I think the next issue relates to

10    then we get to the plaintiff's exhibits.  So I have

11    Mr. Larkins' objections.  I think some of these I've already

12    resolved, Jessica Pierce's report, the grand jury minutes.  So

13    I am not sure why we need the grand jury minutes in the

14    criminal case.

15         MR. LARKIN:  It would only be Peguero's testimony to

16    show inconsistency with which he was going to -- the crime,

17    your Honor, and why it is that detectives believed her.

18         THE COURT:  I think the facts of prior consistent

19    statements would be admissible to show the state of mind of the

20    defendants, right?  If they could show this is what I was told

21    and --

22         MR. LARKIN:  Yes.

23         THE COURT:  This is what he said on all the prior

24    occasions.  The fact of a require consistent statements would

25    be relevant.

1          MR. LARKIN:  So the defendants would have, for

2     example, there are notes of interviewing the victim and the

3     police reports that they generated and they would describe that

4     first interview and what the victim said.  We would then use

5     the grand jury minutes, I guess just to show the jury, it may

6     be obvious to show the jury that she continued to tell the same

7     version of events from beginning right through the conviction

8     and she never waived from that story which resulted in the

9     conviction.

10         THE COURT:  So, is there any dispute that she wavered

11    in her story?  Are you suggesting, Mr. Garber, that if she

12    waived or that she said more that the grand jury minutes don't

13    reflect?

14         MR. GARBER:  I guess before I answer I have to try and

15    understand this.  The defendants testify.  They state what

16    Peguero told them to inform whether or not they are being

17    truthful or not about this fight and that's it.  I don't

18    understand why post trial statements by Peguero have any

19    relevance.

20         THE COURT:  Not talking about post trial.

21         MR. LARKIN:  I am talking about the grand jury.

22    Peguero's testimony from the grand jury that indicted

23    Mr. McCaffrey, not the subsequent grand jury.

24         MR. GARBER:  But only to the extent that they knew

25    that, I don't know if it's relevant.  It's what the defendant's

```
1    knew.  So they could be questioned about if it would refresh

2    their recollection about what they knew at some point it's

3    relevant then I guess the grand jury testimony would come in.

4    But the misdeed here predates her grand jury testimony.

5              THE COURT:  The what here?

6              MR. GARBER:  The misdeed, the Brady violation.

7              THE COURT:  The Brady violation is a continuing Brady

8    violation up until the trial, right?

9              MR. GARBER:  Yes, I guess it is.

10             THE COURT:  So, look, I think the prior statements of

11   Peguero would be admissible.  They are not being offered for

12   the truth.  They're being offered for the absence of other

13   facts that would support an inference that the defendants knew

14   that there was more to the story.  I think that that's fair.

15             MR. GARBER:  But I assume they could be questioned

16   about and if they need to refresh their recollection --

17             THE COURT:  I don't know if it's coming in through

18   those witnesses unless they were there.

19             MR. LARKIN:  Their not going to testify to what she

20   said to the grand jury.  It's in the transcript and it would be

21   put into evidence so a jury can understand this victim was the

22   main witness told detectives a version of what happened and

23   then was put under oath in front of a grand jury and gave the

24   same story and then was put under oath at trial and gave the

25   same story again.
```

1          THE COURT:  I think that that's fair.

2          MR. GARBER:  I don't see the relevance.  I don't see

3     why it would be admissible.  I don't see what the rule of

4     evidence would be that it would come in under.  I mean, I

5     just --

6          THE COURT:  Well, the whole issue is what the

7     defendants knew and so if all the prior statements of Peguero

8     reflect no disclosure I think that the jury can infer from that

9     that the agents, the detectives didn't know.  So I think it's

10    relevant and I don't think it's being offered for the truth.

11    It's being offered for the consistency.

12         MR. GARBER:  Yeah, but if our position is, look, these

13    police officers believed Peguero.  They believed that a rape

14    happened.  What if we take that position, OK, there is no

15    dispute.  I don't think it's going to be a dispute about that.

16         THE COURT:  The dispute is whether or not they knew

17    there was a fight and covered it up, right?

18         MR. GARBER:  I understand.  So if Peguero is -- if the

19    plaintiff's position is, look, these police believed her and

20    then they went forward on this prosecution but what they did

21    hear was they gave McCaffrey an unfair fight by taking away the

22    fight.  That's what they did.  There's no dispute that Peguero

23    said that she was raped.  She said to the same nurse, she said

24    to the detectives, she said at the grand jury.  She said it at

25    trial.  OK, but there is no dispute about that.  Why does her

1  grand jury testimony then come in to make that point that's an

2  uncontested point?  And so, because there's consistency to her

3  story?

4           THE COURT:  I think it goes to the defendant's state

5  of mind.  So, I think it is relevant.

6           MR. GARBER:  OK.  Objection.

7           THE COURT:  OK.  All right.  Then we have a number of

8  different things that seem like they are no longer really

9  issues.  The trial testimony I guess we pretty much come to

10  ground on but you are going to let me know if there are

11  specific portions of the transcript that you think shouldn't

12  come in.  So the sentencing minutes related to the criminal

13  case, I am not sure.

14           Are you still seeking to introduce this, Mr. Larkin?

15  Plaintiff's Exhibits are you seeking to introduce the

16  sentencing.

17           MR. GARBER:  When I submitted my exhibit list what I

18  said was that I put together binders of everything, use of

19  everybody for ease.  We are not saying that these were all

20  admissible but we may be questioning somebody and saying, look,

21  didn't you say, you know that -- becomes relevant.  We have it.

22  We know that he was sentenced.  I don't think that there's a

23  rule of evidence, OK, or some sort of common law rule that says

24  that those sentencing minutes come in.

25           THE COURT:  Come in or don't?

1              MR. GARBER:  They don't come in.  They're irrelevant

2      and they're hearsay.

3              THE COURT:  So, you don't -- well, depends on what

4      they're being used for.  So you are seeking to introduce -- you

5      are not seeking to introduce?

6              MR. GARBER:  No.

7              THE COURT:  Well, this is your exhibit.

8              MR. GARBER:  OK.  Then I am --

9              THE COURT:  You don't want to do it.  That's fine.  No

10     one's making you do it.  DNA reports I've already ruled on

11     that, so I think it can be relevant to impeach.  It might be

12     impeachment material but we'll cross that bridge when we get to

13     it.  The deposition testimony as to basically all the

14     witnesses, I mean unless these witnesses are unavailable it

15     seems to me they're only going to be -- they can be used to

16     impeach of course but they are not just coming in.

17             MR. GARBER:  Can I this easier for you?  There was a

18     misunderstanding.  What I did with these exhibits is I put

19     everything in binders for the Court and for my adversary for

20     ease.  I believe that's the entire relevant base for

21     documentation for this case.  Some of it maybe used for

22     impeachment purposes.  We are not saying, OK, that this stuff

23     should come in because there's some sort of exception to the

24     hearsay rule.  So if you want -- we are just trying to be easy.

25     So this way we don't have to walk in with huge carts and this

1    way the Court also knows when someone's being cross-examined.

2    Let's look at Plaintiff's Exhibit 53.  That's why I did it that

3    way but I could specify what I think it comes in and it's very

4    little because most of this is going to be questioning of

5    witness.

6            THE COURT:  What are you trying to introduce in your

7    case in chief?  That is on your exhibit list, so I guess I am

8    trying to figure out what are we disagreeing on?

9            MR. LARKIN:  I think the next thing would be play

10   audio recording.  It's hearsay.  But to impeach is a different

11   story a witness gives an inconsistent statement.

12           THE COURT:  I've ruled on that.

13           MR. LARKIN:  Assume if plaintiff is going to play a

14   portion of the record it would be, it's different from a

15   deposition when you have page and line.  I have it right in

16   front of me.  I can say, OK, we object to that cause it's not

17   inconsistent.  We object because you have to read the following

18   two lines.  I am going -- it's only going to have a recording

19   and he is going to play it.  So he can't script this all in

20   advance obviously but if counsel starts to play portions of the

21   recording and I have an objection to it because it isn't

22   improper impeachment I guess I'll just object in the middle of

23   it.

24           THE COURT:  The way to impeach the audio is if the

25   witness denies having made a statement then I think I would ask

E4NAAMCCC                    Conference

1    her, do you recall making this statement and state what the

2    statement is, so she has an opportunity to admit, deny or

3    explain.  It's possible we could play it for her without

4    playing it for the jury necessarily.  And let me listen to it

5    so that she is then able to confront or admit, defy or explain.

6    And then after that then the issue does this come in, I don't

7    think it is going to be collateral though I think she denies

8    what was said I think certainly going to allow the jury to hear

9    the tape.

10             MR. LARKIN:  OK.

11             THE COURT:  The same way I would allow him to read

12   from the transcript, "isn't it true that you said", then read

13   it out loud.

14             MR. LARKIN:  But the tape recording is hearsay though.

15   It is an out-of-court statement and it can be used to impeach.

16             THE COURT:  Right.

17             MR. LARKIN:  In the same way that you can say isn't it

18   true that you told Police Officer John Smith X, Y and Z?  And

19   the witness says no.  Well, let me show the report to the

20   witness.  Look at it and the witness says okay, yes, I did say

21   that.  So if the Court were to play the recording for the

22   witness to listen to on earphones and say, well, did you hear

23   your voice?  Yes.  Did you make that statement?  Yes.  That it

24   seems to me would be the proper use of out-of-court statement

25   to impeach rather than having to play it for the jury.

1          THE COURT:  I think that they can confront her with

2     her statements whether on a transcript or recording.  She may

3     have explanation for it.  The jury may buy the explanation or

4     not but they're allowed to hear the recording if in fact she

5     denies --

6          MR. LARKIN:  OK.

7          THE COURT:  Or depending on whether she denies not

8     having made the statement but offers an alternative reason for

9     having made the statement.  That may also justify it being

10    played.  So she can explain why she where in this recording

11    were you being bullied on intimidated or imposed upon by the

12    speaker which is I guess Mr. Dwyer.

13         MR. LARKIN:  It's a one hour long recording.  It's the

14    concern not all of it is intelligible.  Some of it is shorter

15    garbled.  Portions of it is very clear.  I understand it's very

16    hard to script all this in advance.  My concern is having the

17    recording played for the witness and then having the witness

18    asked questions like, well, did you tell the truth?  That would

19    be impossible.  I am not sure what more we can do about it.

20    Depends on what she says.

21         THE COURT:  I agree.  Something else?

22         MR. GARBER:  Mr. McCaffrey's grand jury testimony,

23    he's maintained his innocence all along and it would seem to

24    me --

25         THE COURT:  That's not in dispute, is it?

1        MR. LARKIN:  We don't dispute that.

2        THE COURT:  I'm not sure what is to be gained by

3   giving the jury further -- no one is suggesting that he

4   committed this crime.

5        MR. GARBER:  Well, I guess I don't fully grasp the

6   relevance of Peguero's grand jury testimony but if there is a

7   counter narrative.

8        THE COURT:  Peguero is relevant because it goes to the

9   knowledge of the defendants.  Your case turns on the defendants

10  having had knowledge of this fight and having buried it, right?

11       MR. GARBER:  Yeah, but the knowledge -- OK, his denial

12  is their knowledge too, OK, and doesn't that also inform the

13  same issue as the flip side of the Peguero grand jury or the

14  logic of that coming in?

15       THE COURT:  There's no question that he didn't commit

16  this crime.  The issue is whether or not the detectives got

17  more of the story than they're letting on, whether Peguero told

18  them or somebody else told them, I think that that's the issue

19  for this trial.  That the defendant at all times denied that he

20  committed the crime and in fact has been exonerated with the

21  crime is not a dispute.  So, I think of course he never

22  admitted that he did this.  If he admitted it then I guess that

23  might be relevant but there is no question that he denied at

24  all times.  He's always maintained his innocence.  So, you

25  think the defendant's obligations with respect to Brady differs

1    whether or not he gave grand jury testimony denying that he

2    committed a crime?

3          MR. GARBER:  I guess what I am not grasping is the

4    relevance of Peguero's grand jury testimony.  If the whole

5    point of the defense here is that the police told them not to

6    mention the fight.  So when she goes into the grand jury of

7    course she's not going mention the fight.  Just as the other

8    witnesses didn't mention the fight in the grand jury.  So, the

9    fact that she didn't mention the fight in the grand jury and

10   adhere to the fact that she was raped somehow is relevant, I

11   guess I don't get that and I guess that's why I am saying it's

12   good for the goose, it's good for the gander.  But look if I

13   want to put it in with McCaffrey for innocence and there is no

14   contest on innocence then I guess it doesn't come in because --

15         THE COURT:  So, I mean I think you are going back to

16   the argument of relevance issue with respect to the Peguero's

17   statements and I think I've already resolved it.

18         MR. GARBER:  OK.

19         THE COURT:  Is there anything else you are looking to

20   get in, certificate of disposition?  Justice Carruthers'

21   decision granting the motion to --

22         MR. GARBER:  We've already ruled on those things.

23         THE COURT:  Right.

24         MR. GARBER:  Now, all these reports that I mentioned

25   which are --

E4NAAMCCC                    Conference

1          THE COURT:  That you mentioned?

2          MR. GARBER:  In my exhibit lists cause there's a

3    number of police reports.  I assume they don't come in other

4    than for impeachment or to refresh recollection unless there is

5    some sort of exception to the hearsay rule.

6          THE COURT:  I don't think they're being offered for

7    the truth.  They are being offered to show that the absence of

8    any reference to the facts that are in issue for this trial.

9    So, there's a fight.  There's no reference to the fight.  There

10   is no reference to bikes or broken windows.  No mention of that

11   in various documents that there are documents they are required

12   to keep and maintain as detectives.  You are certainly free to

13   argue, yeah, OK, it's buried in their reports and they did.

14   It's not worth its weight but that goes to weight, not

15   admissibility.

16         MR. GARBER:  I understand.

17         THE COURT:  OK.  So, I sent to the parties my proposed

18   voir dire.  Other than what I would like to be able to include

19   a brief description of the case and some stipulated facts, are

20   there any objections to what's in the voir dire?

21         MR. LARKIN:  Could we have until tomorrow morning?  I

22   doubt we are going to.  I just want to look at it one more

23   time.

24         THE COURT:  All right.  I just need -- we start trial

25   on Monday.

E4NAAMCCC                    Conference

1          MR. LARKIN:  It'll be by ten tomorrow morning.

2          THE COURT:  Any objections that anybody knows about?

3          MR. GARBER:  Not at this point.

4          THE COURT:  I've asked the parties proposed and you

5     should presume that if what you'd proposed was not an accident

6     and I've made a decision that it wasn't necessary or worth

7     including or it's different than my standard instruction and

8     within my standard but if there are really pinpointed

9     objections, then you can make submissions by tomorrow at ten,

10    OK.

11         MR. LARKIN:  Thank you, your Honor.

12         THE COURT:  Because I do want to get those finalized

13    before the weekend because I want to make copies for the jury,

14    just the questions.  I'll give them questionnaires that make

15    easier for them to pick up.  If strike you "for cause" I can

16    bring people into the box and it's lot easier to just get them

17    to tell us, yes, I had affirm I have answers to questions.

18         MR. LARKIN:  You are going to give all the questions

19    in writing?

20         THE COURT:  They are not going to fill them out.  They

21    are going to use them to follow along.  And those in the back

22    who are not in the first eight, I might instruct them to circle

23    the ones you have affirmative answers to so that when I call

24    them to, I can just say you got any affirmatives, what numbers,

25    we can then move much faster than subsequent.

1          MR. LARKIN:  It's three per side.

2          THE COURT:  That's right.  Plaintiff goes first each

3   round and defendants go second but we'll do three rounds.  So,

4   I don't think it'll take too long.  I think we should have the

5   jury picked by, probably won't get them here until 10:15 or

6   10:30.  I think we'll have picked the jury by lunch.  Be

7   prepared to open and call your first witness before lunch if

8   necessary.

9          do you know your order of witnesses?

10          MR. GARBER:  No.  We anticipate --

11          MS. ZGODNY:  Your Honor, can you inform us as to the

12   timing?  I don't think your Honor informed us what time we are

13   starting in the morning.

14          THE COURT:  Everyday at 9:30 going to 5:30 with an

15   hour lunch, a morning break, an afternoon break of ten to 15

16   minutes, so a longish day.  Make sure you've got your witnesses

17   ready to go.  Judge Martin always said if you are not ready

18   with your next witness you rest.

19          MR. LARKIN:  I saw Judge Chin on the way over and

20   warned us he said you'd better be ready with witnesses one,

21   two, three, four, five.

22          THE COURT:  That's usually the way works in federal

23   court.  So I think I am not telling anybody anything they don't

24   know.  You all practice here primarily, right?  So I don't

25   think that's different than most judges here.  The ones who've

got a trial going I want witnesses ready to go that require us

to anticipate that crosses might be shorter than you expect and

that you've got your witnesses lined you for as soon as the

witness finishes.  I don't want long gaps.  It is not fair to

the jury.  We have to be here any way but I think the jury

feels like the system fails them if they're waiting around for

long periods of time.  So, I want to keep right with them and

make them.  I think the whole thing works better if the Court

can promise and keep the promise that we are not going to waste

any time.  We're going to use all your time efficiently.  We'll

have our arguments at breaks and at lunch and before and after

the jury's here so that we're maximizing the trial day for

testimony, OK.

            MR. GARBER:  We'll have our witness order by e-mail

tomorrow at ten.

            THE COURT:  That's fine with me.  Each side should

keep the other apprized.  I am the least important in that.  I

just want to make sure that you are all ready with your cross

and nobody's blindsided, bearing in mind of course that it is

an imperfect science and some witnesses have places to be and

it's trickier to get them here.  So sometimes you have to take

a witness out of order because you know they really had a

commitment and couldn't be here until 2:00 and the witness

before then finished early, so you've got to rejigger the

order.  I don't mind that if it's done sparingly but keep each

1   other apprized of who's on deck, they are aware of what

2   exhibits are going to be coming in through that witness so you

3   can deal with issues before the jury is in the box.  I hate

4   sidebars.  There are times when you may need to do it but I

5   really would prefer to be doing that before the jury comes out

6   in the morning or at breaks.

7            MR. GARBER:  What about Friday?  They're

8   deliberating -- we are here on Friday but if not, have off on

9   Friday?

10           THE COURT:  That's right.  If a juror says, look, I

11  can't deliberate on Friday.  I have plans.  I might cut them

12  slack.  Do you think we are going to be finished by Friday?

13           MR. GARBER:  Possibly.

14           THE COURT:  I am not going to tell them we are off on

15  Friday and then I am going to assume that we may be sitting

16  Friday.  You have something on Friday?

17           MR. COHEN:  Yes.  I switched this case from Thursday

18  to Friday with Judge Preska.

19           THE COURT:  What do you have?

20           MR. COHEN:  A sentence.

21           THE COURT:  We'll work around that.  I think they will

22  be deliberating at that point.  If we're doing summations then

23  I'll --

24           MR. COHEN:  I have a matter with Judge McMahon at

25  12:30 on Monday.  Do you have a fixed time when you take your

E4NAAMCCC                   Conference

```
 1   lunch?

 2             THE COURT:  Usually at 1:00.

 3             MR. COHEN:  Would we be able to do it at 1:00?

 4             THE COURT:  Might.  I'd hate to break the flow if

 5   we're in opening.  I think generally like to where possible

 6   like to have jury addresses sort of continuous.

 7             MR. COHEN:  See how it goes.  I might be able to have

 8   somebody cover, probably not but we'll see how it goes.

 9             THE COURT:  I'll try to work around that.  If we're at

10   a breaking point we could stop at 12:30.  Just remind me on

11   Monday.

12             MR. COHEN:  I will.

13             MR. LARKIN:  Mr. McCaffrey had another lawsuit.  We

14   understand at the time of settlement he did receive payment

15   from the state for some period of his incarceration I would

16   like a copy of the stipulation.  I think might be relevant to

17   damages.

18             THE COURT:  Is it a sealed settlement?

19             MR. COHEN:  No, it's not sealed, your Honor.  Our view

20   is that it's totally irrelevant.

21             THE COURT:  He just wants to see it and then we'll

22   decide whether there's going to be cross material.

23             MR. COHEN:  We'll provide it.

24             THE COURT:  Let him see it.  I don't know why it would

25   be relevant or what was the nature.
```

E4NAAMCCC                    Conference

 1              MR. LARKIN:  Wrongful conviction, the Unjust

 2    Conviction Act which is court of Claims Act 8B.

 3              THE COURT:  For the same --

 4              MR. LARKIN:  Yes, for the same issue, the same case,

 5    the same criminal construction, the statute allows plaintiffs

 6    to recover damage in the state.  I know Mr. Cohen is more

 7    experienced with that statute.

 8              THE COURT:  You think you may be arguing that

 9    settlement should be in mitigation of damages in a suit?

10              MR. LARKIN:  Yes.  If there was -- I believe that

11    there was compensation paid and I know that there is law that

12    limits a plaintiff's recovery in a 1983 case if --

13              THE COURT:  I'd like to see the law.  Show him the

14    settlement and then if he is going to make a motion to be -- if

15    he wants to be able to do that then let us know and cite some

16    authority so we know what we're doing.

17              MR. COHEN:  This jury is going to decide what his

18    damages are.  The issue then perhaps becomes whether there's a

19    settlement.

20              THE COURT:  Maybe.

21              MR. COHEN:  When it's a settlement it is not a finding

22    of fact by the jury or a judge.

23              THE COURT:  I get it.  That sounds logical to me.  I

24    don't know what the law is on this, so you'll educate me.

25              MR. LARKIN:  Then we have two trial subpoenas that,

1   your Honor, we wanted to get the originals of complaining

2   witness' medical records and I gave them to Mr. Garber for him

3   to look at.

4           THE COURT:  Complaining witnesses.

5           MR. LARKIN:  Ms. Peguero.  The reason is --

6           THE COURT:  Mr. Garber has seen them?

7           MR. LARKIN:  No.  Mr. Garber has the subpoenas but I

8   was going to ask your Honor to "so order" them so that we could

9   have the hospital provide a clean set to us here because it

10  does contain statements by the complaining witness that night

11  and it also indicates that there was a physical exam done and

12  there was a rape kit checked.  I don't think there is going to

13  be any dispute about that.

14          THE COURT:  Looking to introduce that or not --

15          MR. LARKIN:  Part of it because there were key

16  statements made about this alleged car jacking because there

17  was an attempt to cover up this fight because they claim that

18  there was carjacking that broke the windshield and we all know

19  that was not how the windshield got broken.

20          THE COURT:  Well, with respect to the subpoena, any

21  objections to my signing the subpoenas?

22          MR. GARBER:  No.

23          MR. LARKIN:  May I present the --

24          THE COURT:  Yes.

25          (Pause)

1          MR. GARBER:  With respect to the plaintiff's exhibits

2     misunderstanding on my part I have had very intensive cases,

3     the government has given me, marked a number of exhibits that

4     they don't necessarily intend to use but may come up in cross

5     and making impeachment material or whatever.  I am engaged in

6     an endeavor that way beyond what we've needed.  Now, it was

7     just limited to what will be admissible, it was a very small

8     set of information.  It would be no problem, whatsoever.  So I

9     actually buried myself in paper with my misunderstanding of

10    what that endeavor was.  So, I just sort of an apology because

11    I delayed --

12          THE COURT:  I sort of accept your apology.

13          MR. LARKIN:  -- guilty with an explanation if it was

14    just a matter of a stack like this I could have had it Monday

15    morning but so my bad.  Misunderstood it.  There's a delay was

16    associated with that misunderstanding that I just wanted that

17    to be clear.

18          THE COURT:  All right.  What I am expecting then by

19    tomorrow at ten is any objections to the voir dire and then, is

20    there anything else I should be expecting?

21          MR. GARBER:  Not necessarily by ten but what you are

22    expecting is for me to go through their trial transcripts

23    excerpts.  It is really 403 type arguments I would have, and

24    specify those so that it's very clear and easy for the Court to

25    rule on those.

1           THE COURT:  Right.  And the other thing I want is the

2      parties' stipulation or close to stipulation as to what facts I

3      am going to present to the jury in the voir dire.  So let me

4      have that by tomorrow at ten as well.  So you folks --

5           MR. LARKIN:  At the risk of incurring the Court's

6      wrath I have one last exhibit which is a report done by an

7      investigator working for Mr. McCaffrey's criminal defense

8      counsel in the connection with the criminal case.  It was

9      produced by Mr. Garber in discovery.  There is no excuse to its

10     authenticity, dated August 2006, before the criminal trial and

11     it's a report of an interview with the garage attendant where

12     the garage attendant describes the fight.  And the garage

13     attendant was testifying at the trial that the fight occurred.

14     So this is simply corroborating or it sets up the timeline as

15     to when defense counsel learned about the fight.  The first

16     time they learned about the fight at the latest was this date

17     August 4, 2006 and this was produced by plaintiff in discovery,

18     so there is no --

19           THE COURT:  You are calling the ADA, correct?

20           MR. LARKIN:  Yes.

21           THE COURT:  So you can ask the ADA when did you learn

22     about the fight?  The ADA can explain it if they need that to

23     refresh why the ADA.  But why do we need to introduce it?

24           MR. LARKIN:  The ADA didn't know until the witness

25     took the stand and testified at trial.  Defense counsel on the

1    other hand knew two or three months before the trial when they

2    got their report from his investigator who interviewed the

3    garage attendant and who learned that there had been according

4    to the garage attendant there had been this fight.

5          THE COURT:  Did the plaintiff call the defense lawyer

6    and ask that question?  How do you plan to get this?

7          MR. LARKIN:  This was produced by Mr. Garber in

8    discovery.  I would think that that's sufficient to

9    authenticate it but it would be very short examination.

10         THE COURT:  This goes to prejudice?

11         MR. LARKIN:  Exactly.

12         THE COURT:  For the Brady violation?

13         MR. LARKIN:  Exactly.

14         MR. COHEN:  Very interesting because Mr. McCaffrey

15   retained a particular lawyer to try his case.  All of a sudden

16   the lawyer's partner shows up so the lawyer that tried the case

17   may not have actually have seen this.  I think in that sense

18   this is a hearsay problem.  I don't think we're going to be in

19   a position to agree because Mr. McCaffrey later on complained

20   that, I didn't want you as my lawyer.  I want the other guy.

21   And by the nature in which the case was tried he may have a

22   good complaint but that's besides the point.

23         MR. LARKIN:  The lawyer called the same witness who

24   testified at trial.  There is no dispute he knew what the

25   witness was going to say.  This report sets up the timeline

1    that they few about two or three months earlier.

2              THE COURT:  Who is the "they"?

3              MR. LARKIN:  The defense counsel.  So one of the

4    arguments on prejudice, your Honor, is that defense knew about

5    this fight.  At a minimum they had enough information to

6    cross-examination Pujols and Sosa and Peguero about it and they

7    chose not to.  We should be free to argue that there is an

8    absence of prejudice here.

9              THE COURT:  I don't know what you -- how you are going

10   to prove that this document is what it purports to be and that

11   it was received about by defense?

12             MR. LARKIN:  The attorney was present for the -- it's

13   a report.

14             THE COURT:  But it's -- yeah, then you are offering it

15   for the truth then, right?

16             MR. LARKIN:  No.  No.  We're offering it for --

17             THE COURT:  Well, you are offering it for the truth as

18   to who was present at a particular meeting or a particular time

19   I assume it's a report that says on "X" date --

20             MR. LARKIN:  July 26, 2006, we have an extra copy for

21   the Court.

22             MR. GARBER:  At the trial very called Delacruz.  There

23   is no dispute the defense advanced an argument to the jury that

24   there was a fight.  I don't understand why this document you

25   can't connect it to the lawyer in the case have any relevance.

1   It's cumulative.

2          THE COURT:  Well, it might be relevant because it

3   shows that with respect to prejudice that the fact of the fight

4   which is what you are alleging was suppressed was known to the

5   defense even before the cross.  So I think it's relevant.  I am

6   not sure that it's being offered for some non hearsay purpose.

7          MR. LARKIN:  We're offering it to show knowledge on

8   the part of defense counsel prior to the trial that there was

9   this fight and this is -- I also gave the Court a copy of

10  Ms. Peguero's where he produces notes and reports by

11  investigator Robert Carelli.

12         MR. GARBER:  There's no dispute I gave it to him.

13         MR. LARKIN:  No dispute that it's authentic.  And that

14  in addition we tried during discovery to subpoena Mr. Feliciano

15  who is the defense counsel that appeared at trial and we were

16  informed his by partner the poor guy has dementia and he

17  couldn't testify.  So I would have used it at a deposition.

18         THE COURT:  The trial attorney is Feliciano.

19         MR. LARKIN:  Correct.  Those are the attorneys

20  retaining the investigator to do this report for them.

21         THE COURT:  Well, I mean you could call the

22  investigator and the investigator could indicate this report

23  was prepared by him and provide it to the defense counsel seems

24  to knee that is really the proper way to do this and I don't

25  know but how you would authenticate it without a witness seems

E4NAAMCCC                    Conference

1    to me.

2              MR. LARKIN:  Is there a dispute.

3              THE COURT:  If you want to stipulate to it --

4              MR. LARKIN:  I think counsel said there is no dispute

5    as to authenticity.

6              MR. GARBER:  Well, we are not stipulating.  There may

7    be certain things we want to ask Carelli.

8              MR. LARKIN:  OK.  Thank you, your Honor.

9              THE COURT:  All right.  Anything else we should cover

10   today?

11             MR. GARBER:  I don't think.

12             THE COURT:  No.  All right.  So I'd like the voir dire

13   stuff by ten.  And when are you going to have objections to the

14   trial transcript and stuff?

15             MR. GARBER:  Four o' clock, is that OK?  And what

16   other stuff, I mean --

17             THE COURT:  I think that basically you want to put in

18   certain excerpts.  They want to put in certain excerpts.  They

19   are not objecting to any of yours.  If you are objecting to

20   some of theirs then know what you are objecting to, know why

21   you are objecting and give them an opportunity to respond.

22             MR. GARBER:  Is four o' clock tomorrow OK for that?

23             THE COURT:  Then by four o' clock Friday.

24             MR. LARKIN:  Yes, your Honor.

25             MR. GARBER:  Now on Strain -- this is the ADA -- I

1    assume they're not calling -- and talked about this and

2    relevance and I would ask that -- be precluded from testifying.

3    He learns everything after the fact and it's all hearsay that

4    he has.  So, I would object to him testifying.  I thought the

5    way this shook out at the last pretrial conference summarizing

6    what I think you said which is I don't see why Strain comes in

7    unless the female witnesses testify a concern way about what

8    would make her relevant, for example, she had a conversation

9    with them about the car jacking, about the fighting that

10   somehow has bearing on their testimony.

11              THE COURT:  I think there might be a lot reasons why

12   Strain has relevant testimony.  I don't think anybody's moved

13   to preclude the testimony.  So, if you are doing that then I

14   think you should make that motion.

15              MR. GARBER:  I did.

16              THE COURT:  But she may have had conversations with

17   the defendant in which first she disclosed certain things or

18   didn't.  I think it may be that there may be a lot of relevant

19   testimony she's got.  So, I am not sure whether you are asking

20   me to preclude the testimony --

21              MR. GARBER:  We talked about -- and post conviction

22   and limiting this to essentially that the Brady violation.  And

23   I don't understand since the trial's coming in.

24              THE COURT:  That's what it's about.  This is all about

25   the Brady violation.  So I don't know that she has no relevant

E4NAAMCCC                   Conference

1   testimony as far as that.  I don't know.  So what are you

2   offering?  What are you eliciting from her?

3           MR. LARKIN:  A couple things.  The -- trial in the

4   Brady cases she is going to testify that the victim gave a

5   consistent story throughout.  She's going to testify that the

6   women never said anything to her about any kind of fight.  She

7   is going to testify that when she asked him about this note

8   concerning the broken windshield that they gave her the same

9   story that they had given to the detectives in New Jersey,

10  namely, that there had been some sort of a carjacking and that

11  the car was driven by three Hispanic males and that's what

12  resulted in the broken which is consistent with the witness'

13  suppression of the conscious decision not to say anything about

14  the fight.  She's going to say that the victim specifically

15  told her that the assailant bit her on the shoulder, OK --

16          THE COURT:  Presumably Pujols is going to state the

17  same thing, right?

18          MR. LARKIN:  I don't know.  I think there's a very

19  good chance that they will not own up to having said those

20  things to ADA Strain and I think it's important for the jury to

21  know that the women were consciously aware that the windshield

22  was broken in this fight, made up a story for the purposes of

23  preventing any of authorities from finding out about it.

24  That's what happened in this case.

25          THE COURT:  If they're going to be on the stand under

1    oath and going to ask them did they do it and they are going to

2    say yes, we did or no, we didn't do it.

3           MR. LARKIN:  -- to say, no, we didn't say that or gee,

4    I don't remember.  If they say they don't remember I think that

5    Strain's testimony becomes very important to demonstrate that

6    they did have a consistent story here that was intended to

7    prevent disclosure of facts concerning the broken windshield.

8           THE COURT:  Well, it seems like you are contemplating

9    calling Strain to impeach your own witnesses.

10          MR. LARKIN:  No.  No.  It's call Strain to show, to

11   prove up exactly the point we want to prove up which is that

12   they gave the story to the New Jersey detective who in turn

13   gave the story to our detective that there have been this

14   carjacking that resulted in that broken windshield.  The fight

15   caused the broken windshield.  The girls made that story up in

16   New Jersey when they went across the river to the hospital.

17          THE COURT:  But they are not going to say that on the

18   stand.  They're going to say that didn't happen, so you believe

19   they're going to perjure themselves and you want to call Strain

20   to undercut they're testimony that you have elicited.

21          MR. LARKIN:  I don't know.  I think they're going to

22   the deny making the statements about the carjacking.

23          THE COURT:  You believe that's false.

24          MR. LARKIN:  I think they are going to deny making

25   statements about the carjacking and I believe that those

E4NAAMCCC                    Conference

1    statements are false.  And I believe -- I think, your Honor, we

2    have Pujols here and Sosa and we don't have Peguero.

3              MR. GARBER:  I am not so sure.

4              MR. LARKIN:  And Peguero may have been the one who

5    made the story up about the carjacking.  We know that she's the

6    one that made the story up in New Jersey.  Strain was a little

7    unclear as to whether she spoke to her, that is Peguero or the

8    other two witnesses about that carjacking.

9              THE COURT:  Well, I think she may have relevant

10   testimony.  I am not sure how it's going to play out with the

11   other witnesses but I am not going to preclude her at this.

12             MR. GARBER:  It might be good for plaintiff also.

13             THE COURT:  Might be very good for the plaintiff.

14             MR. GARBER:  It's interesting it was Peguero and not

15   Sosa but this will be interesting.  We'll see how it goes.

16             THE COURT:  I agree with you on that.

17             MR. COHEN:  I guess the question is, are they going to

18   be able to open on it?

19             THE COURT:  Open on?

20             MR. COHEN:  On what Strain might testify to.  I don't

21   think so.

22             THE COURT:  I wouldn't rule it out.  I think,

23   obviously, they should know what they're witnesses are going to

24   say before they open on it.  And they shouldn't be opening on

25   things that are irrelevant.  But I am not precluding them from

1   opening on what they believe the testimony to be if it going to

2   be relevant.

3         MR. COHEN:  I am only talking about ADA Strain, not

4   the witness, not the young ladies because that seems to me that

5   what ADA strain will be allowed to testify to was going to

6   depend on what those witnesses say.

7         THE COURT:  Well, it would seem to me -- I am not sure

8   why -- you'll call her if there is no dispute as what the

9   witnesses said and if she is going to be called to undercut

10   what the witnesses are expected to say, I think it's a pretty

11   tricky opening.  So, I am not sure.

12         MR. GARBER:  I would ask that they be required to give

13   us some offer of proof as to what Strain would say.  We don't

14   have access to Strain.  I've asked.  We've subpoenaed her as a

15   plaintiff's witness, actually, so if they are going to open on

16   it I would at least like to know the general content of that

17   would be, really the content of that we could prepare --

18         MR. LARKIN:  If we open on something that we can't

19   prove it's on us, obviously, so we're not going to do that.

20         THE COURT:  Unless it's something that's really

21   improper I am not going to let you open on anything you want.

22         MR. LARKIN:  Of course not.

23         MS. ZGODNY:  I also would add that it is relevant when

24   ADA strain learned about the fight.  She testified at his

25   deposition she learned about it when the garage attendant took

1    the stand during the criminal trial.  So, she is the only one

2    that could testify to that.

3              THE COURT:  Well, she's going to testify about when

4    she learned about it.

5              MS. ZGODNY:  Right.

6              THE COURT:  All right.  Well --

7              MR. LARKIN:  Maybe we can do this by deposition

8    designation.  It might save a lot of trouble.  It is not a lot

9    of testimony, a few questions and answers.  If the Court thinks

10   she's relevant I think maybe we should offer deposition

11   designation that might save --

12             MR. GARBER:  I don't know now.  I may want her on

13   there.

14             THE COURT:  You may.  Look, I am not prepare to say

15   that's irrelevant testimony.  I think the fact of what the

16   witnesses Pujols, Peguero and Sosa said to the defendant and

17   said to others associated with the prosecution team is relevant

18   and I think it's relevant for purposes of this trial.  So, I am

19   not prepared to say it's not relevant.  I am not sure I recall

20   her but that's not the issue.

21             MR. GARBER:  And I am assuming that if Strain or

22   Crutoy is called they can't elicit testimony, well, did you

23   believe them?  Cause I don't want them to be able to advance

24   some sort of a conclusion or some sort of argument through

25   these witnesses.  Just to be very factual, did they tell you

1    this, did they not?  And I am just concerned about that because

2    Crutoy makes certain conclusions, for example, in his

3    memorandum that the police did not know about it.

4              THE COURT:  Well, we certainly can't opine as to

5    whether the police knew but, no, I am not sure whether he can't

6    state or Strain can state whether he or she believed the women.

7    I am not sure that that's the same thing.  They are not going

8    to get into opine whether the defendant's knew certain facts or

9    believed certain things.  They are not qualified to do that.

10   Their own belief and their own testimony as to how persuasive

11   and believable the women were, I am not sure that's irrelevant

12   or out of bounds.  So I guess I want to think about it.  But

13   seems to me that to hear that he always told me this.  I found

14   them believable and felt that I had no reason to question or

15   doubt what they were saying.  Why would that be improper?

16             MR. GARBER:  You take away the jury's role on some

17   critical issues for this trial.  Like let's say the girl said,

18   well, we never told the police.  They told -- I told Crutoy we

19   we've never told the police then, well, did you believe them?

20   He goes "absolutely".  You know that's problematic because it

21   takes away from the jury the credibility issue.

22             THE COURT:  But I think the issue is how believable

23   were these women?  That goes more to the failure to investigate

24   argument than the burying of the fight argument.  So, I think

25   it could be exactly what you're arguing.  But I think the

1    believability and the steps taken by the prosecution team after

2    conferring with those witnesses is relevant doesn't seem to me

3    to be --

4            MR. LARKIN:  Well, Crutoy is after.  He is post

5    conviction.

6            THE COURT:  Crutoy --

7            MR. GARBER:  So, it's one thing --

8            THE COURT:  I'd forgotten that.

9            MR. LARKIN:  Your Honor, we are not going to ask him,

10   did you believe what they said or did you not believe what they

11   said.  We might ask him, What did they say?  OK.  And that

12   would be the extent of it.  He'll say what the witnesses told

13   him.  Again, if the witnesses acknowledge that they gave a

14   couple of different versions of events here to the prosecutors

15   we may not need to call Crutoy.

16           THE COURT:  So, all right.  I am not sure I need to

17   resolve that now but let us know if you plan or calling these

18   people, OK.

19           MR. LARKIN:  Yes, your Honor.  I think Strain in one

20   form or another will either be live or at by deposition.

21           THE COURT:  OK.  Well, we're running out of time.  So

22   I'll see you Monday 9:30 here.  Though I don't think we'll get

23   the jury until later but we could do some housekeeping.  Any

24   other materials in tomorrow and Friday.  Thank you.

25                           (Adjourned)