Te4s0mcc1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------------x

3  WILLIAM MCCAFFREY,

4                  Plaintiff,

5            v.                              11 CV 1636(RJS)

6  DAVID DIAZ and ROBERT ARBUISO,

7                  Defendants.

8  ------------------------------------x
                                     New York, N.Y.
9                                    April 28, 2014
                                     2:40p.m.
10
   Before:
11
                     HON. RICHARD J. SULLIVAN
12
                                     District Judge
13                                    and a Jury
                        APPEARANCES
14
   IRVING COHEN
15 GLENN A. GARBER
        Attorneys for Plaintiff
16
   NEW YORK CITY LAW DEPARTMENT
17 OFFICE OF CORPORATION COUNSEL
        ANDREW GABRIEL LARKIN III
18      VICKI BECKER ZGODNY
        Assistant Corporation Counsel for Defendants
19

20

21

22

23

24

25

E4s0mcc1

1          THE COURT:  All rise for the jury, please.

2          (In open court)

3          (Jury present)

4          THE COURT:  Generally, what you do is remain standing

5     until everybody is in the box, and I'll tell you to have a

6     seat.  But now you're down, that's fine.  As a general matter,

7     you'll get used to it and be comfortable.

8          Okay, have a seat.

9          Everyone else have a seat, as well.  Thank you.

10         So ladies and gentlemen, some of you are wearing

11    coats.  It does get chilly in here.  It's hard to regulate the

12    temperature in a room this big or cavernous.  Best to bring a

13    light sweater or jacket or something.  You can bring water into

14    the courtroom.  Nobody else can eat or drink in the courtroom.

15    You can bring in water from the jury room.  So I want to make

16    sure you're hydrated.  No coffee or anything else.  Spills

17    happen and that's how a courtroom gets kind of trashed.  And we

18    want to keep this nice for another hundred years.

19         You have your notebooks, that's great.  I'll give you

20    instructions in a moment.  But, first, I'm going to have you

21    stand and take another oath.  You took an oath this morning

22    that you would truthfully answer my questions.  Now you'll take

23    an oath that you will faithfully execute your duty as jurors.

24         Raise your right hands.

25         (Jury sworn)

E4s0mcc1

1          THE COURT:  All right.  Please have a seat.

2          All right.  So, members of the jury, now that you have

3     been sworn, I'm going to give you some preliminary instructions

4     to guide you as we participate -- as you participate in the

5     trial.

6          I will give you much fuller instructions at the end of

7     the trial.  This is just to help you get started.

8          To begin with, as I told you before, as you already

9     know, I think you are here to administer justice in this case,

10    according to the law and the evidence.  You are to perform this

11    task with complete fairness and impartiality, and without bias,

12    prejudice or sympathy, for or against any party.

13         It will be your duty to find, from the facts -- excuse

14    me, to find from the evidence, what the facts are.  You, and

15    you alone, are the judges of the facts.

16         And that's not an exaggeration.  You are judges, you

17    are judges of the facts.  I'm the judge of the law.  And so you

18    will have to apply to those facts the law as I describe it to

19    you.

20         You must follow the law that I -- that I explained to

21    you, whether you agree with it or not, whether you think it is

22    good or bad, or should be different, you have to follow my

23    instructions on the law.  I'm the judge of on the law, you are

24    the judge on the facts.

25         Now, nothing that I say or do during the course of

E4s0mcc1

1   this trial is intended to influence you in any way, so don't

2   read into it.  Don't assume that I'm signaling to you.  I'm

3   not.  I have too much respect for what you do as the judges of

4   the facts.

5         Now, the evidence from which you will find the facts

6   will consist of the testimony of the witnesses, the documents

7   that are received into evidence, as well as any other facts

8   that the parties agree to that are sometimes referred to as

9   stipulations.

10         Certain things are not evidence, and I want to go over

11   a few of those things with you right now.  First of all, the

12   statements, arguments, and questions of the lawyers are not

13   evidence.  Nor are my statements to you evidence.  Only the

14   answers given by the witnesses on the stand are evidence, as

15   well as the exhibits and the stipulations.  Objections to

16   questions are not evidence.

17         The parties and lawyers have an obligation to make an

18   objection if they believe that evidence being offered is

19   improper or shouldn't be received.  You should not be

20   influenced by my ruling on an objection.  You have all seen TV,

21   right.  If the objection is sustained, then that means the

22   question is impermissible and there should be no answer to it.

23   If the objection is overruled, then that means the witness can

24   answer the question, and you should consider the answers like

25   you would any other answers.  It is not entitled to any greater

E4s0mcc1

1    or lesser consideration because there happened to be an

2    objection that I overruled.  So the fact that there was an

3    objection doesn't give it any extra weight.

4         Now, testimony -- well, I guess I should say this.  If

5    you are instructed that some part of the evidence, an answer,

6    or some other evidence in the case is being received for a

7    limited purpose only, then you have to follow my instructions

8    on that, and only consider it for that limited purpose.  I'll

9    explain that more as we go.  But use your common sense.

10        Now, testimony that I tell you to exclude or tell you

11   to disregard as evidence, that's not evidence.  You can't

12   consider it as evidence, so put it out of your mind.  You can't

13   make your brain race like it's a computer, but I will ask you

14   to just put it to the side and not consider it as evidence.

15   Don't treat it the way you would treat other evidence in the

16   case.  And I think that you are all capable of following that

17   instruction, so I'm not worried about that.

18        Finally, anything you may have seen or heard outside

19   of the courtroom is not evidence and must be disregarded.  You

20   are to decide case solely on the evidence presented in this

21   courtroom.

22        Now, when you are determining the facts, keep in mind

23   that there are two kinds of evidence.  And I think you know

24   this, too; direct and circumstantial evidence.

25        Direct evidence is proof of a fact based on what the

E4s0mcc1

1    witness has observed or experienced based on his or her own

2    five senses.  That's direct evidence.

3         Circumstantial evidence is proof of facts from which

4    you infer or conclude that other facts exist.  The word infer

5    or the expression to draw an inference simply means that a fact

6    exists from proof of another fact.  So an inference is to be

7    drawn only if it is a logical and reasonable thing to do.  And

8    it's not supposed to be based on speculation or guesswork.

9         In deciding whether to draw an inference, you must

10   look at, and consider, all of the facts in light of reason,

11   common sense, and experience.  Whether a given inference is or

12   is not to be drawn is entirely for you, the jury, to decide.

13   Circumstantial evidence does not necessarily prove less than

14   direct evidence, nor does it prove more.

15        Now I'll give you a brief example of circumstantial

16   evidence that has been used probably longer than this courtroom

17   has been around, which is 80 years or so.

18        Assume when you came in here this morning that it was

19   a beautiful day outside, which was the truth.  Assume, also,

20   that we had curtains and blinds so you couldn't look outside

21   the window.  The windows were completely closed up, you

22   couldn't see what it was like outside.

23        Assume that as you were sitting here, somebody walked

24   in with an umbrella that was dripping wet.  And then a couple

25   of minutes later, somebody else walked in with a raincoat that

E4s0mcc1

1    was dripping wet.  Now, you couldn't see outside of the windows

2    in the hypothetical I'm giving you, because of the curtains, so

3    you wouldn't have any direct evidence of it raining outside.

4              But based on the other facts that I have asked you to

5    consider and assume, the dripping wet raincoat, the dripping

6    wet umbrella, it would be reasonable for you to conclude, for

7    you to infer that it was raining outside.  That's all there is

8    to circumstantial evidence.  You conclude, from certain facts,

9    the existence of other facts.  Again, you do that on the basis

10   of common sense and reason, not on speculation or guesswork.

11   I'll give you further instructions on this at the end of the

12   trial.

13             Now, one of your most important tasks as jurors is to

14   assess and evaluate the credibility of the witnesses who will

15   testify here in court.  Listen carefully to each witness as

16   they testify, both during the direct examination and the

17   cross-examination, and consider whether the witness is telling

18   the truth.  It will be up to you to decide how much of the

19   witness' testimony to believe, which witness to believe or not

20   believe, and how much of any witness' testimony to accept or

21   reject.

22             Now, how do you decide what testimony to believe, what

23   witnesses to credit?  Well, you should listen to the witness

24   testimony, of course.  Observe their testimony and their

25   demeanor.  And then decide, as you would decide such questions

E4s0mcc1

in your own life.  Did they know what they were talking about.

Were they candid, honest, open.  Did they appear to be

truthful.  Did they have a reason to falsify, exaggerate, or

distort their testimony.  Sometimes it's not what a witness

says, it's how he or she says it that really strikes a chord

with you.  That may give you a clue to whether or not the

witness' version of an incident is accurate or truthful.  In

short, the way a witness testifies may play an important part

in your reaching a judgment as to whether or not you can accept

the witness' testimony as reliable.

          Now, as I told you before, this is a civil case.  It's

not a criminal case.  So the plaintiff, Mr. McCaffrey, has the

burden of proof in this case.  He has the burden of proving his

claims by what is called a preponderance of the evidence.

          Now, those of you who have sat as jurors in criminal

cases, or if you watch TV, you know the standard in a criminal

case is proof beyond a reasonable doubt.  That standard does

not apply in a civil case such as this one.  You should put

that standard out of your mind, except to the extent that it

may be relevant to your determination as to whether a fair

trial took place.  There is a fair trial claim that I will

explain more in detail.

          What does a preponderance of the evidence mean?  To

establish a fact by a preponderance of the evidence means to

prove that the fact is more likely true than not true.

E4s0mcc1

Preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and the persuasiveness of the evidence, not to the number of witnesses or the number of documents.

This means that a party has to produce evidence that, considered in light of all of the facts, lead you to believe that what the party claims is more likely true than not.

To put it another way, imagine that you are reviewing Mr. McCaffrey's claim against the defendants.  If you were to put the evidence that supported the plaintiff's claim on one side of the scales, and the evidence that supported the defendant's version on the other side of the scales, the plaintiffs evidence would have to make the scales tip ever so slightly in his favor.  That's all there is to a preponderance of the evidence.  If the plaintiff fails to do that, he has not met his burden, and your verdict on the plaintiff's claim must be for defendants.

Now, a few other words about your conduct as jurors.  First, during the trial, you are not to discuss the case with anyone, nor should you permit anyone to come talk to you about the case.  This includes posting anything on the internet.  Don't do that.  Don't Tweet about the case.  Don't go on Facebook, any of the social media sites that we all live our lives on these days.  As a juror, you can't do that.  You can't talk about this case.  You have to put that aside, at least for

E4s0mcc1

the duration of this trial.  And if you don't, it really can

have serious repercussions for this trial, and for you,

yourselves.  And I don't tell you that to scare you, but just

so you understand that it is very important that you not

discuss this case with anyone, that you not sort of go outside

and hit social media sites to discuss what you are doing, what

you have seen, and what you are thinking about this trial,

okay.

          I also don't want you discussing this case with

anyone, really.  You're going to get home tonight, and people

are going to say did you get picked for the jury, tell me about

it, what's it all about.  And I want you to resist the

temptation to do that.  You can say that, yes, you were picked.

You can say it's a civil trial.  But beyond that, I really

don't want you to discuss it.  And here's why.  I think that if

you start describing the case and explaining it to others,

there is a natural tendency to sometimes start adopting a

version of the story before you have heard all of the evidence,

before you have heard my instructions on the law.  And I want

to prevent you from doing that.  I want you to remain pure, as

it were.  Because until you have heard all of the evidence,

until you have heard my instructions on the law, you are really

not in a position to make conclusions.  So I want you to not

discuss this case with anyone.  There will be a little bit of

disappointment because people love to know, but it is not a

1    long trial, and it shouldn't be too much of an inconvenience.

2    So please take that seriously.

3              Now, don't, while you are serving as a juror, have any

4    conversations with the parties, the attorneys, or any of the

5    witnesses.  As I said before lunch, if you see any of those

6    folks in the elevator, in the lobby, in the security line,

7    don't talk to them, don't acknowledge them.  They will do the

8    same to you.  It's just easier and better if we all do it that

9    way.  It keeps the appearance of propriety, as well as

10   propriety itself.  And that's important because sometimes

11   appearances really matter, especially in a court of law like

12   this, all right.

13             Third, don't read, listen to, or do any investigation

14   about the case in any way.  If there is any news reports, I

15   don't know that there will be, but if there are, I don't want

16   you to read it, or listen to it.  I want you to change the

17   channel or turn the page and immediately tell Mr. Deluzio about

18   it.  Don't discuss it with your fellow jurors:  Oh, you won't

19   believe what I heard.

20             I don't want you to taint anybody else.  And it may

21   not be a problem at all for you, but I want to make sure we are

22   careful about it, we deal with it before you have talked to

23   anybody else about it.  Tell Mr. Deluzio and he'll tell me and

24   I'll follow up with you.  You can read the paper, watch TV, I'm

25   not saying you have to be in isolation.  If you see anything

E4s0mcc1

1    else touching on this case, immediately stop at your earliest

2    convenience, tell Mr. Deluzio.

3            Don't let anybody talk to you about this case.  If

4    anybody approaches you to talk to you about this case,

5    immediately tell Mr. Deluzio.  Tell them you can't speak to

6    them and tell Mr. Deluzio, all right.

7            If any person you know comes into this courtroom, let

8    us know that, too.  It's a public courtroom, everybody is

9    welcome to come into the courtroom.  But, if there is someone

10   that you know that comes in, it may be that when the jury is

11   back in the jury room, that person will hear or see things that

12   are not intended for the jury.  And so I don't want them to

13   inadvertently say things to you that are not properly before

14   you.  I want you focused only on the evidence in the case and

15   my instructions on the law.  So just let us know if you have a

16   friend, or you recognize someone in the courtroom.  And that

17   way we'll take steps to make sure that we're careful about what

18   we say or take precautions to make sure that things are not

19   shared inappropriately.

20           Don't do any research, don't do any investigations

21   about this case.  Don't go on line, don't go on the internet.

22   Don't check me out to see, oh, let's find out about this judge.

23   Don't check the lawyers out.  Don't check out any of the

24   parties.  Again, that could compromise the trial.  Because I

25   want you focused exclusively on the evidence, or the lack of

E4s0mcc1

1    evidence presented in this courtroom.  Once you go outside and

2    start doing investigations of your own, it will compromise that

3    process and it could also result in serious repercussions for

4    you.  Ever once in a while you read about a case like that,

5    where a juror or some jurors decide, well, I'm going to do some

6    internet stuff, I'm going to go Tweet and talk about the case.

7    And not only does it undermine the trial, but we have to start

8    all over.  But the jurors themselves can then be prosecuted.

9    And I don't tell you that to scare you, just so you realize and

10   are mindful of how serious an endeavor this is.  So definitely

11   take it seriously.  I know you will.

12            Finally, don't form any opinion until all of the

13   evidence is in.  As I have said now three or four times, until

14   you have heard all of the evidence, until you have heard the

15   lawyers in their summations, until you have heard my

16   instructions on the law, you are really in no position to make

17   any firm conclusions.  So don't go back to the jury room and

18   talk about what you have seen.  I don't want you to do that

19   until you are deliberating.  So even among yourselves, don't

20   discuss the case until I have instructed you on the law and

21   it's time for you to begin your deliberations.

22            Now, I see you have notebooks, which is great, that's

23   fine.  You're certainly free to take notes.  I ask that you

24   each put your name on the front of the notebook and that that

25   be the exclusive place where you keep notes throughout the

E4s0mcc1

1    trial.  At the end of the day, I'll ask you to keep the

2    notebooks here.  We'll secure them so that nobody else will see

3    them.  But I don't want you taking them home on the subway or

4    bringing them to your apartments or home.  So keep all your

5    notes in those notebooks, and keep your note books here at the

6    end of the day.

7         Keep in mind -- obviously, take notes as you feel

8    comfortable taking notes, but at some point when we were all in

9    school, we all realize you can sometimes take so many notes

10   that you are missing every other word from the source that you

11   are supposed be writing the notes about.  So be mindful of

12   that.  We have the best court reporters around.  We're very

13   fortunate.  We have just really talented court reporters.  So

14   there will be a transcript of this whole proceeding that will

15   be available to you at the end of the trial.  So if you would

16   like to have some portion of that transcript, we'll make it

17   available to you.

18        At the end of the trial, I'll also send you a list of

19   all of the names of the witnesses, and an exhibit list, so if

20   there is anything you want to see or any testimony you want to

21   have sent back to you, we can send that to you.

22        Now, if there is a dispute while you are deliberating

23   between one juror's notes and another juror's notes or one

24   juror's notes and another juror's memory, the fact that one

25   juror has notes doesn't give it any greater weight.  Again, the

E4s0mcc1

official record, that is binding, and it's your memory that

controls.  Notes can be an aid to your memory, but they are not

entitled to any greater weight just because one juror just

happened to have notes, okay.

As I said during the course of the trial, there will

be exhibits that are received in evidence.  They will have

numbers.  And so I'll make them available to you.  I'll send

you a list at the end of the case.  You can jot down numbers if

you think you are interested, if you would like to see them in

the jury room, you can then quickly tell us what you want.  But

I'll send you the list so you don't have to worry about that

too much.

All right, let me tell you about how this trial will

proceed.  We are about to begin the trial.  We'll begin each

day at 9:30 and we'll go to about 5:30, take an hour for lunch,

usually take 10 or 15 minutes in the morning and another 10 or

15 minutes in the afternoon.  Please be on time.  I promise

that I will be respectful of your time.  I know you are all

busy.  I know you have other responsibilities and obligations

and that it is in some ways an imposition for you to be

serving.  You all recognize it is an important duty and are

taking it seriously.  I promise that we will use your time

efficiently.  We will do everything we can.  That involves

talking about legal issues when you are not around in the

morning before you get here, in the evening when you have left,

E4s0mcc1

1    at lunch, at breaks.  Occasionally, it may be necessary to have

2    a side bar but only occasionally.  And I'll certainly be very

3    careful that we not waste your time and keep you waiting

4    around.  But, in turn, I really hope that you will all be on

5    time.  Because if we have to wait just for one person, it means

6    we all wait, because we can't do anything unless we're all

7    here.  Some of you have longer commutes than others and that

8    makes this a tougher duty than for some, but build in time for

9    transportation glitches and weather, because those things

10   happen from time to time.

11           If you are running late because the 4 train is not

12   running, make sure you have our number, we'll get your numbers.

13   And we'll give you our numbers so you can call us, if possible,

14   to let us know you are running late, or if you are sick, or

15   something, okay.  But 9:30 to 5:30, just about every day.  That

16   will be our plan.  If we're going to finish early some days

17   because maybe I have another matter, I'll let you know in

18   advance, all right.

19           Let me tell you how the case will go.  We'll first

20   start with opening statements.  Opening statements are

21   presented by the lawyers.  They are not evidence and they are

22   not argument.  They are just views of what the lawyers believe

23   the evidence will show.  They are important.  Listen carefully.

24   And it will help you understand the evidence as it comes in

25   during the course of the trial.

E4s0mcc1

1          After the opening statements, the plaintiff will

2     present his case.  The plaintiff will call his witnesses.  And

3     after each witness testifies on direct examination, then there

4     will be cross-examination by the defense lawyers.  And you have

5     seen it all on TV, you know how that goes.  After the cross,

6     there might be some brief, what's called redirect examination.

7     And then maybe some brief recross.  But it gets shorter and

8     shorter each time.

9          After the plaintiff has finished, the plaintiff will

10    rest.  The defense will then, if they wish, put on a case of

11    their own.  They'll call witnesses.  They'll be examined on

12    direct examination.  And there will be cross-examination, just

13    like before.

14         After the evidence is completed and both sides have

15    rested, the parties will then give their summations.  And

16    that's the final opportunity for the lawyers to summarize the

17    case and to make their arguments as to what the evidence shows.

18         After that, I will then instruct you on the law much

19    more fully than I did today.

20         And after that, you will then begin your

21    deliberations.

22         So we've get a few days of work ahead of us, but I

23    want to thank you for your attention so far.  And I look

24    forward to serving with you in this matter.

25         Okay, so with that, we'll now begin with the

E4s0mcc1

1    plaintiff's opening by Mr. Garber.

2              Mr. Garber.

3              MR. GARBER:  Thank you.

4              As the judge, said my name is Mr. Garber, Glenn

5    Garber.  And I represent Wil McCaffrey, along with my

6    co-counsel, Irving Cohen.

7              Good afternoon, ladies and gentlemen.

8              This case is about the conviction of an innocent man

9    who faced an unfair trial, and was convicted of one of the most

10   horrific crimes imaginable.  Of a rape.  A rape in the first

11   degree, and sentenced to 20 years in maximum security prisons

12   in New York State, despite his innocence.  Four years before

13   the truth came out and he was finally exonerated and set free.

14   There is no dispute about his innocence, ladies and gentlemen.

15             Buirny Peguero, the purported rape victim, pled guilty

16   to perjury and went to jail herself.  She came forward to a

17   priest and admitted that she had lied at the trial of Mr.

18   McCaffrey.

19             But this case, here, is also about the actions of the

20   defendants, Detectives Arbuiso and Detective Diaz.  And in

21   their zeal -- this is in the investigation of that criminal

22   case -- in their zeal to get a conviction at all costs, they

23   cheated.  And the evidence will show that these defendants,

24   knowing that the cause of the physical injuries on Buirny

25   Peguero -- Buirny Peguero was the purported rape victim --

knowing their significance and knowing how important they were

to the criminal trial of Wil McCaffrey, they influenced --

okay, let me just back up a bit.

Those injuries turned out to be very, very important,

because they were corroborative evidence of what Buirny Peguero

was saying about the rape.  And what the defendants did, was

they influenced other witnesses.  These are the friends of

Buirny Peguero who were critical witnesses at that trial.  It

was Aurora Pujols and Maria Sosa.  Influenced those witnesses

not to tell the jury, at the criminal trial, about the true

source of those injuries.  Because it was portrayed at the

trial that it was Wil McCaffrey who caused those injuries.  And

it was corroborative evidence, as it was argued by the

prosecutor at that trial, of the rape and of what Buirny

Peguero was saying.  But, in reality, there had been a fight

between Buirny Peguero, the purported rape victim, and her

friends.  And they were, in fact, the cause of those injuries.

And these defendants influenced them to not tell the

prosecutor, and not tell the jury about that, throwing the

fight and causing this innocent man, Wil McCaffrey, to go to

jail for a crime that he did not commit.

Now, the case is also about tragedies and a series of

tragedies.  There was the purported rape of Buirny Peguero,

which was a false tragedy.  And there was the nightmare that

flowed from that.  It was not only the unfair trial, the

E4s0mcc1                    Opening - Garber

1    evidence will show, of Mr. McCaffrey who had to sit through

2    this case and feel his heart sink as evidence came in that was

3    not true, it was the terror of facing that despite his

4    innocence, the run-away train, his protestations of innocence

5    which he made to the police when they first arrested him, which

6    he made when he testified before the grand jury, which he made

7    when he testified at the trial, were ignored.  And then the

8    verdict of guilty that he had to sit through and hear guilty of

9    rape in the first degree.  And other charges.  And the harsh

10   sentence of 20 years in a maximum security prison.

11           This poor man was placed in a facility, or in

12   facilities, with the worst of the worst, and for the crime of

13   rape, one of the most disgusting, vile, heinous crimes.  And

14   you will hear that the one thing that people in maximum

15   security prisons, murderers, other violent criminals, what they

16   can rally around is we all hate rapists.  It's a terrible,

17   terrible thing.  You wouldn't wish it on your worst enemy.

18           And this case is about that, in many ways, and about a

19   man, a proud man who was actually raised by women.  His father

20   had left, he really didn't have a father.  And he had to deal

21   with the badge, or the scarlet R of rape.  Had to deal with his

22   family about that, and all of the shame and embarrassment.  The

23   most insidious violation of women, he was falsely convicted of.

24           You'll hear about the emotional suffering that he

25   endured while he was going through the process, sitting through

1    the trial, and then going up to maximum security prisons with

2    the toughest guards, and the toughest criminals.

3           You will hear that Wil is not a choirboy.  Wil has had

4    his scrapes with the law.  Wil grew up in a tough neighborhood

5    in the South Bronx.  But he's a proud, stoic, quiet man.  And

6    he's going to testify at this trial.  And he's going to try

7    very hard to express to you the suffering that he went through,

8    for a crime that he did not commit.  The deprivation of

9    dignity, the contemplation of suicide, as he languished in

10   State prison, hoping that evidence would come forward that

11   would free him.

12          The evidence will show, well, you'll learn about the

13   criminal justice system.  And you'll learn about sort of like a

14   multilayered trial, in a way.  You have a trial in a civil case

15   that, actually, the subject of it is what happened in a

16   criminal case, but you'll learn how vulnerable that criminal

17   justice system is.  And how the suppression of evidence that is

18   favorable to an accused, is an insidious thing.  And it can

19   undermine and deprive somebody's right to a fair trial, as what

20   happened in this case.

21          You will also learn how easy it is for detectives,

22   trained police officers with a Special Victims Unit that deal

23   with rape cases, how easy it is for them to manipulate

24   evidence, to throw a fight, or to make a trial unfair.  And how

25   they exploited that knowledge to do it.

 1            You will learn that the criminal case against Mr.

 2   McCaffrey was not a very strong case.  It rested on the word of

 3   Buirny Peguero, only.  The rape victim.  Or the purported rape

 4   victim.  She was intoxicated.  There was no semen found to

 5   corroborate that there was a rape.  The physical examination

 6   was inconclusive.  And what became significant during that

 7   investigation and that trial, were the physical injuries that

 8   she had on her.  The photographs that were taken when she was

 9   first evaluated for this purported rape.  And the injuries, by

10   the way, that were caused by her friends and not Wil McCaffrey,

11   became touted before that criminal jury, and became argued by

12   the prosecution as strong corroborative evidence.  Strong

13   corroborative evidence of a fight that happened between the

14   women, and not -- and not injuries caused by Mr. McCaffrey.

15            Now I'm going to digress a little bit, because I want

16   to get into the background of the trial, so that I can give you

17   a little bit more context of beyond what I have just given you

18   and just so you know, the criminal trial is a historical event.

19   It happened in 2005, 2006.  And we're going to recreate it for

20   you.  We're going to try to streamline it a little bit.  There

21   is gonna be transcripts that are going to come in.  And they're

22   going to be available to you to read, because you have to

23   understand that criminal trial.  And what's going to happen is

24   there will be kind of like a little play, I guess.  There is

25   gonna be excerpts that are going to be read to you, we're going

E4s0mcc1                    Opening - Garber

1   to read to you.  And then Mr. Cohen is going to act as a

2   witness, I'm going to act as a lawyer from that criminal trial

3   and read transcripts.  And we're going to hear Q and A so that

4   it can be reenacted for your benefit.  And during that part of

5   the plaintiff's case, the defendants and their counsel are also

6   going to reenact portions of it, as well.

7           But I'm going to give you a little bit of background,

8   okay.  It was a September 18th or 19th of 2005, that evening.

9   And Buirny Peguero, Aurora Pujols, and Maria Sosa, residents of

10  New Jersey, came to Manhattan to go clubbing.  Two other people

11  came with them, as well, it Heliana Medina and Orlando

12  Betonces.  They went out to a club called The Umbrella Lounge.

13  And Ms. Peguero and Aurora Pujols got intoxicated.  I think Mr.

14  Betonces and Ms. Medina did, as well.  They drank multiple

15  drinks called Blue Hawaiians that have vodka in it, mixed

16  drink.  Maria Sosa was the designated driver, and she was not

17  drinking.

18          After clubbing, they stopped at a restaurant in upper

19  Manhattan before they were going return to New Jersey in the

20  car that they had, and they were going to use the bathroom and

21  they were going to get something to eat.

22          Ms. Peguero and Ms. Pujols are in the vehicle, alone,

23  while the others were in the restaurant, before they were going

24  back to New Jersey.  And the car was illegally parked at a bus

25  stop in front of the restaurant.

1          Meantime, Mr. McCaffrey and three of his friends were
2     cruising around, and hoping to go to an after-hours club.  And
3     they were looking, hoping that some women would accompany them
4     to the after-hours club.  Otherwise, they feared that they were
5     not going to be able to get in.
6          They see Ms. Peguero and Ms. Pujols in their car.  And
7     Mr. McCaffrey strikes up a conversation with Ms. Peguero.  She
8     is receptive and she's willing to go to this after-hours club
9     with him.  He's a little bold, there is no question about that.
10    Gets into their car, the women's car, and continues talking to
11    Ms. Peguero.  And she offers to drive the car -- his friends
12    are in another car nearby -- off to go to the after-hours club.
13         Ms. Pujols, who is drunk, gets out of the car and says
14    I don't want to go.  And the car drives around the corner.
15    Mind you, there is no discussion with Ms. Peguero or Mr.
16    McCaffrey about the other friends back at the restaurant, and
17    they are left in the lurch without a car.
18         Ms. Pujols -- in Ms. Pujols's car, by the way, who
19    gets out of her own car.  And there is no way for these
20    individuals to get back to New Jersey.
21         So what happens is Wil McCaffrey and Buirny Peguero --
22    she actually gets in the car to drive, initially, but she is
23    too drunk.  He drives around to a parking lot nearby.  They
24    park her car and go out looking for the after-hours club in a
25    van that one of his friends had.  And they are gone for maybe

1    45 minutes.  There is no after-hours club.  It was closed and

2    they never wound up going.  And they wound up dropping

3    Ms. Peguero back at the parking garage.  And in the meantime,

4    Ms. Peguero's friends are panicking.  Calls going back and

5    forth.  It is not clear what exactly is being said.  It's

6    disputed at the criminal trial, what's going on with the phone

7    calls between Ms. Peguero and her friends.  But, eventually,

8    probably 45 minutes, maybe an hour later, Ms. Peguero was

9    dropped off at the parking garage.  And she's still drunk.  And

10   Mr. McCaffrey says to the garage attendant, or one of them.

11   Her friends are coming, don't give her the keys to the car,

12   she's drunk.  There is argument -- that came out at the

13   criminal trial -- between Mr. McCaffrey and the garage

14   attendant about the keys.  And they leave.  And Ms. Peguero is

15   at the parking garage.

16           Now, it's the events that unfold at this point that

17   become very, very critical.  Ms. Peguero's friends join up with

18   her a few minutes later.  And there is a fight, a violent

19   alteration.  It's not clear who starts the fight.  It may be

20   Ms. Peguero.  It may be Ms. Pujols.  But there is a fight

21   amongst the women in the car.  And it gets so violent that

22   there is hair pulling, there is scratching, and kicking.

23           Ms. Pujols actually bites Ms. Peguero in the arm.

24   Ms. Peguero kicks the windshield of the car, and causes about a

25   10-inch crack in the windshield of the car.  And this is all

1    witnessed by two parking garage attendants who are situated

2    only a few feet away from this.

3          The women go back to New Jersey.  And on the way back,

4    one of the women, it appears as if it is probably Heliana

5    Medina says to Buirny Peguero -- this is after they settle down

6    after this major fight -- did they rape you.  And Ms. Peguero

7    says, yes.  That's what happened.

8          So the women get concerned and take her to a hospital.

9    They go to a hospital in New Jersey.  It's Christ Hospital in

10   Jersey City.  And she's given an exam.  And, very importantly,

11   photographs are taken of all of those injuries.  Those injuries

12   caused by her girlfriends and, likely, Aurora Pujols.  These

13   photos are passed along to detectives in the case, the

14   defendants here.  They are given to the prosecutor, ultimately,

15   for the trial.  And they become the false evidence that,

16   corroboration that they portray at trial as the injuries caused

17   by Mr. McCaffrey.

18         Now, what happens, though, is after the hospital

19   evaluation, the women are all brought back to the precinct in

20   New York.  It's a New York case.  So the detectives in New

21   York, these detectives, have jurisdiction over it.  Even though

22   the women were in New Jersey at the hospital, the case became

23   investigated by the police in New York.  And, there, the police

24   first drive the women around, looking to retrace the steps from

25   the prior evening.  They are taken back to a precinct and they

1    are interviewed.

2            Now, mind you, the detectives get information from the

3    other detective in New Jersey who was at the hospital, that the

4    windshield of the car had been broken, that there might have

5    been a carjacking of the car.  And they interview the women at

6    the precinct about what happened.  At that interview, these

7    detectives are informed, by the women, that there was a fight

8    in the car amongst them.  And what the police say, what these

9    defendants, these detectives, say is that, look, your friend

10   was raped.  That's not important.  That fight you had in the

11   car can only affect the case.  And they influence them not to

12   bring that up, moving forward.  And they faithfully adhere to

13   that advice.  And that's what happened, as far as the

14   deprivation of the right to a fair trial.

15           Now, the police also say something that becomes an

16   insidious thing, because they say, look, your friend was raped.

17   It's really not that important in the scheme of things, who

18   cares about that fight.  And that thought, that notion, becomes

19   part of the coverup that not only continues throughout that

20   police investigation and at that trial, but today, that coverup

21   continues.  And the defendants, these detectives who are likely

22   going to testify, are gonna get up here and they're going to

23   lie.  And they are going to say we never knew about that --

24           MS. ZGODNY:  Objection, your Honor.

25           THE COURT:  Sustained.  Don't speculate as to what the

1    witnesses are going to say.

2                MR. GARBER:  Okay.

3          The evidence will show, okay, well, you'll hear

4    testimony from the defendants and you'll make your own

5    conclusions, about whether or not that is truthful or not.

6          The women will testify, or at least two of them, Miss

7    Peguero was, after she was convicted and served her sentence

8    for perjury, she went back to the Dominican Republic.  She was

9    deported.  She's not going TO be at this trial.  But Maria Sosa

10   may testify.  And Aurora Pujols certainly will testify.  And

11   you'll hear from them.  And they're going to vacillate.  They

12   are going to adhere, to some extent, maybe, to their story.

13   Well, it wasn't that important; we don't know if we said

14   anything; we don't know if we did or didn't say anything to the

15   police because, really, it was all about the rape and it wasn't

16   all that important.

17         But it's a vicious lie.  And you are going to hear

18   that at this trial.  Because what happens, and you're going to

19   hear evidence about this too, is that Ms. Pujols was

20   interviewed previously.  And when her guard was down, she

21   admitted to a private investigator who was looking into the

22   case, and volunteered to that person that not only did she know

23   about the fight, or did the police know about the fight, but

24   they told the police during those interviews and the police

25   said, and I quote: It can only -- don't mention it, it can only

1    affect the case.

2           And it was a recorded conversation.  It's something

3    that she can't deny, and it's something that she can't back out

4    of, although she may try to.

5           The evidence will show that this fight was a bigger

6    deal than they probably are now going to say at this trial.

7    And that the women and the police not only knew about it before

8    the trial and continued to suppress it, but understood its

9    significance.  In fact, it ultimately got exploited in a

10   criminal trial in a way that will become very, very apparent to

11   you.

12          The detectives also went so far as to misrepresent to

13   the prosecutors conversations that they had with garage

14   attendants who they interviewed before the trial.  And one of

15   those garage attendants, Pelazo DeLaCruz testified at the

16   criminal trial.

17          And the information passed on by these defendants to

18   the prosecutors about their interviews of the garage attendant

19   was used to unfairly undermine his testimony.  He testified

20   that there was a violent fight, and he was attacked, and the

21   prosecutor, based on information provided by these individuals,

22   was able to undermine his credibility and have the jury

23   believe, okay, that he was lying when he told the jury,

24   truthfully, that there was, in fact, a fight.

25          And then Detective Diaz testified about his

1  conversations with that garage attendant, or supposed

2  conversations, and testified falsely in an effort to undermine

3  Mr. McCaffrey's right to a fair trial.

4          And you will hear, from the criminal trial, I'm going

5  to give you one passage.  There is many others that show how

6  the prosecutor was able to exploit the misconduct of these

7  defendants.  She says, this is Shanda Strain, the prosecutor at

8  Mr. McCaffrey's unfair trial: Because what the defense would

9  have you believe is, is that they created this entire scenario

10  to frame a man they have never met --

11          Talking about the women.

12          -- they would have you believe that a friend, upon

13  finding her in a state of distress and shock, proceeded to beat

14  the crap out of her.  Did anyone else hear this?  Punching her,

15  kicking her.  Are you kidding me?  This is ridiculous.

16          That argument, which was central to Mr. McCaffrey's

17  right to a fair trial, was made by the prosecutor.  And the

18  reality is, is that Pelazo DeLaCruz, who testified about that

19  fight, was testifying truthfully, and it was not ridiculous.

20  It was, in fact, the truth.  And if these officers had done

21  what they were supposed to do, if they engaged in their

22  investigation the way they should have, passed off information

23  that was honest, they didn't influence these women to suppress

24  evidence --

25          MS. ZGODNY:  Objection.

1                MR. GARBER:  -- about that fight, this man would not

2      have been wrongfully convicted.

3                THE COURT:  Is there an objection?

4                MS. ZGODNY:  Objection, argumentative.

5                THE COURT:  Let's keep this to a preview, not a

6      summation.

7                MR. GARBER:  The evidence will show that this man

8      would not have been wrongfully convicted of rape and not have

9      been subjected to the horrific experience he went through for a

10     crime that he did not commit.

11               Ladies and gentlemen, I urge you to listen closely

12     throughout this trial, to listen to the evidence, to listen to

13     what the witnesses say, and to use your common sense and

14     understand what happened here.

15               And, finally, we are hopeful that the truth will come

16     out, and this man will be vindicated on another level --

17     because he is entitled to compensation for what he went

18     through -- and avoid another tragedy from happening in this

19     terrible, terrible, line of events.

20               Thank you very much.

21               THE COURT:  Okay, thank you, Mr. Garber.

22               We'll now hear from Ms. Zgodny.

23               MS. ZGODNY:  Thank you, your Honor.

24               MS. ZGODNY:  Good afternoon, ladies and gentlemen.  My

25     name is Vicky Zgodny, and I represent these two detectives,

1   Detective Robert Arguiso and Detective David Diaz.

2           Now you have heard Mr. Garber talk for a little while

3   about what the plaintiff believes this case is about, and what

4   they believe that the evidence is going to show you.  But let

5   me take a step back, and let's talk about why you are here.

6   You are here for a very limited purpose.  You are here for a

7   very specific purpose.  You are here to decide whether these

8   two detectives, Detective Diaz and Detective Arbuiso hid

9   information, deliberately hid information about a physical

10  fight between Ms. Peguero and one of her friends after the

11  point in time when Ms. Peguero said that she had been raped.

12  And whether that information about that physical fight would

13  have changed the outcome of plaintiff's criminal trial.

14          That's why you are here, and the answer to those

15  questions are, no, these detectives did not hide any

16  information about a fight.  And the information about the

17  physical fight would not have changed the outcome, would not

18  have changed the verdict of plaintiff's criminal trial.

19          Now, let me talk about why that is.  In this lawsuit

20  okay, in this lawsuit, you're going to hear about, and you will

21  be examining, what these detectives learned during their

22  investigation of the rape.  And you are going to hear about,

23  and you are going to be examining, what the jury and what the

24  criminal trial heard, and all of the evidence that came out in

25  that criminal trial against plaintiff.  So that's gonna be your

1    world.  So now let me talk about it.

2              Now, you have already heard from plaintiff's counsel

3    that the victim, Buirny Peguero, has since recanted.  She has

4    since recanted her story about the rape.  And as you heard from

5    Mr. Garber, she was prosecuted and spent time incarcerated, and

6    she was prosecuted by the same district attorney's office who

7    prosecuted plaintiff.

8              Now, let me take a step back and let's talk about the

9    evidence that was presented at plaintiff's criminal trial, and

10   what these two detectives learned during their investigation

11   for rape.  And what I mean by that, is what these detectives

12   were told by the witnesses.

13             So let me start off by talking about Buirny Peguero.

14   Now, what Ms. Peguero had said happened to her, what she told a

15   jury in that criminal trial -- and by the way, much of this is

16   what the detectives learned during their investigation of the

17   rape.  And, by the way, much of this is actually not in

18   dispute.  And it's consistent with what plaintiff testified to

19   at his criminal trial.

20             So let me begin the night of September 18th, 2005,

21   into the early morning hours.  Ms. Peguero and four of her

22   friends, three women and one man, were out drinking at a

23   nightclub in Washington Heights.  Ms. Peguero had a lot to

24   drink that night and she was drunk.

25             At about 4:30 in the morning, Ms. Peguero and her

E4s0mcc1                      Opening - Zgodny

1    friends went to a restaurant after they left the nightclub to

2    get some food, use the bathroom, on their way up to New Jersey

3    where they live.

4            Now, Ms. Peguero and one of her friends, Aurora

5    Pujols -- and you will hear that name a lot throughout this

6    trial.  And you have already heard it from Mr. Garber's

7    comments.  Ms. Pujols and Ms. Peguero were in the back seat of

8    Ms. Pujols' car.  And their friends were in that restaurant.

9    They were illegally parked in a bus stop in front of the

10   restaurant, okay.  Another car pulls up.  A white Mercedes

11   containing plaintiff and three of his male friends.

12           So let me set the scene.  Ms. Peguero and Ms. Pujols

13   are in the back seat of their car, drunk and slouched over.

14   And plaintiff pulls up with three of his guy friends in a white

15   Mercedes, right next to their car.  Now, plaintiff, who was

16   about 27 years old at the time, approached the car that

17   Ms. Peguero was in, who by the way was about 22 year old at the

18   time, and opened the front passenger door.  So a total

19   stranger, uninvited, opens the front passenger car door of Ms.

20   Pujols' car and proceeded to get into the car.  And sat down in

21   the passenger seat while Ms. Pujols and Ms. Peguero are drunk

22   in the back seat.

23           Now, according to plaintiff, he was not drunk.  Ms.

24   Pujols and Ms. Peguero were both telling plaintiff to get out

25   of the car.  Ms. Peguero was pushing plaintiff out of the car.

 1    Ms. Pujols has testified, and excuse my language, but she has

 2    testified, and I quote, "Get out of my fucking car."  That's

 3    what they are saying to plaintiff.  He does not get out of the

 4    car.

 5             MR. GARBER:  Objection to "they."

 6             THE COURT:  To "they."

 7             MR. GARBER:  This is what their version of the

 8    evidence.

 9             THE COURT:  All right, overruled.  Go ahead.

10             MS. ZGODNY:  As I was saying, plaintiff did not get

11    out of the car.  Ms. Pujols did get out of her own car and went

12    inside to the restaurant to tell her friends that some strange

13    man was sitting in her car and wouldn't get out.

14             Now, plaintiff began having a conversation with Ms.

15    Peguero.  At some point, Ms. Peguero decided that she was going

16    to park Ms. Pujols' car in a legal parking spot.  As I told you

17    earlier, it was parked in an illegal parking spot in a bus

18    stop.  So, now, she wants to park the car in a legal parking

19    spot.  So here's the scene.  Ms. Pujols gets out of the car,

20    goes into the restaurant with her friends.  Ms. Peguero is now

21    in the driver's seat.  Plaintiff is in the passenger seat.  And

22    Mrs. Peguero began driving the car.

23             Now, at some point, the car stops.  According to

24    Ms. Peguero's testimony at the criminal trial, plaintiff pulled

25    up on the emergency brake, according to plaintiff.  He had her

1    stop the car.  Either way, the car stopped.  And one of

2    plaintiff's other friends, who was in that white Mercedes that

3    I had told you about earlier, got into the car with them.  So

4    now it's Ms. Peguero, this young drunk woman, in the car with

5    these two men.  Now, according to plaintiff at his criminal

6    trial, he got into the driver's seat.  According to

7    Ms. Peguero, that other friend that got into the car actually

8    got into the drivers seat.  Either way, one of these men took

9    over that car and began driving it to a parking garage.

10         So as the evidence will show you, Ms. Peguero only

11   wanted to park her car in a legal parking spot.  But these men

12   took Ms. Peguero, in that car, to a parking garage that was

13   actually a distance away.

14         And this is what -- all that was said at the criminal

15   trial.  All of what I am saying to you was said at the criminal

16   trial.

17         Now, plaintiff and his friend park Ms. Pujols' car in

18   a parking garage.  And when they get to the parking garage,

19   that white Mercedes is also in that parking garage.  And it

20   is two of plaintiff's other friends in that vehicle.  So, now,

21   they have Ms. Peguero get into that white Mercedes with them.

22   So it's four men, and Ms. Peguero, in that car.

23         Now, according to plaintiff's testimony at the

24   criminal trial, they actually got into a van.  So they switched

25   from a sedan into a van.  But according to Ms. Peguero, they

1    actually got into that white Mercedes.

2            Now, plaintiff testified at that criminal trial he was

3    going to take Mrs. Peguero with the rest of her friends to an

4    after party.  Ms. Peguero testified at the criminal trial she

5    thought they were going to park Ms. Pujols' car in a legal

6    parking spot, and then take her back to her friends at the

7    restaurant.  But they did not take her back to that restaurant.

8    They took her further away from the restaurant.  And, in fact,

9    they went in the opposite direction.  And, in fact, they went

10   over a bridge, onto a highway, and they left the Borough of

11   Manhattan and they left the Borough of Manhattan and they went

12   into the Bronx.

13           Now, Ms. Peguero at this point testified at her

14   criminal trial that she was crying and she was afraid.  And

15   this has never been recanted by Ms. Peguero to the district

16   attorney's office.  And by the way, much of it is consistent

17   with what plaintiff testified to at his own criminal trial.

18           Now, when Ms. Peguero realized that they were not

19   taking her back to the restaurant, back to her friends, as I

20   said to you already, she was crying, she was afraid.  At this

21   point, Ms. Peguero is in the back seat of this vehicle with

22   four men.  She's getting phone calls from her friends who are

23   worried about her.  Ms. Maria Sosa and Ms. Aurora Pujols, two

24   of plaintiff's friends, testified at -- two of Ms. Peguero's

25   friends -- I apologize.  So Ms. Peguero is in the back seat of

1   the vehicle and getting phone calls from two of her friends,

2   Maria Sosa and Aurora Pujols.  And they testify at plaintiff's

3   criminal trial.  And they testified that they were calling

4   Ms. Peguero and that Ms. Peguero was crying.  And that her

5   voice seemed shaky.  Her friends get on the phone with one of

6   the men that is in that car, and they tell those men to take

7   their friend back to that restaurant, to take her back to

8   Manhattan, otherwise they are calling 911.

9        So Ms. Peguero is in this car with plaintiff and three

10  of his friends.  Now, at some point, one of the men are dropped

11  off somewhere in the Bronx.  So, then, it become Ms. Peguero

12  with only three men in the car.  Originally, as I had said,

13  there were four men.  So now it is Ms. Peguero and these three

14  men in the car.

15       Now, the person who was dropped off, his name is Mr.

16  Uribe, was actually the owner of that white Mercedes.  Now,

17  what happened in the back seat of this car at that point,

18  Ms. Peguero told a criminal jury -- excuse me, a jury at a

19  criminal trial, I should say -- was a rape.  And she has since

20  recanted that piece.  And she has come out and said that no

21  rape occurred.  And she has changed that part of her story.

22       But most of what she testified to, leading up to that

23  alleged rape, has not changed and is independently corroborated

24  by other witnesses, including plaintiff's own testimony at the

25  trial at that criminal trial.

1          But prior to Ms. Peguero's recantation to the district

2     attorney's office, prior to Ms. Peguero recanting that rape,

3     she testified to a jury in a criminal trial about a violent

4     assault and rape by three men in the car that morning.  She

5     testified about how one of the men threatened her with a knife,

6     slapped her, bit her, pulled her pants down to her knees, and

7     forcibly had sex with her.  The person that she claimed to have

8     done this to her was plaintiff.

9          Ms. Peguero testified at that criminal trial, as I

10    have been talking about, that she was raped in the car.  She

11    testified that plaintiff and his friends, after that rape,

12    drove her back to the parking garage where they had originally

13    parked Ms. Pujols' car.  It is in that parking garage that

14    Ms. Peguero is then reunited with her friends.

15         Ms. Peguero' friends Ms. Sosa and Ms. Pujols, who I

16    have already spoken about, who testified at the criminal trial

17    as well, they testified at that criminal trial that when they

18    got back to that parking garage, they saw Ms. Peguero, excuse

19    me, sitting in Ms. Pujols' car, that she was crying.  They saw

20    mascara running down her face, her hair was a mess, her clothes

21    were disheveled, her pants were unbuttoned, and her belt buckle

22    was broken.  And what I mean by that, is the chains on her belt

23    buckle had been broken.  And this was not caused by any fight

24    that occurred later with the friends.

25         Now, this is how her friends find her.  You will learn

1    that Ms. Peguero was hysterical, she was crying.  But at that

2    point, she would not tell her friends what happened.

3           Now, this is where that physical fight happened.  In

4    that garage, in Ms. Pujols' car, right there, right in this

5    part of the story that I'm telling you about, is where that

6    fight happened.  So the rape occurred, Ms. Peguero is dropped

7    off at the garage, her friends find her, and then, in that car

8    when she is sitting in the car, she gets into the physical

9    fight with Ms. Pujols.

10          However, neither Ms. Pujols, Ms. Peguero, or Ms. Sosa,

11   all of the women that I have been talking about, none of those

12   women testify at that criminal trial about that physical fight.

13   And what the evidence will show you, is that none of these

14   women told anyone about that physical fight at any time before

15   plaintiff's criminal trial; not these detectives, not the

16   assistant district attorney who was prosecuting the case, and,

17   in fact, the women described to the ADA who was prosecuting the

18   case, and her name is ADA Shanda Strain.  You will hear a lot

19   about her throughout this trial.  They described to ADA Strain

20   a verbal fight, a verbal fight that took place in the garage

21   that morning.

22          Now, Ms. Peguero and her friends head back to New

23   Jersey after this physical fight appeared in the car, and it is

24   during that car ride back to New Jersey that Ms. Peguero

25   informed her friends that she had been raped.  The women took

1     Ms. Peguero, immediately, to Christ Hospital in New Jersey.

2     When Ms. Peguero got to Christ Hospital, she met with a sexual

3     assault nurse examiner who conducted the rape kit.  The name of

4     that nurse examiner is Farkhanda Farooqui.  You will hear about

5     nurse Farooqui's testimony because she also testified to that

6     jury at that criminal trial.

7               Now, nurse Farooqui's testified at that criminal trial

8     about that interview with Ms. Peguero.  She testified that

9     Ms. Peguero was crying and she was upset.  She testified about

10    Ms. Peguero's injuries.  She testified to finding the following

11    injuries on Ms. Peguero; bite marks and redness on her body,

12    her arms, shoulders, leg.  And she also testified to the

13    jury -- and, by the way, I think this is what Mr. Garber

14    referred to as the false evidence.  She testified about

15    Ms. Peguero having a bruise on her pubic area above her vagina.

16    She told the jury about how she gave the victim a tetanus shot

17    because of the bite marks and abrasions.  She also gave her

18    antibiotics and Plan B, the morning after pill, to avoid the

19    unwanted pregnancy.

20              She testified about conducting what you will hear

21    these defendants refer to as a rape kit, which you will learn

22    is an invasive physical and vaginal exam, and in which nurse

23    Farooqui took cervical and vaginal swabs from Ms. Peguero to be

24    tested for DNA.  You will learn that Detective Arbuiso was

25    provided with this rape kit when he first met with Ms. Peguero,

1   and that he had this rape kit sent to a laboratory to be

2   tested.

3          There was no semen found, but Detective Arbuiso will

4   tell you that the fact that Ms. Peguero agreed to this rather,

5   what I described to you already, invasive procedure, suggested

6   at least to Detective Arbuiso, that a rape had happened.

7          Now, while Ms. Peguero is at Christ Hospital in New

8   Jersey being examined, she met with a detective in New Jersey.

9   And her name is Detective Joannne Rak.  Detective Rak also

10  testified at that criminal trial.  And she testified that when

11  she met Ms. Peguero, she was visibly shaken and that she

12  appeared to be in pain.

13         She testified that she learned from Ms. Peguero that

14  she had been raped, but that crime occurred in New York City.

15  So she testified, because the crime occurred in New York and

16  not New Jersey, she called detectives and Special Victim squad

17  in Manhattan to refer the case, because it was out of her

18  jurisdiction.

19         So this is now, for the first time, when my clients,

20  Detective Arbuiso and Detective Diaz come into this case.  So

21  let me just pause for a minute and tell you what Detective

22  Arbuiso and Detective Diaz will explain to you in this trial.

23         These detectives were working in the Special Victim

24  Squad, aimed at sex crimes involving children and adults. So on

25  that morning, Detective Arbuiso and Detective Diaz received a

call from that New Jersey detective, Detective Rak about a

young whom who claimed she had been raped.

        Detective Arbuiso will explain to you that he happened

to be the next one up to receive the next investigation, so he

received that case.  He received this rape investigation.  And

he asks Detective Diaz to assist him in this investigation.

        Now, Detective Arbuiso was informed that the victim

was undergoing a rape kit at Christ Hospital in New Jersey.

Detective Rak informed him that they would meet, so that

Detective Rak can provide him with that rape kit, and so that

Detective Arbuiso can take Ms. Peguero and her friends, who are

at the hospital with her, back to the police precinct where

they work, so that they can begin their investigation and they

can interview the witnesses.

        So you will learn, through Detective Arbuiso and

Detective Diaz, about the steps that they took in their

investigation.

        So let me just spend a couple of minutes talking about

it.  You will learn that Detective Arbuiso and Detective Diaz

met with Detective Rak, as I already described to you, and she

turned over the rape kit and a bag of clothes that was worn by

the victim during, what she described as a rape, which included

that broken belt buckle and her pants, which I have described

for you earlier, when her friends saw her, how her pants were

open.  It was that pair of pants that was also provided to

1    Detective Arbuiso.  So all of this evidence, this rape kit, the

2    clothing, the broken belt buckle, was all provided to Detective

3    Arbuiso.

4           Now -- and by the way that was for Detective Arbuiso

5    to send it to the laboratory to be tested, okay.  So now at

6    this point, Detective Arbuiso and Detective Diaz take

7    Ms. Peguero and her two friends who were with her, Ms. Sosa and

8    Ms. Pujols, back to their police precinct so that Detective

9    Arbuiso can interview them.  And Detective Arbuiso was the lead

10   detective on this case.  So he met, by himself, with no other

11   detectives in the room, with each of these witnesses,

12   individually.

13          So, first, he met with Ms. Peguero.  Then he met with

14   Ms. Pujols.  And then he met with Ms. Sosa.

15          Now, Ms. Peguero told Detective Arbuiso basically what

16   happened, and basically what we've been talking about, that she

17   told him how plaintiff got into Ms. Pujols' car, uninvited,

18   that they did not want her in the car, that she was trying to

19   push him out of the car, that he drove the car to a parking

20   garage away from her friends, and that he moved her into

21   another car, that white Mercedes.  Although she described it as

22   a white luxury vehicle.  And that she told Detective Arbuiso

23   how she was raped in that car by three men.

24          Ms. Pujols and Ms. Sosa told Detective Arbuiso that

25   when they found Ms. Peguero in that parking garage, that she

1   was upset and crying, and that on the car ride home she told

2   them that she had been raped.

3            Now, what none of these women told Detective Arbuiso

4   during these interviews, or at any time, and what none of these

5   women told Detective Diaz at any time, none of these women said

6   anything about a physical fight that took place between

7   Ms. Peguero and Ms. Pujols in that parking garage after the

8   period of time that Ms. Peguero had said that she had been

9   raped.

10           You will hear from Detective Arbuiso about his

11  investigation, and the steps that he took to track down

12  plaintiff.  Now, you will remember that Ms. Peguero had said

13  that the men who raped her were total strangers.  So at this

14  point, they don't have any names.  They don't know the name of

15  William McCaffrey.  All they know is a description of this

16  vehicle that she was placed into where she says that she was

17  raped.

18           So the detectives go to that garage where those men

19  had parked Ms. Pujols' car, where they had her get into that

20  white Mercedes with them.  And they were able to get

21  information about that vehicle that she was in that night,

22  where she says she was raped.  Once the detectives figure out

23  information about that white Mercedes, about that vehicle, they

24  were able to track down the car owner, which led them,

25  eventually, to plaintiff.

1        So they go to this parking garage.  And they speak

2   with a Mr. Rodriguez, and DeLaCruz.  And you will hear that the

3   garage attendant never said anything to the detectives about

4   any physical fight between the women that night.  But what one

5   of them did say, Mr. Rodriguez said, that Ms. Peguero was

6   hysterical and her friends had to calm her down.

7        Now, plaintiff was brought in for questioning and

8   admitted to being with Ms. Peguero, but denied that any rape

9   occurred.  Detective Diaz placed plaintiff in a line-up.  And

10  I'm sure most of you are familiar, whether it is from TV or

11  whatever the other source you're familiar with the term

12  line-up, or maybe even what it is.  But just so I know

13  everybody knows what I'm talking about when I use that term, a

14  line-up is when a suspect is placed in a line, whether they are

15  standing or sitting, with other individuals who match their

16  same description; so maybe height, weight, et cetera.  And

17  there is a one-way mirror so that the individuals who are in

18  the line-up in one room, separated by the one way mirror with

19  the victim or witness to look through, so that they can see,

20  you know the line-up, but the people in the line-up cannot see

21  the person who is conducting the identification.

22       So, Detective Diaz will you that he placed

23  Ms. Peguero -- I'm sorry he placed plaintiff in this line-up,

24  and that he asked Ms. Peguero and Ms. Pujols to come down to

25  the precinct to view the line-up.

1          Now, Detective Diaz will tell you that he asked

2     Ms. Peguero, which he got into the observation room, if she

3     recognized anybody in the line-up.  And Detective Diaz will

4     tell you that Ms. Peguero was visibly shaking and was upset.

5     She pointed to plaintiff.  She identified him as the rapist,

6     and she collapsed.  She collapsed on Detective Diaz, who had to

7     hold her up.  And he almost went down himself.

8          Now, Ms. Pujols also viewed that same identification

9     line-up right after Ms. Peguero.  Because, remember, as I

10    talked about earlier, Ms. Pujols had seen plaintiff in that

11    vehicle before she had gotten out of the car.  Now Ms. Pujols

12    did not identify plaintiff in that line-up.  And in fact, she

13    identified somebody else in the line-up, somebody that is

14    called a filler, okay.  It's basically just somebody that

15    matches the description of the suspect who is in the line-up.

16    But all of that information, as you will learn, was turned over

17    to the plaintiff before his criminal trial, and during the

18    criminal trial that jury heard that Ms. Pujols did not identify

19    plaintiff.  Now, at this point, plaintiff is arrested and

20    prosecuted by the Manhattan District Attorney's office.  So

21    what that means is that the DA's office brought criminal

22    charges against plaintiff and presented these charges to a

23    grand jury.

24         Ms. Peguero testified in the grand jury.  Plaintiff

25    testified in the grand jury.  Plaintiff was indicted, which

1    means that the grand jury found that there was enough evidence

2    for the DA's office to proceed against plaintiff for rape,

3    assault, criminal possession of a weapon, and kidnapping.  And

4    as we've been talking about, this case then proceeded to a

5    criminal trial.

6          And the Manhattan ADA presented the case to a jury

7    during that criminal trial.  We've been talking a lot about

8    that.

9          Now, you're going to have the transcripts from that

10   criminal trial, but let me just remind you that you are not

11   here to decide what that jury and that criminal case had to

12   decide.  You are not here to decide whether or not anyone has

13   proven beyond a reasonable doubt that plaintiff committed a

14   rape.  The issue for you is whether these detectives were

15   informed about a physical fight that occurred between

16   Ms. Peguero and one of her friends after that period of time

17   that Ms. Peguero says that she was raped, and whether these

18   detectives instructed these women not to bring up the physical

19   fight during the course of plaintiff's criminal prosecution

20   because it would harm the case.  And moreover, whether any of

21   that would have made a difference in the criminal trial.

22         I told you about several witnesses who testified in

23   that criminal trial, including Ms. Peguero, her two friends

24   Ms. Sosa and Ms. Pujols, Nurse Farooqui, Detective Rak that New

25   Jersey Detective.  I told you about, Detective Diaz, Detective

1    Arbuiso.  But let me talk about what other evidence was

2    presented during that criminal trial.

3              So, now, after ADA Strain, the prosecutor, presented

4    her case, the defendant, who at the time the defendant was Mr.

5    McCaffrey, presented a case, as well.  Plaintiff actually took

6    the stand at his criminal trial and testified in his own

7    defense.  Plaintiff also called his friend, that owner of the

8    vehicle, that white Mercedes that I talked about earlier, his

9    name is Mr. Uribe.  He also took the stand.  Now, you will

10   learn that plaintiff also called one of the garage attendants

11   who I talked about earlier, Mr. Pelazo DeLaCruz.

12             Now Mr. DeLaCruz testified at the criminal trial.  And

13   you will learn a few things about his testimony at that

14   criminal trial.  First, Mr. DeLaCruz testified about a physical

15   fight that took place, that he observed take place, between Ms.

16   Peguero and her friends in the car in that garage.  So remember

17   the allegation in this lawsuit is that information about a

18   physical fight would have changed the verdict at that criminal

19   trial.

20             MR. COHEN:  Objection, your Honor.  That is not

21   accurate at all.

22             THE COURT:  Overruled.

23             MS. ZGODNY:  But Mr. DeLaCruz testified about seeing a

24   physical fight.  So that jury, at that criminal trial, heard

25   about a physical fight, and they convicted plaintiff.

1          Second, Mr. DeLaCruz' name and where he worked was in

2     my client's investigation file, which was turned over to

3     plaintiff before that criminal trial.

4          Third, Mr. DeLaCruz was asked at that criminal trial

5     by ADA Strain if he had met with any of plaintiff's criminal

6     defense attorneys prior to testifying at that trial, and he

7     said that, yes, he had met with them, one of them, and told him

8     what he -- what his testimony was going to be.  So plaintiff

9     and his lawyers knew, prior to that trial, that Mr. DeLaCruz

10    was going to testify about seeing a physical fight.

11         And let me tell you one other thing that you will

12    learn, and what the evidence will show you.  Mr. DeLaCruz

13    testified that -- I'm sorry.  Let me back up for a second.

14         Sometime after Mr. DeLaCruz testified, ADA Strain

15    spoke to Ms. Peguero and Pujols and told these women what Mr.

16    DeLaCruz testified about, that he testified in a trial about a

17    physical fight between these women in the car in that garage.

18    And ADA Strain told these women that plaintiff was claiming

19    that Ms. Peguero's injuries had been caused by that physical

20    fight between the women.

21         And you will learn, and the evidence will show you,

22    that Ms. Peguero and Ms. Pujols told ADA Strain that she was

23    crazy, that that never happened.  You will learn that neither

24    one of these women told ADA Strain that a physical fight

25    happened.  And you will also learn that when ADA Strain

E4s0mcc1                          Opening - Zgodny

1    confronted them with Mr. DeLaCruz' testimony, neither one of

2    them said, okay, yeah, a physical fight did happen, but the

3    detectives told us not to say anything.  None of that happened.

4           And moreover, you will learn that neither one of these

5    women told my clients about the physical fight.  So what we

6    know at this point is that everyone believed Ms. Peguero.

7    Everyone believed that she had been raped.

8           As I told you earlier, nurse Farooqui who examined

9    Ms. Peguero at the hospital a couple of hours after the rape

10   had occurred, these two detectives who investigated the rape

11   case, ADA Strain, who prosecuted the case, the grand jury, the

12   jury at the criminal trial, and even her friends, her friends,

13   who are her friends, believed her.  Everyone believed her.  She

14   convinced everyone.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            MS. ZGODNY:  So we are here because plaintiff was

2    convicted of rape, assault, criminal possession of a weapon,

3    unlawful imprisonment and kidnapping and three years later

4    Ms. Peguero recanted.  She was prosecuted by the District

5    Attorney's office and she spent time incarcerated.  She

6    recanted and she said that the rape did not happen.  And what I

7    mean by that is that she said that nobody attacked her or raped

8    her in the car that night when they had driven up to the Bronx.

9            The plaintiff was released from prison and his

10   conviction was overturned.  As an aside, you will hear that

11   plaintiff spent time incarcerated prior to this criminal

12   prosecution, and since his conviction has been overturned, he

13   has been convicted of felony assault and felony criminal

14   possession of a weapon.

15           Let me get back to what I talked about at the very

16   beginning of my remarks.  The question for you to decide in

17   this lawsuit is whether my clients suppressed information about

18   a fight that occurred between Ms. Peguero and Ms. Pujols after

19   the period of time when Ms. Peguero said that she had been

20   raped.  And what plaintiff is claiming here is that these women

21   told these detectives about that physical altercation and that

22   these detectives hid that information and said not to say

23   anything.  And you are here to decide whether these two veteran

24   detectives, knowingly suppressed evidence of this physical

25   fight or hid evidence of this fight during plaintiff's criminal

1    prosecution and whether the evidence of this fight would have

2    changed the verdict at that criminal trial.

3              So let me repeat that.  Whether the evidence of that

4    physical fight would have changed the verdict --

5              MR. COHEN:  I object again.

6              THE COURT:  Let's not get into -- I am going to

7    instruct the jury as to what the law is and what they are going

8    to be asked to find, but right now just about what the evidence

9    will show.

10             MS. ZGODNY:  Yes, your Honor.

11             The defendants believe that once you have heard all of

12   the witnesses in this trial and you have seen and heard all of

13   the evidence, that you will find that these detectives did not

14   do anything wrong and you will render a verdict in our favor.

15             Thank you.

16             THE COURT:  Thank you.

17             We will now, I would say, hear from your first witness

18   but I think that we are going to do what you described in your

19   opening, Mr. Garber, with respect to the trial transcript?

20             MR. GARBER:  Yes.

21             MR. COHEN:  Could I make a short record noting what

22   the objection was?

23             THE COURT:  We can do that after.  I think that I want

24   to now start the evidence.

25             MR. GARBER:  I think that we are borrowing documents

1   from the defendants' counsel.  Is it possible to take a

2   five-minute recess just so that we can set things up?

3           THE COURT:  I would rather not do it now.

4           Do the jurors need a break?

5           You need a break.

6           Let's take a short break of about five minutes to use

7   the bathroom, and then we will go until about 5:30 today.

8           All rise for the jury.

9           Don't discuss the case.  Keep an open mind.

10

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          MR. COHEN:  Could I state my objection while they are

3   gone?

4          THE COURT:  Yes.

5          MR. COHEN:  The opening of the defendants suggested

6   that the only way that Mr. McCaffrey could prevail is if the

7   jury would have acquitted him at the trial, if there was a

8   different verdict.  That is not the law.  The law is, he

9   prevails if there was an unfair trial which your Honor has

10  already ruled, that a trial whose outcome has a lack of

11  confidence -- the jury may have still convicted him, but it

12  still would have been an unfair trial and I think that that was

13  misleading to the jury.

14         THE COURT:  There is going to be an instruction on the

15  law with respect to what prejudice would need to be

16  established.  So I am not sure that I am going to agree with

17  either of you with respect to how you want to phrase it but,

18  again, for an opening, it is really about what the evidence is

19  going to show.  So I sustained the last objection because I

20  really don't want the lawyers to be getting into my charge, my

21  instructions on the law in the opening.  I will certainly give

22  you a copy of my instructions before summations so that there

23  will be no dispute as to what I am saying and I will give you

24  all an opportunity to be heard on that subject.  So I

25  understood the gist of that objection.

E4SUMCC2                        Opening - Ms. Zgodny

1              MR. COHEN:  I really think that there ought to be a

2      curative instruction that at least that whatever statements

3      were made about the law -- ideally, I would like you to say

4      that it is not necessary for the burden at the criminal

5      trial -- the question is, was the trial fair.

6              THE COURT:  I have not instructed them on the law so I

7      am not going to do it.

8              How long is it going to take us to set up for this

9      first phase of the evidence?

10             MR. GARBER:  Two minutes.

11             (Recess)

12

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  The cafeteria screwed up.  We had ordered

3    cookies, fruit, beverages for this afternoon.  We apologize.

4    Hopefully, tomorrow we will work out the Kinks, but my

5    apologies.

6        One other thing, always take your notebooks with you.

7    Don't leave them out here.  I was here so nobody saw them or

8    fiddled with them, but I think it is better if you bring them

9    with you each time that you come in and out.

10       So now we are going to begin with the evidence portion

11   of the trial.  As I told you before, the opening statements of

12   the lawyers are not evidence; they are just previews.

13       For the presentation of evidence the plaintiff's goes

14   first with the plaintiff's case.  I think, as Mr. Garber

15   explained, there are going to be portions of the transcript

16   from the criminal trial that are now read into the record.  So

17   they will be made part of the case.  You can have copies of the

18   transcript, but they will be read into the record now.

19       Mr. Garber, we are all set?

20       MR. GARBER:  Yes.

21       THE COURT:  Mr. Cohen, you are going to be in the

22   witness box reading the portions of the transcripts that relate

23   to the witness on the witness stand at the criminal trial,

24   correct?

25       MR. GARBER:  Correct.

1              THE COURT:  And, Mr. Garber, you are going to be

2      reading the part of the lawyer doing the direct examination

3      which was the Assistant District Attorney?

4              MR. GARBER:  Yes.  I will preface each section.  This

5      is the direct examination by Shandra Strain, the prosecutor in

6      the criminal trial, and the witness on the stand is Maria Sosa.

7              THE COURT:  You are Shandra Strain.

8              MR. GARBER:  He is Maria.

9              THE COURT:  They are method actors, so this should be

10     fine.

11              Let's proceed.

12              MR. GARBER:  Page 56, we are starting.

13              (Mr. Garber and Mr. Cohen reading)

14     "Q  Maria, how old are you?

15     A.  25.

16     Q.  You currently live in New Jersey?

17     A.  Yes.

18     Q.  How long have you lived in New Jersey?

19     A.  Approximately two years now.

20     Q.  Where did you live before that?

21     A.  Florida.

22     Q.  Where were you raised?

23     A.  New York.

24     Q.  Do you work, Ms. Sosa?

25     A.  Yes.

1   Q.  What do you do for a living?

2   A.  Receptionist.

3   Q.  How long have you been doing that?

4   A.  For about a year.

5   Q.  Do you know a woman by the name of Biurny Peguero?

6   A.  Yes.

7   Q.  Do you refer to her as a different first name?

8   A.  Yes.

9   Q.  What do you refer to her as?

10  A.  Mary.

11  Q.  How do you know Biurny Peguero?

12  A.  Close friend of mine.

13  Q.  Approximately how long have you known her?

14  A.  I would say for about five years.

15  Q.  How would you classify your friendship with Biurny Peguero?

16  A.  Very close.

17  Q.  I'd like to direct your attention to September 18th, 2005.

18          Do you remember that date?

19  A.  Yes.

20  Q.  Who were you with on that night?

21  A.  A group of friends and a -- may I name them?

22  Q.  Go ahead.

23  A.  OK.  It's Aurora, Mary, Orlando, Heliana and myself.

24  Q.  And what were you guys doing that night?

25  A.  We were out clubbing.

E4SUMCC2                          "Maria Sosa"

1    Q.  Do you remember what club you went to?

2    A.  Yes, it was Umbrella Lounge.

3    Q.  And is that located here or in the County of New York?

4    A.  Yes.

5    Q.  Do you know what general vicinity it's located in?

6    A.  It's in Dyckman, the Dyckman area.

7    Q.  How did you guys get to Umbrella Lounge that night?

8    A.  We -- we drove in Aurora's car.

9    Q.  Who drove the car to the club?

10   A.  Aurora.

11   Q.  And who went with you to the club?

12   A.  In the car, it was -- in the vehicle, it was Aurora

13   driving.  I was on the passenger's side, Mary in the back and

14   Heliana.

15   Q.  Do you know Heliana very well?

16   A.  Yes.

17   Q.  How do you know Heliana?

18   A.  She's a cousin of Aurora.

19   Q.  When was the last time you saw Heliana?

20   A.  I believe it was the day we testified -- sorry -- the day

21   of that incident.

22   Q.  OK.

23       And when was the last time that you saw Orlando?

24   A.  That same night as well.

25   Q.  Have you spoken to either of them since then?

E4SUMCC2                          "Maria Sosa"

1   A.  No.

2   Q.  Do you know where either of them are today?

3   A.  No.

4   Q.  Do you remember if any photographs were taken of the guys

5   earlier that night when you were at the club?

6   A.  Yes.

7   Q.  I'm showing you what I previously marked as People's 1 for

8   identification, can you take an look at People's 1?

9           Can you take a look at People's 1?

10  A.  Yes."

11          MR. GARBER:  Your Honor, just so that you know, we do

12  not have pictures.  They were not provided, so they are not

13  going to be shown, and that is going to come up throughout.  I

14  am just letting you know.

15          THE COURT:  What we are reading into the record now is

16  the transcript.  The parties have stipulated to this.  Does it

17  have a document number?

18          MR. GARBER:  It is People's 1.

19          THE COURT:  I mean, for this trial.  We are going to

20  use this exhibit.  This is going to be available?

21          MR. LARKIN:  Yes, your Honor.  We are going to have a

22  binder prepared by the time that the parties sum up.

23          MR. GARBER:  You mean these transcripts?

24          THE COURT:  Yes.

25          MR. LARKIN:  We will have a binder prepared for the

1    jury and we will mark it as a plaintiff exhibit number.

2              THE COURT:  We are reading from a document.  This is

3    in evidence, so we are calling this what?  Plaintiff's 1?

4              MR. GARBER:  Plaintiff's 70 is what it would be.

5              THE COURT:  Then Plaintiff's 70 is the transcript from

6    the criminal trial.  It is in evidence.  The parties have

7    stipulated to it.  We are reading it now so that you can hear

8    it.  It will also be available to you in the jury room should

9    you wish to review it during your deliberations.  We are going

10   to call it Plaintiff's 70, but as I said I will give you a list

11   of all of the exhibits by their number and a brief description.

12             (Plaintiff Exhibit 70 received in evidence)

13             MR. GARBER:  Thank you.

14             (Mr. Garber and Mr. Cohen reading)

15   "Q  Can you take a look at People's 1?

16   A.  Yes.

17   Q.  Do you recognize that?

18   A.  Yes.

19   Q.  What do you recognize that to be?

20   A.  It was a picture taken of us at Umbrella Lounge.

21   Q.  OK.

22             Who does that picture depict?

23   A.  It is Mary on the left-hand side -- can I show it?

24   Q.  One second.

25   A.  It's Mary on the left-hand side, the one next to her, the

1   one following is Aurora, and the last one on the right-hand

2   side is Heliana.

3   Q.  Does that picture fairly and accurately show the way you

4   guys looked that night at the Umbrella Lounge?

5   A.  Yes."

6          MR. GARBER:  Page 62 by the way, bottom.

7          (Mr. Garber and Mr. Cohen reading)

8   "Q  Can you turn that picture so that we can see, all see, it

9   now and can you tell us who's who in that photograph?

10  A.  This is Mary.

11  Q.  And you're pointing to the right-hand side of the photo?

12  A.  Right.

13  Q.  OK.

14          Next to Mary?

15  A.  Next to Mary is me.

16  Q.  Mm hmm.

17  A.  Then it's Aurora.

18  Q.  OK.

19  A.  The last one here is Heliana.

20  Q.  Approximately what time did you arrive at the Umbrella

21  Lounge that night?

22  A.  It was around 1:00 a.m.

23  Q.  And how long approximately did you stay at Umbrella Lounge?

24  A.  For, I would say, three hours and a half.

25  Q.  OK.

1        Did you have anything to drink that night?

2   A.   No.

3   Q.   Was there a designated driver for the four of you?

4   A.   Yes, myself.

5   Q.   Did you drink anything before you arrived at the club?

6   A.   No.

7   Q.   And what about after you left?

8   A.   No.

9   Q.   Approximately what time did you leave Umbrella Lounge that

10  night?

11  A.   4:30 a.m.

12  Q.   Where did you go when you left the club?

13  A.   Towards the car.

14  Q.   OK.

15        What did you do once you got to the car?

16  A.   I was the one driving, I was on the driver's side.  Heliana

17  was on the passenger's side.  Aurora was behind the passenger's

18  side.  And Mary was behind the driver's side.

19  Q.   Was anyone else with you at that time?

20  A.   Yes, Orlando.

21  Q.   How would you describe yourself when you left the club that

22  night?  What was your state of mind?

23  A.   I was conscious and sober.

24  Q.   OK.

25        Where did you guys go once you got into the car?

E4SUMCC2                          "Maria Sosa"

1   A.  We were driving towards New Jersey, our home, and we

2   stopped at a restaurant on our way that was actually in the

3   same direction we had to take the highway home.

4   Q.  Do you recall where the restaurant was located?

5   A.  Yes, it's -- its the corner of Dyckman and Broadway.

6   Q.  And approximately what time did you arrive at the

7   restaurant?

8   A.  I would say around 4:45.

9   Q.  Where did you park the car when you arrived at the

10  restaurant?

11  A.  Right in front of the restaurant.  It was a bus stop.

12  Q.  Was the car parked legally?

13  A.  No.

14  Q.  What happened once you all arrived at the car?  What did

15  you all do?

16  A.  Well, I believe Mary and Heliana went into the restroom in

17  the restaurant, came back into the car.  At that point, myself,

18  Orlando and Heliana went back into the restaurant leaving

19  Aurora and Mary inside the car.

20  Q.  Is that restaurant located still in the County of New York?

21  A.  Yes.

22  Q.  What did you do with the keys to the car when you went into

23  the restaurant?

24  A.  They were left in the ignition.

25  Q.  Where was Biurny seated, or Mary, when you were in the

1   restaurant when you left to go in?

2   A.  The backseat behind the driver's seat.

3   Q.  And where was Aurora?

4   A.  Backseat behind the passenger's side.

5   Q.  How were the car doors, were they locked or unlocked?

6   A.  Unlocked.

7   Q.  And what about the windows, do you recall if they were up

8   or down?

9   A.  I believe they were up.

10  Q.  I'm showing you what's already been admitted into evidence

11  as People's 3 and 31.

12         Do you recognize the photographs and what they depict

13  in People's 3 and 31?

14  A.  Yes.

15  Q.  What do you recognize those to be?

16  A.  A picture of the restaurant where we stopped.

17  Q.  Can you, using either one of those, 3 or 31, just tell us

18  which one you're using, can you show us where the car was

19  parked when you went into the restaurant to get food?

20  A.  OK.  Using picture 3 --

21  Q.  Mm hmm.

22         Can you show us so we can see?

23  A.  OK.  This is the restaurant here.

24  Q.  OK.

25  A.  We were parked right here.

1   Q.  OK.

2           So you're pointing in the middle, right in front of --

3   A.  Right in front of where the bus stop begins, that's right.

4   Q.  Did there come a point, Ms. Sosa, when Aurora came into the

5   restaurant?

6   A.  Yes.

7   Q.  Can you describe for us what happened when she came into

8   the restaurant?

9   A.  She said there was -- there were guys inside the car.  She

10  numerated them as three guys.  She said three guys were in the

11  car and she was able to get out of the car.

12  Q.  And where was Mary when she was telling you this?

13  A.  She was still inside the car.

14  Q.  And what happened next?  What did you do next?

15  A.  Well, we went back outside -- well, she had told Aurora --

16  well, OK, let me go back.  Sorry about that.

17          When we asked her what do you mean there's three guys

18  inside the car, she said:  Oh, yeah, there's three guys, you

19  know.  We started calling Mary's cell phone.  At one point she

20  picked up and said:  I will be there in five minutes, I went to

21  park the car.

22  Q.  Let me stop you.  Let me back up.

23  A.  OK.

24  Q.  When you were in the restaurant, did there come a point

25  when you walked out of the restaurant?

E4SUMCC2                        "Maria Sosa"

1    A.  Yes.

2    Q.  And what happened when you walked out?  What did you

3    observe?

4    A.  The vehicle wasn't there.

5    Q.  Did you see Biurny at that point?

6    A.  No.

7    Q.  Did you see any guys at that point?

8    A.  No.

9    Q.  OK.

10          Did you have any idea where she was at that point?

11   A.  No.

12   Q.  Did you ever see the car pull away from the restaurant?

13   A.  No, I was inside the restaurant.

14   Q.  What happened after you called Biurny on her cell phone?

15   A.  That's when she said that she would be back in five

16   minutes.

17   Q.  And what did you guys do next?

18   A.  We waited for awhile.

19   Q.  And what happened after that?

20   A.  We continued to call.

21   Q.  Could you hear anything in the background when you made

22   those phone calls?

23   A.  Voices.

24   Q.  Were those voices male voices or female voices?

25   A.  Male voices.

1   Q.  And approximately how much time past when you were making

2   these phone calls?

3   A.  I would say like five minutes.

4   Q.  What did you do next after she told you she'd be back in

5   five minutes and she didn't come back?

6   A.  We waited for awhile.  We continued to call after that and

7   I noticed when we spoke to her she was nervous, her voice was

8   shaky.

9   Q.  Could you hear anything else when you were speaking to her?

10  A.  Just voices in the back.

11  Q.  Did there come a point that you called her phone and other

12  things began happening?

13  A.  Yes.

14  Q.  Can you describe for us what those were?

15  A.  The crying.

16  Q.  Who was crying?

17  A.  She was.

18  Q.  Were you able to speak to her?

19  A.  Yes.

20  Q.  And what did you learn as you were speaking to her?"

21          MR. GARBER:  It picks up on 72.

22          (Mr. Garber and Mr. Cohen reading)

23  "Q   When you were calling her phone, what did you hear

24  whenever the phone would get picked up?

25  A.  She was crying.

E4SUMCC2                          "Maria Sosa"

1   Q.  And did there come a time that you spoke to other people in

2   the car?

3   A.  Yes.

4   Q.  And what type voice was it?

5   A.  It was a male voice.

6   Q.  What did they tell you?

7   A.  That they would take her back.

8   Q.  And what happened next?

9   A.  I -- I actually told them that I was going to call the

10  cops.

11  Q.  Could you hear Biurny at that point?

12  A.  Yes, she was crying in the back.

13  Q.  What did you do after you spoke to one of the men in the

14  car at that point?

15  A.  We called the police.

16  Q.  And did you know where she was at that point in time?

17  A.  No.

18  Q.  Did you have any idea exactly how many people were in the

19  car at that time?

20  A.  No.

21  Q.  Had you --

22  A.  I'm sorry.

23  Q.  At that point when you called 911, did you know how many

24  people were with Mary?

25  A.  I assumed there was more than one person because I heard a

E4SUMCC2                    "Maria Sosa"

1   variety of voices.

2   Q.  But you actually didn't know --

3   A.  The amount, no.

4   Q.  When you guys were calling her on her cell phone, whose

5   phones were you using?

6   A.  Orlando's and Heliana's.

7   Q.  Did you actually call 911 that night?

8   A.  Yes.

9   Q.  At what point in the night did you call 911?

10  A.  After I had spoken to someone, the male voice on Mary's

11  phone number.

12  Q.  And at that point in which you called 911, did you know

13  where she was at all?

14  A.  No.

15  Q.  How long after you had spoken to the guy and heard her

16  crying did you call 911?

17  A.  I would say like two seconds afterwards."

18          MR. GARBER:  We pick up on 80, line 10.

19          MR. COHEN:  80?

20          MR. GARBER:  80.

21      (Mr. Garber and Mr. Cohen reading)

22  "Q   Ms. Sosa, after you spoke to those men on the phone, what

23  did you do next?

24  A.  I'm sorry, could you repeat the question?

25  Q.  When --

1           Before we took a break, you were talking about how you

2     called Biurny on the phone?

3     A.   Right.

4     Q.   And you spoke to a man on the phone as well?

5     A.   Yes.

6     Q.   What did you do after SU spoke to them?

7     A.   We called 911.

8     Q.   OK.

9           And who were you with when you called 911?

10    A.   Orlando, Heliana, Aurora and myself.

11    Q.   I'm showing what I previously marked as People's 30 for

12    identification.

13          Do you recognize People's 30?

14    A.   Yes.

15    Q.   What do you recognize that to be?

16    A.   The recording of the call we placed to 911.

17    Q.   How do you know that?

18    A.   I initialed and signed it.

19    Q.   OK.

20          Have you heard that prior to testifying here?

21    A.   Yes.

22    Q.   And when was that?

23    A.   This morning.

24    Q.   Ms. Sosa, when you called 911, the tape that you just

25    heard, who is the first person on the tape?

1    A.  That's Heliana.

2    Q.  And who was the second voice on that tape?

3    A.  Myself.

4    Q.  OK.

5           And when you called 911, what car did you think Biurny

6    Peguero was in?

7    A.  Aurora's car was the tan Honda Civic that I described.

8    Q.  And did you know exactly how many people were in the car at

9    that point?

10   A.  No.

11   Q.  When you were calling Biurny's cell phone, was Heliana and

12   Orlando and Aurora also with you?

13   A.  Yes.

14   Q.  And did any of them speak to her away speak to the men, if

15   you know?

16   A.  I was the only that spoke to someone on the phone.

17   Q.  And what happened after you called 911?

18   A.  We continued to call, just to see if she was OK.

19   Q.  And did she answer every time?

20   A.  She answered not all the time.

21   Q.  What happened --

22           Can you take us what happened when you called the

23   various times?  What would occur?

24   A.  The various times I called, let's say four out of five

25   calls, she would pick up two and she would just cry on the

E4SUMCC2                         "Maria Sosa"

1   phone.

2   Q.  And what happened as you continued making these phone

3   calls?

4        Did there come a time when you went to look for her?

5   A.  Yes.

6   Q.  How did that come about?

7   A.  In one of the phone calls we made, I spoke to a male on the

8   phone and he said:  We're taking her there, we're taking her

9   there.  I asked him:  Where.  He gave me a location, which I

10  don't remember, and we jumped in a cab, all of us.

11  Q.  And where did you go once you got in the cab?

12  A.  To the location he had told me on the phone.

13  Q.  And do you remember that location today?

14  A.  No.

15  Q.  OK.

16        What did you guys do once you got into that cab?

17  A.  We headed towards the location.

18  Q.  And what happened as you went to that location?

19  A.  They were -- there was no car to be seen.

20  Q.  So what happened next?

21  A.  We continued to call.

22  Q.  And then what happened?

23  A.  And the male kept -- I mean that male kept on, you know,

24  picking up the phone and saying that:  We're going to take her

25  there, we're going to take her there.  And after that, we

1    continued to call, because I mean, you know, he would say:  I'm

2    going to take her to the location I told you.  And he never

3    arrived.  We waited there for awhile.

4    Q.  What happened?

5          Did there come a point where you eventually found

6    Biurny?

7    A.  Yes.

8    Q.  And where was that?

9    A.  In a parking lot.

10   Q.  Was that in the County of New York?

11   A.  Yes.

12   Q.  Can you tell us how you found her in that parking lot?

13   A.  He -- since we continued to call, at one point she answered

14   the phone at -- you know, I'm assuming she was alone at that

15   point.

16   Q.  What happened when they answered the phone that time?

17   A.  She was still crying and we asked her:  Where are you.  She

18   said:  I'm in a parking lot.  She asked one of the parking lot

19   attendants to give them address and that's how -- we told the

20   cab driver to drive us over to the parking lot where she was

21   at.

22   Q.  And did you speak to the parking lot attendant?

23   A.  Yes.

24   Q.  And did you go to that location?

25   A.  Yes.

1  Q.  What happened when you arrived at that parking garage?

2  A.  Aurora's car was parked right in front of the attendance

3  booth in the entrance of the parking lot and Mary was inside

4  the car.

5  Q.  And what did you observe about her when you saw her sitting

6  in the car?

7          What did you observe about Biurny when you approached

8  her in the car?

9  A.  She was crying, her makeup looked smeared, her hair was

10 messed up, her pants were undone and her belt was torn.

11 Q.  Did you see Biurny earlier in the night?

12 A.  Of course.

13 Q.  And did you see her when you were at the restaurant?

14 A.  Yes.

15 Q.  Did you have an opportunity to view her as a whole, her

16 entire body?

17 A.  Yes.

18 Q.  Were her pants undone when she came out of the restaurant

19 and got in the car?

20 A.  No.

21 Q.  Was her belt broken when she came out of the restaurant?

22 A.  No.

23 Q.  Was her makeup smeared?

24 A.  No.

25 Q.  Was she crying?

 1    A.  No.

 2    Q.  Was her hair messed up?

 3    A.  No.

 4    Q.  Approximately how long was she missing for?

 5    A.  I would say for more than two hours.

 6    Q.  What makes you say that?

 7    A.  When we -- when the incident occurred, when they, you know,

 8    when they took the car from in front of the restaurant, it was

 9    still night and when we actually reached her at the parking

10    lot, it was already daylight.  So I would say it was more than

11    two hours.

12    Q.  When you were in the parking garage, was there a time when

13    uniformed police officers arrived at the garage?

14    A.  Yes.

15    Q.  Did you speak to those officers?

16    A.  No.

17    Q.  Did you see whether or not Biurny spoke with those

18    officers?

19    A.  No.

20    Q.  What was Biurny doing?  How was she behaving when you

21    arrived at the parking garage?  What was her demeanor?

22    A.  She was just crying hysterically.

23    Q.  Backing up to earlier in the evening when you were at the

24    club and at the restaurant with Biurny, did you notice -- well,

25    what was she wearing that night?  What kind of top was she

E4SUMCC2                    "Maria Sosa"

1    wearing?

2    A.   A halter top.

3    Q.   Could you see her arms?

4    A.   Yes.

5    Q.   Could you see her shoulders?

6    A.   Yes.

7    Q.   Did you notice at any point in the night whether or not

8    before she went missing if she had any injuries to her body?

9    A.   There was none on her body.

10   Q.   Did there come a point when Biurny told all of you that she

11   had been raped?

12   A.   Yes.

13   Q.   When did that occur?

14   A.   Inside of the vehicle driving back to Jersey.

15   Q.   And did she tell you who had raped her?

16   A.   She just said it was three guys.

17   Q.   Did she tell that all three had raped her?

18   A.   No.

19   Q.   Did she say --

20          Who was there when she told you that she had been

21   raped?b

22   A.   Orlando, Aurora, Mary and myself.

23   Q.   Was Heliana still present?

24   A.   No.

25   Q.   What did you do next?

E4SUMCC2                          "Maria Sosa"

1   A.  We went to the hospital.

2   Q.  And where's that hospital located, in New York?

3   A.  In New Jersey.

4   Q.  In New Jersey.

5        How long were you at the hospital approximately?

6   A.  Four to five hours.

7   Q.  When you were at the hospital, did there come a point when

8   you noticed any injuries to Biurny?

9   A.  Yes.

10  Q.  What kind of injuries did you notice?

11  A.  She had bruises on her arms.

12  Q.  I'm showing you People's Exhibits 6 through 15 which are

13  marked for identification.

14       Ms. Sosa, could you please take a look at People's

15  Exhibit 6 through 15 and let me know when you're done looking

16  at them.

17  A.  Done.

18  Q.  Do you recognize those photos?

19  A.  Yes.

20  Q.  What do those photos depict?

21  A.  Bruises on Mary's arms and shoulder and legs, I think.

22  Q.  Do those photos fairly and accurately depict the injuries

23  that you saw that night in the hospital?

24  A.  Yes.

25  Q.  Were you present when the detective took those photographs?

E4SUMCC2                         "Maria Sosa"

1   A.  Yes."

2          MR. GARBER:  At this time the photographs were

3   received into evidence.

4          (Mr. Garber and Mr. Cohen reading)

5   "Q  Ms. Sosa, in those photographs that you just looked at,

6   were any of those injuries on Ms. Peguero when you last saw her

7   at the restaurant?

8   A.  No.

9   Q.  I just want to back up.  I have one last question for you.

10          When Ms. Peguero told you she had been raped, did she

11   tell you when she had been raped?

12   A.  While she was missing.

13   Q.  I have no further questions."

14          MR. GARBER:  Now this is cross-examination of Ronald

15   Veneziano.

16          THE COURT:  You are going to play that role?

17          MR. GARBER:  Yes.  I am now Mr. Veneziano, same

18   witness, Ms. Sosa.

19          (Mr. Garber and Mr. Cohen reading)

20   "Q   Ms. Sosa, you say that the first time the alleged victim

21   claimed she was raped was in the car with you going back to

22   Jersey?

23   A.  I'm sorry, can you repeat that for me?

24   Q.  Did you not testify that Biurny said to you, words to the

25   effect, she had been raped and he told you that while she was

1    in the car going back to Jersey with you, previously that

2    evening she had been raped?

3    A.  She said that when we were in the car going back to jersey.

4    Q.  Right.

5    A.  Yes.

6    Q.  You were in the car, she's in the car, the others are in

7    the car, you're going to Jersey and it was on that trip to

8    Jersey she mentioned to you that earlier in the evening she had

9    raped?

10   A.  No.  You are confusing me.  You're confusing me.  When we

11   were driving back to Jersey after we met her at the parking

12   lot, she mentioned to us that she had been raped in the time

13   that she was missing.  When she was missing, when she was taken

14   in the car prior on that evening, earlier in that evening, yes.

15   Q.  So the first time that she told you that was not in the car

16   ride back to the New Jersey but it was when you were all

17   together in the parking lot?

18   A.  We were riding back to Jersey.  That's when she told us she

19   was raped.

20   Q.  That's the first question that I asked you.

21   A.  And -- yes, that's what I'm telling you.  We were in the

22   car driving back to Jersey, yes.

23   Q.  What did she --

24          She just said out of the clear blue sky I was raped?

25   A.  No, we were all trying to comfort her.  She was crying all

1   the way to Jersey.  We were asking her questions, what

2   happened, what did they do to you, you know, and that's when

3   she told us what happened.

4   Q.  What approximately was the time was the time that everybody

5   arrived at the Umbrella?

6   A.  1:00 a.m.

7   Q.  1:00 a.m.

8           And what was the approximate time that pretty much

9   everyone left the Umbrella?

10  A.  4:30.

11  Q.  4:30?

12  A.  Leaving Umbrella, yes.

13  Q.  So everyone was at the Umbrella for approximately three,

14  three and a half hours?

15  A.  Yes.

16  Q.  And as the designated driver, I guess you're in a position

17  to watch and see who was drinking, who was not, how much they

18  are drinking?

19  A.  Can you repeat the question.

20  Q.  Yes.

21          As the designated driver, as one who herself was not

22  drinking -- by the way, was that true, that you, yourself, were

23  not drinking at all that night?

24  A.  I was not drinking at all that night.

25  Q.  And that was because you were the designated driver?

1   A.  Right, I was, yes.

2   Q.  Now, the Umbrella has a drink, does it not if you know,

3   it's called the Blue Hawaiian?  You heard that term, that

4   drink?

5   A.  Yes, that is a common drink, yes.

6   Q.  OK.  Do you know what that drink consists of in terms of

7   alcohol?

8           Have you, yourself, ever had a Blue Hawaiian?

9           Were you in a position what Biurny had to drink that

10  evening for that three and a half hours?

11  A.  Was I in the position of --

12  Q.  Yeah.  Were you, like, even though you were the designated

13  driver, were you seated at the same table?

14  A.  Yeah, we were all together at the same table, yes.

15  Q.  OK.

16          And except for yourself as the designated driver, the

17  others were drinking?

18  A.  Right.

19  Q.  Was Biurny drinking?

20  A.  Yes.

21  Q.  Now, in that time period, that three and a half hour time

22  period, how many drinks would you recollect that she had?

23  A.  I don't know.

24  Q.  You have no idea?

25  A.  No.

E4SUMCC2                          "Maria Sosa"

1   Q.  Now, you said a few moments ago that you were familiar with

2   a term Blue Hawaiian --

3   A.  Yes.

4   Q.  -- correct.  OK.

5            Now, you said yes and you nodded your head.  Is

6   that -- isn't that what they were drinking at the table for

7   three and a half hours, a Blue Hawaiian?

8            It's a drink that's got vodka in it for one thing,

9   isn't that right?

10  A.  Yes.

11  Q.  And were others drinking anything else other than Blue

12  Hawaiians?

13  A.  Honestly.

14  Q.  Yeah.

15  A.  I didn't keep track of what everyone else was drinking

16  because I wasn't drinking.  I just knew I was responsible for

17  driving everyone safely home.

18  Q.  But you now know, thinking about it, that the others were

19  drinking?  Blue Hawaiians?

20  A.  Yes.

21  Q.  Over the course of the three and a half hours, how many

22  Blue Hawaiians, if you can remember exactly or if not

23  approximately, how many Blue Hawaiians did she drink?

24  A.  I don't know that answer.

25  Q.  Hm?

1   A.  I don't know.

2   Q.  But you know that when she left the restaurant she was

3   pretty much drunk, wasn't she?

4   A.  She was.

5   Q.  And -- withdrawn.

6           Do you know who first mentioned that all three of the

7   men raped her that evening?

8   A.  I'm sorry?

9   Q.  Did you hear from anyone --

10  A.  That all three men raped her?

11  Q.  Yeah.  Did you hear anything of that nature?

12  A.  No.

13  Q.  No one told you that?

14  A.  No one told me three men raped her.

15  Q.  Well, did --

16          Was there any time during that evening when she

17  herself was back in your car that she said it herself?

18  A.  Three men did take her in the car.

19  Q.  Right.

20  A.  But she emphasized that two of them, one holding her and

21  the other one raped her.

22  Q.  But there were three men.

23  A.  Right.  The other one she aid did not touch her.  There was

24  one of the three men did not touch her.  That's what she told

25  myself.

1    Q.  When you and the others were talking to her about if

2    afterwards, after it allegedly happened, back at the parking

3    lot, let's say, OK, in -- did you ask her about the fact that

4    she was in disarray, that her pants were undone, that the belt

5    was broken?  Did you have any discussion with her about those

6    facts?

7    A.  When we were in the parking lot when we met up with her?

8    Q.  Yeah.

9    A.  We all asked her questions.  We asked her what happened.

10   She doesn't want to answer at that point.  She was just crying.

11   Q.  When you first asked her what happened, her first response

12   was to cry?

13   A.  Yes, she was in shock.

14   Q.  She was in shock?

15   A.  She was in shock.  She was crying.

16   Q.  Alright, could you --

17            Without anyone trying to minimize the trauma of the

18   rape, could it have been, and you can you remember because you

19   think back to when you spoke to her, it could have been she was

20   crying because she was drunk or intoxicated?

21   A.  No.

22   Q.  By the way, have you been out with her on previous

23   occasions?

24   A.  Yes.

25   Q.  Before this evening?

E4SUMCC2                        "Maria Sosa"

1    A.  Yes.

2    Q.  OK.

3         And was getting drunk pretty much a part of the

4    scenario?

5    A.  In other occasions I have never seen her, no.  Like, she

6    would drink occasionally, socializing with all of the us, you

7    know, all of the friends we have.  We're all, yeah.

8    Q.  I didn't mean to interrupt you, I'm sorry.

9         On other occasions have you seen her drunk or you have

10   not seen her drunk?

11   A.  She's -- I can't say that she's drunk because I usually

12   don't, you know, go if I'm not the designated driver and I

13   don't know what condition she might leave, you know, with

14   another friend or something.  But we've had, you know,

15   acquaintances in a social place and we've all drank.

16        That day it was my responsibility not to drink because

17   I was the designated driver.  So I knew I was sober and I know

18   what, you know, how everyone's condition was.  In other social

19   occasion, I wouldn't keep track of that because I was not

20   responsible for anyone.

21   Q.  Well, meaning that on other social occasions when you were

22   not the designated driver that you might drink yourself?

23   A.  Right.

24        Everyone's allowed to drink occasionally.

25   Q.  I didn't say no.

1          Now, did the police try to talk to her, if you know?

2    A.  I don't know.

3    Q.  Well, were there uniformed police officers in the garage,

4    in the parking lot, at the time that you were there?

5    A.  Yes.

6    Q.  And, again, Biurny was there before you arrived --

7    A.  Yes.

8    Q.  -- to the parking lot, OK.

9          And when she was there, were the police there,

10   uniformed officers there?

11   A.  They were actually.  Yes, they were.

12   Q.  Approximately how many would you say they were?

13   A.  Two.

14   Q.  Two?

15   A.  Yeah.  From my memory, I think two, yes.

16   Q.  Did they have a marked radio patrol car with them?

17   A.  I'm sorry.

18   Q.  OK.

19          Now, I don't mean to belabor this, I want to make sure

20   that we have a clear answer there.  You've seen Biurny out

21   socially, occasionally, on other occasions?

22          When you first called 911, was that action that you

23   took in response to something that made you call something that

24   made you want to call?

25   A.  I called 911 after I spoke to the male voice when we

1   spoke -- when we dialed Mary's number, Biurny's number.

2   Q.  Right.

3        And you spoke to the male?

4   A.  The male right.

5   Q.  The male who picked up the cell phone on their end?

6   A.  Right.

7   Q.  OK.

8        And you spoke to that individual?

9   A.  Right.

10  Q.  OK.

11       And what specifically, as far as you can remember, did

12  he say to you?

13  A.  We'll take her back there in five minutes.

14       We will return her in five minutes, We'll be there in

15  five minutes are the answers he would give me.

16  Q.  We will return in five minutes or we'll be there in five

17  minutes?

18       Two different things.

19  A.  We'll take her back in five minutes.

20  Q.  Now, at that point did you ask:  Take her back from where?

21  Why is she gone in the first place?

22       Things like that?

23       Did you have any kind of conversation?

24  A.  At that point I was actually arguing with that male on the

25  phone asking him to bring her back, and that if not, I was

E4SUMCC2                         "Maria Sosa"

1    going to call 911.  Those are my exact words.

2    Q.  All right.

3            And you gave him five minutes to bring her back?

4    A.  Yeah.  I would say five minutes.

5    Q.  OK.

6            And did you wait the five minutes that you gave to

7    bring her back?  Did you wait the five minutes before you

8    dialed 911?

9    A.  No, I would say two seconds after I was hung up the phone

10   with him I dialed 911.

11   Q.  And approximately how soon after you called 911 did the

12   police respond?

13   A.  Can you repeat the question for me?

14   Q.  Yeah.

15           Approximately how soon after you dialed 911 was it

16   that the police responded?

17   A.  I don't recall.

18   Q.  Well, roughly?  Minute?  Two minutes?  Five minutes?  Ten

19   minutes?

20   A.  We were on the phone with the police.  I don't know how

21   long.

22           You're asking me when did they call back?

23   Q.  Well, let me ask you --

24           They did not come at all?

25   A.  No.

E4SUMCC2                        "Maria Sosa"

1    Q.  And the first time you saw any police presence in this

2    whole situation was later on at the parking lot you -- after

3    Mary was released standing there?

4    A.  Right.

5    Q.  And that's when they tried to take a statement from her and

6    couldn't do it?

7    A.  Right.

8    Q.  I have no further questions."

9           MR. GARBER:  Now this is the redirect of Ms. Strain.

10          THE COURT:  So you are ADA Strain again?

11          MR. GARBER:  Yes.

12          (Mr. Garber and Mr. Cohen reading)

13   "Q   On cross-examination Mr. Veneziano asked you about prior

14   occasions that you've been out with Biurny.

15   A.  Yes.

16   Q.  Has anything like this ever happened before?

17   A.  No.

18   Q.  Has she ever taken the car and driven off?

19   A.  No.

20   Q.  Has she ever disappeared?

21   A.  No.

22   Q.  Has she ever come back and said that men raped her?

23   A.  No.

24   Q.  No further questions."

25          MR. GARBER:  This is now the recross by Mr. Veneziano.

1              (Mr. Garber and Mr. Cohen reading)

2       "Q    Has she ever gotten drunk

3       A.   I answered that question before but there's OK.  I have

4       been on occasions with her and socializing, we've all been

5       drinking.  I don't know what in condition she has left that

6       place to her home or wherever she's going, I wouldn't be able

7       to answer that."

8              MR. GARBER:  And that's the end of Maria Sosa's

9       testimony at the criminal trial.

10             Now we are going to move on to Aurora Pujols'

11      testimony, and I am now Shandra Strain doing the direct

12      examination of Ms. Pujols.

13             THE COURT:  So Mr. Cohen you are going to be

14      Ms. Pujols.

15             MR. GARBER:  It starts on page 108, line 12.

16             (Mr. Garber and Mr. Cohen reading)

17      "Q  How old are you?

18      A.   29.

19      Q.   And where do you live?

20      A.   In New Jersey.

21      Q.   How long have you lived in New Jersey?

22      A.   All my life.

23      Q.   Do you work?

24      A.   Yes.

25      Q.   What line of work do you do?

1    A.   I work for the airlines.

2    Q.   Are you also currently in school?

3    A.   Yes, I am a full-time student, full-time nursing student.

4    Q.   Do you live alone?

5    A.   No, I live with my husband and my two children.

6    Q.   How old are your children?

7    A.   Nine and four.

8    Q.   Do you know a woman by the name of Biurny Peguero?

9    A.   Yes, I do.

10   Q.   Do you refer to her by another name?

11   A.   Yes, I refer to her as Mari.

12   Q.   How long have you known her?

13   A.   For about eight years.

14   Q.   How would you classify your friendship with her?

15   A.   We're like sisters.

16   Q.   How often to you currently see her?

17   A.   Maybe twice, three times a week.

18   Q.   Prior to September 18, 2005, how often did you see her

19   then?

20   A.   A lot more.  We used to go a lot on the weekends.

21   Q.   I'd like to direct your attention to September 17, 2005,

22   that night, going into the early morning of September 18, 2005.

23            Do you remember that night?

24   A.   Yes, I do.

25   Q.   Who were you with on that night?

1    A.  I was with Mari, with Maria and with a cousin of mines

2    named Heliana.

3    Q.  Do you still talk to Heliana?

4    A.  No.

5    Q.  Do you know where she's currently residing?

6    A.  No.  The last time I heard, she was somewhere in New

7    Hampshire.

8    Q.  And did there come a time that night when you met up with

9    someone else?

10   A.  Yes.  We met up with a mutual friend of ours, whose name is

11   Orlando.

12   Q.  When was the last time that you talked to Orlando?

13   A.  The last time we came for when we saw the grand jurors.

14   Q.  Where did you guys go that night?

15   A.  We went to a club called Umbrella.

16   Q.  Is that here in the County of New York?

17   A.  Yes, it is.

18   Q.  Do you know the general area of where it's located?

19   A.  I know it's off Dyckman, but I don't know exactly.

20   Q.  How did you guys get there that night?

21   A.  We drove there.

22   Q.  OK.

23            Who drove?

24   A.  I did.

25   Q.  In whose car was it?

E4SUMCC2                        "Aurora Pujols"

1   A.   My car.

2   Q.   Who did you take to the lounge?

3   A.   Myself, Maria and Heliana and Mari.

4   Q.   I'm showing you what's previously been entered into

5   evidence as People's 1.

6        Do you recognize that?

7   A.   Yes.

8   Q.   What is that a picture of?

9   A.   That's a picture of us at the club.

10  Q.   And does that picture fairly depict the way you guys looked

11  that night?

12  A.   Yes, it does.

13  Q.   You mentioned that you have two children.

14       Who was taking care of them while you guys were at the

15  club?

16  A.   Their daddy.

17  Q.   Approximately what time did you arrive at that club that

18  night?

19  A.   Probably around midnight.

20  Q.   And how long did you stay there?

21  A.   Until it closed, till about 4, 4:15.

22  Q.   And were you drinking that night?

23  A.   Yes, we were.

24  Q.   What you were drinking?

25  A.   We were drinking Blue Hawaiians.

E4SUMCC2                    "Aurora Pujols"

1    Q.  Do you know what's in that?

2    A.  I know that it has Hypnotiq, but other than that...

3    Q.  Do you know what Hypnotiq is?

4    A.  It's like -- it's like a liquor, like a blue -- like a

5    fruity liquor.

6    Q.  Do you know how many drinks you had that night?

7    A.  Probably about four or five.

8    Q.  Did you know if Biurny was drinking?

9    A.  Yes.

10   Q.  Do you know what she was drinking?

11   A.  We were all drinking the same thing.

12   Q.  How would you classify yourself when you left the club that

13   night?

14   A.  I was drunk.

15   Q.  And what about Biurny?

16   A.  The same.

17   Q.  How about Maria?

18   A.  No.  Maria was the only one that was sober.  She was the

19   designated driver.

20   Q.  Did you have anything to drink before you arrived at the

21   club that night?

22   A.  No.

23   Q.  What about after you left?

24   A.  No.

25   Q.  What happened when you left the club?  Where did you guys

 1  go?

 2  A.  We went to a restaurant on the corner of Dyckman and

 3  Broadway.  We went to eat.

 4  Q.  Who drove you there?

 5  A.  Maria drove.

 6  Q.  Where was the car parked, and what happened when you guys

 7  arrived at that location?

 8  A.  We parked in front of the restaurant, like right in front

 9  of it at a bus stop.  I stayed in the backseat because I didn't

10  feel real good, and everybody else got out of the car to go use

11  the bathroom and to get something to eat.

12  Q.  Did there come a time whether Biurny was with you in the

13  backseat of the car?

14  A.  Yes.  After she used the bathroom, she came back outside

15  and sat with me inside the car in the backseat.

16  Q.  Did you have an opportunity to view her at that point and

17  see what she looked like?

18  A.  Yes, I did.

19  Q.  Was she wearing --

20        Do you recall what she was wearing that night?

21  A.  She was wearing dress pants and a tube top.

22  Q.  Do you notice if she had any accessories or belt?

23  A.  She a belt on and earrings, you know, bracelets.

24  Q.  And when she came out of the bathroom, did she still have

25  all of those things on?

1    A.   Yes, she did.

2    Q.   Where were you seated in the car in front of the

3    restaurant?

4    A.   I was seated in the backseat on the passenger's side.

5    Q.   And where was Biurny?

6    A.   Sitting next to me behind the driver's side.

7    Q.   Do you know where the keys to the car were at that time?

8    A.   They were in the ignition.

9    Q.   Was the car parked legally?

10   A.   No, it was parked in front of a bus stop.

11   Q.   Do you know if the doors were locked or unlocked?

12   A.   They weren't locked.

13   Q.   Were not locked?

14   A.   No.

15   Q.   What about the windows, were they up or down?

16   A.   The windows were all up.

17   Q.   Can you describe for us what happened while you and Biurny

18   were in the backseat of the car?

19   A.   There was a -- I happened to look over and I saw a

20   gentleman approaching the vehicle, but I really didn't pay any

21   attention.  I didn't think that he was coming to the car.  Then

22   he opened the car and came inside the car.

23        And of course I said, you know:  What are you doing in

24   my car, who are you, get out of my car.  He said:  No, no,

25   wait.  I just want to talk to you guys, I just want to talk to

1   you guys.  I'm saying:  Look, get out of my car, there is

2   nothing to talk about, get out of the car.

3           So he kept on insisting that he wanted to talk to us.

4   And at that moment, Mari got up and she said:  I'm going to

5   move the car.  I said:  No, Mari, what are you going to move

6   the car for?  She said:  I'm just going to move the car.  I

7   said:  No, no, don't move the car, just stay here.

8           I said to the man:  You need to get out of my car.

9   She was like:  Wait, wait, wait, let me move the car.

10          She climbs over the center of the two seats and gets

11  in the driver side to move the car.  I'm like:  Mari, don't

12  move the car, wait, he needs to get out.  So we're bickering

13  back and forth.  She is insisting she's going to move the car.

14          So I got upset, I said, you know:  Do whatever you

15  want.  And I got out of the car.  I walked into the restaurant

16  to let everyone else know she was in the car and there was a

17  guy in the car.  By the time we came back out, the car was no

18  longer there.

19  Q.  I will back up for a moment, OK?

20          The guy car you saw get into the car, do you know --

21  what would you consider his race?

22  A.  I thought he was Hispanic.

23  Q.  And what kind of --

24          What was his skin color?

25  A.  He was white.

E4SUMCC2                          "Aurora Pujols"

1    Q.  So you thought it was a white Hispanic?

2    A.  Mm hmm.

3    Q.  What made you think that?

4    A.  Because of his appearance, because of his attire, what he

5    was wearing.

6    Q.  Was there anything else that made you think he was

7    Hispanic?

8    A.  Just his mannerisms, the way that he spoke, you know, the

9    slang he used.

10   Q.  But you would classify his skin color --

11   A.  As white, ye, a white Hispanic.  That's what I assumed he

12   was.

13   Q.  Did you see anyone else when you got into the car?

14   A.  No, I did not.

15   Q.  Did you ever go in the restaurant and tell them that there

16   was more than one guy?

17   A.  No, I did not.

18   Q.  Did you later, at the end of the evening, learn that there

19   were -- that there was more than one guy?

20   A.  Yes, I did.

21   Q.  But at that point in which when you went into the

22   restaurant, how many men had you seen?

23   A.  One.

24   Q.  When he got into the car, which side did he get into?

25   A.  He got in on the passenger's side of the car.

E4SUMCC2                        "Aurora Pujols"

1   Q.  Did you ever ask him to get into the car?

2   A.  No, I did not.

3   Q.  What about Biurny?

4   A.  No, she did not.

5   Q.  When he was talking to you in the car, how was his body

6   positioned in the seat?

7   A.  Can I show you?

8   Q.  Go ahead.

9   A.  Like this.

10  Q.  OK, so you're --

11  A.  He's sitting, I'm sitting behind him, so I'm seeing his

12  profile.

13  Q.  OK.

14          Who was he facing?

15  A.  He was facing Biurny.

16  Q.  What was Biurny saying when he got into the car?

17  A.  She was not really speaking.  It was mostly me telling him

18  to get out of the car.  Most of the time when we spoke, it was

19  just him and me.  He kept saying:  Wait, wait, wait, let me

20  talk to you guys.  I said:  There's nothing to talk about, just

21  get out of my car.

22  Q.  What emotions were you feeling when you got into the car?

23  A.  I was nervous.

24  Q.  But you decided to get out?

25  A.  Yes, I did.

E4SUMCC2                          "Aurora Pujols"

1   Q.  For what reason?

2   A.  I was scared.  I just got out of the car.  I was upset that

3   I was bickering, telling her not to move the car, then he's in

4   my car, I don't know who he is.  And maybe I was under the

5   influence of alcohol, I didn't think to wait.  My reaction was

6   to get out of the car.

7   Q.  When you got out of the car, did Biurny stay in the car?

8   A.  She did.

9   Q.  Did you know this man?

10  A.  No, I did not.

11  Q.  Had you everywhere seen him before?

12  A.  No, I had not.

13  Q.  Did you ask him to get into the car?

14  A.  No, I didn't.

15  Q.  Did you ever agree to go anywhere with this man?

16  A.  No.

17  Q.  Did you ever go anywhere with this him?

18  A.  No.

19  Q.  I'm going to show you what's previously been entered into

20  evidence as People's 3.

21          Can you show us in this picture where the car was

22  parked?

23  A.  It was parked right in front where the bus stop is.

24          Here.

25  Q.  So right there in the middle of the photograph?

E4SUMCC2                          "Aurora Pujols"

1   A.  Yes.

2   Q.  When you got out of the car, did you look back?

3   A.  No, I was just walked straight in the restaurant to tell

4   the rest of them to come out, that it was time for us to leave.

5   Q.  Is it fair to say when you got out of the car you were

6   angry?

7   A.  Yes, I was.

8   Q.  Who were you angry at?

9   A.  Just at the situation.

10  Q.  Why?

11  A.  Because I wanted to leave, and then he was in the car and

12  then I ended up bickering with her.  It was just -- I guess it

13  was the moment.  I was just upset.

14  Q.  Who was in the restaurant when you went in?

15  A.  Orlando, Maria and Heliana.

16  Q.  And what happened when you went into the restaurant?

17  A.  I explained to them what had happened, that she was still

18  outside.  I had to use the bathroom.  I went in to use the

19  bathroom.  I -- I can't actually recall if it was Maria or

20  Heliana that went in with me to the bathroom.  I remember

21  vomiting.  By the time I came out of the bathroom, they were

22  already outside.

23  Q.  And when you came outside, where was the car?

24  A.  It was gone.

25  Q.  Did you ever see the car pull away?

E4SUMCC2                        "Aurora Pujols"

1   A.  No, I didn't.

2   Q.  Did you ever see any other men in the car at that time?

3   A.  No, I didn't.

4   Q.  Approximately how long were you have inside the restaurant?

5   A.  Probably for 10 or 15 minutes.

6   Q.  After you got out of the car and you went into the

7   restaurant, approximately how long were you in the restaurant?

8   A.  Probably about 10 minutes, 10, 15 minutes.

9   Q.  And what happened when you came back out?

10  A.  The car was gone.

11  Q.  What did you guys do next?

12  A.  Maria was asking, you know, where the car was and I had

13  already explained to her what had happened.  So Heliana called

14  her, called Mari, and she kept saying she would be back in five

15  minutes.

16          Five minutes kept passing and she wasn't coming back.

17  So Heliana kept calling.  And then at one point when she called

18  she could hear her crying, and talking and crying, and

19  Heliana's asking her:  What's wrong.  And she's saying:  Please

20  just come get me, please just come get me.

21  Q.  And did you see Maria also calling Biurny?

22  A.  Yes.

23  Q.  And who else was still with you at that time?

24  A.  Orlando was with us also.

25  Q.  And was he also making phone calls?

1   A.  They were using his phone and he was talking, but it was

2   Maria and Heliana dialing the number.

3   Q.  OK.

4           Were they using anyone else's phone?

5   A.  No.

6   Q.  Just Orlando's?

7   A.  Orlando's and Maria's.

8   Q.  Maria's phone?

9   A.  I think it was either Maria's or maybe Heliana's phone.

10  Q.  Did you have a cell phone with you?

11  A.  Not on me.  I didn't.  It was in my car.

12  Q.  Did you guys call the police immediately?

13  A.  Probably about after five minutes of standing out there

14  seeing she wasn't coming, Heliana called 911.

15  Q.  OK.

16          When you came out of the restaurant, where did think

17  Biurny was?

18  A.  I thought she went to park the car.

19  Q.  Did there come a point when you all went to look for

20  Biurny?

21  A.  No.  We called 911.  We walked to the corner.  You, how

22  there's the corner to look.  As a matter of fact, it was

23  Heliana that walked to the corner and didn't see the car.  They

24  called 911.  We were just waiting hoping that she would come

25  back.

E4SUMCC2                    "Aurora Pujols"

1              And they kept speaking to the other guy.  He kept

2     saying:  I'm going to bring her back, I'm going to bring her

3     back, I'm going to bring her back, just don't call the police,

4     just don't call the police.  But she wasn't coming back.

5     Q.  So then what happened?

6     A.  We called 911.

7     Q.  What happened after you called 911?

8     A.  Then he called and we called -- yeah we called the cab to

9     try to look for her.

10    Q.  A cab?

11    A.  Yeah, one of those livery things.

12    Q.  OK.

13    A.  Those ones that drive by.

14             And we were looking for her.  I know Orlando was on

15    the phone and they were explaining to where, you know, where

16    she was, where we could find her.  I remember going over a

17    bridge and then we made an immediate U-turn.  They told him she

18    was in a parking lot and that's where we found her, in the

19    parking lot.

20    Q.  Was Maria also on the phone at that time while you were in

21    the cab?

22    A.  Yes, she was.

23    Q.  Where did you go after you made that U-turn?

24    A.  We went to a parking lot.

25    Q.  And what did you observe when you arrived at the parking

 1   lot?

 2   A.  My car was there and Mari was inside the backseat of the

 3   car.

 4   Q.  Were there any men there at that time?

 5   A.  No.

 6   Q.  Were there any parking lot attendants there?

 7   A.  The attendants were there.

 8   Q.  Did there come a time that police officers arrived.

 9   A.  Yes, there did.

10   Q.  OK.

11           What happened when you approached Biurny?

12   A.  She was crying hysterical and she was very -- she was just

13   like -- how could I explain to you -- she was just hysterical,

14   she was just destroying crying not even reacting, just not

15   herself.

16   Q.  Did you see whether or not she spoke to the police

17   officers?

18   A.  I don't remember.

19   Q.  Did you notice anything about her when you approached her

20   and saw her in the car?

21   A.  Her pants were opened and her belt was broken.

22   Q.  What did her face appear like to you?

23   A.  As if she had been crying.  Her mascara were all spread.

24   Her face was very flustered, very red.  Her hair was all messed

25   up.

E4SUMCC2                        "Aurora Pujols"

1   Q.  Approximately how long was Mary missing?

2   A.  About an hour and a half maybe.

3   Q.  When you saw her that night at the club and in your car at

4   the restaurant before she was missing, did you have an

5   opportunity to see her body, to see her arms?

6   A.  Yes.

7   Q.  Do you know if she had any injuries?

8   A.  She didn't.

9   Q.  At that point in which you were inside the car before she

10  disappeared.

11  A.  She had no injuries.

12  Q.  Was her belt broken at that time?

13  A.  No.

14  Q.  Did there come a point when Biurny told all of you that she

15  had been raped?

16  A.  Yes.

17  Q.  When did that occur?

18  A.  When we were all in the car.

19  Q.  Did she tell you who had raped her?

20  A.  The guy who had gone in the car and drove off with her.

21  Q.  OK.

22          And did she tell you when that had occurred?

23  A.  She said that they moved her from one car to another car.

24  So she was raped in a different car, not in my -- not in my

25  vehicle.

1    Q.  Did you --

2            Did she tell you whether or not more than one

3    individual had raped her?

4    A.  Yes.

5    Q.  Did she tell you how many?

6    A.  She said it was a total of three.

7    Q.  When you were in the car and she told you that she had been

8    raped, what did you guys do next?  Where did you go?

9    A.  We came back to Jersey, we took her straight to the

10   hospital.

11   Q.  At the hospital, did there come a point when you saw

12   whether or not she had had any injuries?

13   A.  Yes.

14   Q.  What were those injuries?

15   A.  She had bruises on her arms and on her shoulder.

16   Q.  I'm showing you what's previously been entered into

17   evidence as People's 6 through 15.

18            Could you take a look at those for me, please, and let

19   me know when you're done looking at them.

20   A.  I'm finished.

21   Q.  What do those pictures depict?

22   A.  The bruises that she had on her arms and on her shoulders,

23   of her arm.

24   Q.  Did she have any of those injuries the last time you saw

25   her before she was missing?

E4SUMCC2                    "Aurora Pujols"

1    A.  No, she didn't.

2    Q.  After the hospital, did you return with Biurny to New York

3    City and meet with detectives?

4    A.  Yes, we did.

5    Q.  What did you guys do at that time?

6    A.  We had to give our statements of what had happened.

7    Q.  Did you also drive around with the detective?

8    A.  Yes, we did.

9    Q.  Was that Detective Arbuiso?

10   A.  Yes, it was.

11   Q.  You stated earlier that you had a cell phone that night but

12   it wasn't with you when you were calling Biurny.

13   A.  No, I had left my cell phone in my pocketbook in the car.

14   Q.  When you returned to your car, was that cell phone still

15   there?

16   A.  No, it was missing.

17   Q.  Aurora since this incident, how have things changed between

18   you and Biurny?

19   A.  A lot.  We're not as close as we used to be.  It's caused

20   like -- I feel guilty, you know.  It's put a big strain on our

21   friendship.  We have children who are days apart.  They are not

22   as close as they used to be because it's hard to look at her.

23   I feel like a lot of guilt because of what happened.  I feel if

24   I hadn't been drinking --

25   Q.  I have no further questions."

E4SUMCC2                    "Aurora Pujols"

1           MR. GARBER:  Now it is the cross-examination of Ronald

2    Veneziano.

3           (Mr. Garber and Mr. Cohen reading)

4    "Q  How do you pronounce your last name?

5    A.  Pujols.

6    Q.  Sorry?

7    A.  Pujols.  The J is silent.

8    Q.  Pujols?

9           Can I just call you Aurora, that will be easier?

10   A.  That's fine.

11   Q.  OK.

12   A.  Mm hmm.

13   Q.  That evening you said that you had been drinking for the

14   full amount of time and that everyone was in the Umbrella,

15   correct?

16   A.  When we got there, yes, we started drinking.

17   Q.  And you calculate that you had four, five, six drinks?  How

18   many drinks would you say?

19   A.  Four to five.

20   Q.  And that was enough to make you intoxicated?

21   A.  Yes, it was.

22   Q.  During the time when you were drinking, were you eating

23   anything?

24   A.  Munching on chips.

25   Q.  That's all?

E4SUMCC2                          "Aurora Pujols"

1    A.  Mm hmm.

2    Q.  OK.

3         And there came a time when you left and you frankly

4    admit that you were drunk?

5    A.  I was drunk, yes.

6    Q.  Is that correct?

7    A.  Yes.

8    Q.  OK.

9         And the only one who was sober was Maria Sosa?

10   A.  Correct.

11   Q.  Because she was the designated driver, correct?

12   A.  Correct.

13   Q.  Now, there came a time when you were sitting in the

14   backseat of your car when this individual came into the car?

15   A.  Yes.

16   Q.  OK?

17        You had never he seen him before?

18   A.  No, I had not.

19   Q.  And you had never spoken to him before?

20   A.  No, I had not.

21   Q.  OK.

22        And he was, on that evening, for all accounts and

23   purposes, a total stranger who you were seeing for the first

24   time?

25   A.  Yes.

E4SUMCC2                         "Aurora Pujols"

1   Q.  OK.

2           So he comes into the car and he sits -- he's seated in

3   the front seat, correct?

4   A.  Yes.

5   Q.  OK.

6           And you're in the backseat of the car?

7   A.  Yes.

8   Q.  Correct?

9           And at this time were you aware that there was some

10  problem with Biurny, that she wasn't around or something

11  happened to her or she left and did something?

12  A.  I don't understand.

13  Q.  OK.

14          At the time this individual came into the car, were

15  you aware that something had happened to Biurny?

16  A.  Nothing had happened to her.  She was sitting next to me.

17  Q.  Sorry.  She's sitting next to you, right.

18          Now, you're having some kind of dialogue and

19  discussion with this individual, yes?

20  A.  Yes.

21  Q.  OK.  He wants --

22          He wants to take you somewhere or talk to you, and you

23  say:  No, I don't want to do any of that, words to that effect:

24  Just get out of my car?

25  A.  He never spoke of taking us anywhere.  He said:  I want to

1    speak to you, let me talk to you.

2    Q.  OK.

3            He didn't suggest going anywhere?

4    A.  No, he did not.

5    Q.  Did he suggest to you what it was that he wanted to talk to

6    you about?

7    A.  I never gave him the opportunity.  I kept saying:  I don't

8    want to talk to you, just get out of my car.

9    Q.  OK.

10           Now, what was -- to the extent that you can bring it

11   back and recollect it as a thought in your mind, what was the

12   total amount of time that you would say you were in the car, he

13   was in the front, and that you were having this dialogue where

14   he wanted to talk to you and you kept telling him just get out

15   of the car?  How long?

16   A.  Five to ten minutes we were bickering back and forth.

17   Q.  Five to ten minutes?

18   A.  Yes.

19   Q.  Bickering back and forth for five to ten minutes?

20   A.  Mm hmm.

21   Q.  All right.

22           So during that time that he was in the front of the

23   car and you were in the back of the car, I assume as you were

24   talking to him you were looking at him?

25   A.  He was never looking directly at me.  He was always looking

E4SUMCC2                    "Aurora Pujols"

1   at Biurny.  Speaking to Biurny.  And I was the one that kept

2   saying:  Just get out of the car, just get out of the car, just

3   get out of the car.

4   Q.  OK.

5          But he was in car.  The fact that he was in the car

6   and you were in the car and you were looking at him for at

7   least, say, ten minutes?

8   A.  Yes.

9   Q.  While this one sided conversation was going on?

10  A.  Yes.

11  Q.  Correct?

12         And then there reaches a point where you start to

13  think about it and you say to yourself:  I don't like this

14  situation, I'm going to get out of here, and then what did you

15  do, just open the door and leave?

16  A.  I opened the door and got out of the car.

17  Q.  OK.

18         Because you were concerned about what would happen or

19  could happen?

20  A.  Yes.

21  Q.  OK.

22         Now, you say that during that time the person that you

23  were speaking to in the front of the car was looking to the

24  side straight ahead or was positioned in such a way that you

25  got a profile of him, you were able to see his profile?

E4SUMCC2                    "Aurora Pujols"

1   A.  I was able to see his profile.

2            He was also wearing a hat.

3   Q.  He was wearing a hat?

4   A.  Yes.

5   Q.  What kind of hat was he wearing?

6   A.  Like a baseball cap type of hat.

7   Q.  A baseball cap hat?

8   A.  It was one like a baseball hat, specifically like the hats

9   that don't have anything.

10  Q.  Right.  He was wearing one of things?

11  A.  A hat, yes, he was wearing a hat.

12  Q.  OK.

13           After you had told him to get out and he wouldn't get

14  out and you got out, how much time would you say elapsed

15  between the time that you got out of the car and when the

16  police was first called by Ms. Sosa I think it was?

17  A.  Exact time, I wouldn't be able to tell you.

18  Q.  OK.

19  A.  I went into the restaurant, I told them.  So the exact time

20  I wouldn't be able.

21  Q.  OK.

22           Now I've asked you some questions and I want to ask

23  you just a few more and I ask you to forgive me if they sound

24  somewhat embarrass --

25           You say you have a husband and two children?

E4SUMCC2                        "Aurora Pujols"

1   A.  Yes, I do.

2   Q.  How old are the two children?

3   A.  Nine and four.

4   Q.  On this particular evening when were you out --

5   A.  Yes.

6   Q.  -- you say that the two children were with their father?

7   A.  Which is my husband.

8   Q.  Which is your husband?

9   A.  Yes.

10  Q.  So you're not estranged or divorced -- you're husband and

11  wife?

12  A.  Yes.

13  Q.  And you were out with three or four other people?

14  A.  Females.

15  Q.  OK.

16        Drinking rather heavily that evening?

17  A.  Yes.

18  Q.  OK?

19        You mentioned very forthrightly that you had been

20  drinking, and I believe the answer you gave to one question in

21  response to Ms. Strain's question was you aid specifically I

22  was drunk, right?

23  A.  Yes, I was.

24  Q.  OK.  I know that you were but you said that you were.

25        Assuming that none of this ever happened, you would

E4SUMCC2                        "Aurora Pujols"

1   just be taken back home, is that correct?  The designated

2   driver would drop off all the other people who were in the car

3   one of which was you?

4          Yes?

5   A.  Meaning if I would have been drinking?

6   Q.  No.  Was that the plan?

7   A.  Meaning if I would have been drinking.

8   Q.  No.  Was the plan that evening for you to drive home by the

9   designated driver?

10  A.  No.  Usually when we got out on the weekends after we would

11  leave the club, we usually go to eat.  That's like part of it.

12  Q.  But it would --

13         Had all of this thing not happened on that evening,

14  you say that you would have just left the restaurant and then

15  go --

16  A.  After the restaurant we would have went home.

17  Q.  And would have just gone home.

18         Given the fact that drunkenness was part of the

19  scenario or, to put it a different way, drinking sufficient

20  alcohol content to become drunk, how would you -- how would you

21  plan to get home?  Who would take you home?

22  A.  I was able to walk.  I wasn't tripping over my feet and I

23  wasn't out with strangers, I was out with family members.

24  These are not just strangers.  They're family members.

25         Worst case scenario:  If I was really, really bad that

E4SUMCC2                        "Aurora Pujols"

1   I couldn't walk, they would have escorted me upstairs to my

2   house.  They're not -- these are my friends from years.

3   Actually two of them are related to me.

4   Q.  So these are just not friends, this is more than friends,

5   this is family?

6   A.  Yeah, they're not random friends.

7   Q.  Basically I think that the question I want to ask you is:

8   You would have -- you would have been brought to your home or

9   gone to your home back to your children, especially your two

10  younger children.

11  A.  That were sleeping.

12  Q.  You would have gone to your home to your family drunk?

13  A.  Yeah.

14  Q.  Right?

15  A.  And my husband would have been fine with that.

16  Q.  And your husband would be fine with that?

17  A.  Yeah, he.  Would help me, yeah.

18  Q.  Would your children also be fine with that?

19  A.  My children would have been sleeping when I got home.

20  Q.  Now, again, I want you to think about to the conversation

21  that you were having when you were in the backseat of your car

22  and this man got into the front, OK?

23        Given the amount of time you spent with him, whether

24  you were looking right at him, whether willing or unwilling,

25  you were talked with him, you --

E4SUMCC2                    "Aurora Pujols"

```
1          The question is, I'd like you to look at this man.

2   Take a look at him.

3          Is this the person that was in the car that night or

4   not?

5   A.  Yes, it was.

6   Q.  You're positive of that?

7   A.  Yes.

8   Q.  What makes you positive?

9   A.  Because I know.  I know that that's him.  I remember him.

10  I may not have remembered him the day of the lineup.  I may not

11  have picked him out of the lineup.  I was nervous.  We had just

12  been through an extreme ordeal, but that's him.

13  Q.  That's him?

14  A.  Yes, it is.

15  Q.  But that's --

16         That's not what you told the police when the police

17  arranged the lineup?

18  A.  I just told you that.

19  Q.  Isn't that right?

20  A.  Yeah.

21  Q.  So when you went to the lineup and the defendant was in the

22  lineup?

23  A.  Yes, he was.

24  Q.  Wasn't he?

25  A.  Yes.
```

E4SUMCC2                    "Aurora Pujols"

1    Q.  And there were five other people who were in the lineup,

2    correct?

3    A.  Yes.

4    Q.  And you were asked to see if you could pick out the one

5    individual that they were interested in, Mr. McCaffrey, right?

6    A.  Yes.

7    Q.  Do you remember how long you looked at that lineup before

8    you told them what you told them?

9    A.  No, I don't remember.

10   Q.  Was it a matter of seconds or a minute?

11   A.  I don't remember.

12   Q.  You don't remember?

13   A.  No.

14   Q.  Isn't it a fact, to cut right to the chase of it, right to

15   the heart of it, that you told the police officers:  I don't

16   see him, he's not in the lineup, and in addition to that, you

17   picked out a filler?

18           Isn't that right?

19           Do you know --

20           on the night that you had the lineup, did any of the

21   police officers tell you what the word 'filler' meant?

22   A.  No.

23   Q.  They didn't tell you they are another person --

24           Do you know what a filler means?

25   A.  Now that you're telling me.

1    Q.   It's someone else who stands in the lineup but where they

2    know he is not guilty of anything?

3    A.   OK.

4    Q.   Just to make a lineup, OK?

5    A.   OK.

6    Q.   So you had that here, you had Mr. McCaffrey in the lineup

7    and you had the rest of the fillers --

8            In that lineup, did you pick out the defendant?

9    A.   According to the Detective Arbuiso, I did not.

10   Q.   In that lineup, did you pick out someone who you said was

11   the rapist where it turned out that that person was a filler,

12   probably a police officer?

13   A.   I never knew anything about a filler.  They didn't even

14   tell me that I picked the wrong person.  I didn't find out that

15   I picked the wrong person until way later.  It's not like they

16   told me that day.

17   Q.   No one told you that day?

18   A.   No, they didn't.

19   Q.   How much time would you estimate went by --

20           How much time would you say went by between the night

21   where you made the misidentification and picked out the filler

22   and the time that the police told you what happened that night

23   and the mistake that you had supposedly -- the mistake you had

24   made?

25           Did there come a time when someone told you that you

1   had picked out -- made what they consider to be a

2   misidentification and an incorrect selection of a filler?

3   A.   There did come a time.  Exactly when it was, I don't

4   remember.

5   Q.   I have no further questions."

6           MR. GARBER:  This is redirect by Shandra Strain.

7           (Mr. Garber and Mr. Cohen reading)

8   "Q  As you sit here today, how sure are you that the defendant

9   is the man who got into the car?

10  A.   A hundred percent.

11  Q.   When you were out that night -- actually, strike that.

12          How often prior to that, to September 18, 2005, would

13  you go out at night?

14  A.   We go out not every weekend.  At least twice during the

15  weekend or sometimes we got, go out to eat, you know, during

16  the week.

17  Q.   When was the last time since then have that you've been

18  out?

19  A.   That day, together, that day.

20  Q.   No further questions."

21          MR. GARBER:  Recross-examination by Mr. Veneziano.

22          (Mr. Garber and Mr. Cohen reading)

23  "Q  You are a hundred percent sure that Mr. McCaffrey is the

24  one who committed the rape?

25          And that Mr. McCaffrey was the one in the car,

E4SUMCC2                      "Aurora Pujols"

1    correct?

2    A.  Yes.

3    Q.  You are a hundred percent certain?

4    A.  Yes.

5    Q.  And when did you first communicate this strong total on

6    hundred percent certainty to Ms. Strain?

7    A.  Ms. Train and I have not spoken specifically about him.

8    This is -- we never spoke about that.

9    Q.  So are you saying that --

10   A.  You're going to have -- you are going to have to ask your

11   questions a little more clearly so I can understand what you

12   are asking.

13   Q.  Are you saying, are you saying, that the first time since

14   that evening of the lineup that you were a hundred percent

15   certain it was him was when?

16   A.  That I'm telling you, I'm telling you now.

17   Q.  That you are telling me now?

18   A.  I'm telling you now.

19   Q.  All right.

20          And that's the first time that you communicated that

21   you were a hundred percent certain to anybody?

22   A.  From this, yes, from this here, mm hmm.

23   Q.  OK.  OK.

24          Now, how many times would you say that you've spoken

25   to Ms. Strain as a result of your participating as a witness in

1    this case?

2    A.  With this time?

3    Q.  Yes.

4    A.  This would be about the third time.

5    Q.  Third time.

6            And during those three times, had you reached your

7    level of one hundred percent certainty about the defendant?

8            Do you know?

9    A.  Yes.

10   Q.  OK.

11           When was the first time you conveyed to Ms. Strain

12   that you were absolutely positive that it was William McCaffrey

13   in the car with you?

14   A.  That conversation never came up between her and I.

15           I don't know what you're trying to ask.

16   Q.  Well, if you were a hundred percent certain, why did you

17   not tell that to Ms. Strain?

18           Why didn't you communicate that certainty?

19   A.  Because we never spoke about it.  Obviously if I'm coming

20   to trial and I'm testifying, it's because I am positive that it

21   was him.  I wouldn't sit here and accused somebody that didn't

22   do something.

23   Q.  Well, isn't that --

24           Isn't that exactly what you did on the night of the

25   lineup, isn't that right?

E4SUMCC2                        "Aurora Pujols"

1              When you picked out the filler, you believed that the

2    filler was the individual?

3    A.   No.

4              If you go back, you can probably ask them what I said.

5    I said I'm not sure.  I was nervous.  She had been through a

6    traumatic experience.  And yeah, I was nervous.  It might have

7    made a mistake, but I'm sure.

8    Q.   Now you are sure?

9    A.   I'm positive, yes.

10   Q.   No further questions."

11             MR. GARBER:  Redirect by Ms. Strain on 151.

12             (Mr. Garber and Mr. Cohen reading)

13   "Q   Since the lineup, have you ever seen this man and asked to

14   identify himself since then?

15   A.   No.

16   Q.   Was today the first time that you are asked to identify

17   him?

18   A.   Yes.

19   Q.   By the defense attorney?

20   A.   Yes.

21   Q.   Thank you.

22             No further questions."

23             MR. GARBER:  Now this is going to be brief.  This is

24   page 158, and it is lines 7 to 19.

25             And your Honor, this is Susan Johnson who is a

 1    T-Mobile, a cell phone representative.

 2              THE COURT:  All right.

 3              MR. GARBER:  So I am going to be Ms. Strain for this

 4    series of questions and answers.

 5              THE COURT:  Again, Ms. Strain is the Assistant

 6    District Attorney in Manhattan.  She is the prosecutor.

 7              MR. GARBER:  Page 158, starting on line 7.

 8              (Mr. Garber and Mr. Cohen reading)

 9    "Q  If a phone call is made and the person answers but

10    immediately hangs up, how is that billed?

11    A.  It would be billed at one minute.

12    Q.  Looking at People's 29, when do these phone calls begin?

13    A.  September 18, 2005.

14    Q.  At approximately what time?

15    A.  5:14 a.m.

16    Q.  When do these calls end?

17    A.  September 18, 2005 at 6:08 a.m.

18    Q.  And the telephone number again associated with these

19    records?

20    A.  551-358-0988.

21    Q.  I have no further questions."

22              MR. GARBER:  And that is it for Susan Johnson.

23              I believe at this juncture, I think that the

24    defendants' counsel is going to handle that part.

25              THE COURT:  Handle what part?

1           MR. GARBER:  A different witness, Biurny Peguero, her

2      testimony.

3           THE COURT:  15 minutes.  We want to use this time, so

4      let's go.

5           MR. COHEN:  I have a different binder.

6           THE COURT:  All of the trial testimony will be

7      Plaintiff's 70.

8           MR. COHEN:  It is in here, it is up to you.  I will

9      just leave it.

10          MR. LARKIN:  This is the complete direct examination

11     of Biurny Peguero who is the complaining witness in this case.

12          I will be Ms. Strain and Ms. Zgodny, my co-counsel,

13     will be the witness.

14          THE COURT:  So you are the Assistant District

15     Attorney, Ms. Strain, and you are Ms. Peguero.

16          MS. ZGODNY:  Yes, your Honor.

17          THE COURT:  Everybody got that?

18          All right, let's proceed.

19          (Mr. Larkin and Ms. Zgodny reading)

20     "Q  Good morning, Biurny.

21          Do you go by any other names?

22     A.  Yes.

23     Q.  What do people call you?

24     A.  Mari.

25     Q.  Who calls you Mari?

E4SUMCC2                    "Biurny Peguero"

1    A.  My friends and family.

2    Q.  Where are you from?

3    A.  Dominican Republic.

4    Q.  And how long have you been in the United States?

5    A.  Like eight years.

6    Q.  Eight years?

7    A.  Seven years, I could be.

8    Q.  How old are you?

9    A.  23.

10   Q.  Where do you live?

11   A.  New Jersey.

12   Q.  Who did you live with?

13   A.  My son.

14   Q.  How old i your son?

15   A.  Four.

16   Q.  How long have you lived in New Jersey?

17   A.  Four, five, six years.

18   Q.  Where did you live before that?

19   A.  New York.

20   Q.  What is your current marital status?

21   A.  I'm married.  I'm separated.

22   Q.  Where does your husband live?

23   A.  New Jersey.

24   Q.  When did you get separated?

25   A.  Like around three years ago.

1    Q.  How long were you married?

2    A.  Five years.

3    Q.  Who has custody of your son?

4    A.  I do.

5    Q.  Are you a legal citizen of the United States?

6    A.  No.

7    Q.  Why not?

8    A.  I don't have papers.

9    Q.  Are you currently in the process of getting your

10   citizenship?

11   A.  Yes.

12   Q.  Where was your son born?

13   A.  New Jersey.

14   Q.  Biurny, how tall are you, approximately?

15   A.  Five-two.

16   Q.  And approximately how much do you weigh?

17   A.  One thirty.

18   Q.  Hundred thirty pounds?

19   A.  Yes.

20   Q.  Do you currently work?

21   A.  Yes.

22   Q.  What kind of work do you do?

23   A.  I am a salesperson in a cell phone store.

24   Q.  How long have you been doing that?

25   A.  Two years.

E4SUMCC2                          "Biurny Peguero"

1    Q.  What type of hours do you work?

2    A.  A week, like around 53, 54 hours.

3    Q.  I'd like to direct your attention to the night of Saturday,

4    September 17, 2005 through the early morning hours of September

5    18, 2005.  OK?

6            Do you remember that night?

7    A.  Yes.

8    Q.  Who were you with that night earlier in the night?

9    A.  Early in the night, my friend Aurora, Maria and Heliana.

10   Q.  What were you guys doing that night?

11   A.  We were going to a club.

12   Q.  What was the name of the club, do you remember?

13   A.  Umbrella.

14   Q.  Umbrella?

15   A.  Mm hmm.

16   Q.  Do you know where that's located?

17   A.  In New York in 202, I don't -- I don't know the exact

18   address.

19   Q.  OK.

20           Is it here in the county of New York?

21   A.  Yes.

22   Q.  And how did you get there?

23   A.  By car.

24   Q.  Do you know who drove?

25   A.  Aurora.

E4SUMCC2                          "Biurny Peguero"

1    Q.   Whose car was it?

2    A.   Her car.

3    Q.   Do you know what kind of car it is that you drove in?

4    A.   A Honda.

5    Q.   A Honda?

6             Do you know what color it was?

7    A.   It was like gold.

8    Q.   Do you remember what you were wearing that night?

9    A.   Yes.

10   Q.   Can you tell us what you were wearing?

11   A.   Jeans and a tube top, black.

12   Q.   Did you have any accessories?

13   A.   Yeah, my belt.

14   Q.   What kind of belt was it?

15   A.   It was a silver belt.  It was like metal.

16   Q.   I'm going to show you what's already been admitted into

17   evidence as People's 1.

18            Do you recognize People's 1?

19   A.   Excuse me?

20   Q.   Do you recognize that?

21   A.   Yes.

22   Q.   What do you recognize that to be?

23   A.   That was in the club.

24   Q.   OK.

25            Who is in that photograph?

1    A.  Heliana, Aurora, Maria and me.

2    Q.  Does that photograph fairly depict the way that you looked

3    that night while you were in the club?

4    A.  Yes.

5    Q.  And is that taken that night, September 18, 2005?

6    A.  Yes.

7    Q.  Who was taking care of your son that night?

8    A.  His father.

9    Q.  Approximately what time did you arrive at Umbrella Lounge?

10   A.  At around 12:45, 1.

11   Q.  In the morning?

12   A.  Yeah.

13   Q.  Did you have anything to drink that night?

14   A.  Yes.

15   Q.  What were you drinking?

16   A.  Blue Hawaiians.

17   Q.  Do you know what's in that?

18   A.  Vodka.

19   Q.  And approximately, if you can recall, how many drinks did

20   you have?

21   A.  Four or five.

22   Q.  And where did you have those drinks at?

23   A.  Umbrella Lounge.

24   Q.  Did you have anything to drink before you went to the

25   lounge?

E4SUMCC2                              "Biurny Peguero"

1    A.  No.

2    Q.  What about after you left?

3    A.  No.

4    Q.  Approximately what time did you leave the club that night?

5    A.  4, 4:15.

6    Q.  Where did you go when you left the club?

7    A.  Went to the car.

8    Q.  Who was driving at that point?

9    A.  Maria.

10   Q.  Who else was with you when you left the club?

11   A.  Orlando.

12   Q.  Was it just you, Maria and Orlando?

13   A.  No, me, Orlando, Heliana Maria and Aurora.

14   Q.  How long have you known Aurora, approximately?

15   A.  Like around seven years, six years.

16   Q.  What about Maria?

17   A.  Like around three years, four.

18   Q.  And Heliana?

19   A.  Five, six years.

20   Q.  And Orlando?

21   A.  At this point?

22            Two years.

23   Q.  Do you know where Orlando is today?

24   A.  No.

25   Q.  When was the last time you heard from him?

E4SUMCC2                       "Biurny Peguero"

1    A.  Like a month and a half ago.

2    Q.  Has anyone told you where he might be?

3    A.  His brother told me.  He's in the Dominican Republic.

4    Q.  What about Heliana, when was the last time that you spoke

5    to her?

6    A.  Like around six months ago.

7    Q.  Do you know where she is?

8    A.  She moved to New Hampshire.

9         I never -- I used to talk to her before.  Now I don't

10   talk to her anymore.

11   Q.  OK.

12        Once you got back to the car after leaving the club,

13   where did you guys go next?

14   A.  To -- to this restaurant, International Restaurant.

15   Q.  Do you know where that's located?

16   A.  In Dyckman.

17   Q.  Is that still in the County of New York?

18   A.  Yes.

19   Q.  OK.

20        And what happened when you arrived at the restaurant?

21   A.  We wanted to stop because I wanted to use the restroom, so

22   Heliana, Maria, Orlando and me, we went to inside of the

23   restaurant.  We used the bathroom.  Then on the way back, they

24   wanted to eat because it was a restaurant, they were hungry.  I

25   wasn't hungry, so Aurora and I went to the car.  I was in the

1    car in the backseat.

2    Q.   Where was Aurora seated in the car at that time?

3    A.   She was in the backseat.

4    Q.   Which side was she on?  Was she behind the driver or the

5    passenger?

6    A.   The passenger.

7    Q.   OK.

8         And where did you go when you went out to the car?

9    A.   To the driver's seat.

10   Q.   The front or the back?

11   A.   The back.

12   Q.   And did you get into the car?

13   A.   Huh?

14   Q.   Did you get into the car?

15   A.   Yeah.

16   Q.   When you went to the bathroom and went back out to the car,

17   did you still have all of your clothes with you?

18   A.   Yes.

19   Q.   Was anything wrong with any of your clothes?

20   A.   No.

21   Q.   Was your belt still attached?

22   A.   Yes.

23   Q.   Was it broken at all?

24   A.   No.

25   Q.   Do you know if Aurora was drinking that night?

E4SUMCC2                    "Biurny Peguero"

1    A.  Yes.

2    Q.  How would you describe how she was at that point?

3    A.  She was drunk.

4    Q.  What about Heliana?

5    A.  She was drunk too.

6    Q.  What about Maria?

7    A.  She wasn't drunk.

8    Q.  And Orlando?

9    A.  He drank too.  I don't know.

10   Q.  Do you recall where the car was parked at that time?

11   A.  Yeah, it was in the bus stop right in front of the

12   restaurant.

13   Q.  Where were the keys to the car, if you remember?

14   A.  Attached to the car.

15   Q.  What do you mean attached?

16   A.  The car was on.

17   Q.  Was the car parked willingly?

18   A.  No, it was in the bus stop.

19   Q.  I'm showing you what's previously been entered into

20   evidence as People's 3.

21        Using People's 3, can you just show for us on People's

22   3 where the car was parked?

23        You can turn the picture so we can see it and you can

24   tell us.

25   A.  Over here.

E4SUMCC2                    "Biurny Peguero"

1   Q.  You are pointing to in front of the bus stop?

2   A.  Yes.

3   Q.  OK.

4           About the middle of the page -- of the photograph?

5   A.  Yes.

6   Q.  I can take the photograph, thank you.

7           Do you recall if the doors to the car while you were

8   seated in the car were locked or unlocked?

9   A.  They were unlocked.

10  Q.  Do you recall if the windows were up or down?

11  A.  Up.

12  Q.  Can you describe for us what happened as you and Aurora

13  were seated in the car?

14  A.  We were in the car, then a guy came into the car from the

15  passenger's seat.

16  Q.  What side of the car did he get into?

17  A.  The passenger seat.

18  Q.  Was it the front or the back?

19  A.  The front.

20  Q.  Had you ever seen this guy before?

21  A.  No.

22  Q.  What did he look like?

23  A.  Light skin.

24  Q.  Light skin.

25          And you did notice anything else about him?

1    A.  He was, like, a little bit chubby.

2    Q.  I want you to take a look around the courtroom.  Can you

3    just take a look around the courtroom and tell me if you

4    recognize anyone?  You can take your time?

5    A.  Yes.

6    Q.  Who do you recognize?

7    A.  Him.

8    Q.  Can you describe an article of clothing that he is wearing

9    today?

10   A.  A shirt and a tie.

11   Q.  For the record, indicating the defendant.

12           Who do you recognize him to be?

13   A.  The guy that got into the car.

14   Q.  Did anyone ask him to get into the car?

15   A.  No.

16   Q.  Had you ever seen this man before?

17   A.  No.

18   Q.  Was he --

19           Before that night, had you ever seen him before?

20   A.  No.

21   Q.  Did you know, if you know, did Aurora know him?

22   A.  No.

23   Q.  What happened once he got into the car?

24   A.  He was talking to us.

25   Q.  What was he saying, if you can remember?

E4SUMCC2                         "Biurny Peguero"

1    A.  I don't remember exactly what he was saying.  I remember

2    that he was calling me ma.

3    Q.  Ma.

4             What does that mean to you?

5    A.  It's like a ghetto way to talk to -- to a lady, to a woman.

6    Q.  And what was happening while he was in the car with you and

7    Aurora?

8    A.  She was telling him to get out of the car.

9    Q.  And did he get out of the car?

10   A.  No.

11   Q.  What happened next?

12   A.  Then I told Aurora that I was going to park the car, and

13   she told me that, that I was crazy because I don't -- I don't

14   know how to drive.

15   Q.  And were you also drunk?

16   A.  Yeah.

17   Q.  Why were you going to park the car?

18   A.  I know that if I -- if I were to be sober, I would just get

19   out of the car, but I didn't.  I just -- I didn't thought

20   something was going to happen to me.

21   Q.  What happened after you told Aurora that you were going to

22   park the car?

23   A.  She got mad.  And I jumped into the front seat, the

24   driver's seat, and she got out of the car.

25   Q.  How did you get out from the backseat to the front seat?

1    A.  I just jumped into it, from the space between the passenger

2    and the driver's seat.

3    Q.  Did you agree to go anywhere at that point with the

4    defendant?

5    A.  No.

6    Q.  Did Aurora agree to go anywhere with him?

7    A.  No.

8    Q.  Did you notice anything that he was wearing at that time?

9    A.  A hat.

10   Q.  What kind of hat?

11   A.  Like a baseball hat.

12   Q.  What happened after Aurora got out of the car?

13   A.  I drove, I turned, make a right and he knew that I didn't

14   know how to drive so he stopped the car.

15   Q.  How is it apparent that he knew you didn't know how to

16   drive the car?

17   A.  Because I wasn't driving right.

18   Q.  Approximately how far did you drive before the car was

19   stopped?

20   A.  Like a block.

21   Q.  OK.

22        And how did the car come to a stop?

23   A.  The brake thing.

24   Q.  And who pulled the emergency brake?

25   A.  He did.

1    Q.  When you say 'he,' you mean the defendant?

2    A.  Yes.

3    Q.  I am showing you what's already in evidence as People's 31.

4         Using People's 31, can you see where you drove to,

5    what corner you went down?

6    A.  Yeah.  Like around the Fine Fair Supermarket.

7    Q.  OK.

8         So at the edge of that photo, the far left edge of the

9    photograph is where you turned?

10   A.  Yeah.

11   Q.  OK.

12        When you first drove away, were you able to get the

13   car -- did the car go around -- actually go around the corner?

14   A.  Yes.

15   Q.  When the defendant first got into the car with you, who was

16   he facing?  How was his body positioned in the car?

17   A.  He turned around, he was facing me.

18   Q.  What happened when the defendant pulled the emergency

19   brake.

20   A.  His friend came into the car.

21   Q.  Can you describe for us what happened once the car was

22   stopped?  Where did this friend come from?

23   A.  He came from a white car and he told me that he was -- he

24   was talking to me in Spanish.  So he told me that -- that he

25   was going to park my car and that he was going to take me back

E4SUMCC2                      "Biurny Peguero"

1   to the restaurant.

2   Q.  And where was --

3           So the second guy, what language was he speaking to

4   you in?

5   A.  Spanish.

6   Q.  And where were you when he was speaking to you?

7   A.  In the driver's seat.

8   Q.  And where was the defendant?

9   A.  In the passenger's seat?

10  Q.  And where was the friend?

11  A.  Right next to me.

12  Q.  Was he in or outside of the car?

13  A.  Out.

14  Q.  What happened after he said that he would drive you back to

15  your friends?

16  A.  Nothing.  He was acting very nice with me.  So I just went

17  into the backseat.  He drove my car to -- Aurora's car, to the

18  parking lot."

19

20          (Continued on next page)

21

22

23

24

25

E4s0mcc3                          "Biurny Peguero"

1    "Q.  Approximately how far away was the parking lot?

2    A.  It was like around six, seven blocks, I think.

3    Q.  Okay.  Where was the defendant when you drove to the

4    parking lot, the original guy?

5    A.  The original guy, he was in the front seat.

6    Q.  Okay.  And where were you?

7    A.  In the back seat.

8    Q.  And where was the Spanish-speaking guy?

9    A.  Driving.

10   Q.  Did you see what happened to the white car?

11   A.  He was following us.

12   Q.  What happened when you arrived at the parking garage?

13   A.  He parked the car there, and then went to the white car.

14   Then he was -- I mean I was under the impression that he

15   wasn't -- I was under the impression that he was going to take

16   me back to the restaurant.

17   Q.  Who walked back to the white car with you?

18   A.  The driver.  He did.

19   Q.  And when you say he, do you mean the original guy?

20   A.  Yeah.

21   Q.  The defendant?

22   A.  Uh-huh.

23   Q.  Was anyone else there at the time?

24   A.  The other friend.

25   Q.  And did you see where this friend came from?

E4s0mcc3                          "Biurny Peguero"

1   A.   From the white car.

2   Q.   And where was the white car parked when you walked up to

3   it?

4   A.   Right in front of the parking lot.

5   Q.   Where did everyone go.  Once you arrived at the white car,

6   where was everyone seated.

7   A.   The one that was driving -- the one that was driver

8   Aurora's car was driving.  The third guy was in the passenger's

9   seat.  I was in the back with this guy.

10  Q.   With the original guy?

11  A.   Uh-huh.

12  Q.   What did the other two guys look like?

13  A.   The driver looks, he looks Spanish to me.  He looks

14  Dominican.  The other guy, he looks Spanish.  I don't really

15  know, I don't really remember him.

16  Q.   And what ethnicity are you?

17  A.   Excuse me?

18  Q.   What ethnicity are you, are you Dominican?

19  A.   Yes, I am.

20  Q.   Was the original guy lighter or darker than you?

21  A.   Lighter.

22  Q.   What about the second guy, the Spanish-speaking guy?

23  A.   Darker.

24  Q.   Than you?

25  A.   Uh-huh.

E4s0mcc3                          "Biurny Peguero"

1   Q.  And what about the third guy.

2   A.  Darker.

3   Q.  Than you?

4   A.  Yes.

5   Q.  Where were the two -- excuse me, I'm sorry.  Were the two

6   guys, the driver and the front passenger, the second and third

7   guy, darker or lighter than the first guy?

8   A.  Darker.

9   Q.  What happened as you got into the car, where did you go?"

10          THE COURT:  Is it a breaking point here?

11          MR. LARKIN:  Sure.

12          THE COURT:  It's now 5:30, so let's break here, ladies

13  and gentlemen.  We're going to pick up tomorrow at 9:30, so be

14  here ready to go at 9:30.  If you get here early, then you will

15  get first dibs on coffee and Danish and things like that.

16  We'll make sure it is here.

17          Bring your notebooks to the jury room, leave them

18  there, Mr. Deluzio will take them.  And let's do everybody's

19  phone numbers.

20          THE DEPUTY CLERK:  I'll print that out.

21          THE COURT:  All right.  We'll give you a number you

22  can reach us, if you need to.  We'll see you tomorrow.

23          Don't discuss the case, keep an open mind.  Don't do

24  any research, investigations of any kind, nothing, chat rooms.

25  Just have a good night.  Watch TV or listen to the radio or do

E4s0mcc3

1    whatever it is you normally do.  And we'll pick up again

2    tomorrow.  Thanks so much.

3              All rise for the jury.

4              (Jury excused)

E4s0mcc3

1              (In open court)

2              THE COURT:  Okay, have a seat.  And you can resume

3     your place at the table.

4              MS. ZGODNY:  Thank you, your Honor.

5              THE COURT:  All right.  I want to give the jury a

6     chance to get out of here without us all bumping into them.

7              Also, I should note that we got a letter at 4:22 from

8     Sarah Hines which some of you may have gotten, as well.  I'm

9     not sure if it was cc'd or not.  Doesn't indicate that it was

10    cc'd, but it's a letter from Ms. Hines, a motion to quash a

11    letter regarding notes that are the subject of the subpoena.

12    That's the header, all right.

13             So what I propose is there are four different grounds

14    on which Ms. Hines is opposing the subpoena for interview

15    notes.  Take a look at those, Mr. Garber and Mr. Cohen.  And I

16    have made arrangements for her to be here tomorrow at 9:00 so,

17    hopefully, you can read the letter and respond to it tonight.

18    So that we can use the time before the jury gets here tomorrow

19    at 9:00 and, hopefully, have resolved the issue quickly, okay.

20             MR. GARBER:  You want us to be here at 9:00 also.

21             THE COURT:  Yes.  You folks should all be here at 9.

22    9:00.  It occurs to me that it could be tricky for Mr.

23    McCaffrey, since he is in custody.  Do you think we have a shot

24    at getting him here at 9:00, marshals?

25             THE MARSHAL:  That shouldn't be a problem, I'll let my

E4s0mcc3

1    supervisor know, so.

2              THE COURT:  Okay, great.  Good.  Thank you.

3              All right, so anything else we need to discuss today

4    before I let you go?

5              MR. GARBER:  I did speak to Ms. Hines over the lunch

6    break, and she told me this letter --

7              THE COURT:  Is the jury gone?

8              THE DEPUTY CLERK:  Filling out the sheet.  They have

9    not left yet.

10             THE COURT:  Go ahead.

11             MR. GARBER:  I spoke to Ms. Hines.  She told me this

12   letter was coming out, which I didn't see yet.  But I also

13   addressed with her the issue of scheduling for Ms. Strain and,

14   possible, Mr. Krutoy.  And she said that it's a big problem for

15   Ms. Strain to testify any time before Thursday afternoon.  And

16   I said, well, that could pose a problem for us because of how

17   things move.  So I just, make a theme that will continue.  I

18   think we'll just revisit this tomorrow and see how the schedule

19   is going, but I'm alerting you to the fact you might have to

20   make a call to Judge Weibel to carve out some time for her

21   maybe Wednesday.

22             THE COURT:  We'll see what the happens tomorrow.

23   Anything else, Mr. Larkin?

24             MR. LARKIN:  I'm sure there is and I'm forgetting it.

25   I'll remember it ten minutes after we leave, so if there is,

E4s0mcc3

I'll --

     THE COURT:  Let's talk about just logistics and timing.

     So how much more of this trial testimony do we have, ballpark?

     MR. LARKIN:  Up to you guys.  What we planned to read was the rest of direct, and for Farooqui's direct examination.  And then whatever else the -- I guess whatever else we --

     MR. GARBER:  We previously provided it.  But I think what it's going to be is I would say another -- Peguero is one of the longest witnesses.  I would say maybe two hours.

     THE COURT:  Okay.  And then after that?

     MR. GARBER:  Mr. McCaffrey.  And then Ms. Pujols.  And the likelihood is that is probably tomorrow.  But if we get --

     THE COURT:  Ms. Pujols is coming at 2:00.

     MR. GARBER:  Yeah.

     THE COURT:  I mean do you think we're going to finish two hours worth of this readback and then Mr. McCaffrey, direct and cross?

     MR. GARBER:  I don't know.  I think my direct of him is about an hour.  I don't know how long the cross will be.

     MR. LARKIN:  A lot depends on if whether doors are opened, and what areas we can get into on cross.  I just, it's hard for me to know in advance.  I wouldn't be surprised if it's about an hour.  So, at least, so --

E4s0mcc3

1          THE COURT:  All right.  But then that sounds like we

2     would at least start Ms. Sosa tomorrow.

3          MR. GARBER:  Pujols, or Sosa.

4          THE COURT:  I'm sorry, Ms. Pujols.

5          MR. GARBER:  Yes.

6          MR. LARKIN:  Sure.

7          THE COURT:  If she's coming at 2:00, we'll start her.

8     I don't know if it is worth letting her know it could go into

9     Wednesday.  She probably won't like that, but it's --

10          All right.

11          MR. GARBER:  Okay.

12          THE COURT:  Anything else for today?  All right, so

13     marshals are going go through this way, great.  So that

14     shouldn't be a problem.  Good.

15          All right, let me thank the court reporters.  I'll see

16     you all tomorrow at 9:00.

17          If the defendants wish to respond to Ms. Hines'

18     letter, you can do that, too.

19          MR. LARKIN:  Okay.

20          THE COURT:  I guess by tonight.

21          MR. LARKIN:  If we are going to just join, we'll

22     orally say we join.  And if we have anything independent to

23     say, we'll --

24          THE COURT:  Right.  Really, you're not really a party

25     to this thing.

E4s0mcc3

1              MR. LARKIN:  Okay.

2              THE COURT:  Mr. Garber is obviously going to be

3     opposing the motion.

4              MR. GARBER:  On the potential door opening, okay, I

5     just wanted to revisit that previously, because I have an

6     understanding of what the Court's ruling is.  If he says that

7     he is still currently grappling, okay, with the psychological

8     trauma from this wrongful conviction, that would then open the

9     door to the fact that he is currently incarcerated.  And if he

10    says something along the lines of he got rearrested because of

11    the psychological harm he has suffered from his wrongful

12    conviction, then that would open the door to his prior criminal

13    record.

14              That's my understanding of the Court's ruling.  I just

15    want to make sure that we're still on the same page with that.

16    Because, you know, obviously, we want -- I want him to be able

17    to be comfortable thinking about his direct tonight, and I

18    certainly don't want to bring out questions that are going

19    to open the door.

20              THE COURT:  Yeah, I think that -- that pretty fairly

21    states it.

22              MR. GARBER:  Okay, okay.

23              THE COURT:  Mr. Larkin, do you want to add anything?

24              MR. LARKIN:  I -- no, I -- after -- I have to hear

25    what he says, before we can make a decision.

E4s0mcc3

1          THE COURT:  To the extent he wants to avoid opening

2     doors, then, I think I need give him as much guidance as I can.

3     And I think if the argument is going be that the wrongful

4     conviction I what spawns the criminal conduct that has now led

5     him back into jail, I think that does open the door to other --

6          MR. LARKIN:  I think that opens door to prior arrests

7     and underlying conduct with regards the prior arrests, as well.

8          THE COURT:  Everybody can sit.  I guess sounds like

9     we're not done.

10          MR. GARBER:  Underlying conduct.  If he is still

11     grappling with conduct, then it seems to me that brings into

12     question, calls into question what other causes there might be

13     for current trauma.  I mean current emotional trauma, I -- it's

14     hard for me to know exactly how it's gonna come out on the

15     direct.  But if that's --

16          THE COURT:  The point was he -- at least I took the

17     point to be if the argument, if the assertion on direct is

18     going to be that this recent conviction, and the conduct

19     underlying it are a result of the trauma that flowed from the

20     wrongful conviction in this rape case, I think I that would

21     open the door.  If he is saying and I still am dealing with the

22     trauma of, you know, the wrongful incarceration, you know, that

23     that might -- that, alone, I think might only open the door a

24     crack.  I mean it depends on what the trauma is, so what --

25     what he is dealing with.  So I'm not sure if you intend to be

1    more specific than what you just said, Mr. Garber, but I think

2    I need to know that to give you guidance.

3         MR. GARBER:  Okay, I mean we're not trying to open any

4    doors, we are not going to be addressing that argument that I

5    said that the weapons charge and assault charge you know

6    were -- you know, the result of the wrongful conviction.  We're

7    not going there.  I addressed that just to sort of vet it.

8         So we're not opening that door.  But as far as like,

9    you know, the suffering he is going through, I think we're

10   going to be addressing it in the past tense.  And if we're

11   addressing it as he is currently suffering, I think I have to

12   be very specific about what that is in an effort to not relate

13   it to his prior conduct.

14        THE COURT:  What is the current suffering that you

15   intend to elicit?  Flashbacks of some kind?

16        MR. GARBER:  The reality is, is that he was diagnosed

17   with post traumatic stress disorder.  We have been precluded

18   from putting on Dr. Pearson, so we're never going to go there.

19   His life is never going to be the same.  He is struggling with

20   it.  And, you know, going to jail as a rapist in a maximum

21   security prison is a traumatic event that he grapples with.

22   He has trouble sleeping.  I don't know if I'd call it

23   flashbacks, necessarily.  But maybe he has that.  And I don't

24   want to be prevented from bringing that out.  I don't know that

25   I'm going to guild the lily on it, but I would assume if it's

1    that specific, it doesn't then open the door to the fact that

2    he had prior arrests, unless I'm wrong about that.

3         THE COURT:  Well, I mean it depends on sort of what

4    the, I think, what the trauma is now.  He has trouble sleeping,

5    that he has, you know, that he is having flashbacks.  I guess

6    I'm not really sure what --

7         MR. GARBER:  What if he says:  My life will never be

8    the same, I'll never forget what I went through, that

9    experience, okay, has really messed me up, what if he says

10   that?

11        THE COURT:  Really messed me up, I'm not sure what

12   that means.

13        MR. GARBER:  Well, it would be his way of saying it.

14   I don't have a period of time to put that into context, but

15   that's Wil McCaffrey saying that this really messed me up.

16   Those are the words that he uses, or words along those lines

17   when I'm prepping him, but I don't know, does that open door.

18        THE COURT:  Well, I mean let's assume that that is the

19   testimony, Mr. Larkin, what are you planning to do?

20        MR. LARKIN:  Well, it really messed me up.  I was

21   convicted.  I went to maximum security prison.  I have trouble

22   sleeping.  I mean, I think at a minimum, fairly, he's currently

23   in a maximum security prison.  Perhaps if he has trouble

24   sleeping, it is because he is in a maximum security prison.

25   Maybe had nothing to do with the fact that he was once in a

E4s0mcc3

maximum security prison as a rapist.  Now he is in a maximum

security prison for other reasons.  I mean if all he does is

gets on the stand and says in one sense it messed me up, you

know, there are lots of reasons why things were messed up, so

to speak, with him, prior to this incident.  And there is lots

of material on this, your Honor.  I mean he has something like

20 adult arrests.  He has got multiple assaults.  He has

assaults of police officers.  He has orders of protection

entered against him in favor of citizens in multiple cases.

One is a 15-year old kid.  I mean he has a couple of DWIs,

assaults with a knife.  He has the current several convictions.

And, your Honor, if I can also add, I found out there was a

third felony that he was convicted of.  I'm not sure it matters

all that much, aggravated unlicensed operation of a motor

vehicle, E felony, third incident, separate incident. I had

planned to cross him on that, unless your Honor tells me not

to.  I'm not sure it matters all that much for credibility, but

there is it.  So to attribute a general bad emotional state to

this conviction, it seems to me, opens the door to at least

some discussion, some cross-examination of other possible

causes.

THE COURT:  I mean that sounds right.  I mean if

causation is going to be the issue, I do think the fact of

these other arrests and conduct that predates the wrongful

conviction, would be relevant to that, so.

E4s0mcc3

1          MR. GARBER:  If he says that he is messed up.

2          THE COURT:  Well --

3          MR. GARBER:  What if he doesn't say anything, now does

4     it open --

5          THE COURT:  If he doesn't say anything.

6          MR. GARBER:  I don't know what -- what --

7          THE COURT:  Look, I think he certainly can describe

8     what the conditions were in jail while he was wrongly

9     convicted.  And I think a jury should hear that, and should

10    know that that's what it is like.  And they can then assess

11    damages, if it gets that far.

12          But to the extent that you are suggesting that that

13    experience is causing current and future conduct, I mean I do

14    think that opens the door to whether or not there were other

15    causes for it.  And, you know, I think that's what Mr. Larkin

16    is saying.  But it is difficult to know in the abstract.  It is

17    difficult to know what the response is in the abstract.

18          MR. LARKIN:  I think in the opening, Mr. Garber's

19    opening, he described Mr. McCaffrey a proud stoic man.  I mean

20    the fact is --

21          THE COURT:  Chris, is that some of our jurors looking

22    for us?  I don't want them waiting for us.

23          Yeah, I think they've filled out there information

24    forms.  And we should have done that earlier.

25          MR. LARKIN:  Mr. Garber's opening described his client

E4s0mcc3

1    as a proud, stoic man, as a quiet man.  I suggest your Honor

2    that the record really is otherwise.  I mean he just, at

3    opening, in and of itself, opens the door to some

4    cross-examination.  I --

5              MR. GARBER:  He has trouble expressing himself.

6              MR. LARKIN:  Describe him that way, given the history

7    that is there.  And I can go through some of it if the Court

8    wants to hear it before hand.  I mean there are at least three

9    or four --

10             THE COURT:  Let's make sure none of the jurors are out

11   there.  Can we close -- thank you.

12             MR. GARBER:  Arrests, or just convictions.  I mean the

13   line has never been drawn.

14             MR. LARKIN:  Arrests that I'm aware of, has led to

15   some disposition, so --

16             THE COURT:  Okay, I'm sorry, I just --

17             MR. LARKIN:  Every arrest that I'm aware of, all 20 of

18   them led to some disposition, your Honor.  And many of them are

19   involve serious assaultive behavior.  Several, he was charged

20   on multiple occasions with resisting arrest, with assaulting.

21             THE COURT:  But you are looking to rebut, what, the

22   statement that he is a proud and stoic guy?

23             MR. LARKIN:  That he is a stoic, quiet man.

24             THE COURT:  I don't think his stoicism, I don't think,

25   in the opening, alone, with that reference, is enough to open

E4s0mcc3

the door to all of the other prior convictions that were prior

bad conduct.  So I think I'll take a look, again, at the

opening, but I don't think -- it didn't seem to me to cross the

line.  He acknowledges that he wasn't a choirboy.

MR. LARKIN:  He said, also, that he had suicidal

thoughts in prison.  That statement was made to jury in the

opening.

THE COURT:  Right.

MR. LARKIN:  I mean, you know, do suicidal thoughts

arise solely -- if the jury is led to think that the sole basis

for suicidal thoughts were a rape conviction, and certain time

in maximum security prison as a rapist, what if there are

alternate reasons for that sort of mindset.

THE COURT:  So I mean like what are you referring to?

MR. LARKIN:  It goes back to the idea, well, does this

conviction -- it has caused him tremendous trauma, he is messed

up.  He was -- I can go back to the first arrest he had when he

21, he made a statement to the police that someone came to his

home, knocked on the door and threatened him.  He came out of

the house with a knife and ended up stabbing the guy.  And he

pled to an assault.  He made a statement to police that the

person who he stabbed had stolen, previously stolen property

from his house.  That person, as far as I know, was not

prosecuted.  Mr. McCaffrey was.  And that was the start of, you

know --

E4s0mcc3

 1          THE COURT:  Right.  Look, I don't think we have opened

 2     the door to all of this.  So I think to the extent that you are

 3     asserting that various ongoing and future harm is caused by the

 4     rape conviction, I think that does open up the door to other

 5     possible causes, because causation is gonna matter.  So, like I

 6     said, I would just say be mindful of that.  I don't know what

 7     else to say.

 8          MR. GARBER:  Okay.  So if I limit it to the thinking

 9     he has when he is in jail, serving the time for the rape --

10          THE COURT:  I think the conditions of jail, when he is

11     incarcerated, is certainly --

12          MR. GARBER:  And the suffering he went through during

13     that time period.  If it is specific to that time period.  Not

14     currently, but while he is in jail, okay.  The suffering that

15     he went through.  You know, I assume that that is okay.

16          THE COURT:  Well, again, it depends on what the

17     suffering is, right, I mean so --

18          MR. GARBER:  Suicidal thoughts while he is sitting

19     there.  You know, time.  I'm doing 20 years for a rape I didn't

20     commit, and I contemplated suicide.  Does that open the door

21     to?

22          THE COURT:  It opens the door to did you ever think

23     about suicide before.  Did you ever think about suicide on

24     other occasions, including when you have been in jail before.

25     I do think that kind of does open it.

1          MR. GARBER:  He is admitting he was in jail for four

2     and a half months on Rikers Island.  We have already vetted

3     that.

4          THE COURT:  My point is if suicidal thoughts are going

5     to be attributed only to the wrongful conviction, I think there

6     is certain leeway the defense gets to explore whether or not

7     suicidal thoughts are independent of that, or they have some

8     other source.  I don't know the answers to any of these

9     questions.  I think a certain amount of cross is permissible on

10    that.

11         MR. GARBER:  So you said that you had suicidal

12    thoughts, while you were incarcerated for this rape, well, did

13    you have suicidal thoughts when you assaulted somebody with a

14    knife when they came to your house.

15         THE COURT:  Did you have suicidal thoughts prior to

16    this; suicidal thoughts, previously, when you were

17    incarcerated.

18         MR. LARKIN:  I was going to ask questions --

19         MR. GARBER:  He says no.

20         MR. LARKIN:  With regards to -- he can answer how he

21    wants to answer.  That's not the issue.  The issue is what

22    avenues do we have to explore.  I mean in a most generic sense,

23    the Court said the prior periods of incarceration would be

24    relevant, okay.  And there are at least 13 arrests prior to

25    this one in which he was taken into custody and detained for

E4s0mcc3

some period of time.  And deprived of liberty.  So at a

minimum, it seems to me the Court's ruling would permit some

exploration of whether he was taken into custody on a certain

date and for approximately how long.  And we have records that

can establish that there was some occasions he was taken into

custody and bound over for a day, brought in front of a judge,

and he pled to something.  So the specifics wouldn't come out

in the sort of purest baseline cross we might have, assuming

that no doors are opened.  We might be able to ask, I assume,

you were in the custody of law enforcement officials on X date,

you were deprived of liberty for 24 hours.  Then, on such a

such a date, you were taken into custody, deprived of liberty

for such and such, you know, for 48 hours.  You were required

to appear in Court afterward, perhaps.  Leave it at that.  On

two occasions, or on three occasions.

         Then on to the next, you know, 2002, you were in

custody on Rikers Island for 4 months.  You were sentenced to

7 months, you served 4 months, correct?  Correct.  In

November 2003, you were in custody for X amount of, you know --

         THE COURT:  I get it, I get it.  The gist, I mean

that's -- I think I ruled on that.

         MR. GARBER:  You ruled against him.  The rule was that

we can bring out that -- that it would bring out that he was in

a county jail for a period of time.  Not every time that he was

incarcerated for a brief period of time on an arrest, because

E4s0mcc3

1   that's the same way as him telling the jury you were arrested

2   on this.

3           THE COURT:  We're not going to get into the arrests,

4   the subject of the arrests.  We're going to get into the fact

5   of detention, all right.  And then, again, I'm happy to give a

6   limiting instruction.  I don't want the jury speculating as to

7   the conduct that got him into custody.  But, seems to me, the

8   fact that he was in custody is relevant to the damages here.

9   And so take a look at my ruling on this.  I think it was pretty

10  clear.

11          MR. LARKIN:  I thought the Court was clear on that.

12          THE COURT:  Yeah.

13          MR. GARBER:  All right.  Well, then, I mean more

14  prejudicial than probative.  I will go back and read it.  But

15  if he acknowledges on his direct that he was in custody, or

16  acknowledges on cross, for a period of time on Rikers Island,

17  if they start going through a litany, it is very effective

18  cross-examination of essentially running around your ruling,

19  because they are showing you were arrested this time.  They may

20  not say that, but that's the implication of it.  And little

21  stints, you know, 24 hours here, 24 hours there, all it shows

22  is that he is -- has a tremendous amount of contact with law

23  enforcement.  And what does that serve?

24          THE COURT:  Well, it serves to show -- I mean for the

25  same reason that Judge Swain and other judges in the Eastern

E4s0mcc3

1    District have recognized that this would be relevant to the

2    damages of the wrongful conviction.  That a person who is a

3    first-time resident at one of these facilities is gonna have a

4    different set of experiences than a person who has previously

5    been there before.

6              Now, I don't think the jury should be able to infer

7    from that, that no harm, no foul, because even if he didn't

8    commit the rape, he has committed other crimes.  That's not

9    proper.  I'll certainly give a limiting instruction.  If

10   anybody wants to think about what it should look like, send me

11   a draft.  But I do think they are allowed to get into the fact

12   that this is not somebody who was there for the first time and

13   that, I think, is relevant to damages, and only damages.

14             MR. GARBER:  Okay.  The other thing is there

15   was reading in his trial testimony, or giving Mr. McCaffrey's

16   criminal trial testimony to the jury, they do cross-examine him

17   about his prior criminal --

18             THE COURT:  I thought there was agreement to keep that

19   out.

20             MR. LARKIN:  We agreed to withdraw those designations,

21   unless the door gets opened, we'll withdraw them and they will

22   not be put in binders for the jury.

23             THE COURT:  I thought we had figured that out on

24   Friday.  Anything else?

25             MR. LARKIN:  Just to be clear, after the direct, if we

E4s0mcc3

1    need the sidebar, that's okay, we'll just ask for it and we'll

2    resolve it that way.

3            THE COURT:  Yeah, we want to be careful.

4            MR. LARKIN:  Thank you.

5            THE COURT:  Okay.  Take a look at the letter.  I

6    would, again, I don't know if it was sent to you.  We can print

7    you out a copy if it allows you to read it on the subway.

8            MR. LARKIN:  E-mailed to the both myself and Garber,

9    so I'll forward it to you right now.

10           MR. COHEN:  I didn't see it.

11           THE COURT:  Take a look at that.  And let me get your

12   responses tonight and deal with that in the morning.

13           Thanks very much.  Have a good evening

14           I thank the marshals and the court reporters for their

15   help.

16           MS. ZGODNY:  May we leave some of the boxes?

17           THE COURT:  Yeah, no one is in here.

18           (Proceedings adjourned until 9 a.m., April 29, 2014)

19

20

21

22

23

24

25

E4s0mcc3

INDEX OF EXAMINATION

Examination of:                                    Page

"Maria Sosa" . . . . . . . . . . . . . . 58

"Aurora Pujols"  . . . . . . . . . . . . 92

"Susan Johnson"  . . . . . . . . . . . . 127

"Biurny Peguero" . . . . . . . . . . . . 128

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

70    . . . . . . . . . . . . . . . . . . . .62