E4t0mcc1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

WILLIAM MCCAFFREY,

                    Plaintiff,

          v.                              11 CV 1636(RJS)

DAVID DIAZ and ROBERT ARBUISO,

                    Defendants.

------------------------------------x
                                    New York, N.Y.
                                    April 29, 2014
                                    9:00 a.m.

Before:

                    HON. RICHARD J. SULLIVAN

                                    District Judge
                                     and a Jury
                         APPEARANCES

IRVING COHEN
GLENN A. GARBER
     Attorneys for Plaintiff

NEW YORK CITY LAW DEPARTMENT
OFFICE OF CORPORATION COUNSEL
     ANDREW GABRIEL LARKIN III
     VICKI BECKER ZGODNY
     Assistant Corporation Counsel for Defendants

E4t0mcc1

1    (Trial continuing in open court; defendant present)

2    (Jury not present)

3           THE COURT:  So I asked the parties to be here at 9:00.

4    And I also asked Ms.  Hines to be here at 9:00.  Some were,

5    some were not.  We don't have defense counsel, I'm not sure

6    why. I'm not waiting.

7           Over the weekend, the plaintiffs served a subpoena on

8    the district attorney's office requesting all notes of witness

9    interviews of Evan Krutoy in relation to People vs. McCaffrey

10   and People vs. Peguero.  It was -- the subpoena was made

11   returnable for yesterday morning at 9:30.  I have a letter from

12   Ms. Hines responding to that subpoena, seeking to basically

13   quash it on several grounds.  I won't repeat what is in the

14   letter, but it's a two-page letter.  I then, last night,

15   received an e-mail from Mr. Cohen, which I guess responds to

16   some of the points in Ms. Hines' letter.

17          Ms. Hines, have you seen the e-mail from Mr. Cohen?

18          MS. HINES:  Yes, your Honor.  I saw it this morning on

19   my Blackberry.  Since my Blackberry is downstairs, I no longer

20   have a copy.

21          THE COURT:  Can we print out a copy, please.  It's not

22   long.  In any event, I think I get the gist of your arguments.

23   Do you want to take a look at the letter from Mr. Cohen before

24   I hear from you, or do you know what you want to say.

25          MS. HINES:  If I might see it, even on a telephone.

E4t0mcc1

1               MR. GARBER:  I have it.

2               THE COURT:  It's right here.  Go ahead and give it to

3       her.

4               MR. COHEN:  If I might, Ms. Hines and I have had a

5       discussion before.

6               THE COURT:  Oh, all right.

7               MR. COHEN:  And we're really only interested in Pujols

8       and Sosa.

9               THE COURT:  So the witnesses' statements of Pujols and

10      Sosa, not all witness interviews in both cases.

11              MR. COHEN:  Well, yes, in both cases, but of course

12      Mr. Krutoy interviewed them with respect to the

13      reinvestigation.

14              THE COURT:  So it's a slightly narrower request.

15              Now, let's let Ms. Hines take a look at your e-mail

16      and then I'll hear from her.

17              MS. HINES:  By way of a response, I would simply say

18      that contrary to Mr. Cohen's assertion that having the matter

19      come up in Mr. Krutoy's deposition should have put us on notice

20      that we should be looking to produce them.  I think we had

21      every reason to believe that request was abandoned when we

22      didn't hear another word about it for another two years.

23              THE COURT:  Okay.

24              MS. HINES:  I mean it was certainly discussed.  And if

25      I received a telephone call after the deposition, it would have

E4t0mcc1

1    been one thing, but a subpoena the weekend that the trial is

2    beginning, is certainly untimely.

3           THE COURT:  It is puzzling to me, Mr. Cohen, something

4    you have known about for years, could have been the subject of

5    a request in discovery, and then we would have had plenty of

6    time to deal with this issue.  Instead, it gets served the

7    Saturday you know before a Monday trial with a request that it

8    be produced by 9:30 that morning.  What's going on?

9           MR. COHEN:  As I indicated, your Honor, trials --

10          I think what's fair for the goose is fair for the

11   gander.  We received the subpoena for Mr. Dwyer's financial

12   records within the same day, I believe it was --

13          MR. GARBER:  Friday.

14          MR. COHEN:  It was Friday, actually.  And, in fact, we

15   have gotten those documents together for the defendants.

16          Mr. Krutoy was not really scheduled to be a witness.

17   The only reason he would be a witness is if, depending upon the

18   testimony of the Ms. Pujols and Ms. Sosa.  And so the

19   importance of it was not totally realized until we started

20   doing intense preparation.

21          THE COURT:  Wait.  Seems to me it would have been very

22   relevant, from the beginning, to see whether or not pujols and

23   Sosa were saying things to Krutoy that are inconsistent with

24   what they said subsequently, and what they said before.  I mean

25   I -- it would have struck me as very relevant to the case from

E4t0mcc1

1    the get-go, not as impeachment for Krutoy.

2              MR. COHEN:  We were having discussions here for

3    several days about what witnesses would be called.  And a lot

4    depended upon what Ms. Pujols, especially, and to some degree

5    what Ms. Sosa, would say on the witness stand.  It may not even

6    be necessary at all, under those circumstances, depending upon

7    what they testified to.

8              I just think that this could be important for us to be

9    able to fully present our case.  And I don't see why it is such

10   an onerous thing to do, especially now.  We pared it down to

11   these two witness.  And Ms. Hines said it would make it her

12   job, or whoever's job it is, a lot simpler and easier.

13             So, on balance, I think that we should be able to, if

14   we can get it, I don't see any reason why we shouldn't be able

15   to get it.

16             THE COURT:  Well, I mean the timing is unfortunate, I

17   think.  It's pretty obvious that this was relevant.  And I

18   these are things I think should have been requested in

19   discovery.

20             With respect to overbroad, I guess we have dealt with

21   that Ms. Hines, right?

22             MS. HINES:  Yes, your Honor.

23             THE COURT:  So you're not arguing that two

24   witnesses -- notes with respect to two witnesses is overbroad.

25             MS. HINES:  No.

E4t0mcc1

| | |
|---|---|
| 1 | THE COURT:  Okay.  So then we get to unduly |
| 2 | burdensome.  And so this is certainly less burdensome, so are |
| 3 | you abandoning unduly burdensome as a basis for opposing at |
| 4 | this point? |
| 5 | MS. HINES:  I'm certainly emphasizing it less. |
| 6 | THE COURT:  Okay. |
| 7 | And the last one, of course, is that there is |
| 8 | privilege.  There is privilege.  I don't think there is any |
| 9 | dispute there is privilege here.  The issue is whether that |
| 10 | privilege can be overcome.  It is not attorney/client, it's |
| 11 | work product.  And so there certainly are circumstances under |
| 12 | which the privilege could be overcome.  And it would be |
| 13 | admissible and relevant evidence.  Hard to say without knowing |
| 14 | what the notes are.  So I guess I'm inclined to defer on the |
| 15 | last point.  I take your point with timeliness.  And, |
| 16 | obviously, you have not produced the documents, you didn't |
| 17 | proceed them yesterday.  No one could fault you for not |
| 18 | producing them yesterday.  But given the narrower request, how |
| 19 | long do you think it will take you to review these materials |
| 20 | and find what is responsive to the request. |
| 21 | MS. HINES:  Two to three days. |
| 22 | THE COURT:  Two to three days. |
| 23 | MS. HINES:  Maybe two days, if I go back to my office |
| 24 | now. |
| 25 | THE COURT:  Okay.  So two days, means the end of the |

E4t0mcc1

 1    day on Wednesday.

 2              MS. HINES:  Well, that would be tomorrow.

 3              THE COURT:  So that's two days.  I mean all day today,

 4    all day tomorrow, end of the day tomorrow.  You are talking

 5    about Thursday?

 6              MS. HINES:  Thursday morning.

 7              THE COURT:  Thursday morning, okay.

 8              I mean I don't think that is unreasonable.  Do you

 9    think that's unreasonable, Mr. Cohen?

10              MR. COHEN:  No, your Honor.

11              THE COURT:  No so Thursday morning, then, if you want

12    to come back, we can do this again at 9:00.  Or you can send

13    the documents sooner, if you have got them, so I can take a

14    look at them, and it would be an in-camera review, I suppose.

15    But there really has to be a showing as to why there

16    is materials in those notes that would overcome the privilege.

17    So I mean at this point it sounds like you are just sort of

18    guessing, Mr. Cohen.  Or you're hoping that there might be

19    something there.

20              MR. COHEN:  I don't think it is guesswork.

21              As I said in my brief response, it's an investigator,

22    which is what Mr. Krutoy was acting as at the time, hearing

23    witnesses, and taking notes of what they were saying.  That's

24    not work product, that is statements of witnesses.  His

25    thoughts, and his feelings about it, and what he wanted to do

E4t0mcc1

```
 1   with it, and whatever else he was talking to other assistants
 2   about, that of course is different.
 3           But those were the words that he took down that were
 4   said to him by Ms. Pujols and Ms. Sosa, those are not work
 5   product.
 6           THE COURT:  All right.  Well, let's see.  I guess
 7   let's see what we've got, and then to the extent you are
 8   asserting privilege, you'll do that on Thursday, right?
 9           MS. HINES:  Yes, your Honor.
10           THE COURT:  I mean it's not all privileged, clearly, I
11   doubt.  And so there might be some things that are clearly not
12   privileged that would be producible, and other things over
13   which he would be asserting a privilege.
14           MS. HINES:  I'll have to see the notes.  And I'll
15   bring them to your Honor Thursday, if not submit them before.
16           THE COURT:  Okay.  All right, so I think that's the
17   best we can do.  And I think that's a reasonable approach.  I
18   thank you for doing it.  I thank you for being here today.
19           While you're here, do you have any information you can
20   share with us concerning Ms. Strain and her availability?  I
21   thought that it was suggested yesterday you might know the
22   answers to these questions.
23           MS. HINES:  I spoke with her yesterday.  She is
24   actually on trial before Justice Zweibel in New York State
25   Supreme Court.  And she has the possibility for being here
```

E4t0mcc1

1    Thursday, because Judge Zweibel runs his Court calendar on

2    Thursday.  Anything else, I think, would inconvenience that

3    Court and interrupt your trial.

4              THE COURT:  I think that sounds like it would probably

5    work okay.  Then, if we had to call her on Thursday, we'll make

6    it work; right?

7              MR. GARBER:  Yeah, the only issue is it is out of

8    turn.  And there is some issue about, you know, motions at the

9    end of the plaintiff's case, you know, but --

10             THE COURT:  I'll reserve if I have to.

11             MR. GARBER:  Yeah.

12             THE COURT:  But I mean, look, out of turn, this is I

13   think the quintessential situation in which a witness should be

14   taken out of turn, where it is a lawyer who is engaged with

15   another trial with another jury in front of another judge.

16   Lots of good reasons there for us to be accommodating.  So I

17   think that's what we'll do, okay.  If you could communicate

18   that to her, that would be terrific, that I'll expect Thursday

19   is when we'll get her on, I assume.

20             Who is calling her, Mr. Garber?

21             MR. GARBER:  Depends on how things unfold but there's

22   a good chance we would call her.

23             THE COURT:  Who is going to be in contact with her

24   about what time to be here?

25             MR. GARBER:  She won't communicate with me.  I have

E4t0mcc1

1   been communicating with Ms. Hines.

2            MS. HINES:  Calling me is the best.

3            THE COURT:  Let's do that yet.

4            Anything else while Ms. Hines is here?

5            MR. GARBER:  Yes.  Mr. Krutoy, also an uncertain thing

6   as to whether or not we are going to call him.  He was also

7   subpoenaed.  I think if we're going to deal with -- well, I

8   would prefer to have him here on Thursday as well, if needed.

9            THE COURT:  All right.  He has been subpoenaed.

10           MR. GARBER:  Or available.

11           THE COURT:  Subpoenaed for what day?

12           MR. GARBER:  Subpoenaed for Monday, with the caveat

13   that we would alert their office to scheduling issues.

14           THE COURT:  Okay.  All right.  So, Ms. Hines, you

15   think your responsible for Mr. Krutoy, too?

16           MS. HINES:  Yes.

17           THE COURT:  And so is there any problem with him being

18   here, or available to testify, on Thursday?

19           MS. HINES:  I have not spoken to him about his

20   schedule, but I'll certainly be the contact person.  And if for

21   any reason he can't come Thursday, I'll tell the lawyers.

22           THE COURT:  Okay, that's great.

23           MS. ZGODNY:  Excuse me, your Honor?

24           THE COURT:  This is a short trial, make sure we don't

25   have any long glitches.

E4t0mcc1

1              Yes, Ms. Zgodny?

2              MS. ZGODNY:  With respect to ADA Krutoy, I thought

3    your Honor had already addressed that at one of the pretrial

4    hearings that he would not be testifying.

5              THE COURT:  I think the only way he would be

6    testifying is if there are statements that were made by Peguero

7    or made by Sosa, to Krutoy, that contradict what they say on

8    the stand.  And then it seems to me it is a good chance it is

9    coming in, because I don't -- depending on what the statement

10   is, it's probably not collateral, and so I think some extrinsic

11   evidence would be okay.

12             I don't know whether that is going to be the case, I

13   mean so I guess once we see the notes, we'll have a sense as to

14   whether there are any inconsistent statements at all made by

15   Peguero or Sosa.  If there aren't, I can't imagine what

16   Mr. Krutoy is going to talk about.  So I mean I think that you

17   can reserve an objection as to relevance or admissibility of

18   any testimony he's gonna have.  But my sense is that it's

19   primarily to impeach Sosa and Peguero; is that right, Mr.

20   Garber?

21             MR. GARBER:  Yes.

22             THE COURT:  Yeah.  So that makes sense to me.  But

23   it's hard to know whether there is anything that is going to

24   come of it.

25             All right, Ms. Hines, thanks a lot, I appreciate it.

E4t0mcc1

1              MS. HINES:  You're welcome, Judge.

2              THE COURT:  Good to see you.

3              MS. HINES:  Nice to see you.

4              THE COURT:  It's now 9:25.  I'm going to check in to

5      see where we are with the jury.

6              Are there other things we need to deal with before the

7      jury gets here?

8              MR. GARBER:  Briefly.

9              THE COURT:  Chris, could you check the jury?

10             MR. GARBER:  I have, for Mr. Larkin --

11             Can I proceed?

12             THE COURT:  Yeah.

13             MR. GARBER:  -- all of the checks that were paid to

14     Joe Dwyer from Glenn A. Garber, PC, and the Exoneration

15     Initiative over the course of the relationship.

16             As I stated, our relationship has terminated at least

17     a year now.  He is also not a cooperative witness.  It is kind

18     of a theme in this case, apparently.  So it looks like he has

19     been served.

20             THE COURT:  Maybe nobody wants to cooperate with you?

21             MR. GARBER:  It must be me, I'm giving off a vibe.

22             THE COURT:  I'll take judicial notice of that.

23             MR. GARBER:  I hope I can turn that around.  And we'll

24     see, okay.

25             THE COURT:  Okay.

E4t0mcc1

```
1              MR. GARBER:  But anyway, we're going to need a

2    material witness order, I think, because he has been very

3    difficult and we --

4              THE COURT:  Wait a minute, wait a minute.  He is not

5    responding to subpoenas?

6              MR. GARBER:  No.  I mean I can show you the e-mails

7    I'm having with him.  I don't need to burden you with it.  The

8    latest is I don't recall getting a subpoena from you, if you

9    don't pay my witness fees, I'm going to take the position I was

10   not served with a subpoena.  We served, a month ago, he said he

11   would accept a subpoena by e-mail.  I re e-mailed him last

12   night, said if I don't hear back from you by 9:00 a.m. today,

13   I'll bring it to the Court's attention.  I don't want to be in

14   a situation where Ms. Pujols is testifying this afternoon,

15   probably spill into tomorrow.  But he should be here tomorrow

16   morning.  And I don't want to be in the spot where we have not

17   taken the right process to get him here.  So we can give it to

18   him maybe lunchtime.  I just don't want to mess around with

19   this.  The tape has to be discussed a certain way with him,

20   that I'm not, I'm not successful with Ms. Pujols, or other

21   things surrounding his conversation with her, that I'm not

22   successfully getting out to Ms. Pujols, there is a possibility,

23   I'm not saying a great possibility, but a possibility he may

24   have to testify.

25             THE COURT:  All right.
```

E4t0mcc1

1          Well, if you want a material witness warrant, then I

2     guess make a request and get the paperwork together.

3          MR. GARBER:  Okay, we'll get some paperwork in this

4     afternoon.

5          THE COURT:  Certainly.  You can convey that that's

6     what you are going to be seeking, and the marshals are going to

7     have to come get him.  And I'm not going to be pleased if I

8     have to waste resources because some guy thinks he doesn't have

9     to accept subpoenas.  I could also hold him in contempt, I

10    suppose, if he doesn't think the subpoena is --

11         MR. GARBER:  I'll try reasonably with some more

12    e-mails throughout the course of the day.  And, hopefully, I

13    guess we can reconsider that drastic step before the business

14    closes.  Maybe that's the way to go.

15         THE COURT:  If a guy is trying to make his living as

16    an investigator, with the understanding that investigators

17    sometimes have to testify, and he has the gall to think that he

18    doesn't need to show up when he is subpoenaed, I would think

19    that's going to compromise his ability to make a living.

20    Because I'm certainly not going to tolerate a guy who does

21    that.  And I can, going forward, he will probably have to be a

22    part of any direct or cross that he gives.  I mean that's fair

23    impeachment material, that he doesn't think subpoenas apply to

24    him, when it doesn't suit him.  So seems like a foolish move.

25    Every witness has to be here when they are subpoenaed.  And

E4t0mcc1

1    there are no exceptions for investigators, whether they have

2    been paid or not.

3             MR. GARBER:  Yeah, can I represent to him that I have

4    raised this in Court?

5             THE COURT:  Sure.  Do you want to get a copy of the

6    transcript, you can send it to him.

7             MR. GARBER:  I can do that, but I want to make sure I

8    don't go farther than what the conversation is about, that the

9    Court is considering, when you don't comply with the subpoena

10   to hold you in contempt or issue a material witness order.  I

11   would like to state that to him in e-mail fashion today,

12   because that may prompt him to comply.  You are considering it,

13   that's all I would say.  I've raised that, the Court is

14   considering those options.

15            THE COURT:  All right.

16            MR. GARBER:  Okay.

17            THE COURT:  Well, I'm considering all of these

18   options, but I am really not looking forward to wasting time

19   with this kind of nonsense when somebody has been subpoenaed, I

20   think is the short answer.

21            All right, we are missing three jurors, which troubles

22   me.

23            MR. GARBER:  As far as Dwyer's, the payments to Dwyer.

24            THE COURT:  Right.

25            MR. GARBER:  Do you want me to turn those over now to

E4t0mcc1

1    Mr. Larkin?

2             THE COURT:  I mean I don't care if they are

3    responsive, and you have no problem doing it, then that's fine.

4             MR. GARBER:  Okay.

5             THE COURT:  If you think there is a reason not to do

6    it.

7             MR. GARBER:  Well.

8             THE COURT:  Or that it should be turned over in a

9    different form, then --

10            MR. GARBER:  No.

11            THE COURT:  -- that's fine, too.

12            Okay, all right, Chris, have you told them to knock

13   when they are all here?

14            THE DEPUTY CLERK:  I will do that.

15            THE COURT:  Let's do that.

16            While we're waiting are there other things that we

17   should be focused on?

18            MR. GARBER:  No.  I would like a few minutes with Mr.

19   McCaffrey, probably right here, if we could.

20            THE COURT:  All right.  Okay, let's bring in the jury.

21            THE DEPUTY CLERK:  All rise.

22

23

24

25

E4t0mcc1

1              (In open court)

2              (Jury present)

3              THE COURT:  Have a seat, good morning.  Good morning,

4    ladies and gentlemen.  We have a late start.  Ms. Romero, you

5    got lost or something?

6              JUROR:  Quite lost.

7              THE COURT:  As I said, there is nothing we can do if

8    one person is late.  We'll try to make up some lost time.

9              Coffee and everything came today?  It's not the

10   greatest, I would rather get Dunkin Donuts, candidly.  But let

11   us know if there is something you have not seen.

12             We'll resume with reading the transcript of the

13   criminal trial, same way we did yesterday.

14             So Mr. Larkin, and Ms. Zgodny, are you going to do the

15   readings?  Okay, come on up.

16             MR. LARKIN:  And this is picking up at trial

17   transcript page 189, line 10, okay.

18   "Q.  What happened as you got into the car, where did you go?

19   A.  They were going to take me back to the restaurant, but they

20   took me -- they took a bridge, like a little bridge.  Then

21   that's when I realized I was not going back to the restaurant,

22   because we never took a bridge to go to park the car.  Then I

23   started crying.

24   Q.  What happened as you were on the bridge?

25   A.  I was crying.  And he -- the driver was saying:  Leave her

E4t0mcc1                              "Buirny Peguero"

1    alone, leave her alone; he was acting nice to me.

2    Q.  That was the original guy?  Or the driver?

3    A.  The driver.

4    Q.  Was saying that to the defendant?

5    A.  To the defendant.  To leave me alone.

6    Q.  Okay.

7    A.  And I was trying to look for the thing to get out of the

8    car, to jump out of the car.  I was so nervous, I couldn't find

9    it.  And then my phone started ringing.

10   Q.  Okay.  I'm going to back up for a minute.

11            What was the defendant doing that sparked the driver

12   to say leave her alone.

13   A.  Touching my leg.

14   Q.  And did you want him to touch your leg?

15   A.  No.

16   Q.  And were you crying at this point?

17   A.  Yes.

18   Q.  Is it possible -- "

19            Sustained.  Moving to line 19.

20   "Q.  Do you know if you made any phone calls before you got on

21   the bridge?

22   A.  I don't remember.  I remember that when I was in the on --

23   the bridge, I received a phone call.

24   Q.  And do you know who was on the other line of that phone

25   call?

E4t0mcc1                          "Buirny Peguero"

1    A.   Well, I believe it was Heliana, I'm not sure.

2    Q.   Okay.

3    A.   Because the only two persons I spoke, all of the time, was

4    Orlando and Heliana.

5    Q.   And if you know, when you left the restaurant, was Maria

6    and Aurora also with Heliana and Orlando?

7    A.   Yes.

8    Q.   And what happened as your phone started ringing?

9    A.   He took a knife out.

10   Q.   Who?

11   A.   The original guy.

12   Q.   The defendant?

13   A.   Uh-huh.

14   Q.   Do you know what color the knife was?

15   A.   Dark.

16   Q.   And what did he do with the knife?

17   A.   He just took it out.

18   Q.   Could you see it?

19   A.   Yeah.

20   Q.   And what if anything did he say to you when he took the

21   knife out?

22   A.   To pick my phone up and say I was going to go back in five

23   minutes.

24   Q.   And were you crying at that point?

25   A.   Yes.

E4t0mcc1                          "Buirny Peguero"

1    Q.  What did you do next?

2    A.  I picked up my phone without crying, and told my friend

3    that I was going to be back in five minutes.

4    Q.  What happened next?

5    A.  Then they were driving.  Then my phone keeps ringing.  I

6    didn't pick up for a couple of times.  Then whenever I picked

7    up, I was very, very scared, but I thought he was like going to

8    kill me.

9    Q.  Were you crying at some of those points when your phone was

10   picked up?

11   A.  When I was going back.

12   Q.  And who was calling you, if you know, on the phone when it

13   was ringing, and you were crying?

14   A.  Orlando and Heliana.

15   Q.  Did there come a time when you didn't have your phone with

16   you in the car?

17   A.  Yes.

18   Q.  And how did that come about?

19   A.  The driver got my phone.

20   Q.  And did you notice or observe him using your phone?

21   A.  He spoke to Orlando.

22   Q.  The driver, that is?

23   A.  Yes.

24   Q.  When you first got to the bridge, what did you do when you

25   realized you were on the bridge?

E4t0mcc1                       "Buirny Peguero"

1    A.  I start crying.  I was trying to get out of the car.

2    Q.  Did you ever ask them to let you out?

3    A.  Yeah.

4    Q.  And what happened?

5    A.  I told them take me back, where are you taking me.  And

6    then he said he was going to drop off his friend at his house.

7    Q.  And did they -- "

8         MR. LARKIN:  And the Court says:  Who said that?

9    "A.  The driver he told me not to the worry about it, not to

10   worry about it, nothing is going to happen to you.  I was just

11   going to drop off my friend, and I'm going to take you back to

12   the restaurant.

13   Q.  Did you ever agree to go with him to the Bronx?

14   A.  Uh-uh, never.

15   Q.  Did you agree to go with them anywhere other than the

16   restaurant?

17   A.  No.

18   Q.  Do you know what kind of car you were in?

19   A.  It was a white car.

20   Q.  I'm going to show you what have previously marked as

21   People's 4 and 5.  Can you take a look at those photos and let

22   me know when you are done looking at them.

23        You done?

24   A.  Uh-huh.

25   Q.  What is the first photograph, can you tell us what that --

E4t0mcc1                        "Buirny Peguero"

1    excuse me.  Can you tell us what the number is at the bottom?

2    A.   Four?

3    Q.   Yes.  What is depicted in that photograph?

4    A.   That's the car.

5    Q.   Okay.  And what color is it?

6    A.   White.

7    Q.   Could that be the car that you were in that night?

8    A.   It could be, I'm not sure.

9    Q.   What is the second number on the photograph?

10   A.   Five.

11   Q.   And what is depicted in picture number 5?

12   A.   The back seat.

13   Q.   And could that be the back seat where you were in that

14   night?

15   A.   Could be, I'm not sure.

16   Q.   Okay.  Approximately how many times was your phone ringing

17   while you were on the bridge, and after the bridge, if you --

18   if you know.

19   A.   Like around four times, five.

20   Q.   What happened after the car went over the bridge?

21   A.   They took me to a street, dark street.

22   Q.   And what happened -- what did they do with the car at the

23   street.  Was the car parked?

24   A.   Yeah.

25   Q.   What happened once the car was parked?

E4t0mcc1                          "Buirny Peguero"

1  A.  I started fighting with the original guy, because he was

2  touching me.

3  Q.  Okay.  Is that the defendant?

4  A.  Yes.

5  Q.  How was he touching you?

6  A.  He was touching my leg.  He was touching me.

7  Q.  And how were you fighting with him?

8  A.  I tried to push him away from me, and he kept trying to

9  take my pants off.

10 Q.  And what happened as you -- as you fought with him?"

11       MR. LARKIN:  The transcript says follow him, but,

12 looks -- I'll read it as -- I'm sorry, I'll read the question

13 as it says.  This is page 196 line 5.  Question is --

14 "Q.  What happened as you followed him?

15 A.  He did -- took my pants off.

16 Q.  What happened to your belt?

17 A.  He broke my belt.

18 Q.  The original guy?

19 A.  Uh-huh.

20 Q.  Do you know where the other two guys where when he was

21 doing this?

22 A.  In the front.

23 Q.  What did the defendant do as he tried to take your pants

24 down?

25 A.  He took -- he took them out -- he took pulled my pants down

E4t0mcc1                              "Buirny Peguero"

1   and --

2   Q.  What were you doing?

3   A.  Fighting.  He slapped me in my face.

4   Q.  How many times did he slap you in your face?

5   A.  I don't remember.

6   Q.  What happened after he slapped you, where were his hands

7   and where were yours?

8   A.  He was grabbing my hands.

9   Q.  Your hands?

10  A.  Uh-huh.

11  Q.  Was he grabbing any other part of your body?

12  A.  I cannot describe, really, how everything happened.  We

13  were just fighting, and he was trying to have -- to have sex

14  with me.

15  Q.  What happened after he pulled your pants down?

16  A.  He did put his penis inside of me.

17  Q.  And what was he doing with your arms at that point?

18  A.  He was grabbing me.

19  Q.  Could you push him off?

20  A.  I was trying, but I couldn't.

21  Q.  Where are your arms was he holding you?

22  A.  Over here.

23  Q.  You're pointing to right above your elbows?

24  A.  Yeah.

25  Q.  On both arms?

E4t0mcc1                          "Buirny Peguero"

1    A.  Yeah.

2    Q.  And how was he holding you?

3    A.  Hard.  Like holding me for me to stay still.

4    Q.  And did you feel his penis enter your vagina?

5    A.  Yes.

6    Q.  Did he penetrate you?

7    A.  Yes.

8    Q.  When he was doing this, did he do anything else to you?

9    A.  He bite me.

10   Q.  Where did he bite you?

11   A.  In my shoulder.

12   Q.  Approximately how long was his penis inside of you?

13   A.  A couple of minutes.

14   Q.  What were you doing at that point?

15   A.  Fighting.

16   Q.  Were you still crying?

17   A.  Yeah.

18   Q.  Could you tell if your phone -- do you know what happened

19   to your phone at that point?

20   A.  No.

21   Q.  Did you tell him that you didn't want to have sex with him?

22   A.  Yeah.

23   Q.  What did you say?

24   A.  I just -- I didn't care about that.  All I care -- I was

25   afraid that he kill me, that's when I was -- that's what I was

E4t0mcc1                          "Buirny Peguero"

1    saying.

2    Q.  What were you saying?

3    A.  Not to kill me.

4    Q.  Did you tell him -- did you want to have sex with him?

5    A.  No.

6    Q.  Did you agree to have sex with him?

7    A.  No.

8    Q.  Did you ever help him take your pants off?

9    A.  No.

10   Q.  Do you know if he was saying anything to you?

11   A.  I don't remember.

12   Q.  Did you tell him to stop?

13   A.  No.

14   Q.  Did you tell him no?

15   A.  Yes.

16   Q.  Do you know if he was using a condom?

17   A.  No.

18   Q.  Were you able to see him the entire time when he was

19   fighting with you?

20   A.  No, but I'm sure -- I mean I was fighting with him, I was

21   not looking at him, because I was just crying.

22   Q.  While he was having sex with you, did he cause any other

23   pain to you, other than the bite and the holding of your arms?

24   A.  My leg.

25   Q.  What kind of pain to your leg?

E4t0mcc1                          "Buirny Peguero"

1    A.  He did a bruise to my leg.

2    Q.  Do you know if he ejaculated?

3    A.  No.  I don't know.

4    Q.  Approximately -- do you know if he ejaculated?

5    A.  No.

6    Q.  No, you don't know?

7    A.  I don't know.

8    Q.  After he stopped having sex with you, where did he go?

9    A.  He get out of the car.

10   Q.  And what did -- what did you do next?

11   A.  Stayed there, crying.

12   Q.  And did you try to get out of the car at that point?

13   A.  No.

14   Q.  Why not?

15   A.  Because I -- I was just crying.  And the second guy came.

16   Q.  The second guy, being which one?

17   A.  The driver.

18   Q.  Was that the Spanish-speaking guy?

19   A.  Uh-huh.

20   Q.  And what did he do?

21   A.  He had sex with me, too, but he -- he was just a few

22   seconds, and he said to me:  Sorry.

23   Q.  He said to you, sorry?  How long was his penis inside of

24   you?

25   A.  Seconds.

E4t0mcc1                         "Buirny Peguero"

1   Q.  Did he penetrate you?

2   A.  Yeah.

3   Q.  Do you know if he used a condom?

4   A.  No.

5   Q.  No, you don't know?

6   A.  I don't know.

7   Q.  And the first guy, do you know if he used a condom?

8   A.  I don't know.

9   Q.  Did the second guy cause you any injuries?

10  A.  No.

11  Q.  What happened after he said I'm sorry?

12  A.  He just got out of the car.

13  Q.  And what were you doing at that point?

14  A.  I had just laid down there, I didn't do anything.

15  Q.  Did you attempt to fight with the second guy?

16  A.  No.

17  Q.  Why not?

18  A.  I was just crying, and I didn't want -- I didn't want to

19  care anymore, that's it.

20  Q.  Why not?

21  A.  Well, all I was caring for they not to kill me.

22  Q.  Did you want to have sex with the second guy?

23  A.  No.

24  Q.  Did you ever agree to have sex with the second guy?

25  A.  No.

E4t0mcc1                        "Buirny Peguero"

1  Q.  What happened after the second guy got out of the car?

2  A.  His friend came in.

3  Q.  Was that the original guy?

4  A.  No, the third guy.

5  Q.  And what did he do?

6  A.  He did have sex with me.

7  Q.  And did he injure you in any way?

8  A.  No.

9  Q.  Did his penis penetrate your vagina, as well?

10  A.  Yes.

11  Q.  How long was he inside of you?

12  A.  A minute.

13  Q.  What if anything did he say?

14  A.  He didn't say anything.

15  Q.  Do you know if he used a condom?

16  A.  I don't know.

17  Q.  Do you know if he ejaculated?

18  A.  I don't know.

19  Q.  What happened after the third guy had sex with you?

20  A.  I pulled my pants up.

21  Q.  Do you know where the defendant was at that point?

22  A.  In the back seat.

23  Q.  And where was the driver, the Spanish-speaking guy?

24  A.  Driving.

25  Q.  And where was the third guy?

E4t0mcc1                         "Buirny Peguero"

1    A.   In the front seat, passenger's seat.

2    Q.   Approximately how long, how much time passed between the

3    time in which the car was parked, and the three of them, each

4    of them, penetrated and raped you?

5    A.   Like an hour -- I'm not sure.  It could be half hour, but

6    I'm not sure.

7    Q.   What happened -- take us through.  Everyone's back in the

8    car now.  Where do you go next?

9    A.   He dropped the third guy somewhere.

10   Q.   And who is still in the car with you at that point?

11   A.   The driver and the original guy.

12   Q.   And where was the -- the original guy?

13   A.   In the back.

14   Q.   So when you are in the car and they drop someone off, who

15   is left in the car?

16   A.   It was him, the original guy, and the driver.

17   Q.   The original guy, being the defendant."

18           MR. LARKIN:  And this is line 5.

19   "Q.   Where did you go next?

20   A.   To the parking lot.  I remember that the driver said that

21   he was going to drop me off in the parking lot, and he said to

22   leave you there.

23   Q.   He, being the defendant?

24   A.   The original guy?

25   Q.   Leave you where.

E4t0mcc1                          "Buirny Peguero"

1    A.   In the street.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E4TUMCC2                           "Biurny Peguero"

1  Q.  And did they bring you back to the parking garage?

2  A.  Yeah, the driver said that he was going to bring me back to

3  the parking lot.

4  Q.  If you know, was your phone still ringing at that point?

5  A.  Yeah, my friends were calling me and then that's when I

6  picked up and I was crying, and then he said, the original guy

7  said:  Oh, stop crying, they're going to think something's

8  wrong, something's happening to you, stop crying.

9  Q.  The original guy being the defendant?

10 A.  Yeah.

11 Q.  OK.

12         And what happened next?

13 A.  Then I remembered that he spoke to Orlando.

14 Q.  Who?

15 A.  The driver.

16         And then he gave me the address where they can pick me

17 up.  I don't know where I was at that time but I remember that

18 they gave -- he gave Orlando the wrong address and they took a

19 cab to pick me up, and whenever I was at the parking lot, the

20 guy from the parking lot gave Orlando the right address so

21 that's how they find me in the parking lot.

22 Q.  OK.

23         When you got to the parking lot.  Did the driver and

24 the defendant stay with you?

25 A.  Yeah.  Then I had -- I was in the passenger's -- I mean the

E4TUMCC2                         "Biurny Peguero"

1   driver's seat, and I got in the car.  I got in the car.  I was

2   there.  Because they went to look for my friend's car.

3           Then he said:  Let her drive, let her drive.  Then the

4   other driver said:  No, she don't know how to drive.  He said

5   that:  Let her take care of herself.

6   Q.  The person saying:  Just let her drive, let her drive --

7   A.  It was the original guy.

8   Q.  The defendant?

9   A.  Yeah.

10  Q.  And what was the Spanish-speaking guy saying?

11  A.  I don't know how to drove.  So he took the key out of the

12  car and he put it up on the car, on top of the car.

13  Q.  Did the defendant and the other guy stay there with you

14  until your friends arrived?

15  A.  No, they left.

16  Q.  Do you know if your friends Maria, Aurora and Heliana were

17  also with Orlando?

18  A.  Yes.

19  Q.  Did there come a point when they arrived at the, ing

20  garage?

21  A.  Yes.

22  Q.  What happened when you arrived at the garage?

23  A.  I was arguing with Aurora because she left me by myself.

24  Q.  And what were you like at that point in time?  How was your

25  demeanor?

E4TUMCC2                           "Biurny Peguero"

1          What were you doing at that point in time?

2     A.  I was just crying and arguing with Aurora when they found

3     me.

4     Q.  And when they found you, were all of your clothes still

5     intact?

6     A.  No.

7     Q.  What was wrong with your clothing?

8     A.  My belt was broken.

9     Q.  Do you know how your belt got broken?

10    A.  He did.  He broke my belt.

11    Q.  The defendant?

12    A.  Yeah.

13    Q.  Did you --

14         When you got brought back to the parking lot, did you

15    interact with the parking lot attendant?

16    A.  Excuse me?

17    Q.  Did you speak to the parking lot attendant?

18    A.  No.

19    Q.  Approximately how long after you arrived at the parking lot

20    was it before your friends arrived?

21    A.  I don't know, but it could be, like, around seven, ten

22    minutes.  Probably less.

23    Q.  From the time in which you first drive away from the

24    restaurant until the time in which you're reunited with your

25    friends, approximately how much time passed, if you know?

E4TUMCC2                         "Biurny Peguero"

1    A.  I don't know.  It could be an hour, hour and so.

2    Q.  Did there come a point when you realized that you had been

3    injured?

4    A.  Yeah.

5    Q.  When was that?

6    A.  Actually I saw everything when I was in the hospital.

7    Q.  And do you know what your injuries were?

8    A.  Yeah.

9    Q.  Can you tell us what they are?

10   A.  My arms.

11   Q.  What was wrong with your arms?

12   A.  Bruises.  I had bruises.

13   Q.  Did you have injuries anywhere else?

14   A.  My stomach over here.  My leg.  My shoulder.

15   Q.  And how did you get those injuries?

16   A.  He did it.

17   Q.  'He,' the defendant?

18   A.  Yes.

19   Q.  Do you remember if any police officers came to the parking

20   garage while your friends were there?

21   A.  Yes.

22   Q.  Did you tell the police what happened to you?

23   A.  No.

24   Q.  Why not?

25   A.  Because I was scared.  I was in shock.  I was just crying.

E4TUMCC2                        "Biurny Peguero"

1   Q.  Did you speak to the police?

2   A.  No.

3   Q.  When your friends first arrived, did you immediately tell

4   them what had happened to you?

5   A.  No.

6   Q.  Why not?

7   A.  First of all, I was embarrassed in front of Orlando.  I

8   didn't want him to know.

9   Q.  Why?

10  A.  Because -- I don't know.  I don't know him like that.  He's

11  a man.  I mean, I just felt very embarrassed and I don't want

12  to say anything in front of him.

13  Q.  Did there come a point in time when you did tell your

14  friends what happened?

15  A.  Yeah.

16  Q.  Where was that?

17  A.  I was crying in the backseat and then Heliana asked me what

18  happened to me, what happened to me.  Then I started crying.  I

19  didn't say anything.  Then she asked me if they raped me and

20  then I said yes.

21  Q.  And did you say who raped you?

22  A.  I didn't say.  They knew it was the guys.

23  Q.  Which guys?

24  A.  The original guy which is there.

25  Q.  The defendant?

E4TUMCC2                        "Biurny Peguero"

1   A.  Yeah.

2   Q.  And who else?

3   A.  And his friends.

4   Q.  And did you tell them --

5        Did you tell Heliana that those were the three guys

6   that raped you?

7   A.  Three, yeah.

8   Q.  When you told Heliana that, who was in the car?

9   A.  Aurora, Orlando and Maria.

10  Q.  Where were you going at that point in time?

11  A.  We were going to drop off Orlando, but then after I say

12  that, they took me straight to New Jersey to the hospital.

13  Q.  Was the car --

14       Were you guys driving at that point in which you told

15  them?

16  A.  Yeah.

17  Q.  Why did you decide to tell them at that point in time?

18  A.  Because Heliana asked me and I didn't -- I didn't thought

19  that she was going to say anything.  I thought she was going to

20  stay quiet until we drop off Orlando.  But she started crying

21  and then she say everything.

22  Q.  Did you tell everyone in the car what happened?

23  A.  No.

24  Q.  Did there come a point when you began talking about it in

25  the car in which everyone heard?

204

E4TUMCC2                          "Biurny Peguero"

1   A.  I just was crying.  Heliana was the one that say

2   everything.

3   Q.  At the time of this incident back in September of 2005, you

4   had a cell phone?

5   A.  Yeah.

6   Q.  And that was the cell phone that you were using that night?

7   A.  Yes.

8   Q.  Was that cell phone number 551-358-0988?

9   A.  Yes.

10  Q.  Is that still your phone number?

11  A.  No.

12  Q.  Did Orlando have a cellular telephone that night?

13  A.  Yes.

14  Q.  And was his number at the time 646-351-7228?

15  A.  Yes.

16  Q.  And did Heliana also have a cell phone that night?

17  A.  Yes.

18  Q.  Was her number 551-998-2788?

19  A.  Yes.

20  Q.  What hospital did you go to?

21  A.  Christ Hospital.

22  Q.  And is that in New Jersey?

23  A.  That's in New Jersey.

24  Q.  And once you arrived at the hospital, what happened?

25  A.  A doctor came, a nurse, they took my clothes off.

E4TUMCC2                          "Biurny Peguero"

1   Q.   And were you examined by a doctor and sexual assault

2   examiner?

3   A.   Yes.

4   Q.   Did they take photographs of you as well?

5   A.   Yes.

6   Q.   Did you have injuries when you arrived at the hospital?

7   A.   Yes.

8   Q.   When you woke up on the morning of September 18, 2005, did

9   you have any of those injuries?

10  A.   You mean before everything happened?

11  Q.   Yes.

12  A.   No.

13  Q.   September 17, before you went out that night --

14  A.   Yeah?

15  Q.   -- did you have any of those injuries?

16  A.   No, not at all.

17  Q.   I'm showing you what's already been admitted into evidence

18  as People's 6 through 15.

19       Just take a look at those and let me know when you are

20  done looking at them.

21  A.   I'm done.

22  Q.   OK.

23       Can you just pick each one up and tell us what the

24  number on each one is and tell us what is depicted in the

25  photo?

E4TUMCC2                           "Biurny Peguero"

1   A.  15 is my elbow.

2   Q.  If you can show us?

3          What is pictured in that photo?

4   A.  My elbow.

5   Q.  Is there anything else pictured or anything about your

6   elbow that you notice in that photograph?

7   A.  Bruises.

8   Q.  Where did you get those bruises?

9   A.  He did it to me.

10  Q.  The defendant?

11  A.  Yeah.

12  Q.  Did you have those bruises to your elbow before you were

13  taken by the defendant?

14  A.  No.

15  Q.  Move on to the next one.

16  A.  14.

17  Q.  Can you please show us what that is?

18  A.  My arm.

19  Q.  And what's depicted in that photograph?

20  A.  Bruises.

21  Q.  Can you point to where it is?

22          OK.

23          And how did you get those bruises?

24  A.  He did those bruises to me, too.

25  Q.  'He', the defendant?

E4TUMCC2                        "Biurny Peguero"

1    A.   Yeah.

2    Q.   OK.

3              What number is that?

4    A.   13.

5    Q.   What is that a picture of?

6    A.   My arm.

7    Q.   And what is shown in that photograph?

8    A.   Bruises.

9    Q.   And do you know which arm that is?

10   A.   My left.

11   Q.   OK.

12             And how did you get those bruises?

13   A.   He did it that night, the original guy.

14   Q.   The defendant?

15   A.   Mm hmm.

16   Q.   OK.

17             What's the next one?

18   A.   My stomach.

19   Q.   What number is that?

20   A.   12.

21   Q.   And what is shown in that photograph?

22   A.   Bruises.

23   Q.   OK.

24             Can you point to them for us?

25   Q.   And how did you get those bruises?

E4TUMCC2                    "Biurny Peguero"

1    A.  The defendant did it to me.

2    Q.  What's in the next photograph?

3            what number is that?

4    A.  11.  11.

5    Q.  What's depicted in that photograph?

6    A.  My shoulder.

7    Q.  Can you show us, please?

8            And what is that?

9    A.  That's a bite.

10   Q.  Whose bite mark is that?

11   A.  The defendant.

12   Q.  Did you have that bite mark prior to that night?

13   A.  No.  You can even see it in the pictures.

14   Q.  What?

15   A.  You can see that in the pictures, that in the club, I

16   had -- I mean, I can see in the picture.  You can see my

17   elbows.  I don't have that.

18   Q.  What's the next picture?

19   A.  10.

20   Q.  OK.

21           And what is that a picture of?

22   A.  My shoulder.

23   Q.  And what does that show?

24   A.  The same bite.

25   Q.  OK.

E4TUMCC2                    "Biurny Peguero"

1    A.   9 is my arm.

2    Q.   Which arm, if you know?

3    A.   I don't know.

4    Q.   OK.   What's pictured there?   Can you show us?

5    A.   A bruise.

6    Q.   How did you get that bruise?

7    A.   The defendant did it to me.

8    Q.   OK.

9              What's next?

10   A.   Number 8.

11   Q.   And what's pictured there?

12   A.   My arm.

13   Q.   And do you know which arm?

14   A.   No.

15   Q.   And what's pictured there?

16   A.   A bruise.

17   Q.   How did you get those bruises?

18   A.   The defendant did it to me.

19   Q.   OK.

20   A.   This is number 7.

21   Q.   What's depicted there?

22   A.   That's my arm.

23   Q.   Do you know which arm?

24   A.   My left.

25   Q.   And what to you see there?

E4TUMCC2                        "Biurny Peguero"

1   A.  Bruises.

2   Q.  And who did those bruises?

3   A.  The defendant.

4   Q.  What's the next photograph?

5   A.  Number 6.

6   Q.  And what is that a photograph of?

7   A.  My face.

8   Q.  Is that how you looked that night when you arrived at the

9   hospital?

10  A.  Yeah.

11  Q.  OK.

12          You can put the photos down.

13          In all of those photographs depicting those injuries,

14  at what point in time in the night did the defendant inflict

15  those injuries upon you?

16  A.  Excuse me?

17  Q.  When did he cause those injuries to you?

18  A.  When he was raping me.

19  Q.  When you were at the hospital, did they then perform a

20  pelvic exam on you?

21  A.  I don't know.

22  Q.  A gynecological exam?

23  A.  Yes.

24  Q.  Approximately how long did the exam last?

25  A.  I don't know.

E4TUMCC2                    "Biurny Peguero"

1    Q.  Did they also run tests while you were there?

2    A.  Yeah.

3    Q.  And did they draw your blood?

4    A.  I don't remember.

5    Q.  Did they prescribe you medications?

6    A.  Yes, they gave me antibiotics.

7    Q.  Do you know in of if they gave you anything else?

8    A.  No.

9    Q.  Did there come a time when a detective came to the hospital

10   and spoke with you?

11   A.  Yes.

12   Q.  Did you tell her that you were raped?

13   A.  Yes.

14   Q.  Did you tell her how many men had raped you?

15   A.  I don't remember.

16   Q.  Did you tell her the entire incident?

17   A.  No.  I don't remember.

18   Q.  Did you held her that you had been raped that night?

19   A.  Yeah, I have did.

20   Q.  Did you tell her the circumstances that led up to you being

21   raped?

22   A.  Yes.

23   Q.  Did you also tell the doctor and examiner what had happened

24   to you?

25   A.  Yes.

E4TUMCC2                         "Biurny Peguero"

1    Q.  What happened after you left the hospital?

2    A.  They took me to the city, to New York.

3    Q.  And did you meet with Detective Arbuiso?

4    A.  Yes.

5    Q.  Once you I arrived in New York?

6    A.  Yes, I did.

7    Q.  And what did you do next?

8    A.  He was driving me around the restaurant, and then he was

9    trying for me to remember where they took me at and he was just

10   driving around to see if I can recognize anyplace.

11   Q.  And were your friends with you still at that point, if you

12   recall?

13   A.  Aurora.

14   Q.  I'd like to direct your attention to approximately five

15   days later after this incident.

16        Did there come a point when you went to the District

17   Attorney's office?

18   A.  Yes.

19   Q.  And were photographs taken of you on that date?

20   A.  Yes.

21   Q.  I'm showing you what I previously marked as People's 16

22   through 20 for identification.

23        If you can take a look at these and let me know when

24   you are done looking at them.

25   A.  I'm done.

E4TUMCC2                          "Biurny Peguero"

1   Q.  Do those photographs fairly and accurately depict the way

2   that you looked approximately five days after this incident?

3   A.  Yes.

4        MR. LARKIN:  And then I think that the transcript

5   reflects that those 16 through 20 were offered in evidence.

6   And the next question is 223, line 8.

7        (Mr. Larkin and Ms. Zgodny reading)

8   "Q  You can use 16 through 20.  Tell us what number you are

9   looking at and what the photograph shows and if you can just

10  show us?

11  A.  16, that's my arm.

12  Q.  OK.

13        And what does 16 show?

14  A.  Bruises in my arm.

15  Q.  If you could hold it up so we can see it?

16        What does 17 show?

17  A.  Bruises.

18  Q.  Can you turn it so we can see?

19  A.  Sorry, this is 19.

20  Q.  OK.

21        What does 19 show?

22  A.  Bruises in my legs.

23  Q.  OK.

24        What is the next one?

25  A.  20.

E4TUMCC2                          "Biurny Peguero"

1   Q.  What does 20 show?

2   A.  My leg.

3   Q.  And what does it show about your leg?

4   A.  Bruises.

5   Q.  The next one?

6   A.  18.

7   Q.  What does it show?

8   A.  My arm.

9   Q.  And what about your arm?

10          If you can turn it so we can see it?

11  A.  Bruises.

12  Q.  And next?

13  A.  17.  My arm, bruises.

14  Q.  OK.

15          Is that all the photographs?

16  A.  Yes.

17  Q.  The injuries depicted in People's 16 through 20, how did

18  you get those injuries?

19  A.  The defendant did it to me.

20  Q.  And when did he do that to you?

21  A.  The 18th of --

22  Q.  September?

23  A.  -- September of 2005.

24  Q.  At what point in the night did he cause those injuries to

25  you?

E4TUMCC2                          "Biurny Peguero"

1    A.   When he was raping me.

2    Q.   I'd like to direct your attention back to that time that

3    when you were at the hospital.

4              What happened to all of your belongings?

5    A.   They took it.

6    Q.   The police?  Do you know who took it?

7    A.   No, people from the hospital.

8    Q.   OK.

9              I'm showing you what's been previously marked as

10   People's 33 for identification.

11             Have you seen this envelope and the contents of this

12   envelope prior to testifying today?

13   A.   Yes.

14   Q.   Do you know what is need that envelope?

15   A.   My belt.

16   Q.   When did you look at that?

17   A.   A couple of minutes ago today.

18   Q.   OK.

19             Was Detective Arbuiso there when that was opened?

20   A.   Yeah.

21   Q.   Is that the same belt you were wearing that night?

22   A.   Yes."

23             MR. LARKIN:  And then the record shows that the belt

24   was admitted into evidence.

25             (Mr. Larkin and Ms. Zgodny reading)

E4TUMCC2                         "Biurny Peguero"

1    "Q   Looking at that the belt, Biurny, can you hold it up for us

2    and show where it's broken?

3    A.   Over here.

4    Q.   OK.

5            That night, how was it positioned on you?  Can you

6    stand up and show us how it was on you?  Just hold it on you.

7            And where is it broken on the belt?

8    A.   This piece over here.

9    Q.   How is it connected?

10   A.   Sorry?

11   Q.   How was it connected?

12   A.   Like that.  It should go like this.

13   Q.   Is that where the clasp is or is the clasp somewhere else

14   on the belt?

15   A.   Somewhere else.  Over here.

16   Q.   You can sit.

17           Prior to that night, was that belt ever broken before?

18   A.   No.

19   Q.   How did the belt get broken that night?

20   A.   He broke the belt.

21   Q.   The defendant?

22   A.   Yes.

23   Q.   At what point did he break the belt?

24   A.   When he was trying to take my pants off.

25   Q.   I'd like to direct your attention to September 25, 2006 --

E4TUMCC2                        "Biurny Peguero"

1    or 2005, I'm sorry, approximately seven days after this

2    incident.

3              Were you at the Special Victims Unit at approximately

4    10:50 p.m. that night?

5    A.  Yes.

6    Q.  And did you view a lineup on that night?

7    A.  Yes.

8    Q.  Do you remember how many men were in that lineup?

9    A.  Five.

10   Q.  Did you see anyone in the lineup that you recognized?

11   A.  Yes.

12   Q.  Who did you recognize?

13   A.  Number 5.

14   Q.  Where did you recognize him from?

15   A.  From that night.

16   Q.  And which guy was he that night?

17   A.  The original guy.

18   Q.  Was that guy the defendant?

19   A.  Yes.

20   Q.  And what number was he?

21   A.  5.

22   Q.  Is that the same man that you see in court today?

23   A.  Yes.

24   Q.  Can you tell us what happened when you recognized him at

25   the lineup?

E4TUMCC2                          "Biurny Peguero"

1    A.   I started crying.

2    Q.   How long did it take for you to recognize him when you

3    viewed the lineup?

4    A.   I was looking one by one.  When I saw him, I recognized him

5    right away.

6    Q.   When you viewed the lineup, how sure were you when you

7    picked him out?

8    A.   110 percent.

9    Q.   And, as you sit here today, how sure are you he' the

10   original guy that got into your car?

11   A.   110 percent.

12   Q.   And the same guy that caused those injuries?

13   A.   Yes.

14   Q.   And raped you?

15   A.   Yes.

16   Q.   I'm showing you what I'm marking myself as People's 27 for

17   identification.

18            Do you recognize People's 27?

19   A.   Yeah.

20   Q.   What do you recognize that to be?

21   A.   The original guy.

22   Q.   And what is that a picture of?

23   A.   Sorry?

24   Q.   Is that a picture of the lineup that you viewed?

25   A.   Yeah.

E4TUMCC2                         "Biurny Peguero"

1    Q.   On September 25, 2005?

2    A.   Yeah.

3    Q.   Does it fairly and accurately depict the way the lineup

4    looked that night?

5    A.   Yeah."

6            MR. LARKIN:  And then People' 27 is marked into

7    evidence.

8            Now page 231, line 25.

9            (Mr. Larkin and Ms. Zgodny reading)

10   "Q   I' showing you what I previously marked as People's 26.

11           I would like you to take a look at People's 26.

12           Do you recognize that photograph?

13   A.   Yes.

14   Q.   Who is depicted in that photograph?

15   A.   The defendant.

16   Q.   Is that the way he looked on September 18, 2005?

17           Does it fairly and accurately depict the way he looked

18   on September 18, 2005?

19   A.   To me he looks different because I saw him with a hat on.

20   Q.   Other than the fact that he's not wearing a hat, does it

21   look like him?

22   A.   Yeah."

23           MR. LARKIN:  And the photo was admitted into evidence.

24           Now picking up at page 234, line 23.

25           (Mr. Larkin and Ms. Zgodny reading)

E4TUMCC2                          "Biurny Peguero"

1   "Q  Ms. Peguero, when you were in the car telling your friends

2   what had happened to you, did you ever tell any of them that

3   only one guy raped you?

4   A.  No.

5   Q.  Did you tell them that only two guys raped you?

6   A.  No."

7            MR. LARKIN:  Moving to page 236, line 25.

8            (Mr. Larkin and Ms. Zgodny reading)

9   "Q  In the weeks following what happened to you on September

10  18, 2005 were you able to leave your house?

11  A.  No.

12  Q.  Why not?

13  A.  I was scared to go out.

14  Q.  And did there come a time after this when you missed days

15  at work?

16  A.  Two weeks.

17  Q.  And for what reason?

18  A.  Because I was scared to go out.

19  Q.  How often since this incident have you been back out in New

20  York City?

21  A.  Very few, and I never went to clubs again here.

22           MR. LARKIN:  And that concludes the direct of the

23  plaintiff -- excuse me -- the direct of the complaining

24  witness.  I apologize.

25           THE COURT:  You are done.

E4TUMCC2                          "Biurny Peguero"

1              MR. LARKIN:  Yes.

2              THE COURT:  Mr. Garber, are you going to read anymore

3    from the trial transcript?

4              MR. GARBER:  Yes.

5              THE COURT:  Mr. Cohen, you are going to be on the

6    stand?

7              (Pause)

8              THE COURT:  What are we hearing now?

9              MR. GARBER:  This is the direct examination of Lisa

10   Miner from the Office of the Chief Medical Examiner.  It starts

11   on page 308.

12             THE COURT:  Lisa Miner?

13             MR. GARBER:  Lisa Miner.

14             THE COURT:  How do you spell it?

15             MR. GARBER:  M-I-N-E-R.

16             MR. LARKIN:  It is Misner.

17             MR. GARBER:  Misner -- it is a typo.

18             Question, on line 23, page 308.

19             (Mr. Garber and Mr. Cohen reading)

20   "Q  Did you obtain any biological material from the rape kit?

21   A.  Yes.

22   Q.  What biological material did you obtain?

23   A.  We detected the presence of amylase on the dried secretions

24   from the left arm bite mark and --

25   Q.  OK, go ahead.

E4TUMCC2                          "Lisa Misner"

1    A.  Amylase is a protein that is commonly found in saliva that

2    would help you break down starch, any items like bread, pasta,

3    things like that.

4    Q.  Does amylase have DNA?

5    A.  No.

6    Q.  Where would the DNA come from?

7    A.  The DNA from the saliva, of course, would come from the

8    skin cells.

9    Q.  And did you test the amylase in connection with this case?

10   A.  Yes.

11   Q.  What kind of tests were performed?

12   A.  We attempted to perform DNA extraction and that sample then

13   reached the quantitation stage where we tried to determine how

14   much DNA was in that sample.  There was no DNA found in that

15   sample.

16   Q.  OK.

17        What does that mean, extraction?  Would you explain to

18   us?

19   A.  The DNA is found inside yourselves.  We need to break open

20   the cells and free the DNA so we can perform our tests on it.

21   Q.  Were you able to obtain DNA from these profile amylase?

22   A.  No, we actually did not detect DNA in that sample.

23   Q.  Can you explain to us why that might be?

24   A.  It could be that there were not enough skin cells present

25   in that sample for us to obtain the amount of DNA that we need

E4TUMCC2                        "Lisa Misner"

1    to perform our tests.

2    Q.  You may continue.

3    A.  I think I was --

4    Q.  You were done?

5    A.  I was done.

6    Q.  OK.

7            Did you perform any other tests on the rest of these

8    specimens in the rape kit?

9    A.  Yes.  We routinely test for the presence of semen and

10   amylase on various items of a sexual assault kit.

11   Q.  Were semen present on any of the sexual assault kit items

12   you received for Biurny Peguero?

13   A.  No."

14           MR. GARBER:  That is the end of Misner.

15           Now we are going to do the direct of Detective Robert

16   Arbuiso and portions of the direct by Shandra Strain.

17           THE COURT:  So you are ADA Strain and Mr. Cohen will

18   be reading the testimony of Detective Arbuiso?

19           MR. GARBER:  Correct.  Page 328, line 8.

20           (Mr. Garber and Mr. Cohen reading)

21   "Q  Detective, I'd like to direct your attention to September

22   18 of 2005.  Were you working on that date?

23   A.  Yes, I was.

24   Q.  And where were you working?

25   A.  At the Manhattan Special Victims Squad.

E4TUMCC2                        "Robert Arbuiso"

1   Q.  Did there come a time when you received a telephone call

2   from a Detective Rak at the Hudson County prosecutor's office?

3   A.  Yes.

4   Q.  And what happened pursuant to that phone call?

5   A.  A short time later I met Detective Rak, the victim and her

6   two friends on the Manhattan side of the Lincoln Tunnel.

7   Q.  When you say "the victim and her two friends," who are you

8   referring to?

9   A.  Aurora Pujols and Maria Sosa.

10  Q.  And who was the victim that you met with on that date?

11  A.  Biurny Peguero.

12  Q.  Approximately what time did you meet with them on that

13  date?

14  A.  It was early afternoon.  Maybe 11, 12 o'clock.

15  Q.  And when you met with Detective Rak, did she turn over

16  certain evidence to you?

17  A.  Yes.

18  Q.  What evidence did she turn over to you?

19  A.  A sexual assault evidence kit, a bag with some clothing and

20  a smaller bag with a metallic belt."

21      MR. GARBER:  Now we are going to page 334, starting on

22  line 12.

23      (Mr. Garber and Mr. Cohen reading)

24  "Q  Detective, on September 18, 2005 when you met with the

25  complainant and two of her friends, what did you do when you

E4TUMCC2                          "Robert Arbuiso"

1    met with them?

2    A.   I brought them to my office where I interviewed them."

3              MR. GARBER:   Page 338, starting line 21.

4              (Mr. Garber and Mr. Cohen reading)

5    "Q   How did it come to be that he came to your office to meet

6    with you?

7    A.   The owner of the car contacted him on his Nextel and I

8    spoke with him over the walkie-talkie."

9              MR. GARBER:   Let me back up to line 17 on page 338.

10             (Mr. Garber and Mr. Cohen reading)

11   "Q   Did Mr. McCaffrey come to your office at the Manhattan

12   Special Victims Squad?

13   A.   Yes, he did.

14   Q.   What did you initially tell him --

15             How did it come to be that he came to your office to

16   meet with you?

17   A.   The owner of the car contacted him on his Nextel and I

18   spoke with him over the walkie-talkie.

19   Q.   And what happened next?

20   A.   I told him I'm investigating a missing cell phone and I

21   believe he has it and I would like him to bring it to me and

22   come to my office, and I gave him directions.

23   Q.   And whose cell phones were you referring to?

24   A.   Aurora's.

25   Q.   And did the defendant come into your office?

E4TUMCC2                         "Robert Arbuiso"

1   A.  Yes, he did."

2            MR. GARBER:  341, line 3.

3            (Mr. Garber and Mr. Cohen reading)

4   "Q   After you read him those Miranda warnings and signed them,

5   did you take a statement from the defendant?

6   A.  Yes, I did.

7   Q.  And how did you begin that statement?"

8            I guess that's it for there.  We are done with

9   Detective Arbuiso.

10           Now we are going to skip to -- wait a second.

11           MR. COHEN:  There was more.

12           MR. GARBER:  There was more.  I apologize.

13           Could we pick up on page 342 at the top, line 4.

14           Are you there?

15           MR. COHEN:  Yes.

16           (Mr. Garber and Mr. Cohen reading)

17  "Q  Detective, can you tell us what you said to the defendant

18  and how he responded?

19           MR. GARBER:  342, line 6.

20           MR. COHEN:  I don't have 342 here.

21           MR. GARBER:  You don't have 342?

22           MR. COHEN:  No.

23           Do you want to just read it?

24           MR. GARBER:  Then could I go back and forth, Judge, Q

25  and A?  He doesn't have page 342.  Could I do Q and A just to

E4TUMCC2                          "Robert Arbuiso"

1    move forward right now?

2              THE COURT:  You will read both parties?

3              MR. GARBER:  Yes.

4              THE COURT:  Everybody understands, just make it clear.

5              MR. GARBER:  Sure.

6              (Mr. Garber reading)

7    "Q  Detective, can you tell us what you said to the defendant

8    respond and how he responded?

9    A.  I basically started out asking where he was on that

10   Saturday night and if he was with Ramon.

11   Q.  And did you show him a photograph of anyone?

12   A.  Yes, I did.

13   Q.  Who did you show him a photograph of?

14   A.  The victim.

15   Q.  And who was that?

16   A.  Biurny.

17   Q.  Biurny Peguero?

18   A.  Yes.

19   Q.  And what did Mr. --

20              What did the defendant tell you after he saw the

21   photograph of Biurny Peguero?

22   A.  He said that they pulled up to a car that she was sitting

23   in, he got in the front passenger seat of the car, she was

24   sitting in the backseat.  He said he was trying to rap to her,

25   talk to her, if she wanted to hang out.  He said she did but

E4TUMCC2                          "Robert Arbuiso"

1   she was too drunk to drive.

2           So he offered to park her car for her.  He then drove

3   the car to the 218th Street parking lot where he parked it.

4   Then he said that he drove his friend Ramon home to the Bronx

5   and he took her along for the ride.

6   Q.  And did he indicate how many people he was with inside the

7   car?

8   A.  Yes.

9   Q.  How many?

10  A.  Mr. McCaffrey and three other males and the victim."

11          MR. GARBER:  Now we go to Detective Joanna Rak, page

12  372.

13          Do you have that, Mr. Cohen?

14          MR. COHEN:  Yes, I do.

15          MR. GARBER:  Starting on line 25, this is now Shandra

16  Strain, Detective Rak.

17          (Mr. Garber and Mr. Cohen reading)

18  "Q  Detective, while you were at the hospital, did you observe

19  any injuries to Ms. Peguero?

20  A.  Yes, I did.

21  Q.  Could you describe for us what those injuries were?

22  A.  Those injuries were abrasions, some red marks, in my

23  opinion they looked like bite marks, all over her body.

24  Q.  And did there come a time --

25          Did there come a time when you took photographs of

E4TUMCC2                         "Joanna Rak"

1    those injuries?

2    A.  Yes.

3    Q.  And was that at the hospital?

4    A.  Yes."

5             MR. GARBER:  Now it is Farkhanda Farooqi and you guys

6    are up.

7             THE COURT:  So you are switching?

8             MR. GARBER:  They are going to do the cross of Rak and

9    direct of --

10            THE COURT:  So we are switching or not switching?

11            MR. GARBER:  We are switching.  They are going to pick

12   up the cross of Detective Rak and then they are going continue

13   to another witness, Farkhanda Farooqi.

14            MS. ZGODNY:  Cross designations of Detective Rak and

15   then we will do it.

16            THE COURT:  That's fine.

17            MR. LARKIN:  Co-counsel will be the witness.

18            So this is page 370 of the transcript, line 6.

19            THE COURT:  Just make it clear, you are who?

20            MR. LARKIN:  I am Assistant DA Shandra Strain and

21   Ms. Zgodny is Detective Joanna Rak.

22            THE COURT:  All right.  Ready?

23            MS. ZGODNY:  Yes.

24            THE COURT:  Let's go.

25            MR. LARKIN:  And it is Joanna Rak, J-O-A-N-N-A  R-A-K.

E4TUMCC2                         "Joanna Rak"

 1              (Mr. Larkin and Ms. Zgodny reading)

 2      "Q   Good morning, Detective.

 3      A.   Good morning.

 4      Q.   Detective, where do you work?

 5      A.   Hudson County Prosecutor's Office.

 6      Q.   What is your job there?  What is your assignment?

 7      A.   I am a detective with the Special Victim's Unit.

 8      Q.   And how long have you been a detective with the Special

 9      Victim's Unit of the Hudson County Prosecutor's Office?

10      A.   Approximately two years.

11      Q.   And where were you assigned prior to that?

12      A.   To various trial teams and sexual assault -- I'm sorry --

13      the Sex Offenders Unit prior to that."

14              MR. GARBER:  Just to clarify, this is actually the

15      direct of Joanna Rak, so there was some confusion, I thought

16      they going to cross.  Just so the jury knows, this is now the

17      direct and they are probably going to re-read some of her other

18      stuff and move on to cross.

19              MR. LARKIN:  She is the People's witness, and I am the

20      Assistant DA --

21              MR. GARBER:  I know.

22              THE COURT:  But it had been said that you were going

23      to do the cross.

24              MS. ZGODNY:  Cross designations.  I apologize for the

25      confusion, cross designations.

1              THE COURT:  So this is the direct examination of

2     Detective Rak?

3              MR. LARKIN:  Yes.  Line 17.

4              (Mr. Larkin and Ms. Zgodny reading)

5     "Q  Where were you assigned prior to that?

6     A.  To various trial teams and sexual assault -- I'm sorry --

7     the Sex Offenders Unit prior to that.

8     Q.  How long have you been a police officer or detective?

9     A.  Approximately nine years.

10    Q.  And during your time as a detective and police officer,

11    approximately how many arrests have you either made or assisted

12    in?

13    A.  At least over 100.

14    Q.  And how many of those were for sexual assault

15    approximately?

16    A.  Arrests or cases?

17    Q.  Arrests.

18    A.  I would say have say at least 40.

19    Q.  Detective, I'd like direct your attention to September 18

20    of 2005.  Were you working on that date?

21    A.  I was on call that day, yes.

22    Q.  And where were you on call or where were you working?

23    A.  I was still working for the Hudson County Prosecutor's

24    Office.  Our procedures are, on the weekends you have an

25    on-call detective approximately 24 hours.  So on that

E4TUMCC2                        "Joanna Rak"

1   particular day I was the on-call detective.

2   Q.  And did there come a time at approximately 9:00 a.m. on the

3   that date when you responded to a call to Christ Hospital in

4   New Jersey?

5   A.  Yes, there was.

6   Q.  When you responded to that location, did you meet with a

7   complainant by the name of Biurny Peguero?

8   A.  Yes, I did.

9   Q.  Who responded to you?

10  A.  It was the SANE nurse, Farooqi.

11  Q.  Did you have an opportunity while there to observe

12  Ms. Peguero?

13  A.  Yes, I did.

14  Q.  What, if any, observations did you make about her?

15  A.  Ms. Peguero was extremely distraught.  She --

16          Objection.

17

18  Q.  You can continue.

19  A.  She was visibly shaken.  She was in a lot of pain.  Her

20  movements were restricted because of the amount of pain that

21  she was in.  And she also stated that, you know, she was

22  sexually assaulted.

23  Q.  And did she indicate to you how many -- how many people had

24  sexually assaulted her?

25  A.  She said three.

E4TUMCC2                         "Joanna Rak"

 1            The Court:  You mentioned, by the way, you were with

 2      Ms. Farooqi and you used the acronym SANE?

 3            The Witness:  Your Honor, SANE is an acronym for

 4      sexual assault nurse examiner.

 5      Q.  Detective, while you were at the hospital, did you observe

 6      any injuries to Ms. Peguero?

 7      A.  Yes, I did.

 8      Q.  Could you describe for us what those injuries were?

 9      A.  Those injuries were abrasions, some red marks, in my

10      opinion they looked like bite marks all over her body.

11      Q.  Did there come a time when you took photographs of her

12      injuries?

13      A.  Yes.

14      Q.  Was that at the hospital?

15      A.  Yes.

16      Q.  Detective, did you photograph every single one of her

17      injuries?

18      A.  No.

19      Q.  Can you explain to us why not?

20      A.  Because she was in distress, meaning she was in pain, when

21      she turned on the bed in certain positions.  So I didn't want

22      to force her to be in any position that was uncomfortable for

23      her.

24            And she was crying during -- primarily most of the

25      time she was crying because she was so distraught that I

1   decided that it was best to stop taking the photos but yet

2   still have it documented by SANE Farooqi.

3   Q.  And when Nurse Examiner Farooqi documented those, did you

4   see where she documented those?

5   A.  Yeah.

6   Q.  Where was that?

7   A.  All over her body, from head to toe, on the diagram.

8   Q.  And was that diagram part of her medical records?

9   A.  Yes.

10  Q.  OK.  I'm showing you what's already been admitted into

11  evidence as People's 6 through 15.  Could you take a look at

12  these and let me know when you have finished looking at them?

13  A.  I'm done.

14  Q.  Do you recognize those photographs?

15  A.  Yes, I do.

16  Q.  What are those photographs?

17  A.  Those are the photograph I took of Ms. Peguero's injuries.

18  Q.  Do those photographs fairly reflect the way she looked on

19  that night or that morning when you met with her?

20  A.  Yes.

21  Q.  Could those photographs document every single one of her

22  injuries?

23  A.  No.

24  Q.  I'm showing you what is already in evidence as People's 21,

25  which is Ms. Peguero's medical records which includes that

E4TUMCC2                          "Joanna Rak"

1   chart that you described Nurse Examiner Farooqi as filling out.

2           Does that chart fairly and accurately reflect the

3   other injuries that you observed that were not photographed?

4   A.   Yes.

5   Q.   Did there come a time when a sexual assault kit was

6   presented to you by nurse Farooqi?

7   A.   Yes.

8   Q.   And what did you do with that kit?

9   A.   I maintained it in my possession until I transferred it

10  over to Detective Arbuiso.

11  Q.   Arbuiso?

12  A.   I always have problems with his name, yes.

13  Q.   Was that the detective in the Manhattan Special Victims

14  Squad?

15  A.   Yes.

16  Q.   And did there come a time when you turned over other items

17  to him on that date?

18  A.   Yes.

19  Q.   What were those items?

20  A.   Those were the items that I obtained from the victim at the

21  hospital.

22  Q.   Do you know what those items included?

23  A.   I don't recall at this time.

24  Q.   Did they include her clothing?

25  A.   Yes.

E4TUMCC2                          "Joanna Rak"

1    Q.  What about a belt?

2    A.  If it was part of her clothing I would have secured that as

3    well.

4    Q.  OK.

5           Detective, I'm showing you what's already admitted

6    into evidence as People's 35.

7           Do you recognize People's 35?

8    A.  Yes, I do.

9    Q.  What is People's 35?

10   A.  It's our sexual assault evidence collection kit.

11   Q.  Detective, on that date when you met with Ms. Peguero, did

12   you take a detailed interview of her?

13   A.  No.

14   Q.  Or of her friends?

15   A.  No.

16   Q.  Can you explain to us why not?

17   A.  Because the alleged crime occurred in the State of New

18   York.  I am a detective from the State of New Jersey.  It's a

19   jurisdictional issue.  Not to mention the fact that other

20   people -- other detectives have different methodology and I

21   don't want to overstep my bounds by initiating an investigation

22   that was not mine to do.

23   Q.  When you respond to Christ Hospital on September 18, what

24   was your purpose in responding?

25   A.  I -- my purpose was to basically gather the evidence and

E4TUMCC2                        "Joanna Rak"

1   the victim and to assist in a courtesy fashion to present the

2   evidence to the detective that would take over the

3   investigation."

4              MR. LARKIN:  No further designations.

5              THE COURT:  We are going to a different witness?

6              MR. LARKIN:  Yes.  We are up to Farooqi.

7              THE COURT:  You are ADA Strain?

8              MR. LARKIN:  Yes.  This is Nurse Examiner Farooqi.

9   This is the direct examination.  It starts on page 389, line

10  16.

11             THE COURT:  Her first name is?

12             MR. LARKIN:  Farkhanda, F-A-R-K-H-A-N-D-A.  And the

13  last name is Farooqi, F-A-R-O-O-Q-I.

14             THE COURT:  Farkhanda Farooqi?

15             MR. LARKIN:  Yes.

16             THE COURT:  Please proceed.

17             (Mr. Larkin and Ms. Zgodny reading)

18  "Q  Can you tell us where you work?

19  A.  I work -- I work with the Hudson County Prosecutor Office.

20  Q.  And what is your job there?

21  A.  I am the SANE coordinator.

22  Q.  What does that mean?

23  A.  Sexual assault response team and sexual assault nurse

24  examiner.  I'm the director of Hudson County.  And also, I'm

25  certified sexual assault nurse examiner.

E4TUMCC2                    "Farkhanda Farooqi"

1    Q.  How long have you been a certified sexual assault nurse

2    examiner?

3    A.  Three years now.

4    Q.  And how long have you been a nurse?

5    A.  I'm graduated from school of nursing 1986.

6    Q.  And are you a registered nurse?

7    A.  Yes.

8    Q.  When you graduated from nursing school, what type of work

9    did you get into?

10   A.  I was a medicine emergency room nurse.

11   Q.  An emergency room nurse?

12   A.  Yes.

13   Q.  Was that here in the United States?

14   A.  Yeah.  I'm in the United States since 1992 and I'm work as

15   ER nurse since 1992, trauma and emergency room.

16   Q.  What is your educational background?

17   A.  I was district nurse and B.S. degree.

18   Q.  Are you currently in school still?

19   A.  Yes.

20   Q.  And what are you in school for?

21   A.  Actually I went for master program but I still have to take

22   credits because of the other country education, you know?

23   Q.  And at this point you're also studying to get your master's

24   in nursing?

25   A.  Yes.

E4TUMCC2                          "Farkhanda Farooqi"

1    Q.  Could you tell us, what is the sexual assault response

2    team?  What does that mean?  What does that program entail?

3    A.  Sexual response team mean there's a three different

4    departments, like law enforcement, nurse examiner and advocate.

5    Q.  And which of those portions do you belong to?

6    A.  I am a nurse examiner.

7    Q.  OK.

8         And what does a nurse examiner do?

9    A.  Nurse examiners, basically the victim of sexual assault, we

10   interview them and physical exam and document any injuries and

11   stuff.

12   Q.  Have you received, yourself, specific training related to

13   sexual assault forensic examination?

14   A.  Yes, I'm board certified by the Board of Nursing and there

15   is a training, like special training, on sexual assault nurse.

16   This basic education is the district nurses, the one that go

17   for the training, it is a 40-hour class training and like

18   pelvic exams and physical injuries.

19   Q.  And that training is in addition to your training as a

20   registered nurse?

21   A.  That's right.  That's correct.

22   Q.  Is that training specifically relative to sexual assault

23   examination?

24   A.  Yes.

25   Q.  Approximately, in your entire career as a nurse and also a

E4TUMCC2                          "Farkhanda Farooqi"

1   sexual assault nurse examiner, how many women have you examined

2   whose complaint is sexual assault?

3   A.  Since 2003 till now, I did like 50 to 55 cases

4   independently.

5   Q.  Are those the cases in which you were the sexual assault

6   nurse examiner?

7   A.  No.  I'm doing as assisting with the cases since 1998 and

8   approximately 70 to 75 cases total.

9   Q.  Total.

10          But how many have you been the actual examiner on?

11  A.  50, 55.

12  Q.  Approximately, during your entire career as a nurse and as

13  a nurse examiner, how many gynecological exams have you

14  performed?

15  A.  Many.  Because I also work as labor and delivery nurse, and

16  more than maybe 200.

17  Q.  OK.

18          And can you explain what takes place when you conduct

19  a gynecological exam in reference to a sexual assault case?

20  What are the procedure that you follow?

21  A.  The sexual assault exam?

22  Q.  Yes.

23  A.  OK, basically we interview the victim and whatever

24  complaint they have.  And then we do physical exam and vaginal

25  exam.

E4TUMCC2                        "Farkhanda Farooqi"

1    Q.  And when you perform the vaginal exam, what does that

2    entail?

3    A.  That's the spectrum insertion and collecting evidence like

4    doing surgical and vaginal swabs.

5    Q.  Have you performed gynecological or vaginal exams in both

6    sexual assault cases and non-sexual assault cases?

7    A.  Yes."

8            MR. LARKIN:  And then the witness is qualified as an

9    expert by the court in that case in the area of forensic exams

10   and sexual assault victims.

11           (Mr. Larkin and Ms. Zgodny reading)

12   "Q   Nurse Farooqi, I'm showing you what's previously been

13   entered into evidence as People's 21.

14           Can you take a look at People's 21 for me?  Do you

15   recognize People's 21?

16   A.  Yes.

17   Q.  Are those the medical records of Biurny Peguero from

18   September 18, 2005?

19   A.  That's right.

20   Q.  And have you reviewed those records prior to coming to

21   court today?

22   A.  Yes.

23   Q.  OK.

24           Did you perform any examinations of Biurny Peguero?

25   A.  Yes.

E4TUMCC2                    "Farkhanda Farooqi"

1   Q.  What, if any, role did you play in the examination of

2   Ms. Peguero?

3   A.  Basically, I'm the one who triaged her and checked her

4   physical injuries and interview her, and also did the physical

5   exam and pelvic exam.

6   Q.  When she presented to Christ Hospital on September 18,

7   2005, what was her chief complaint?

8   A.  She complained she was sexually assaulted.

9   Q.  Did there come a time when you conducted an examination of

10  her?

11  A.  I'm sorry?

12  Q.  Did you conduct an examination of her?

13  A.  Yes.

14  Q.  Can you tell us from the beginning what happened once you

15  met with Ms. Peguero?  What did you do?

16  A.  I spoke with the patient, and she said she was assaulted

17  and she was crying.  She was very upset.  She was brought by

18  two other friends.  There was, like, couple of friends with her

19  who brought her to ER.

20          So we put her in the room and give her a little time

21  to relax.  And then we did vital sign check and everything.

22  And ER physician who medically screened her.  She was given --

23  because she had multiple injuries on her body, and she was

24  given tetanus shot for that and the doctor told me that she's

25  cleared to do forensic exam.

E4TUMCC2                          "Farkhanda Farooqi"

1    Q.  And did you then conduct a forensic exam?

2    A.  Yes.

3    Q.  And during the course which you conducted the forensic

4    exam, did she tell you what had happened to her?

5    A.  Yes.  She told me she got assaulted in New York, somewhere

6    in the parking lot.  She came out of bar around, like, 4:30 in

7    the morning, and she was attacked by three unknown male.  And

8    she was sexually assaulted, vaginal intercourse, by them.

9    Q.  And did she indicate to you how many men had sexually

10   assaulted her?

11   A.  Three.

12   Q.  Did she indicate whether one of them, in addition to

13   sexually assaulting her, had done anything else?

14   A.  There was one male who was biting her and -- with vaginal

15   penetration.

16   Q.  Did she indicate that that male who was biting her also

17   raped her?

18   A.  Yes.

19   Q.  Did she indicate whether or not that male who was biting

20   her and raped her assaulted her?

21   A.  She was assaulted by three of them.  There were three

22   people.  Three of them had vaginal intercourse with her and one

23   of them was biting when he was having sex with her.

24   Q.  Nurse Examiner Farooqi, are there any vaginal injuries

25   documented in the medical records from your exam of her?

E4TUMCC2                    "Farkhanda Farooqi"

1    A.   This victim don't have any vaginal injuries.  There was

2    like bruise on her pubic area above the vagina, lower abdomen.

3    Q.   Is it consistent with forcible penetration for there not to

4    be vaginal injuries to a woman?

5    A.   No, many victims don't have vaginal injuries.

6    Q.   Can you explain to us why?

7    A.   Because of vagina is very fat and the penis is not a sharp

8    object that can cause injury, you know.  Many victims doesn't.

9    Even people who are sexually active or not sexually active

10   don't have injury.

11   Q.   In your 50 to 55 cases that you were the sexual assault

12   nurse examiner on, approximately how many of those cases have

13   had vaginal injuries?

14   A.   Maybe two or three.

15   Q.   OK.

16            Did you observe other injuries to Ms. Peguero's body?

17   A.   Yes.

18   Q.   Can you tell us what those injuries were?

19   A.   She had bite marks and redness all over her body, on her

20   arms, shoulder.  There's some redness on her legs too.

21            If you can look at the diagram I have documented

22   abrasions, bruises redness on right arm, and left shoulder she

23   have big bit marks, like 2.5 inch, and redness on her left arm,

24   and multiple abrasions on the left leg and right knee and then

25   she have redness on her pubic region, left abdomen area.

E4TUMCC2                    "Farkhanda Farooqi"

1   Q.  When you examined Ms. Peguero, did you go through a series

2   of questions with her about what had transpired?

3   A.  Yes.

4   Q.  Could you she tell you whether or not the perpetrators had

5   used a condom?

6   A.  She was unsure.

7   Q.  And could she tell you whether or not the perpetrators had

8   ejaculated?

9   A.  She was unsure.

10  Q.  In your experience, Nurse Farooqi to recover semen or DNA?

11  A.  You can't.

12  Q.  And if someone wears a condom, is it possible in your

13  experience, to recover semen or DNA?

14  A.  You can't.

15  Q.  Even if a victim of a sexual assault complains of pain,

16  would you necessarily find vaginal injury?

17  A.  No.

18  Q.  Can you explain why?

19  A.  Because of the vaginal area elasticity, you know, that's

20  why.

21  Q.  And are --

22          Is there also natural lubrication which occurs in most

23  women?

24  A.  That's true.

25  Q.  What happens at that point?

E4TUMCC2                        "Farkhanda Farooqi"

1    A.   That's -- it's easy penetration.

2    Q.   Was Ms. Peguero prescribed medications on September 18,

3    2005?

4    A.   Yes.

5    Q.   Could you tell us what those medications were?

6    A.   She was given tetanus shot because of the bites and the

7    abrasions, and she was given prophylactics which is protocols,

8    standard protocols.  We give Zithromax Cipro.  She was given

9    plan B to prevent any accidental pregnancy.

10   Q.   What are the possible side effects of those medications?

11   A.   Mostly of GI, nausea and vomiting.

12   Q.   When you took the examination of Ms. Peguero, did you

13   document her injuries somewhere?

14   A.   Yes.

15   Q.   Where did you document that?

16   A.   On the diagram.

17   Q.   And that diagram is contained within People's 21?

18   A.   If that's the separate or is this --

19   Q.   The medical records?

20   A.   No."

21            MR. LARKIN:  So the court asked a couple of questions:

22            "21 is the --"

23            The Witness:  That is the hospital records.  Hospital

24   record, I think it separate.

25            Yes, that's true.  Yes.

E4TUMCC2                    "Farkhanda Farooqi"

1         The Court:  All right, so your documentation is

2    contained within People's 21, the medical records, is that

3    right?

4         The Witness:  The medical record is kept separate in

5    the hospital.  Forensic record, we keep it separate.

6         The Court:  All right.

7         The Witness:  The hospital don't have.  We give them

8    the discharge copy.

9         "The Court:  That's this, that's OK."

10         And now ADA Strain continues page 401, line 6.

11         (Mr. Larkin and Ms. Zgodny reading)

12    "Q  And are you under a duty as you create those reports to

13    record them accurately?

14    A.  Yes, of course.

15    Q.  I'm showing you what's previously been marked as People's

16    24.

17         Using People's 24, if you could, with the Court's

18    permission, if you could step down, I'm going to hand you a

19    marker, I'd like for you to use the chart in People's 21 and

20    document for the members of the jury to see the injuries that

21    you noted on Ms. Peguero on September 18, 2005.

22    A.  OK."

23         THE COURT:  We don't have the exhibit.

24         MS. ZGODNY:  No.

25    "Q  I'm going to hand you a marker.  And a you indicate each

1    one, could you please indicate to us where it was and what it

2    was that you observed, and if the measurement of it was taken,

3    what that measurement is?

4    A.   Sure.

5    Q.   So there you're marking what appears to be the front left

6    shoulder?

7    A.   That's right.  This is left shoulder.  This is bite mark.

8    Q.   And what about it made you believe that it was a bite mark?

9    A.   Because it's like tooth mark on the patient said that, and

10   this redness around it, it's like basically somebody suck it

11   and bite it too.

12   Q.   OK.

13   A.   So it's redness like around.  You can see the lips mark and

14   the teeth in between.  It was, like, 2.5 inch.

15          Then she have redness here.

16   Q.   Where were you marking?

17   A.   Under her breast, left breast.

18   Q.   OK.

19          And you just marked -- I'm sorry.

20          On the left arm you marked two items.  Can you tell us

21   what those are?

22   A.   Yes.  There is like a redness and bruise.  And this was

23   bite mark.

24   Q.   Again, what made you believe that that was a bite mark?

25   A.   Because of teeth.  You know, when you -- somebody bite and

E4TUMCC2                         "Farkhanda Farooqi"

1   you can see that, still there is teeth marks there and that's

2   what the patient said that, that this bite.  Because every

3   injury I was looking at I was asking her how this happen, how

4   this redness happen, how this happen.  Because she was putting

5   a lot of effort fighting back and forth and --

6   Q.  Fighting back and forth with you?

7   A.  With the offenders.

8   Q.  Oh, OK.

9   A.  During the incident.

10  Q.  OK.

11  A.  That's what she said.  So many injuries, whatever.  She

12  have redness and because she was -- because she was making a

13  lot of efforts trying to fight back.  But she was tired of the

14  alcohol use and she was not having that energy to fight.

15  Q.  OK.

16  A.  So...

17  Q.  So on the left arm, this is -- OK.

18  A.  You see the redness?  This just redness, there no bite mark

19  here.

20  Q.  Where is that located?

21  A.  Pubic area above her.

22  Q.  And it is redness?

23  A.  Yes, that's redness.

24          This redness here.

25  Q.  And you're again pointing -- just so the record is clear,

E4TUMCC2                         "Farkhanda Farooqi"

1   you just drew another mark that appears on the right-hand side

2   of her body?

3          Is that the --

4   A.  They is her groin area where pubic region.  This is on her

5   lower abdomen.  Left side.  Left side.

6   Q.  Is that the left side, or is that the left or right?

7   A.  I'm sorry, this is right.

8   Q.  OK.

9   A.  This is left.

10         These are, like, three bruises.

11  Q.  Three bruises on the right arm?

12  A.  Yes, the right arm.

13         And there was abrasions over here.  This is like --

14  Q.  Abrasion on her?

15  A.  Knee.

16  Q.  OK.

17  A.  Her right knee.

18  Q.  And did you measure that abrasion?

19  A.  Yes.  This was, like, one to two centimeter, approximately.

20  Q.  What is that that you just marked?

21  A.  These are, like, three abrasions on her lower leg -- left

22  lower leg.  This is left lower leg.  There was no injury on her

23  back at the time I examined her because sometimes bruises

24  appear later.

25         And there was no bleeding.  Is also superficial

E4TUMCC2                          "Farkhanda Farooqi"

1    abrasions and teeth marks in every bite area.

2    Q.  And did you actually observe those teeth marks when you

3    made these observations?

4    A.  Yes.

5            That's basically it.

6    Q.  Is that all of the marks that are on People's 21?

7    A.  That's it.

8    Q.  Nurse Farooqi, People's 24, does that fairly and accurately

9    reflect the diagram that you made on September 18, 2005 other

10   than the fact that it's blown up?

11   A.  Yes.

12   Q.  And does it document all of the injuries that you

13   documented that same night?

14   A.  That's right."

15           MR. LARKIN:  And then People's 24 is moved into

16   evidence.

17           Picking up at line 18.

18           (Mr. Larkin and Ms. Zgodny reading)

19   "Q  Nurse Farooqi, when you indicated that Ms. Peguero told you

20   that she had been raped by three men, did she indicate that

21   occurred in a vehicle?

22   A.  She was in her car and she pulled out of that car to move

23   another car around, so...

24   Q.  Nurse Farooqi, I'm showing you what's already admitted into

25   evidence as People's 35.

E4TUMCC2                    "Farkhanda Farooqi"

1                Do you recognize People's 35?

2   A.   Yes.

3   Q.   What do you recognize that to be?

4   A.   That's the kit that we use for the exam to collect

5   evidence."

6

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E4TUMCC2                        "Farkhanda Farooqi"

1    Q.  And is that the kit that you took on September 18, 2005?

2    A.  Yes.

3    Q.  How do you recognize it to be that?

4    A.  My signature on -- it's my handwriting.

5    Q.  And did you turn that kit over to Detective Rak?

6    A.  Yes, that's true.

7    Q.  Did you also turn over clothing and a belt which belonged

8    to complainant?

9    A.  Yes."

10           MR. LARKIN:  And that concludes the direct exam of

11   that witness, your Honor.

12           THE COURT:  All right.  Any other witnesses you are

13   doing now?

14           MR. LARKIN:  Not right now.

15           THE COURT:  Back to you, Mr. Garber and Mr. Cohen,

16   let's do that.

17           MR. GARBER:  Just one moment, your Honor.

18           THE COURT:  Okay, let's go.

19           MR. GARBER:  Okay.  Starting at page 46, Pelagio

20   Delacruz.

21           Now we are on the defense's case at the criminal

22   trial.  That is defense witness named Pelagio Delacruz.

23           Examiner is Ronald.

24           THE COURT:  Spell the lawyer's name, too, for the

25   record.

1          MR. GARBER:  Yes.  Ronald V-E-N-E-Z-I-A-N-O.

2          THE COURT:  All right.  Okay, let's proceed.

3          MR. GARBER:  Starts on 487, line 25 Mr. Cohen and Mr.

4     Delacruz.

5          (Mr. Garber and Mr. Cohen reading)

6     BY MR. VENEZIANO:

7     "Q.  Mr. Delacruz, good afternoon.

8     A.  Good afternoon.

9     Q.  Now, Mr. Cruz, you understand the set-up here with the

10    interpreter, and how it's going to work?

11    A.  Correct.

12    Q.  Okay.  Now, if I can ask, how old are you, Mr. Cruz?

13    A.  Fifty years old.

14    Q.  Now, in those 50 years, have you ever had any criminal

15    record, or any involvement with the law of any kind at all?

16    A.  Yes.

17    Q.  Tell us.  Tell us what it is.

18    A.  I was incarcerated for selling alcohol illegally.

19    Q.  When was that, how long ago was that?

20    A.  That was like four years here.

21    Q.  It happened four years ago?

22    A.  Yes.

23    Q.  Okay.  But that's not what you do for a living, is it?

24    A.  No.  I was working in a place, and did not have the

25    appropriate permit.

E4t0mcc3                    "Delacruz"

1   Q.  Right.  So because it didn't have the appropriate permit,

2   you shut it down?

3   A.  It is because I was not the owner, I was only working.

4   Q.  The -- oh, the place was shut down?

5   A.  Yes.

6   Q.  And you lost your job along with it?

7   A.  Yes.

8   Q.  Other than that, anything else, anything of a criminal

9   nature that you were involved in your life?

10  A.  No.

11  Q.  Okay.  Now, are you married or single?

12  A.  Married, but separate.

13  Q.  Separated?

14  A.  Separated.

15  Q.  Do you have any children?

16  A.  Three.

17  Q.  How old are they.

18  A.  20, 19, and 15.

19  Q.  Okay.  When they were younger, did you support them by the

20  job that you have now, or do you have a job, now, in the

21  garage, as a garage attendant?

22  A.  I was working as a parking lot attendant, but it was in

23  different places.

24  Q.  All right, where was it?

25  A.  That was on Tenth Avenue and 216th.

E4t0mcc3                         "Delacruz"

1    Q.  Okay.  And where did you work before that?

2    A.  The job where they -- where I ended up in jail.

3    Q.  Meaning the after-hours liquor license?

4    A.  After-hours?

5    Q.  Is that what you are talking about now?

6    A.  Yes.

7    Q.  Okay.  So is it fair to say that almost all of your adult

8    life, you made a living by being a parking lot attendant and

9    working in that or related jobs, correct?

10   A.  In the United States, yes.

11   Q.  Okay.  Have we met before today?

12   A.  I saw you once.

13   Q.  But you saw me once, but we never met, did we?

14   A.  No.

15   Q.  We never spoke to each other?

16   A.  No.

17   Q.  Okay.  Now, did you come down to testify today,

18   voluntarily, or did you need to be subpoenaed?

19   A.  Voluntarily.

20   Q.  I'm sorry?

21   A.  Voluntarily.

22   Q.  Voluntarily, okay.

23          I would like you to look at the jury, and starting out

24   on the evening of September 18, 2005, please tell the jury

25   everything you know about what occurred on that date.

E4t0mcc3                          "Delacruz"

1              Do you understand my question?

2   A.  Correct.

3   Q.  Just look right at the jury, talk to the jury, and tell

4   them, entirely in your own words, what occurred and what you

5   saw occur that evening.

6   A.  That day, I went to work around 6:00.  6:00.

7   Q.  Is that 6:00 a.m. or 6:00 p.m.  Be specific.

8   A.  In the afternoon.

9   Q.  Between?

10  A.  Between 10:00 and 12:00, I cannot really be precise about

11  it.  There was a customer in the garage who owed a white

12  Mercedes.  And during that time he showed up with another two

13  friends in a red van, a Ford.  They left the red van and they

14  took the white Mercedes.  Then they returned approximately 5:10

15  or 5:15 in the morning with a white car, plus a gold Honda.

16  Q.  I'm sorry, where did the gold Honda come from, when did it

17  come in?

18  A.  The Mercedes, the white Mercedes, came in first.  I

19  normally would take a look to see who is coming in.  Since I

20  saw it was I white Mercedes, I know it was a car that is in the

21  company.  They stopped the car right before the -- by the

22  office.  They got out.  The two guys that were with him, plus a

23  girl.  They got in the van.  The red van.  They left the two

24  cars, and then they left.  During that time, I spoke with them

25  and they got into the red van and then they left.

E4t0mcc3                        "Delacruz"

1          I parked the cars and quarter to six the red van

2     returned.  It stopped right where you get into the garage, the

3     entrance.  And during that time, when I noticed that the van

4     stopped, I drove the girl's car, because they asked me to.  I

5     parked the car.

6          In the meantime, inside the van, the mini van, the two

7     that arrived with owner of the Mercedes, one was sitting behind

8     the wheel, the other one in the front seat, but next to him and

9     in the passenger's seat behind the drivers seat, was the girl

10    that got in the van with them at the beginning.

11         In the meantime, they had -- they were having an

12    argument.  The one that was next to the driver with the girl

13    that was sitting right behind the driver.  The girl got out

14    from the van crying.  She got out crying.  And she asked me for

15    the key that I was holding in my hands.  And the guy that she

16    was arguing with, he got out, as well.  And he said, telling me

17    not to give her the key because she was drunk.  I was between

18    both of them, and I did not know what to do.  He, the guy, he

19    told -- he threatened to hurt me.  And I made the decision to

20    give the key to the girl.  And he continued to argue a little

21    bit more.  And then they left the garage.

22         The girl was there crying, still in the car.  She made

23    a phone call.  I do not recall if my co-worker lent her the

24    phone or if she had her phone.  But she made a phone call to

25    her friends.  Her friends, they arrive in a taxi.  And once

E4t0mcc3                        "Delacruz"

1    they get in there, they got into the car with her, that did not

2    move, and they started to argue.

3         I stepped away from the car to get my things, because

4    I had ended my shift.  Once I was leaving the garage, I see

5    that they -- I notice they were arguing inside the car.  And

6    they were hitting each other.  They were hitting each other and

7    screaming during that time.

8         Then I left.  And, after that, I don't know anything

9    else.

10   Q.  When Mr. McCaffrey asked you not to give her the keys,

11   Cruz, can you look around this courtroom and see if you can see

12   the person who made -- who did not want you to give the keys

13   back to the girl because she was drunk?

14   A.  Here.  You could see, I could see a lot of people that they

15   may look like him.

16   Q.  Okay, all right, you said that that, that person, he asked

17   you not to give her the keys, even though she wanted the keys?

18   A.  Yes.

19   Q.  Because she was drunk?

20   A.  Yes.

21   Q.  And was that accurate, was she drunk?  Well, you said the

22   red van returned approximately 6:45; correct?

23   A.  No.

24   Q.  When did the red van return?

25   A.  It returned before 5:45, around there.

E4t0mcc3                          "Delacruz"

1   Q.  Okay.  Who got out of the red van.

2   A.  The white guy, chubby.

3   Q.  And then he had a conversation with you about the keys?

4   A.  Yes.

5   Q.  Now, at that time, was there any -- could you hear any

6   yelling or screaming inside the car?

7   A.  Inside which car?

8   Q.  Inside the -- inside the red van, when the red van

9   returned?

10  A.  No.

11  Q.  But then, later on, did you see hitting and yelling and

12  screaming, correct?

13  A.  In which car?

14  Q.  In the red van.

15  A.  No.

16  Q.  Now, did there come a time when you said the girl is in the

17  car, some of the girls are in the car, inside the car, a fight

18  broke out, there was an argument and a fight?

19  A.  But inside the gold Honda.

20  Q.  Oh, inside the gold Honda.

21       Now, do you remember who it was that was inside the

22  gold Honda; if you know.

23  A.  The girls that arrived with the guys, plus another two

24  friends that arrived there.

25  Q.  And they got in the Honda?

E4t0mcc3                         "Delacruz"

1    A.  Yes.

2    Q.  And then yelling and hitting and punching broke out inside

3    the Honda; correct?

4    A.  Yes.

5    Q.  Okay.  Well, were they inside the car?

6    A.  Yes.

7    Q.  Okay.  Now, again, tell the jury exactly what happened and

8    what you saw with regard to these people inside the vehicle?

9    A.  About which one?

10   Q.  All right, Mr. Delacruz.  Tell the jury in your own words

11   exactly what it was that you witnessed when they got back in

12   the Honda.

13   A.  The two friends, her two friends arrived in the taxi after

14   she had placed the call.  And the car was exactly the same

15   place where I parked it.  They got inside the car to talk with

16   their friend.  I got away from the car to pick up my things,

17   since my shift had ended.  Once the time that I was leaving,

18   they were yelling and hitting each other.

19   Q.  Well, were they yelling loud?  Were you able to hear them

20   easily?

21   A.  They were yelling.  They were yelling, questioning each

22   other and --

23   Q.  And at some point, did they begin hitting each other?

24   A.  Yes.  They were really hitting each other.

25   Q.  They were really hitting each other."

E4t0mcc3                        "Delacruz"

1              MR. GARBER:  Okay.  That's the end of the direct.

2         And now cross-examination, this would be Shanda

3    Strain, and still Pelagio Cruz.

4              (Mr. Garber and Mr. Cohen reading:

5    BY MS. STRAIN:

6    "Q.  Good afternoon, Mr. Delacruz?

7    A.  Good afternoon.

8    Q.  We have never met before, right?

9    A.  True.

10   Q.  Right?  That's right, we never met?

11   A.  It's true.

12   Q.  But you have spoken to detectives in connection with this

13   case; isn't that right?

14   A.  No.

15   Q.  No, you did not speak to detectives a year ago when this

16   incident happened?

17   A.  No.

18   Q.  Okay.  Your boss, who is your boss at the garage?

19   A.  They change a lot.

20   Q.  The boss changes a lot, is that yes?

21   A.  Yes.

22   Q.  You actually don't work there anymore; isn't that right?

23   A.  No.  Correct.

24   Q.  You do not work there?

25   A.  No.

E4t0mcc3                          "Delacruz"

1    Q.  Right.  And you don't recall on September 19th, 2005, two

2    detectives from the Special Victim Squad, one who spoke Spanish

3    with you, and another one coming to interview you?

4    A.  They did, together, interview me.

5    Q.  You don't recall telling the detectives, you don't recall

6    telling the detectives -- you told the defendants that the girl

7    was drunk, isn't that right?

8    A.  They did not interview me.

9    Q.  Your name is Pelagio Delacruz; is that correct?

10   A.  Yes.

11   Q.  And at that time, September 19th, 2005, you worked 6:00 to

12   6:00; isn't that right?

13   A.  Correct.

14   Q.  And that was at the parking garage in the vicinity of 218th

15   and 10th, correct?

16   A.  Correct.

17   Q.  But it's your testimony here, today, that you never spoke

18   to any police with regard to this case?

19   A.  Correct.

20   Q.  You know the owner of the white Mercedes, right.  He has a

21   monthly -- he was a monthly customer?

22   A.  Correct.

23   Q.  You saw him on numerous occasions before this?

24   A.  Correct.

25   Q.  You knew who he was?

E4t0mcc3                    "Delacruz"

1   A.  Correct.

2   Q.  And you guys were friendly?

3   A.  We know each other.

4   Q.  And every once in a while when you parked your cars, you do

5   a -- you do a favor for some of your customers; isn't that

6   right?

7   A.  Correct.

8   Q.  And Mr. -- well, the owner of that Mercedes is one of those

9   customers?

10  A.  Correct.

11  Q.  And in fact, sometimes Mr. Hangers, Steve Hangers, who is

12  the boss and the owner of that parking garage that you used to

13  work at, sometimes you would get reprimanded, right, for doing

14  favors?

15  A.  It's true.

16  Q.  And you would get reprimanded by the boss because you would

17  do things that you were not supposed to be doing?

18  A.  Incorrect.

19  Q.  Wait, let me just start again.

20          And you would get reprimanded by the boss because you

21  would do things that you were not supposed to be doing?

22  A.  Incorrect.

23  Q.  Well, you got reprimanded for doing favors; that's what you

24  said.

25  A.  Depends on what you understand as a favor.

E4t0mcc3                        "Delacruz"

1    Q.  Right.  But you would get reprimanded for that.

2    A.  I would like you to be more specific.

3    Q.  Well, your boss, Mr. Hangers, and your other boss, Maria,

4    reprimanded you because you didn't follow rules.

5    A.  Which rules?

6    Q.  Did you -- or did you get reprimanded during your time as a

7    parking lot attendant at that garage by your bosses?

8    A.  Repeat the question.

9    Q.  During the time in which you worked at that garage, were

10   you or were you not, in trouble or reprimanded by your bosses,

11   Steve Hangers and Maria, because you didn't follow the rules?

12   A.  I will ask you again, which rules.

13   Q.  I'm going to move on.

14            What have you been reprimanded for?

15   A.  Generally, when you work in a place, sometimes you can make

16   some mistakes.  You can get into an accident, lose a key.

17   Q.  But what were you reprimanded for, not what you could have

18   been, what were you reprimanded for?

19   A.  Because of those reasons that I had said.

20   Q.  And weren't you reprimanded for taking money on the side

21   from some of the customers to do them favors?

22   A.  Never.

23   Q.  That night, you're sure it is a red van.

24   A.  Yes.

25   Q.  No doubt in your mind, it was the color red?

1    A.  Yes.

2    Q.  Would you agree with me that red is very distinctively

3    different than white, right?  When you spoke with the

4    detectives, you told them they took her in a white van, did you

5    not?

6    A.  Miss, I told you that I did not speak with the detectives.

7    Q.  Okay.  You have met with Mr. Veneziano before, right?

8    A.  Who is Veneziano?

9    Q.  The defense attorney who was questioning you before me.

10   A.  Here in court today.

11   Q.  And you saw -- and you said you saw him one time before

12   today.  Where was that?

13   A.  That was a long time ago that I was here in court.

14   Q.  That you saw Mr. Veneziano?

15   A.  I did not know that was his name.

16   Q.  Did you speak to him on that day?

17   A.  No, Miss.

18   Q.  And Mr. Marino, his partner, you have met with him before;

19   isn't that right?

20   A.  Yes.

21   Q.  And you have met with your investigator; right?

22   A.  Who was that investigator?

23   Q.  The investigator that works for Mr. Marino, you met with

24   him?

25   A.  I got together with Mr. Marino.  If he was there, I don't

E4t0mcc3                            "Delacruz"

1    know.

2    Q.   And you went over your testimony with Mr. Marino; isn't

3    that right?

4    A.   I just told him what I saw.

5    Q.   And you told him what you would testify about here in;

6    court; right?

7    A.   I told him the same thing that I'm saying here.

8    Q.   You know Alphonso Rodriguez?

9    A.   He is my co-worker.

10   Q.   Right.  And he worked, when you used to work there, the

11   shift after you; right.

12   A.   Correct.

13   Q.   And he actually showed up later after the girl had been

14   dropped off, right, to work his shift?

15   A.   Correct.

16   Q.   And the cops actually came to the garage that night,

17   uniformed police; right?

18   A.   No.

19   Q.   The police never came?

20   A.   While I was there, no.

21   Q.   And you left sometime after 6:00 a.m.  Isn't that right?

22   A.   Correct.

23   Q.   And it's your testimony that the police never responded

24   while you were there?

25   A.   Correct.

E4t0mcc3                          "Delacruz"

1    Q.  But you and Mr. Rodriguez, you had a conversation about

2    this incident after you guys were working together, isn't that

3    right.

4    A.  What kind of conversation?

5    Q.  You and Mr. Rodriguez talked about the girl that got left

6    behind the garage by the defendant and those others guys?

7    A.  The same day, no.

8    Q.  No, later.  Later after this incident.

9    A.  Yes.

10   Q.  And in fact, you told Mr. Rodriguez that the guys took her

11   in a white Mercedes; isn't that correct?

12   A.  I could never say that.

13   Q.  You could never say that, that you said that, or not?

14   A.  No.

15   Q.  Can you clarify what you mean by no?  Did you, or did you

16   not, tell them; yes or no.

17   A.  What?

18   Q.  Did you tell him that she was taken in a white Mercedes?

19   A.  No.

20   Q.  You stated earlier that two guys bring her back to the

21   garage in the van, right?

22   A.  Correct.

23   Q.  So it's two guys and one girl?

24   A.  Correct.

25   Q.  And you actually stated earlier, on direct, that the guys

E4t0mcc3                              "Delacruz"

 1   she argued with, it was a guy arguing with her, and he is the

 2   one who got out later.  And you saw the guy in the front seat

 3   arguing with her; isn't that right?

 4   A.  I never said that they were fighting.

 5   Q.  You used the word "arguing," did you not.

 6   A.  To argue is not to fight.

 7   Q.  I understand that.  You saw the white chubby guy arguing

 8   with her, though, right?

 9   A.  Correct.

10   Q.  And you saw her get out of the car, crying, right?

11   A.  Correct.

12   Q.  And she was not crying when she got into the car, when they

13   left the first time, right?

14   A.  Correct.

15   Q.  And then you saw -- and then you said he actually

16   threatened you, right?

17   A.  Correct.

18   Q.  And the girl was still crying, right?

19   A.  Yes, sitting in the car.

20   Q.  But he didn't stick around, right?

21   A.  No, they left.

22   Q.  His friend didn't stick around?

23   A.  Repeat the question?

24   Q.  His friend didn't stick around?

25   A.  Which friend?

1   Q.  That he, the defendants, the people that were this van, two

2   guys and one girl, she gets out and she is crying, right?

3   A.  Uh-huh.

4   Q.  And then the two guys, they don't -- they don't stick

5   around, the two guys leave?

6   A.  Correct.

7   Q.  And some of her friends arrive.

8   A.  Friends, girlfriends, her girlfriends.

9   Q.  Are you sure that there was two?  Could there have been

10  more?

11  A.  There were two.

12  Q.  I'm going to show you a photograph that has previously been

13  admitted into evidence.  I'll have you take a look at it.

14          Do you recognize those women?

15  A.  No.

16  Q.  You don't recognize any of those women in the photograph?

17  A.  No.

18  Q.  When she was inside the Honda, when you claim that she is

19  arguing and fighting with her friends, can you show me, show me

20  what they were doing?

21  A.  They arrived.  One sat in the front and the other one in

22  the back.  When the taxi stopped, I was already leaving.  And

23  they started -- and they started to say, why you leave me.

24          I was walking out.  And I stopped by the door.  And I

25  saw that they were kicking and hitting with their hands to each

E4t0mcc3                         "Delacruz"

1   other.

2   Q.  Where was the original girl, that you saw her crying, where

3   in the car was she?

4   A.  Behind the driver's seat -- no, behind the wheel.

5   Q.  She was behind the driver's seat?

6   A.  Yes.

7   Q.  Where did the other two girls -- where did the other girls

8   go before -- where were they in the car during this fight?"

9           MR. COHEN:  Well, you missed a -- the judge asked a

10  question.

11          MS. ZGODNY:  Line 15.

12          MR. GARBER:  Line 15, wait a minute.

13  "Q.  Was she in the drivers seat or in the seat behind where

14  the driver would sit?

15  A.  In the drivers seat, in the gold Honda.

16  Q.  Where did the other girls go, where were they in the car

17  during this fight?

18  A.  One in the front seat, and one in the back seat.

19  Q.  And who was doing the hitting?

20  A.  I don't know, all of them.

21  Q.  Well, how were they hitting each other?

22  A.  With their hands, with their feet.  They were just fighting

23  inside."

24  Q.  I told you that I was standing by the -- oh, okay --

25          MR. COHEN:  No, no.

E4t0mcc3                        "Delacruz"

1             MR. GARBER:  I'm sorry.

2     "Q.  You didn't see anyone biting each other, did you?"

3             MR. GARBER:  I think it's line 8.

4     "A.  I told you that I was standing by the door, if they bit

5     each other I don't know.

6     Q.  I understand.  Did you see anyone bite someone else inside

7     the car?

8     A.  No.

9     Q.  I have no further questions."

10            I think that's the end.  Could we take a short break?

11            THE COURT:  Well, we didn't get started until late.

12    Are we done with the testimony of the trial?

13            MR. GARBER:  We're done with the testimony of

14    Delacruz.  And there is some other testimony.

15            MR. COHEN:  We have half hour more.

16            THE COURT:  I would normally take a break at 11:30,

17    but we didn't start until 10:00.

18            MR. GARBER:  I have to go to the rest room, that's why

19    I'm asking, I apologize.

20            THE COURT:  All right.

21            All right, so I don't know whether we're going to

22    finish all of this.  We have a new witness that we asked to be

23    here at 2:00, so.

24            All right, ladies and gentlemen, we'll take a short

25    break, just about five minutes or so, okay.  Use the rest room,

E4t0mcc3                          "Delacruz"

1    get a drink, don't discuss the case, of course.

2              See you in a bit.  All rise.

3              (Jury excused)

E4t0mcc3                              "Delacruz"

1              (In open court)

2              THE COURT:  Okay.  Use the rest room and we'll pick up

3    in about five minutes.

4              MR. GARBER:  Thank you.

5              (Recess)

6              THE COURT:  All right.  Two things.

7              First of all, Juror No. 4, Ms. Kimbrough passed a note

8    to Mr. Deluzio at the break saying:  Your Honor, is it relevant

9    that I was a SARTS volunteer for two years, North Central

10   Hospital, Bronx, around the year 2006 to 2007.  SARTS is a

11   sexual assault response team volunteer.

12             I'm inclined to bring her out, just say, look, there

13   has been some testimony about -- this is about a rape.  There

14   has been some testimony about hospital witnesses.  Do you think

15   this would affect your ability to be fair and impartial.  I

16   expect it won't.  But if it does, or if it prompts followup, we

17   can do that.

18             MS. ZGODNY:  Okay.

19             MR. GARBER:  Okay.  I would also ask for similar

20   instruction to what I requested with the doctor, which is not

21   to use her own expertise, but to listen to what the evidence is

22   here.

23             THE COURT:  Yeah, I mean I don't think -- doesn't

24   sound like lick she has any expertise, necessarily.

25             But the other point is I got a response to one of your

E4t0mcc3                          "Delacruz"

1  subpoenas.  So I'm going to hand you this.  It was a subpoena

2  that you asked me to sign for you.  And this is their response.

3  So you could take a look.  If you want me to do anything --

4  right, that was your subpoena, or was that the defendant's

5  subpoena.

6             MS. ZGODNY:  Is that ours?

7             MR. LARKIN:  Thank you.

8             THE COURT:  Yeah, okay.  If you need any followup from

9  me, let me know, but I don't think I necessarily need to do

10  anything.

11             Okay, so let's deal with Ms. Kimbrough right before

12  the lunch break, as opposed to delaying this break longer.  So

13  let's bring out the jury.  How much more of this do we have?

14             MR. COHEN:  Probably more than I said.

15             THE COURT:  Is it going to take us through lunch?

16             MR. GARBER:  I don't think so, maybe half hour, 40

17  minutes.

18             THE COURT:  Let's bring in the jury, and we'll finish

19  this up.

20             And then Mr. McCaffrey is going to testify?

21             MR. GARBER:  Yes.

22             THE COURT:  Okay.

23             THE DEPUTY CLERK:  All rise.

24

25

E4t0mcc3                          "Delacruz"

1          (In open court)

2          (Jury present)

3          THE COURT:  All right, have a seat.

4          So we're going to resume and I think conclude the

5     trial testimony.  So, Mr. Garber, you are going to go forward.

6          MR. GARBER:  Yes.

7          THE COURT:  And you are -- who are you now?

8          MR. GARBER:  I am Ronald Veneziano, doing a direct

9     examination of William McCaffrey at the criminal trial.

10         THE COURT:  All right.  So Mr. McCaffrey, who is the

11    plaintiff here, was the defendant in a criminal trial.  And he

12    testified at the criminal trial.  Mr. Cohen is now going to

13    read the testimony of Mr. McCaffrey.

14         All right, let's proceed.

15         (Mr. Garber and Mr. Cohen reading)

16         MR. GARBER:  Page 517 line 16:

17    BY MR. VENEZIANO:

18    "Q.  Mr. McCaffrey, how old are you?

19    A.   Twenty-nine.

20    Q.   And do you have a family?

21    A.   Yes.

22    Q.   Are you married?

23    A.   Technically.

24    Q.   Okay, do you have children?

25    A.   Yes.

E4t0mcc3                         "McCaffrey"

1    Q.  With the same woman?

2    A.  Yeah.

3    Q.  How many children do you have.

4    A.  I have two, a 10 and an 8 year old.

5    Q.  Okay.  Now, I assume you work for a living?

6    A.  Yes.

7    Q.  Can you tell us, tell the jury, what you do, what kind of

8    work do you do?

9    A.  I am an interior contractor.  Put windows in, custom

10   framing, Sheetrock, custom painting, floors; anything interior.

11   Q.  Anything interior?

12   A.  Yeah; kitchens, bathrooms.

13   Q.  Okay.

14   A.  Minus the plumbing.

15   Q.  Now, I want to take you, without further adieu to

16   September 18, 1995; okay?

17   A.  Yeah.

18   Q.  Okay.  September 18, 2005, forgive me.

19           I assume you remember that date very well.

20   A.  Yes.

21   Q.  I assume it's seared into your memory?

22   A.  Yes.

23   Q.  Yes, okay.

24           On September 18, 2005, where did you begin your day?

25   A.  Home.  As I woke up, I got dressed.  And the rest of my day

E4t0mcc3                         "McCaffrey"

1   unfolded.  About 10:00, 10:30, I got picked up by a couple of

2   friends of mine to go out.

3   Q.  Okay.  And what happened then?

4   A.  We went, switched cars at a parking lot to pick up the car

5   that we were going to currently drive that night.

6   Q.  Okay.  When you get to the parking lot -- I want you to

7   face the jury, and tell them everything that you know of what

8   occurred that evening which occurrence brought you here now.

9   A.  After we dropped off the car and we went in the Mercedes to

10  the X Bar.  It is on Fordham Road, right off the Deegan.  We

11  left there about 4:30, 4:45, heading towards the Dyckman area,

12  where it is an area of clubs over there.

13  Q.  This is 4:45, in the afternoon?

14  A.  No, it's in the morning.

15  Q.  It's in the morning.

16  A.  Yes, sir.  And we get to Dyckman.  We're proceeding towards

17  Broadway.  When we get to the corner, there is a car that is

18  parked, a gold Honda.  When we get to the corner, there is a

19  light.  We stopped at the light.  I opened the window and I'm

20  talking to the people.  There was a girl, like Semipartially

21  had her door open, just about to get into the car.  I started a

22  conversation with her.

23  Q.  Who was driving the car?

24  A.  If I'm, to my knowledge it is Peter, but I mean --

25  Q.  Okay.  What's Peter's last name?

E4t0mcc3                        "McCaffrey"

1    A.  I don't know.  I just I just met him that night.

2            I'm in the passengers seat.  I start talking to the

3    young lady, you know, how are you doing, what were you girls

4    doing.  There was another girl in the back seat, leaned up

5    against the door.  I, therefore, jump out the car.

6    Q.  How did you get into the car, into the passenger's seat?

7    A.  When we exited the Mercedes.

8    Q.  Approximately what time of the morning was that?

9    A.  4:30, between -- the latest, 4:45, 4:30.

10   Q.  Sometime between 4:30, 4:45, maybe 5:00 o'clock, you see

11   this woman in the car.  Is that what happened?

12   A.  Yeah, she was sitting at the --

13   Q.  Now, take it from there.

14   A.  I pull up.  I start a conversation with her:  What are you

15   girls doing tonight.

16   Q.  You pull up in your car?

17   A.  In the Mercedes.

18   Q.  In the Mercedes, okay.  I start a conversation with her,

19   regular talk:  How are you girls doing, what did you guys do

20   tonight, would you like to go after-hours with us, that's what

21   we're going to do.

22           She said yes.

23           The car was full.  I asked her, do you mind if one of

24   his friends ride with you, because there were four people in

25   our car.

E4t0mcc3                    "McCaffrey"

1          She said no problem.

2          I get out the passenger's seat.  I go around to the

3    passengers seat and in their car and get in.  She gets in the

4    drivers seat.

5          When the Mercedes pulls off, she pulls behind them.

6    She makes the right on Broadway.  Her headlights are off, and

7    she is swerving a little bit.  I let her know, your headlights

8    are off.  She immediately pulls over and says I can't drive.

9    At that point, at that moment, the girl in the back seat exits

10   the car.  She says, I'm staying here.

11         When the girl in the back seat exits the car, she says

12   can you drive.

13         I said, no problem, I'll drive to the parking lot.  I

14   get out the car.  I get into the drivers seat.  The Mercedes is

15   further up now.  I pull out and I drive three traffic lights.

16   I drive to the parking lot.  It is on the right hand side.

17   Q.  Whose car were you driving?

18   A.  The young lady's.

19   Q.  Okay, continue.

20   A.  All right.  I pulled in the parking lot.  I get out the

21   car.  I got to retrieve something from the Mercedes, I left my

22   watch and my sweater there.  I get out.  I go get my watch, my

23   sweater.  They parking the cars.  The Mercedes gets parked, the

24   mini van gets pulled out, we all started --

25   Q.  You are back in the garage now?

1   A.  Yes.

2   Q.  And they are bringing in the Mercedes?

3   A.  Yes.

4   Q.  Everybody leaves the Mercedes?

5   A.  Yes.

6   Q.  And goes to the mini van?

7   A.  Yes.

8   Q.  What color was the mini van?

9   A.  It's my recollection, red.

10  Q.  Okay.

11  A.  Red and white.

12  Q.  All right, continue.

13  A.  Okay.  We enter the mini van.  Peter sits in the driver's

14  seat.  Raymond is the passenger's seat.  Carlos is in the back

15  seat with the young lady.  And I'm in the third seat.  There is

16  three seats, actually, in the mini van.

17  Q.  Okay.

18  A.  We pull out.  I get on my Nextel to call someone who was

19  downtown in the club to see what they are doing.  When we exit

20  the parking lot, we headed towards 204 Street.  As we're

21  heading towards 204 Street, I'm speaking on the phone,

22  everybody is talking, the music is on.  Some Spanish is being

23  spoken.  So we passed --

24  Q.  By the way, do you understand Spanish?

25  A.  No.

E4t0mcc3                          "McCaffrey"

1    Q.  Can you speak Spanish?

2    A.  No, sir.

3    Q.  Are you Spanish?

4    A.  No, I'm Irish.

5    Q.  You're Irish?

6    A.  Yes.

7    Q.  And you come from the Bronx.

8    A.  Yes, sir.

9    Q.  Okay.  All right, go on.

10   A.  We passed 204 Street.  The club was closed.  We started

11   heading back towards 207 Street, still talking amongst

12   ourselves in the car.  I'm on the -- on and off my Nextel.

13   They discuss with the -- I'm sure, to my knowledge, I thought

14   everybody knew where we were going.  We started heading towards

15   207 Street.  They had head over the bridge.  We get right on

16   the highway.  My assumption, we're bringing Raymond and Jay

17   home, because I live in the opposite direction.

18   Q.  Okay.

19   A.  We get on the highway.  We cut across the bridge and get

20   off Pelham Parkway.  Twenty minutes after, from the time we

21   left the parking lot, we pulling up in front of Raymond's

22   house.

23   Q.  Okay.

24   A.  As we are pulling up, Raymond is going to get out of the

25   car.  He asked me if I want to stay, whatever.  Carlos tells me

1    the girl has to go back to the parking lot, she didn't want to

2    go.  I said no problem.

3           Raymond exits the car.  We pull up further, maybe a

4    block away where Jay lives.  He lives in the next building

5    almost.  He exits the car.  I sit in the passenger's seat and

6    Carlos drives.  The girl sits in the back seat.

7           We leave Jay's house, turn around to go back towards

8    the highway.  About five minutes into the car ride, the phone

9    rings.  Again, she picks up the phone.  She is speaking normal,

10   in Spanish --

11   Q.  Now, on the phone -- I'm sorry, I apologize for

12   interrupting.

13          When the phone rings, are you on the way back down?

14   A.  We are heading back towards the highway.

15   Q.  Heading back towards?

16   A.  Back towards the parking lot.

17   Q.  With the intention of going there?

18   A.  To the parking lot.

19   Q.  To do what?

20   A.  To drop her off.

21   Q.  Okay.  Now, continue.

22   A.  After we're almost reached the highway, she gets a phone

23   call.  She answers the phone.  It starts off regular.  She's

24   having a -- she's having a -- she's having a -- having a

25   conversation.  Then she starts to scream.  The only thing she

1    said in English was something:  Screw the car, or F the car.

2            She hangs up the phone on them.

3    Q.  Right.

4    A.  She's getting upset.  We get on the highway.  Phone calls

5    continues.  She gets another phone call.  She's screaming and

6    yelling at the people on the phone, hangs up on them.

7    Q.  You are not able to understand what she is saying, or --

8    A.  No.  She only say said a couple of words in English.

9    Q.  By the way, at this point, was she drunk?

10   A.  To my knowledge, yeah.

11   Q.  Okay, continue.

12   A.  We get on the highway.  The phone calls continue.  She's

13   screaming a little bit louder with each phone call.  In between

14   one of the phone calls, she says, I need to go back to the car

15   can you hurry up?  We said no problem.  The phone hangs up,

16   calls again.  She screams at the top of her lungs now.  She's

17   started crying.  She passes the phone to the driver.  The

18   driver said something in Spanish.  I tell the driver just to

19   tell them the address of the parking lot and that we would be

20   there in about 10 minutes.  We pass the phone.  After saying

21   something to her, the girl starts screaming and yelling again

22   and hangs up the phone.  Now, she's crying.  The phone

23   continues to ring.  This is the whole way back, almost to the

24   parking lot.  She's answering the phone, she's not answering

25   the phone.  She's picking up the phone.  She's creaming with

E4t0mcc3                        "McCaffrey"

1   them on the phone.  She's crying.  She's back and forth.

2           May I show what she was doing?"

3           MR. GARBER:  I'll be the Court.

4           "Yes.

5   A.   She's talking on the phone and like just screaming, like

6   she's fighting with the phone.

7           We pull into the parking lot.  When we pull in the

8   parking lot, she exits the car, I exit the car.  I'm telling

9   her don't drive.  Because she's drunk.  She going to get, you

10  know, into an accident because the way her headlights was off

11  when she pulled off.

12  Q.   How long had you been with her that evening when you

13  perceived her drinking?

14  A.   Forty-five minutes.

15  Q.   And in the 45 minutes, did she have anything to drink.

16  A.   No.

17  Q.   Well, did there come a time when you saw her drinking?

18  A.   No, I'm not, I didn't see her drinking.

19  Q.   Okay, continue.

20  A.   We pull into the parking lot.  I'm telling her not to drive

21  because she's drunk.  She continues to get the car from the

22  gentleman in the parking lot.  I go and tell the gentleman in

23  the parking lot, she cannot drive, she's drunk.  We told her

24  friends that they are coming, just wait for her friends before

25  you give her the car.

1            He said, you know, that it's -- just let her take her

2    keys.  He's holding the keys, like arguing with me, back.  I'm

3    telling him it's his -- I cursed at him.  I tell him it's his

4    fault if something happens to her and she's drinking.  They

5    talk to her friends on the phone, and she's on the way to the

6    parking lot.  He continues to yell, get out of here and he

7    steps in my face.  We're having a heated argument.  Carlos

8    grabs me and says, you know what, let's just leave.  This

9    argument went on for about 10 minutes.  He says, let's just

10   leave before this gets physical.  I said, no problem.  And I

11   exited.  I left him in the minivan, and got dropped off at home

12   right after that.

13   Q.  You went right back to your house?

14   A.  Yes.

15   Q.  And you went home?

16   A.  Yeah.

17   Q.  Okay.  Now, I would like to take you to that part of the

18   trip where you were driving and the cell phone first started to

19   go off, okay.  There is an allegation that you pulled out a

20   knife, with a black handle, at or about that point.  At or

21   about that moment, are you familiar with that?  Are you not?

22   A.  Yes, I heard it.

23   Q.  All right.  Is there any truth to that, whatsoever?

24   A.  I had no knife.  Exactly what I said, is exactly what just

25   happened.

E4t0mcc3                          "McCaffrey"

1    Q.  Okay.  Now, when you were first contacted by the police,

2    the police asked you to come into the precinct, did they not?

3    A.  Yes.

4    Q.  Now, did they ask you to come into the precinct to do what

5    they call surrender?

6    A.  He -- he said on the phone it had something to do with

7    robbery of a cell phone, so.

8    Q.  You went to the precinct in response to that detective's

9    call.

10   A.  Yes.

11   Q.  That he would like to see you; correct?

12   A.  Yes.

13   Q.  How much time elapsed between the time the defendant called

14   you, and the time you walked into the police precinct?

15   A.  I left immediately from work.

16   Q.  And hour half hour?

17   A.  Half hour.

18   Q.  Okay.  And you got to the precinct?

19   A.  Yes.  I was with my wife.

20   Q.  Okay.  Now, what happened to you, if anything, inside the

21   precinct?

22   A.  I don't understand.

23   Q.  Well, did they put you in a holding pen, did they try to

24   talk to you, did they try to get a statement?

25   A.  They took me to a room, started asking me questions.  I

E4t0mcc3                          "McCaffrey"

1    asked -- I answered the questions to the best that I could.

2    And then the officer started telling me that I was -- did

3    something different.  And at that point I was -- I am arguing

4    with them about what I did that night, and what happened that

5    night, for real.  I told the gentleman if he doesn't believe

6    me, that I could do anything to prove it to him.  I would even

7    take a lie detector test.  Unfortunately, I didn't.

8    Q.  Again, there was nothing to the story about the knife?

9    A.  No.

10   Q.  You did not have a knife?

11   A.  No.

12   Q.  All right.  Now, you say that you work -- that you work

13   interiors.  You do interior decorating, or interior

14   contracting?

15   A.  Renovation.

16   Q.  Renovation?

17   A.  Yes.

18   Q.  Carpentry?

19   A.  Yes.

20   Q.  All of that.  You do all of that.  And could it be possible

21   that you might have had a knife or some other sharp object for

22   purposes of cutting wood and things like that?

23   A.  I just left the club with metal detectors, no.

24   Q.  No, okay.  And it's not your policy to carry anything with

25   you that -- when you are not working, when you are off duty so

E4t0mcc3                              "McCaffrey"

1    to speak?

2    A.  Of course not.

3    Q.  So now, give me, again, your movements from the time it is

4    alleged that you took the knife out -- even though you said you

5    didn't take it out.  Tell me, from that point, what happened

6    next.

7    A.  To what I understood, when this was going on, the alleged

8    moment was after I left the parking lot.

9    Q.  Right.

10   A.  After we left the parking lot, we headed towards the

11   after-hours.  When the after-hours was closed, we headed

12   towards Raymond's house.

13   Q.  Right.

14   A.  There was never a knife taken out.  We got -- we went

15   across 207th Street, got on the highway immediately.  Couldn't

16   have been more than 15 minutes to get to where Raymond lives.

17   Q.  Approximately what time is this now, roughly, do you arrive

18   at Raymond's house?

19   A.  Yeah, maybe 5:20, 5:30, I'm not checking my watch at this

20   time.

21   Q.  All right, I understand.  And from there, you go home?

22   A.  After we went back to the parking lot, dropped the girl

23   off, I got into the argument with the gentleman.  I left

24   immediately, went right home.  Sometime maybe after six, early.

25   Q.  And that was it?

E4t0mcc3                    "McCaffrey"

1    A.  Yes.

2    Q.  Okay.  Now, so that we're clear, did you ever stalk or

3    attack or rape anyone?

4    A.  Never.

5    Q.  I'm not just asking about this case.

6    A.  Never.

7    Q.  Ever do anything like that, in your entire life?

8    A.  No.

9    Q.  And was that the absolute truth before this jury?

10   A.  Absolutely.

11           MR. VENEZIANO:  I have no further questions."

12           MR. GARBER:  That's the direct.  Cross picks up on

13   541.

14           MR. COHEN:  I have it.

15           MR. GARBER:  Line 17.  And this would be cross.  I'm

16   Shanda Strain now, the prosecutor, cross-examining William

17   McCaffrey.

18           (Mr. Garber and Mr. Cohen reading)

19   BY MS. STRAIN:

20   "Q.  Good afternoon, Mr. McCaffrey.

21   A.  Good afternoon.

22   Q.  Okay.  On September 18, 2005, after September 17, going

23   into September 18, you were at X Bar with Raymond, right?

24   A.  Yes.

25   Q.  Who else was with you.

E4t0mcc3                         "McCaffrey"

1    A.   Jay and Carlos.

2    Q.   And that was the first time you -- and was that, and that

3    was the first time you met Jay and Carlos.

4    A.   Yes, I met Carlos one time earlier, maybe.

5    Q.   And that that's Kuba?

6    A.   Kuba.

7    Q.   Kupa?

8    A.   Yeah.

9    Q.   It's now Kupa?

10   A.   That's what it was.  It's always been Kupa.

11   Q.   Carlos Kupa Vargas; is that his name?

12   A.   Carlos Vargas.

13   Q.   And you were at X Bar.  You arrived there about 10:00 p.m.

14   Right?

15   A.   Yes.

16   Q.   You, yourself, were drinking alcohol; right?

17   A.   Two or three drinks.  I drank two earlier, one towards the

18   end.  It didn't agree with me.

19   Q.   You had two or three drinks that night?

20   A.   Yes.

21   Q.   From 10:00 a.m. to 4:00 p.m. you had three drinks?

22   A.   Yes.

23   Q.   You remember that night, right?

24   A.   Yes.

25   Q.   You were able to recall things that happened that night,

E4t0mcc3                        "McCaffrey"

1    right?

2    A.  Yes.

3    Q.  Even though you were out drinking that night, right?

4    A.  Yes.

5    Q.  And you are able to remember people that you met; right?

6    A.  Yes.

7    Q.  People that you saw; right?

8    A.  Yes.

9    Q.  Things that you did --

10   A.  Yes.

11   Q.  -- right?

12          And you remember the female that you met at 4:30 in

13   the morning, right?

14   A.  Yes.

15   Q.  Even though you had been drinking that night; right?

16   A.  Yes.

17   Q.  You remember her?  You remember her?

18   A.  Yes.

19   Q.  You remember her face?

20   A.  Yes.

21   Q.  When you got to X Bar how did you get there?

22   A.  We drove.

23   Q.  Whose car?

24   A.  We took the Mercedes Benz.

25   Q.  Who was "we" who went to the club together?

E4t0mcc3                    "McCaffrey"

1    A.  I just answered, it was Carlos --

2    Q.  Uh-huh.

3    A.  -- Jay, Raymond, and myself.

4    Q.  How did you get to the Mercedes Benz?

5    A.  In a minivan.

6    Q.  Okay.  How did you get into a minivan?

7    A.  He came and picked me up.

8    Q.  Who picked you up?

9    A.  Raymond and Carlos.

10   Q.  And Raymond and Carlos picked you up in a mini van?

11   A.  Yes.

12   Q.  In the Bronx?

13   A.  Yes.

14   Q.  They drove you back to Manhattan.

15   A.  Yes.  We switched the car from the Mercedes.

16   Q.  And you switched the cars?

17   A.  Yes.

18   Q.  And you got into the Mercedes?

19   A.  Yes.

20   Q.  And the three of you went to X Bar?

21   A.  Yes.

22   Q.  You were out having fun, right, at X Bar?

23   A.  Yes.

24   Q.  It's a popular place?

25   A.  Yes.

E4t0mcc3                         "McCaffrey"

1    Q.  It's crowded?

2    A.  Yes.

3    Q.  Lots of people?

4    A.  Yes.

5    Q.  Dance floor?

6    A.  Yes.

7    Q.  Your wife was not with you that night, was she?

8    A.  No.

9    Q.  No one had a girlfriend with them that night?

10   A.  No.

11   Q.  You were there drinking, yes?

12   A.  I had a couple of drinks.

13   Q.  Having fun.

14   A.  Yes.

15   Q.  Meeting women?

16   A.  No.

17   Q.  You didn't flirt with any women that night?

18   A.  I flirted.  I mean I didn't meet anybody.

19   Q.  So you were flirting with woman?

20   A.  You talk to another female.

21   Q.  Talking to females, right?

22   A.  Yes.

23   Q.  But you didn't get anyone's numbers that night?

24   A.  No.

25   Q.  You didn't score at the club that night?

E4t0mcc3                         "McCaffrey"

1    A.   No.

2    Q.   And you had this plan all along to go to an after-hours,

3    isn't that right?

4    A.   I'm not too sure if it came up on the way after X Bar,

5    or -- it wasn't something that was planned.  More spontaneous.

6    It just came about that's where we were going to go to the

7    after-hours.

8    Q.   It was not planned or spontaneous that you were going to

9    the after-hours?

10   A.   Yeah, it just came about that's where we were going.

11   Q.   Okay.  So there was no discussion about it?

12   A.   We talked about it, yeah, do you want to go to the

13   after-hours.

14   Q.   At what point?

15   A.   When we exited.

16   Q.   At what point did the discussion of the after-hours take

17   place?

18   A.   After X Bar.

19   Q.   After X Bar.  Not while you were at X Bar?

20   A.   It could have been during X Bar, it could have been after X

21   Bar when we talked about it.

22   Q.   So you leave X Bar with your guy friends, right?

23   A.   Yes.

24   Q.   No women?

25   A.   No.

E4t0mcc3                        "McCaffrey"

1   Q.   And you decide you want to go to after hours; isn't that

2   right?

3   A.   Yes.

4   Q.   And you decide that it would be better to go to after-hours

5   party with a female, right?

6   A.   Yeah.  Sometimes they are more amenable to let you in with

7   females when it is not just a bunch of guys.

8   Q.   You decided to go looking for females at that point in

9   time, isn't that correct?

10  A.   Not specifically.

11  Q.   You did not tell the grand jury -- do you remember

12  testifying before the grand jury?

13  A.   Yes.

14  Q.   Do you remember swearing to tell the truth.

15  A.   Yes.

16  Q.   You don't remember telling the grand jury that you were

17  looking for women to take to the after-hours, because it is

18  better to arrive with females?

19  A.   What was the question before I answered that.

20  Q.   I am asking you, did you, or did you not, remember making

21  that statement?

22  A.   Okay.

23  Q.   And here it is:

24  "Q.   Question, you didn't know them prior to this night?

25  "A.   No.  No, ma'am.

E4t0mcc3                        "McCaffrey"

1    "Q.  Question, never talked to them?

2    "A.  No.

3    "Q.  You thought you would invite them to a party with you?

4    "A.  Sounds better with females with you."

5          Do you remember being asked those questions?

6    A.  Yes.

7    Q.  Do you remember being asked those questions and giving

8    those answers --

9    A.  Yes.

10   Q.  -- those responses, okay.

11         So at the end of the evening when you leaf X Bar is it

12   fair to say it's -- is it not, that you wanted to meet a lady

13   to take to after-hours?

14   A.  No.  It came about when --

15   Q.  Can you answer my question?

16   A.  No.

17   Q.  So it was not that you were looking for a female to take to

18   this party?

19   A.  In the question that you asked me, the way it was

20   pertaining is that why did I speak to this person.

21   Q.  That's not actually the question I asked you.

22   Mr. McCaffrey.  My question to you, Mr. McCaffrey, is when you

23   were -- after, after X Bar, you were driving around, you decide

24   you want to find a female; is that or is that not true?

25   A.  No.

1    Q.  You didn't want to take a female with you to after-hours?

2    A.  No.

3    Q.  Okay.  But you do admit that you gave that testimony to the

4    grand jury?

5    A.  When we spoke to the female --

6    Q.  Yes or no, Mr. McCaffrey, did you give those answers to the

7    grand jury?

8    A.  Yes.

9    Q.  So at 4:30 in the morning, you are driving down Dyckman and

10   Broadway, right?

11   A.  Yes.

12   Q.  And you see a young woman?

13   A.  Yes.

14   Q.  She in the drivers seat of a car; right?

15   A.  Yes.

16   Q.  She's not standing outside in the street smoking, right?

17   A.  Yes.

18   Q.  Yes or no.

19   A.  No.

20   Q.  She's not standing out in the street smoking, is she, yes

21   or no?

22   A.  I can't -- no.

23   Q.  And in fact, you told the grand jury, right, that she was

24   sitting in the drivers seat of the car; isn't that right?

25   A.  She got into the drivers seat of the car.

E4t0mcc3                          "McCaffrey"

1    Q.  Did you tell the grand jury that when you saw those

2    females, one was sitting behind the driver's wheel?

3    A.  That was what I went meant, she was getting into the

4    drivers seat.

5    Q.  So, now, that's what you meant, right, now, today?

6    A.  That's what happened.

7    Q.  Okay.  Do you remember giving the grand jury -- do you

8    remember giving the following statement to members of the grand

9    jury:  You were driving up Dyckman, you were driving up Dyckman

10   going toward Broadway.  We seen two girls in the car.  One was

11   sitting in the back, and one was in front.

12          Do you remember making that statement to the grand

13   jury?

14   A.  Yes.

15   Q.  You never told the grand jury that anyone was standing

16   outside the car, did you?

17   A.  She was getting into the passenger's seat.

18   Q.  You sat there through everyone's testimony, is that

19   correct?

20   A.  Yes.

21   Q.  You heard all of the witnesses who testified?

22   A.  Yes.

23   Q.  Including your friends, right?

24   A.  Yes.

25   Q.  And you have spoken to your friends in between the time in

E4t0mcc3                    "McCaffrey"

1  which you were arrested today, isn't that right?

2  A.  Yes.

3  Q.  You met with Mr. Uribe?

4  A.  I spoke to him.

5  Q.  You met with him in person, did you not?

6  A.  A long time ago, couple of months ago, six months ago,

7  probably.

8  Q.  Six months ago.  Are you sure about that?

9  A.  I'm not sure of the exact day, but it wasn't yesterday.

10  Q.  We'll come back to that.

11          So you're driving on Dyckman with Raymond.  And who's

12  driving?

13  A.  I remember Jay driving.

14  Q.  Xxx you remember Jay drives?

15  A.  No.

16  Q.  Not Carlos?

17  A.  No.

18  Q.  So Peter Adorno was driving the Mercedes?

19  A.  I don't know them that well.  Maybe that's why, that I

20  didn't get them confused.  It's just that I don't know them

21  that well.  I knew where Raymond was sitting.

22  Q.  Where was Raymond sitting?

23  A.  In the back.

24  Q.  And where were you seated?

25  A.  In the passenger's seat.

E4t0mcc3                        "McCaffrey"

1    Q.  And you see these girls sitting in the car?

2    A.  Yes.

3    Q.  And you can tell they are drunk, right?

4    A.  Not of just looking at them.

5    Q.  Well, they are slouched up, right?

6    A.  One was leaned up against the door in the back, the other

7    one was getting into the drivers seat.

8    Q.  So she was able to walk, and one getting in the driver's

9    seat?

10   A.  She was getting in the driver's seat.

11   Q.  Do you remember telling Detective Arbuiso and the grand

12   jury that she was drunk?

13   A.  Yes.

14   Q.  And it was -- and what was it that made you think she was

15   drunk?

16   A.  It was after the fact that, after I spoke to her.

17   Q.  You knew she was drunk, right?

18   A.  Yes, she had been drinking.

19   Q.  But she was able to walk on her own, right?

20   A.  From what I seen her walk, yes.

21   Q.  And she was able to talk to you guys?

22   A.  Yes.

23   Q.  And have conversations with you guys?

24   A.  Yes."

25            THE COURT:  Mr. Garber, can you keep your voice up.

1    You're trailing off at the end, and I'm having trouble hearing

2    you.  And I'm not sure if the jury is.

3            MR. GARBER:  Sorry, okay.  I'll start back at the top

4    of page 558.

5    "Q.  But she was able to walk on her own, right?

6    A.  From what I seen her walk, yes.

7    Q.  Yes.  And she was able the talk to you guys?

8    A.  Yes.

9    Q.  And have conversations with you guys?

10   A.  Yes.

11   Q.  And she was not hysterical at that point in time?

12   A.  No.

13   Q.  She was not crying?

14   A.  No.

15   Q.  She didn't have any injuries to her?

16   A.  No.

17   Q.  Her clothes were intact?

18   A.  Yes.

19   Q.  Her hair was not a mess?

20   A.  Yes.

21   Q.  Right?

22   A.  Yes.

23   Q.  Who was having the after-hours party?

24   A.  It is a place where it has after-hours.

25   Q.  And where is it?

E4t0mcc3                        "McCaffrey"

1    A.  On 204th.

2    Q.  Okay.  What do you -- what do you call that area of

3    Manhattan?

4    A.  Dyckman, Inwood.

5    Q.  Okay.  That's now downtown?

6    A.  No.

7    Q.  That's not downtown Bronx?

8    A.  No.

9    Q.  That's not the South Bronx?

10   A.  No.

11   Q.  Not downtown Manhattan.

12   A.  No.

13   Q.  You would never refer to it like that, right?

14   A.  No.

15   Q.  Okay.  And on route to this after-hours, you see the two

16   girls, right?

17   A.  Yes.

18   Q.  Before you jump out of the car, what do you say about the

19   two girls.  You see them, what happens, tell us what happens.

20   A.  Start a conversation with them.

21   Q.  No.  No, in the car with your friends, what do you say?

22   The car is driving.  Did you say anything to your friends at

23   that point.

24   A.  I opened the window and started talking to the girl.

25   Q.  I opened the window and started talking to them?

E4t0mcc3                         "McCaffrey"

1    A.   Yes.

2    Q.   And you didn't get out of the car?

3    A.   After I started talking, to get out of the car.

4    Q.   Which girl were you talking to the most?

5    A.   The girl that was in the front.

6    Q.   And the girl in the back, were you talking to her, too,

7    about the after-hours?

8    A.   No.

9    Q.   But she agreed to go with you to the after-hours,

10   initially.

11   A.   No.

12   Q.   She road for two blocks and then jumped out?

13   A.   She road right around the corner.

14   Q.   And then jumped out?

15   A.   She exited.  She got out the car.

16   Q.   But she never agreed to go with you?

17   A.   As I'm speaking to the girl, I'm assuming she is listening.

18   Q.   Okay.  But she, the girl in the back seat, never agreed to

19   go with you, did she?

20   A.   No.

21   Q.   Just like the original girl did not agree to go with you?

22   A.   She agreed, the original girl.

23   Q.   Did you communicate with your boys that you might have

24   found some girls to take to the party with you, now you have

25   your females?

E4t0mcc3                        "McCaffrey"

1    A.   No.

2    Q.   Those females you were looking for to take to the party?

3    A.   We were not looking for females.

4    Q.   Even though it is easier to go to a party with females, did

5    you tell them, your guys, your friends, that you had found

6    them?

7    A.   No.

8    Q.   Okay.  Well, you get out of the car, right.  You get out of

9    the Mercedes?

10   A.   Yes.

11   Q.   Your friend's --

12   A.   It's not my Mercedes.

13   Q.   Your friend's Mercedes?

14   A.   Yes.

15   Q.   You go talk to these girls?

16   A.   Yes.

17   Q.   Your friends are not honking at you, right, they are not

18   honking at you?

19   A.   No.

20   Q.   They are not saying, hey, Wil, come on, let's go, what are

21   you doing, do they?

22   A.   No.

23   Q.   They don't say leave these girls alone, we have a party to

24   go to, do they?

25   A.   No.

E4t0mcc3                          "McCaffrey"

1   Q.  They, in fact, drive, am I right?

2   A.  Yes.

3   Q.  You have no conversation with your friends once you see

4   that car with the girls?

5   A.  I don't remember.  I mean, what conversation.  Meaning?

6   Q.  No one told you that you had to go to the party, right,

7   your friends?

8   A.  Not that I remember.

9   Q.  They didn't rush you along?

10  A.  No.

11  Q.  They didn't say, let's go, you have a wife, we can meet

12  girls later?

13  A.  No.

14  Q.  In fact, they didn't do any of those things, because you

15  had discussed your plan before you got out of the car, isn't

16  that correct?

17  A.  No.

18  Q.  And your plan was to find a drunk girl that you could dupe

19  into coming with you, isn't that true?

20  A.  No.

21  Q.  Your plan was to find someone who might not be able to fend

22  you off, isn't that correct?

23  A.  No.

24  Q.  They knew what you were doing.  That's why they didn't

25  honk.  And at that point where you see the girl, you noticed

E4t0mcc3                           "McCaffrey"

1   she is pretty, right?

2   A.  Yes.

3   Q.  She is an attractive girl?

4   A.  Yes.

5   Q.  So you get into the car, right, her car?

6   A.  Yes.

7   Q.  And you have a conversation about riding with her to the

8   after-hours, because there is not room in your car?

9   A.  I introduced myself first.

10  Q.  Right.  But the reason you got in, as you have just told

11  us, was because there was not room in your car, right?

12  A.  Yeah.  And I assumed she was going to follow the Mercedes.

13  Q.  And that was your friends's understanding, too, as far as

14  you knew?

15  A.  I didn't even think we had think, at any time, discussed

16  it.

17  Q.  You thought all of you would -- would take the two cars and

18  head to the after-hours, right.  That's why you asked if you

19  could ride along with her, right?

20  A.  Yes.

21  Q.  Okay.  Did you tell her where the after-hours was?

22  A.  No.

23  Q.  Did you tell her how far away it was?

24  A.  She didn't ask.

25  Q.  And you didn't tell her who was going?

E4t0mcc3                          "McCaffrey"

1   A.  The people that is in the car.

2   Q.  You told her that?

3   A.  I mean it's -- you could assume.

4   Q.  But did you tell her that?

5   A.  No.

6   Q.  Did you tell her when she would get back?

7   A.  No.

8   Q.  Did you tell her how long you would be at the after-hours

9   party?

10  A.  No.

11  Q.  Did you tell her that her friends were invited?

12  A.  Her friend is in the car.

13  Q.  Do you know that she had friends inside a restaurant?

14  A.  No.

15  Q.  And this is approximately, what time, 4:45 in the morning?

16  A.  Yes.

17  Q.  So --

18  A.  Little bit later, maybe a little bit later.

19  Q.  Sometime between 4:45, 5:00 in the morning?

20  A.  Yeah.  I'm not checking my watch.

21  Q.  You know, it is around this time of day.

22  A.  Yes.

23  Q.  Because that's when the clubs are closing, and you're going

24  to after-hours, right?

25  A.  Yes.

E4t0mcc3                        "McCaffrey"

1    Q.   Okay.  And you mentioned that you have a cell phone that

2    you were using that night; right?

3    A.   Right.

4    Q.   And on -- and one of the reasons that you were using that

5    cell phone was to find out where the after-hours was, is that

6    not true?

7    A.   I was talking to somebody that was already in the different

8    club.

9    Q.   Now is it a different club?

10   A.   He was in a different after-hours.

11   Q.   A different.  Where was the after-hours?

12   A.   Where was that after-hours?

13   Q.   Where was that after-hours?

14   A.   Downtown, midtown; somewhere in Manhattan.

15   Q.   Downtown.  You were talking on your cell phone to that

16   person?

17   A.   Yes.

18   Q.   And you actually communicate?

19   A.   It was later in the car.

20   Q.   Right.  But it's approximately --

21   A.   This was not when I was in the vehicle with the young lady,

22   no.  This is later on, after we're in the minivan.

23   Q.   Is the woman with you, initially in the car, in the

24   minivan?

25   A.   Yes.

E4t0mcc3                         "McCaffrey"

1    Q.   And your friends are still with you?

2    A.   Yes.

3    Q.   And you're talking on your cell phone, isn't that right?

4    A.   Yes.

5    Q.   And how much time had passed between you picking up at

6    approximately -- picking her up at approximately 4:45 a.m.   And

7    you making this phone call about the after-hours?

8    A.   I was on my Nextel, however long it took to switch cars and

9    pull out.

10   Q.   That was your own phone, right?

11   A.   Yes.

12   Q.   The cell phone you had at the time of this incident, and

13   the time of arrest?

14   A.   Well, I have two Nextels.

15   Q.   So you have two.

16   A.   One, that one is for work, and one for home.

17   Q.   You had one phone that night, right.

18   A.   Yes.

19   Q.   And you made phone calls throughout that night, 1:00 in the

20   morning, 2:00 in the morning; things like that?

21   A.   Yes.

22   Q.   Okay.  And isn't it true that your last phone call that

23   night was at 3:00 in the morning?

24   A.   I don't know.  How am I supposed to know, unless I call or

25   key up.

E4t0mcc3                         "McCaffrey"

1   Q.  Isn't it true that you did not use your cell phone between

2   3:00 a.m. and 6:00 a.m. that night?

3   A.  How am I supposed to --

4   Q.  Is it or is it not?

5   A.  It is the truth, I used the phone.

6   Q.  Okay.  Do you remember talking to Detective Arbuiso.

7   Right?

8   A.  Yes.

9   Q.  And you told him the truth about what happened?

10  A.  Yes.

11  Q.  You didn't tell him that her friends road with you for a

12  couple of blocks and jumped out?

13  A.  Yes, I did.

14  Q.  In fact, you didn't tell him anything about an after-hours.

15  You told him that you guys were going to take her for a ride,

16  isn't that true?

17  A.  No.

18  Q.  Do you know whose car that was that you were in, what --

19  that Honda?

20  A.  No, I assumed it was hers.

21  Q.  Okay.  There was no conversation like:  Oh, my God, you are

22  taking my car?"

23          MR. COHEN:  There was no conversation of what is

24  happening to this person's car -- Whoops, sorry.

25          MR. GARBER:  That's okay?  Let's just go back to

E4t0mcc3                        "McCaffrey"

1  line 23, page 569.

2  "Q.  There was no conversation like, oh, my God, you are taking

3  my car?

4  A.  No.

5  Q.  There was no conversation of what's happening to this

6  person's car?

7  A.  No.

8  Q.  The friend didn't express concern?

9  A.  No.

10  Q.  Her friend didn't express concern that her car was being

11  taken?

12  A.  No.  She left the car.

13  Q.  She didn't protest, she just got out of the car?

14  A.  She said she is staying there.

15  Q.  She didn't protest anything, she just got out?

16  A.  No.

17  Q.  So you and the victim are going to this party with your --

18  the victim.  She has difficulty driving, so the car is stopped.

19  And then you took over and you drive?

20  A.  She climbs over, says I can't drive.  The girl gets out the

21  car in the back.

22  Q.  And you then get into the drivers seat?

23  A.  Yes.

24  Q.  Okay.  And you drive to parking garage?

25  A.  Yes.

E4t0mcc3                        "McCaffrey"

1    Q.  And you're following the white Mercedes?

2    A.  Yes.

3    Q.  You are able to drive, right?

4    A.  Yes.

5    Q.  You are able to drive that night?

6    A.  Huh?

7    Q.  You were able to drive that night?

8    A.  Yes.

9    Q.  You were driving her car fine?

10   A.  For three blocks.

11   Q.  Right.  But at that point in which you are driving her car

12   fine, you are not answering -- you're not swerving, right?

13   A.  No.

14   Q.  You are able to drive?

15   A.  Yes.

16   Q.  Okay.  And the Mercedes is on its way, right?

17   A.  Yes.

18   Q.  And you go to the parking garage?

19   A.  Yes.

20   Q.  In between that time that you go, that you got out of the

21   Mercedes and the time in which you drove to the parking garage,

22   is the only conversation you had with Raymond the one about the

23   headlights?

24   A.  Yeah, he keyed me up, and let me know when he was in the

25   car, other than that.

E4t0mcc3                          "McCaffrey"

1    Q.  It was just about the headlights.  Was there a long

2    discussion about what you guys were doing, where you were

3    going?

4    A.  No.

5    Q.  Once you get out of Raymond's car, the only conversation

6    you had with your friends again until you meet up with them is

7    about the headlights, right?

8    A.  I don't understand.  Can you repeat the question?

9    Q.  So you get out of the white Mercedes?

10   A.  Yeah.

11   Q.  Okay.  And you get into the girl's car?

12   A.  Yes.

13   Q.  And then your friends call you, after you start driving,

14   and are saying her headlights are out, right?

15   A.  It was on the speaker, the Nextel.

16   Q.  Right.  And you don't have any other conversations with

17   them at that point?

18   A.  No.

19   Q.  Right.  You just drive to the parking garage?

20   A.  Yes.

21   Q.  Okay.  How long were you planning on staying at the

22   after-hours?

23   A.  Nothing certain.

24   Q.  You didn't have to be at work the next day, right?

25   A.  No.  But if I come too late, my wife, I get in trouble.

E4t0mcc3                        "McCaffrey"

1   Q.  Okay.  So the next day was a Sunday, right, because this

2   was a Saturday night?

3   A.  Yes.

4   Q.  You don't work on Sundays, right?

5   A.  No.  It's family day.

6   Q.  And so you were out fairly late, but --

7   A.  Yes.

8   Q.  -- but you were not in a rush to get home, right?

9   A.  Like I said, you can't stay out extremely late.  I mean

10  when she goes out, she stays out the same amount of time.

11  Q.  You're driving the girl's car, and it's just you and the

12  girl.  Where is she sitting?

13  A.  In the passenger's seat.

14  Q.  How did she get into the passenger's seat?

15  A.  She slid over.  And when I get in the car into the drivers

16  seat.

17  Q.  Okay.  And what conversation are you having on the way to

18  the parking garage?

19  A.  We didn't really have a conversation.  It's two, three

20  traffic lights.

21  Q.  You were sitting, in silence, in the car?

22  A.  I don't recall exactly.  Maybe general conversation.

23  Q.  You didn't discuss the after-hours, or where it was?

24  A.  No.

25  Q.  You didn't discuss any of the timing or anything like that?

1    A.  No.

2    Q.  Didn't discuss how you would get back, right?

3    A.  No.

4    Q.  So you drive to the Bronx and decide to drop Raymond and

5    Jay off?

6    A.  We drove to the parking lot.

7    Q.  Okay, I'm sorry.  You leave the parking lot.  You all get

8    into the minivan, which you just testified on direct that you

9    believe it is red?

10   A.  Red or white.

11   Q.  Now it's red and white.  Now, do you remember testifying in

12   the grand jury?

13   A.  Yes.

14   Q.  And you were -- and you were under oath then, right?

15   A.  Yes.

16   Q.  And that was much closer to time than you are today, right?

17   A.  I mean I was still upset.

18   Q.  You were still upset.  Do you remember telling the members

19   of the grand jury that it was actually a white car?

20   A.  Probably.  But it was white and red.

21   Q.  So, today, is it white and red, though, right?

22   A.  To my knowledge.

23   Q.  Okay.  So you go, and the after-hours is closed, right.

24   You are all in this van.  The after-hours is closed, not open.

25   Right?  The after-hours is closed, it's not open.

E4t0mcc3                    "McCaffrey"

1    A.   Yes.

2    Q.   The after-hours, when you arrive, was no longer open?

3    A.   We passed by the after-hours.  Yes, it was closed.

4    Q.   Okay.  And then it gets decided that you are going to take

5    Raymond and Jay home, right?

6    A.   I don't know exactly where we're gong until we go over the

7    bridge.  Like I said, I assumed that is where we were going.

8    That it's more likely, yeah, we were bringing Raymond and Jay

9    home.

10   Q.   And you don't tell the girl where you are going?

11   A.   I'm not too sure if somebody in the car told her.  She

12   didn't ask me directly.  We were all talking amongst ourselves.

13   The radio was on and off, the Nextel.

14   Q.   You didn't tell her that you were going to the Bronx,

15   though, right?

16   A.   I'm not too sure.

17   Q.   At any point in the night, did you tell her you were going

18   to the Bronx?

19   A.   Somebody had to tell her.

20   Q.   Did you?

21   A.   No.

22   Q.   At any point in the night, did you tell her you were going

23   to Raymond's house?

24   A.   I'm not too sure.

25   Q.   And it is at that time, then, that you are calling people

E4t0mcc3                          "McCaffrey"

1   to go to another after-hours somewhere downtown?

2   A.   I'm calling someone in another after-hours.

3   Q.   Right.   Which is downtown Manhattan.

4   A.   Where they are at, that is where I was saying it was at.

5   Q.   You assumed it was downtown Manhattan?

6   A.   Yeah, because I was having a conversation with somebody.

7   Q.   And you were driving on the Pelham Parkway to drop off

8   Raymond, right?

9   A.   Yes.

10  Q.   And that's in the Bronx?

11  A.   Yes.

12  Q.   And that's nowhere downtown.   And that's -- that's nowhere

13  downtown Manhattan, Pelham Parkway, right?

14  A.   Of course not.   That was my personal conversation on the

15  phone.

16  Q.   On the cell phone?

17  A.   Everybody wasn't listening to downtown Manhattan.

18  Q.   That's what you were doing?

19  A.   I was talking to somebody that was downtown.

20  Q.   And you were planning on going to the after-hours, to that

21  after-hours downtown?

22  A.   No, I was speaking to somebody that was in an after-hours

23  downtown.

24  Q.   And she was not coming on to anyone in the car?

25  A.   No.

E4t0mcc3                         "McCaffrey"

 1  Q.  She was not coming on to you?

 2  A.  No.

 3  Q.  And she was not coming on to any of your friends, that you

 4  could see?

 5  A.  No.

 6  Q.  I mean she was talking --

 7  A.  I mean she was talking to people.

 8  Q.  And approximately how long into the ride, would you say it

 9  was, before she became what you described as hysterical?

10  A.  After we dropped off Raymond and Jay.

11  Q.  And how long does it take, or did it take, for you to get

12  there to drop Raymond off, and Jay?

13  A.  Twenty minutes, 15 minutes.

14  Q.  Do you remember, page 64, line 6:  Raymond and Jay.

15  A.  Yeah.

16  Q.  Where did you get out?

17  A.  Where did they get out.

18  Q.  Where did they get out?

19  A.  Raymond, they live like a block away from each other.  It's

20  not even literally a block.  It is not a traffic light or

21  nothing.  Raymond got off in front of his building.  And I

22  learned later on that that was Jay's building.  I was assuming

23  he is going to stay.  Jay lives like next door to Raymond.

24  Q.  Okay when you pulled up in Pelham Bay Parkway?

25  A.  Yes.

1    Q.   Who let out of the car first?

2    A.   Raymond.

3    Q.   Then what did Jay do?

4    A.   We pulled up in a half block, next building he got out of

5    the car.

6    Q.   Do you remember, page 78 of the grand jury minutes,

7    starting with line 15, giving the following answers to the

8    following questions:

9    "Q.   How many minutes have you been in the car when you dropped

10   off Raymond?

11   "A.   From the parking lot?

12   "Q.   Yes.

13   "A.   Fifteen or 20 minutes.

14   "Q.   And then you dropped off somebody else?

15   "A.   No, we just dropped off Jay and Raymond.

16   "Q.   Dropped him off at the same place?

17   "A.   Yes, ma'am."

18   Q.   Do you remember being asked those questions, do you

19   remember being asked those questions and giving those answers?

20   A.   Yes.

21   Q.   You did not tell the grand jury --

22   A.   They live next door.

23   Q.   Okay.  You are not listening to my question.

24        Mr. McCaffrey, did you tell the grand jury that you

25   drove further up the street to drop off Jay; yes or no?

1   A.  Next door.  No, it was not up the street.

2   Q.  And, in fact, you told the grand jury that no one touched

3   her that night, is that correct?

4   A.  Yes.

5   Q.  No one touched her at all?

6   A.  No one touched her.

7   Q.  Whose minivan was this that you were in?

8   A.  Carlos.

9   Q.  But Jay was driving?

10  A.  Yes.

11  Q.  And then they got to the street.  And then you stated to

12  the grand jury, if you recall:  Everyone got out of the car.

13           Do you remember making that statement?

14  A.  Got out of the car, yeah.

15  Q.  We pull up to Raymond's house and everyone gets out of the

16  car.  Do you remember that?

17  A.  Everyone was staying there to get out of the car.

18  Q.  And it's at that time that her phone starts ringing, right?

19  A.  Right after they got dropped off.

20  Q.  And she becomes hysterical, right?

21  A.  About five minutes after you dropped them off.

22  Q.  Starts crying?

23  A.  She starts off normal, then she's getting into an argument

24  with whoever is on the phone.

25  Q.  And you have no idea why, right?

E4t0mcc3                         "McCaffrey"

```
 1   A.  She said --

 2   Q.  You have no idea why.

 3   A.  She said freak the car, F the car."

 4          MR. GARBER:  Okay.  Instruction by the Court:  "State

 5   exactly what was said.

 6   A.  Oh, fuck the car.

 7   Q.  Did you tell the grand jury that, Mr. McCaffrey?

 8   A.  I told that they were arguing with on the phone, and that

 9   she was screaming and yelling.

10   Q.  Did you tell the grand jury that she made a statement, fuck

11   the car?

12   A.  No.

13   Q.  Okay.

14   A.  I don't remember if I did or not.

15   Q.  That's all I'm asking you.  And you then drive --

16   A.  I mean --

17   Q.  And then you drive.  And then you should drive her back?

18   A.  We get on the highway and proceed to come back to the

19   parking lot.

20          (Continued on next page)

21

22

23

24

25
```

1    Q.  So the first phone call is approximately what, 5:30 in the

2    morning then?

3    A.  I'm not checking my watch.

4    Q.  OK. you --

5         But you say you pick her up at 4:45 to 5, right?

6    A.  Yes, figure the time to get to --

7    Q.  Drive, park the car?

8    A.  Get on the -- get to Pelham Parkway.

9    Q.  Now we're at 5:30, approximately?

10   A.  Yeah.

11   Q.  And is it a 10-minute ride back?

12   A.  Approximately, I don't live there, so...

13   Q.  You drop her off in the garage?

14   A.  Yeah, when we got back.  They would know better than I do.

15   Q.  And you leave her there, right?

16   A.  Well, not exactly just leave here there.

17   Q.  You didn't stick around, right?

18   A.  It was either stick around --

19   Q.  Sir, please listen to my question.

20        What did you do when you got to the garage?

21   A.  I exited the minivan.  She got her car and I stood there

22   for a minute.  I was speaking to -- I spoke to her, I spoke to

23   the parking attendant.

24   Q.  And you didn't stay there, right, in the garage?

25   A.  No.

E4TUMCC4                    "William McCaffrey"

1   Q.  You left?

2   A.  I didn't want to get into a fight.

3   Q.  You left?

4   A.  Yes.

5   Q.  You got back into the minivan with Carlos and he took you

6   home?

7   A.  Yes.

8   Q.  Is that right?

9   A.  Yeah.

10  Q.  You sure about that?

11  A.  Yeah.

12  Q.  You didn't say call Seimen's Cab Company at 6:06 a.m.?

13  A.  No.

14  Q.  You did not?

15  A.  No.

16  Q.  You had a cell phone with you that night, right?

17  A.  Yes.

18  Q.  You had a cell phone when you were arrested, right?

19  A.  Yes.

20  Q.  And that cell phone number is 347-321-1060, is that not

21  correct?

22  A.  Yes.

23  Q.  So you're telling this jury that you did not call a cab at

24  6:06 in the morning and request a cab to pick you up?

25  A.  I got dropped off by car.

E4TUMCC4                    "William McCaffrey"

1              No.

2              I don't recall making a call.

3    Q.  You were here when Ramon Uribe testified, right?

4    A.  Yes.

5    Q.  You heard him say that she actually asked to be taken back

6    before he was dropped off, right?

7    A.  Yeah, a couple of minutes right before we pull up in front

8    of his house.

9    Q.  You heard her say that, right?

10   A.  She told Carlos and Carlos told me.

11   Q.  But you heard her saying she wanted to go back?

12   A.  She needs to go back to her car.

13   Q.  That was before any phone calls, right, according to you?

14   A.  She made the phone call or she received a phone call -- I

15   think she made the phone call.

16   Q.  You just testified that she got phone calls --

17   A.  Yeah, she called someone.

18   Q.  OK.

19              But at the time in which she asks for you to take her

20   back, Raymond is still in the car, right?

21   A.  Yes.

22   Q.  OK.  And --

23   A.  She doesn't ask --

24   Q.  She is not hysterical at that point, right?

25   A.  No.

1    Q.  She's not crying?

2    A.  No.

3    Q.  And she asks for you guys to take her back?

4    A.  She said she has to go back to her car.

5    Q.  And you guys don't take her back at that point in time?

6    A.  We were a couple of blocks from where Raymond lives.  We

7    dropped him off --

8    Q.  You continued driving?

9    A.  He was a couple of blocks away?

10   Q.  So you continue driving, right?  After she's asked to be

11   taken back?

12   A.  She said she has to go back to her car.

13   Q.  OK.

14          And you guys proceed to drive the few blocks, right?

15   A.  Yes.

16   Q.  And then she becomes hysterical?

17   A.  No.

18   Q.  After getting the phone calls?

19   A.  Yeah, we dropped them off, and then we went to turn around

20   to get back on the highway, she received a phone call.

21   Q.  Did you see if Raymond was on the phone at all that night?

22   A.  I don't recall.

23   Q.  So you and Carlos bring her back to the garage?

24   A.  Yes, ma'am.

25   Q.  On the way back she is not banging herself into the

E4TUMCC4                    "William McCaffrey"

1   windows, right?

2   A.   She's actually punching the car seat.  I mean after a

3   couple of phone calls.

4   Q.   She's punching the seat?

5   A.   I mean punching the seat and screaming into the phone.

6   Q.   She's punching the car but she's not pushing herself --

7   A.   Of course not.

8   Q.   She's not fighting with herself?

9   A.   No.

10  Q.   She's not breaking off her clothes, right?

11  A.   No.

12  Q.   You drop her off at 6 a.m. and leave, right?

13  A.   I don't know the exact time but close to it.

14  Q.   You had spoken to Ramon the next day, or Raymond?  Sorry, I

15  keep calling him Ramon.  You spoke to Raymond the next day?

16  A.   Yes.

17  Q.   And you guys spoke, you're friends?

18  A.   Of course.

19  Q.   And, o, you spoke before you were arrested, right?

20  A.   Yeah.

21  Q.   And, in fact, you knew that he was going in to speak with a

22  detective before you went, right?

23  A.   He called me and said somebody had taken his car.

24  Q.   And he told you he was going to speak with a detectives,

25  right?

1    A.  Yes.

2    Q.  And you knew that before you went?

3    A.  Yes.

4    Q.  And you and Raymond spoke before he went and spoke to the

5    police?

6    A.  He told me that he has to go to speak to a detective about

7    his car.

8    Q.  How many times have you been in that parking garage before?

9    A.  Never.

10   Q.  You've never been in that parking garage other than that

11   night?

12   A.  No.

13   Q.  When she's crying hysterical and beating the seats, what

14   are you doing?

15   A.  I'm sitting in the front seat listening.

16   Q.  Trying to calm her done?

17   A.  Trying to tell Carlos to hurry up go back to the parking

18   lot.

19   Q.  Do you try talking to her?

20   A.  She's on the phone on and off --

21   Q.  You don't talk to her?

22   A.  -- cursing in Spanish.

23   Q.  You don't try to calm her down?

24   A.  I told her to relax, we'll be there in 15 minutes the most.

25   Q.  You said that the detectives told you that it was about a

1   missing cell phone when he called you, right?

2   A.  Yeah, robbery of a cell phone.

3   Q.  And you came in and talked about that, right?

4   A.  No problem.

5   Q.  So he told you to come in because you knew that one of the

6   girls was missing a cell phone that night?

7   A.  I cam in because a police officer called my phone and told

8   me to come to the precinct.

9   Q.  And because the police officer wanted to ask you questions,

10  you wanted to tell them -- you wanted the police to believe

11  that you were being a hundred percent cooperative?

12  A.  A police officer called my phone, I was worried, I went to

13  the precinct.

14  Q.  You didn't ask:  What phone, right?

15  A.  He just said it was a over a robbery over a phone.  He

16  said:  How fast can you get down here.  I said:  I'll leave

17  work right now.

18  Q.  You drop everything and leave work?

19  A.  I was in the middle of work.  Actually my wife just brought

20  me lunch.

21  Q.  And you didn't ask:  What phone, what are you talking

22  about?

23          You didn't say:  I'll be there, I'll be done with work

24  in a couple of hours, I'll come down there then?

25  A.  I asked him:  How quick do you want me to come down.  He

1    said:  Right now would be better.

2    Q.  You didn't say:  I don't know what you're talking about?

3    A.  Not until I got down there.

4    Q.  So it's your testimony that when you left Ms. Peguero that

5    night -- what was she wearing that night, do you remember?

6    A.  Jeans and a halter top.

7    Q.  Could you see her arms?

8    A.  Yes.

9    Q.  She wasn't wearing sleeves, right?

10   A.  No.

11   Q.  And you could see her neck and her shoulders?

12   A.  Yes.

13   Q.  I'm going to ask you to take a look at People's 19.

14            That is the girl that got into the car, right?

15   A.  Yes.

16   Q.  And it's your testimony here today that when you got out of

17   the van and left the garage, she didn't have any of those

18   injuries?

19   A.  None.

20            I have no further questions."

21            MR. GARBER:  We have one more and then I think that we

22   are pretty much done with the trial.

23            This is page 604 and it starts on line 16, do you have

24   that?

25            MR. COHEN:  No, I don't -- just a moment, sorry.

1            MR. GARBER:  Good to go?

2            MR. COHEN:  604.

3            MR. GARBER:  This is now the prosecutor's rebuttal

4    case at the trial and this is Shandra Strain, prosecutor,

5    questioning Detective Diaz and this is the direct examination.

6            (Mr. Garber and Mr. Cohen reading)

7    "Q  Detective, do you speak Spanish?

8    A.  Yes, I do.

9    Q.  Are you fluent in Spanish?

10   A.  Yes.

11   Q.  Detective, I'd like to direct your attention to September

12   19 of 2005, the day following the incident in this case.

13            Were you working on that date?

14   A.  Yes.

15   Q.  Did there come a time when you and the lead detective in

16   this case, Detective Arbuiso, went to the parking garage in

17   question here in the vicinity of 216th Street and 10th Avenue?

18   A.  Yes.

19   Q.  And did you at that time interview anyone at the parking

20   garage?

21   A.  Yes, I did.

22   Q.  How many individuals did you interview?

23   A.  Two.

24   Q.  Who were those individuals?

25   A.  Mr. Delacruz and Mr. Rodriguez.

E4TUMCC4                        "David Diaz"

1   Q.  What were their jobs there?

2   A.  They were parking attendants.

3   Q.  And do you know which one worked which shift?

4   A.  Mr. Delacruz works the evening shift, from 6:00 p.m. to

5   6:00 a.m., and Mr. Rodriguez works from 6:00 a.m. to 6:00 p.m.

6   Q.  And did you speak with him in English or Spanish?

7   A.  In Spanish.

8   Q.  Since your interview of Mr. Delacruz, have you seen him

9   since September 19, 2005?

10  A.  Yes.

11  Q.  When was that?

12  A.  Yesterday.

13  Q.  And where was that?

14  A.  Here in court.

15  Q.  And is that the same man that you interviewed one year ago?

16  A.  Yes.

17  Q.  Detective, what did happen when you went to the garage last

18  September 2005 and spoke with both of those attendants?

19  A.  At first we walked in and it seemed like there was some

20  customers bringing in some vehicles, so we stood there until

21  everything cleared up because we wanted to speak with them

22  individually.

23       Mr. Delacruz recognized us by our attire as well

24  shield.  As we approached them, he says:  Are you guys here for

25  the girl that was crying the other day hysterically?  And we

 1   nodded yes.

 2   Q.  And what did he tell you then?

 3   A.  He told us that on the day of the incident, there was a

 4   girl there crying hysterically, no one was able to make any

 5   sense our of her but she was seen with several individuals in a

 6   white minivan.

 7   Q.  OK.

 8          And he told you that the minivan was white?

 9   A.  Yes.

10   Q.  Did he ever mention anything about a red vehicle?

11   A.  No.

12   Q.  Did you ask him what I had observed that day?

13   A.  What he observed is the victim with these males.  She was

14   there about 6:00 a.m. and her -- apparently her friends had

15   come around to the parking lot as well and they had left about

16   7:05 that morning.

17   Q.  And did he ever tell you that at any time during your

18   interview with him that her friends beat her up that night in

19   the parking garage?

20   A.  No.

21   Q.  I have no further questions."

22          MR. GARBER:  Now this is the cross-examination by Mr.

23   Veneziano, page 610.

24          (Mr. Garber and Mr. Cohen reading)

25   "Q  Detective Diaz, when you spoke to those individuals -- and

 1  we're talking about Cruz and Rodriguez, correct?

 2  A.  Yes.

 3  Q.  When you spoke --

 4          Who did you speak to first, Pelagio Delacruz or

 5  Mr. Rodriguez?

 6  A.  Mr. Delacruz.

 7  Q.  Did now, you speak to them together?

 8  A.  No, separate.

 9  Q.  You purposely separated them?

10  A.  Well, they were working.  As they were parking vehicles, so

11  we started the conversation with Mr. Delacruz.

12  Q.  OK?

13  A.  Mr. Rodriguez was attending to other vehicles.

14  Q.  OK.

15          Now, at that point, the investigation had just begun,

16  the case had just begun, correct?

17  A.  Yes.

18  Q.  And the case had begun the day before, right?

19  A.  Yes.

20  Q.  Who, if anyone, ordered you to go out and take the

21  statements of these two individuals?

22  A.  That was the lead detective.

23  Q.  Detective Arbuiso?

24  A.  Yes.

25  Q.  Ordered you to go out.

1         Were you with him when he was ordered --

2    A.  He wasn't ordered.  We work on --

3         We were on the same team.  So at the moment I was the

4    only Spanish-speaking person available.

5    Q.  So you went out?

6    A.  Yes.

7    Q.  Now, in your conversations, besides taking the statement,

8    you had conversations with Pelagio Cruz, did you not?  You

9    spoke to Mr. --

10   A.  Mr. Delacruz?

11   Q.  Correct?

12   A.  Correct.

13   Q.  Pelagio Delacruz.

14   A.  Yes.

15   Q.  OK.

16        And when you spoke to Mr. Delacruz, did you take

17   everything that you said with Mr. Delacruz and place it in this

18   report, this DD5?

19   A.  No.  I didn't make that report.  That was Detective

20   Arbuiso's report.

21   Q.  Oh, that was Detective Arbuiso's report?

22   A.  Yes.

23   Q.  Well, it's not your report, is that right?

24   A.  That's correct.

25   Q.  It's not your report?

E4TUMCC4                        "David Diaz"

1    A.  That is correct.

2    Q.  Well, there is a signature on it.  Can you take a look?

3    Can you tell us whose signature it is?

4            Now, look at the bottom where there is a space where

5    it says signature.

6            Whose signature is that, is that yours?  Is that

7    Detective Arbuiso's?

8    A.  Detective Arbuiso's.

9    Q.  Detective Arbuiso's.

10           So it's his report?

11   A.  Yes.

12   Q.  It's not your report?

13   A.  That is correct.

14   Q.  He spoke Spanish too, correct, Detective Arbuiso?

15   A.  He does not speak Spanish.

16   Q.  He does not speak Spanish.

17           So he's speaking to Mr. Rodriguez and he's speaking to

18   Mr. Delacruz in English?

19   A.  No.

20   Q.  In Spanish?  He doesn't speak Spanish.

21           Well, who was speaking to whom?  Who was speaking to

22   whom that morning?

23   A.  That morning, Mr. Delacruz was very forthcoming in advising

24   us that --

25   Q.  Who was speaking to whom?

E4TUMCC4                          "David Diaz"

1    A.  I was speaking to Mr. Delacruz.

2    Q.  You went out to speak to Mr. Delacruz and Detective Arbuiso

3    is with you?

4    A.  Yes.

5    Q.  OK.  Now --

6            You come back to your office or to your headquarters,

7    and as a result of this visit, you generate what's called a

8    DD5, right, a report of what you did during that day with

9    regard to this case?

10   A.  That's what the lead detective did, yes.

11   Q.  Isn't that right?

12           That's what Detective Arbuiso did, correct?

13   A.  Yes.

14   Q.  Now, it was you, however, who spoke to Mr. Delacruz and who

15   spoke to Mr. Rodriguez, and it was you because you just told us

16   that, Detective.

17           Is that right?

18           You --

19           This visit that you made to that garage the very next

20   morning, the very next day generated this DD5, a report of what

21   you did on this case on that day, right?

22   A.  I don't understand your question.

23   Q.  Just define what a DD5 is for the jury.

24   A.  A DD5 is a report that's of any investigation, any steps

25   that we take during the investigation, during the course of the

1   investigation.

2   Q.  Now, both of these gentlemen, Mr. Pelagio Cruz and Mr.

3   Rodriguez, both of them spoke Spanish?

4   A.  Yes.

5   Q.  Did either one of them, to your knowledge, speak English?

6   A.  If they did speak English, I'm not aware of it.

7   Q.  OK.

8           So if they spoke Spanish, then I assume that they were

9   speaking to you?

10  A.  Yes.

11  Q.  Because you understand and speak Spanish?

12  A.  Yes.

13  Q.  Detective Arbuiso, who was with you, does not understand

14  nor does he speak Spanish?

15          Do you know?

16          You don't know?

17  A.  He does not speak Spanish.

18  Q.  But, for some reason, even though you're the one who did

19  the interview, for some reason, your name does not appear on

20  the DD5 and Detective Arbuiso's name appears on the DD5."

21          MR. GARBER:  Page 618 at the bottom.

22  Q.  If you know, why -- I will try to make it as simple and

23  straightforward as possible -- why did Detective Arbuiso sign

24  this document when you're the one that did the interviews?

25  A.  Because --

1    Q.  Why?

2    A.  Because I translated for Detective Arbuiso.

3    Q.  But the bottom line on it is that for whatever reason, you

4    being the one who spoke to the two individuals, your name --

5    your signature is not on this document, correct?

6    A.  Correct.

7    Q.  And Detective Arbuiso's signature is, correct?

8    A.  Correct.

9    Q.  Is there anything here to indicate Detective Arbuiso --

10   well, or you -- is there anything to indicate your connection

11   with this document?

12           And you're Detective Diaz, correct?

13   A.  Yes.

14   Q.  Is your name, Detective Diaz, anywhere on this document?

15   A.  Yes.

16   Q.  Where is it?

17           Is that he went with you, in other words, on the

18   bottom of the report.  He says that he went with you?

19           The Court:  Well, is your name in the report?

20           The Witness:  Yes, it is.:

21           MR. GARBER:  I believe that's the end of the cross and

22   there is a redirect by Ms. Strain, top of page 622:

23   "Q  Detective, who was with you when you went to the garage?

24   A.  Detective Arbuiso.

25   Q.  Who was the lead detective on this case?

E4TUMCC4                         "David Diaz"

1  A.  Detective Arbuiso.

2  Q.  Was Detective Arbuiso speaking to these individuals or were

3  you?

4  A.  I was speaking directly through Detective Arbuiso.

5  Q.  And what were you doing as you were speaking?

6  A.  I was translating the questions Detective Arbuiso was

7  asking me, then asking Mr. Delacruz as well as Mr. Rodriguez,

8  and then their response I translated back into English.

9  Q.  Did you tell Detective Arbuiso everything that they told

10 you?

11 A.  Yes.

12 Q.  And is that what is contained in this DD5?

13 A.  Yes.

14 Q.  Did anyone ever tell you that those girl's friends were

15 beating her up, kicking her and punching her?

16 A.  No. "

17         MR. GARBER:  There will be no further questions on

18 recross.

19 "Q  Did they ever tell you that she was hysterical?

20 A.  Yes.

21 Q.  When did they say that she was hysterical?

22 A.  The moment Mr. Delacruz saw us, he referred to the victim.

23 Q.  OK.  Now, was there ever a time when -- withdrawn.

24         Did Mr. Delacruz say that he watched the whole

25 situation so that he could not possibly have missed a fight

E4TUMCC4                          "David Diaz"

1    between the girls?

2    A.  Mr. Delacruz never mentioned anything.

3    Q.  Never mentioned that.  Did --

4          Was there an attempt to interrogate Mr. Delacruz --

5          -- to fix the time that this fight in the car between

6    the girls was supposed to have occurred?

7    A.  Mr. Delacruz never mentioned a fight.

8    Q.  So basically what it comes down to is what he said that

9    when he -- at one of the points when he saw her she was not

10   hysterical, correct?

11         Mentions not hysterical?

12         At any time when you are talking to Mr. Delacruz --

13         -- did he say at 6:00 a.m. the girl was here

14   hysterical.  She was with some guys and left in a white

15   minivan.  I don't know them.  They dropped her off here at 6:00

16   a.m.  The police came but they didn't talk with them.  I asked

17   about how the autos were logged into the lot and I was shown a

18   computer.  Other than --

19         Other than the fact that when she was in the garage

20   she was hysterical, did he say anything more on that?  Did he

21   elaborate on that?

22   A.  Not that I can recall.

23   Q.  Did he say whether she was so hysterical that she was

24   incapable of answering questions in the interview?

25   A.  She was crying immensely.  No one could make any sense of

E4TUMCC4                     "David Diaz"

1    what she's saying.

2    Q.  She was crying, is that what you said?

3    A.  Yes.

4    Q.  And nobody could make any sense of what she was saying, is

5    that what you also said?

6    A.  Yes.

7    Q.  So that's when she was hysterical, isn't that correct?

8    A.  That is correct.

9    Q.  Right.

10          And basically did you ask Mr. Delacruz specifically,

11   and straight to the point:  Did you witness her get in a car

12   and become engaged in a fight?

13   A.  No.

14   Q.  So you never --

15          You never posed that question, correct?

16   A.  No.  He provided that information to us.

17   Q.  He provided that information to you, the pronoun 'he'

18   referring to Mr. Delacruz?

19   A.  Yes.

20   Q.  He in your interview with him provided that information?

21   A.  Provided that he saw the victim in the company of some

22   males in a white van.

23   Q.  Well, he didn't just see the victim in the white van.  You

24   also said that in the white van he saw them fighting, yes?

25   A.  No.

E4TUMCC4                        "David Diaz"

1    Q.  No.  What did he say?

2    A.  All he mentioned was that he saw the victim in the company

3    of some males.  He mentioned a white van.  He mentioned that

4    there was police officers that responded, she wasn't able to

5    speak with them but at no time did she -- he ever mention there

6    was a fight.

7    Q.  At no time did she ever mention that there was a fight?

8    A.  He mentioned.

9    Q.  In other words, when you say 'he,' who's he, Mr. Delacruz?

10   A.  Mr. Delacruz.

11   Q.  So, basically what you're --

12        You're saying she was -- she was hysterical but there

13   was never a statement from Mr. Cruz saying that he saw a fight,

14   is that right?

15        I want to be accurate about it.  There was never a

16   statement from Mr. Cruz that he, Mr. Cruz, saw a fight?

17   A.  There was no such statement because he never made that

18   statement."

19        MR. GARBER:  OK.  I believe that is the end of the

20   examination.

21        THE COURT:  That's the end of the trial transcript.

22        MR. GARBER:  There might be one other brief section.

23        (Pause)

24        MR. GARBER:  Mr. Cohen, you are actually done.

25        MR. COHEN:  I am finished.

E4TUMCC4                        "David Diaz"

1             MR. GARBER:  One moment, your Honor.

2             THE COURT:  Can Mr. Cohen step down?

3             MR. GARBER:  He is done.

4             THE COURT:  Are you ready to call your first witness?

5             (Pause)

6             THE COURT:  Mr. Garber, I don't want to have a long

7      delay here, so call your witness.

8             MR. GARBER:  The defense calls -- the plaintiff calls

9      William McCaffrey.

10      WILLIAM MCCAFFREY,

11          called as a witness in his own behalf,

12       having been duly sworn, testified as follows:

13      DIRECT EXAMINATION

14      BY MR. GARBER:

15            THE COURT:  You may proceed, Mr. Garber.

16      Q.  How does it feel to sit here and rehear that trial

17      testimony?

18      A.  It was horrible.  It was like living a nightmare to hear

19      all of those things that I went through on the stand and hear

20      false testimony.  It's surreal.

21      Q.  There were lies that you were sitting here listening to

22      during the presentation yesterday and today?

23            MR. LARKIN:  Objection.

24            THE COURT:  Overruled.

25            Go ahead.

1   Q.  Tell this jury what it was like to sit through a criminal

2   trial accused of a horrific crime like rape that you did not

3   commit?

4   A.  I tried to put it in words, imagine sitting here and you

5   know that you didn't do any of these things and trying to

6   convince people that you did or trying to tell the cops that

7   you didn't do this.  And this is what really happened and

8   fighting and knowing it is just a horrible accusation and just

9   feeling like, how do I let these people know that I didn't do

10  this, that this absolutely didn't happen at all.  It is a

11  nightmare.  I can't even explain it in words.  To sit there and

12  to feel like nobody is believing you, you are telling the

13  truth.

14  Q.  What is your reaction to the word "rape"?

15  A.  You cringe.  I am raised by females.  Anybody, when you

16  hear the word "rape," even if they are innocent, even sitting

17  here right now knowing that I'm innocent, everybody knowing I

18  am innocent and still hearing the word "rape," it's terrible.

19  It is terrible.

20  Q.  How old are you?

21  A.  Currently?

22  Q.  Yes.

23  A.  37.

24  Q.  This ordeal started in 2005?

25  A.  Yes.

E4TUMCC4                         McCaffrey - direct

1    Q.  So almost nine years ago?

2    A.  Yes.

3    Q.  Where were you born?

4    A.  In the Bronx, South Bronx, technical -- North Bronx I was

5    raised in the South Bronx.

6    Q.  What hospital?

7    A.  Misericordia Hospital.  It is currently Our Lady of Mercy.

8    Q.  You need keep your voice up a little bit.  Can you get

9    closer to the microphone.

10            Are you nervous?

11   A.  Of course.

12   Q.  Describe the neighborhood that you grew up in.

13   A.  It was a tough neighborhood, around Soundview, Bronx River.

14   I played you know, amongst the projects outside, you had to be

15   a tough kid to come from there.

16   Q.  Did you have a reputation as being a tough kid?

17   A.  Somewhat in the streets, you know, I was kind of hard

18   growing up at home.  I am kind of a momma's boy.  When I was

19   outside you had to be a tough kid in a tough neighborhood.

20   Q.  You said you are a momma's boy.  Were you raised by your

21   mother?

22   A.  My grandmother, technically, but I call her mother because

23   she raised me.

24   Q.  What is your grandmother's name?

25   A.  Audrey Muncey.

E4TUMCC4                         McCaffrey - direct

1    Q.   Did you have a nickname?

2    A.   Tank.

3    Q.   Tank?

4    A.   Yes.

5    Q.   How did you get that?

6    A.   My grandmother and named it to me, I was a pudgy kid with

7    fat feet and it stuck with me.

8    Q.   So you have some girth to you, right?

9    A.   Yes.

10   Q.   So people call you Tank sometimes?

11   A.   Yes.

12   Q.   Who did you grow up with?

13   A.   My sister Sally, my aunt Rose, my uncle Freddie -- he was

14   in and out periodically -- and Sally's daughter and my niece,

15   Tiffany.

16   Q.   Is that Sally right there?

17   A.   Yeah.

18   Q.   You said sister Sally, is she actually your sister?

19   A.   It is actually kind of complicated because she was the

20   youngest of my grandmother children's, so since I was raised

21   under my grandmother as her own, I was raised with her my

22   mother.

23   Q.   What was she really?

24   A.   My aunt.

25   Q.   What about your dad?

1    A.   I don't know my biological father.  My father that I have

2    his last name raised me until I was 9.  He had to leave the

3    home.  He was actually my grandmother's boyfriend.  He was

4    around before my sister was actually born.  He raised my uncle,

5    stayed around raised me and my sister when I was 9 and moved

6    back to Long Island to take care of his grandmother -- his

7    mother was sick.

8    Q.   Where is he now?

9    A.   He passed away when I was 17.

10   Q.   So he left the house when you were 9?

11   A.   Yes.

12   Q.   He was grandmother Audrey's -- who you call your mother's

13   boyfriend?

14   A.   Yes.

15   Q.   What was his name?

16   A.   John McCaffrey.

17   Q.   So McCaffrey is not your birth name?

18   A.   I didn't have a name on my birth certificate until I was

19   17.  I took his name.

20   Q.   After he died?

21   A.   Before he died, right, he was sick.

22   Q.   So you took the name of your grandmother's boyfriend John

23   McCaffrey who you considered to be your father?

24   A.   He was my father growing up.  He was the only father I

25   know.

1   Q.  Did you live with him any period of time after you were 9.

2   A.  I moved out when I was 16 -- between 16 and 17.  He got

3   sick from complications from bypass surgery and passed away

4   when I was 17.

5   Q.  You said that you were basically raised by women and that

6   you were a momma's boy.  Can you elaborate on that?

7   A.  I was raised by my grandmother and her sister -- I wasn't

8   one that had a big brother I had to go to my big sister with

9   everything.  My aunt kind of figured, she was close in age

10  because my grandmother was working at the time --

11  Q.  Slow down?

12  A.  Social activities in the house, there was no male in the

13  home, so.

14  Q.  What would you do?

15  A.  Things they do.

16  Q.  Like what?

17  A.  Brush my sister's hair, growing up.  Watch stories with my

18  grandmother, learned how to crochet.

19  Q.  Stories?

20  A.  Soap operas.

21  Q.  What soap operas?

22  A.  Guiding Light, One Life to Live, Young and Restless.

23  Q.  But on the street you had a different persona?

24  A.  It was a rough neighborhood.

25  Q.  Now, when you were accused of a rape that you didn't

E4TUMCC4                    McCaffrey - direct

1    commit, OK, how did that affect or -- did it have any effect on

2    your relationship with Sally and Rose and Audrey?

3    A.   It is embarrassing, you know, I have to go to the female

4    that raised me and explain to them, I didn't rape somebody.  I

5    didn't do this.  And they know me, of course.  But like I said

6    before, when you hear that word "rape" you immediately cringe.

7    It is not judgment -- it is a horrible thing to try to explain

8    to your family.  I didn't do this.  You know, and it is just it

9    is crazy like, imagine I am already incarcerated at the time.

10   It is in all of the newspapers.  It is a public case.  They got

11   to answer to their peer groups, to their friends.  Between, you

12   know -- I just felt bad that you know I had to place that

13   embarrassment upon my family that I was even accused of this,

14   let alone that I have to fight, that I am innocent.

15   Q.   OK.  On the opening statement in this trial, Ms. Zgodny got

16   up there and said, well, you know, Ms. Peguero recanted and

17   said that she wasn't attacked and wasn't raped, but that was

18   it.  Do you remember that?

19   A.   Yes.

20   Q.   How did that make you feel?

21   A.   It made me feel terrible.

22            MR. LARKIN:  Objection.

23            THE COURT:  Overruled.

24            You can answer.

25   A.   They were able to take away what little bit of peace of

1    mind that I had, that she admitted that I didn't rape her, that

2    I didn't kiss her or I didn't touch her at all.  I didn't even

3    do anything to her.  And now they made it seem like 99 percent

4    of her story was true and the only part that wasn't was the

5    rape.

6              My grandmother was in the audience, my whole family is

7    there and they are making it seem like -- trial, like I was

8    actually innocent and factually I was innocent, I didn't touch

9    her.  And now my family has got to sit there and listen because

10   they want to spin the story to this fact that, you know, you

11   know, everything is true and she has a perfect recollection of

12   everything but when it came to the rape, that wasn't true.

13             But it is not fair.  It wasn't fair for me and my

14   family.  Regardless of what the situation is to sit there and

15   have to fight all of that time for her to tell the truth.  And

16   she honestly did tell the truth for them to spin that to

17   whatever way they want to -- I didn't touch this girl.  I

18   didn't rape her.  I didn't kiss her.  I didn't contribute to

19   any of this.  This was a complete lie.  I told the truth every

20   time I was asked, whether it was on the stand, grand jury,

21   questions, newspapers -- whatever it was, I told the exact same

22   thing that I said from the day because it was the truth.

23             THE COURT:  I think that we are getting a little far

24   afield from the question.

25             THE WITNESS:  Sorry.

1          THE COURT:  That's all right.

2          Next question.

3  Q.  You said that every time that you were called upon to

4  address this, you told the truth, right?

5  A.  Yes.

6  Q.  Well, there came a point where you came into, you met

7  Detective Arbuiso, right?

8  A.  Yes.

9  Q.  And you voluntarily went into the precinct, right?

10 A.  Yes.

11 Q.  And he questioned you about this case, right?

12 A.  Yes -- well, he asked me what happened the night of the

13 18th, and I explained it.

14 Q.  You told him you were innocent?

15 A.  From the beginning, I mean, after I figured I was there

16 investigated for rape, I told, obviously, I didn't take any

17 cell phone or stole a cell phone after I did tell him the

18 events of the date and I was being accused of rape and I was,

19 how could you do this to her --

20 Q.  Let's back up a second.

21         They contacted you or you were contacted by Detective

22 Arbuiso to go in to talk about a robbery of a cell phone,

23 right?

24 A.  I was doing some work in a car.  I was doing some general

25 work inside of the vehicle.  My wife bring me some lunch.  I

1    got a phone call.  I talked to the detective, he said that he

2    need to ask me some questions about a phone or a robbery of a

3    cell phone.  I told him if I could come down at the end of the

4    day, he said it is important to come down now.  I told him that

5    I would drop everything --

6    Q.  Slow down.  She has to take everything down.

7              THE COURT:  Let's ask specific questions.  We are

8    beyond the question that you asked.

9    Q.  OK.  You went into the precinct, right?

10   A.  Yes.

11   Q.  And you were told that it was about a robbery of a cell

12   phone initially, right?

13   A.  Yes.

14   Q.  That was not the truth, right?

15   A.  Yeah, it wasn't the truth.

16   Q.  So he lied to you to get you to come down, right?

17   A.  Regardless, I didn't mind going to the precinct.  I didn't

18   do nothing, but he lied to me.  He didn't say anything about

19   rape on the phone.

20   Q.  He didn't say anything about rape?

21   A.  No.

22   Q.  When you get there, there is a discussion about an alleged

23   rape?

24   A.  After I explained the events of the night, the car and

25   everything that I testified to, he said that, you know, the

1    girl got raped and she got hurt and bitten and how could you do

2    this.

3    Q.  OK.

4    A.  You are going to spend the rest of your life in jail.

5    Q.  I want you to tell this jury exactly what Detective Arbuiso

6    said to you after you told him you didn't do it.  And don't be

7    shy.  Tell them what he said.

8    A.  He said you are a piece of shit.  How the fuck could you do

9    this?  You are going to spend the rest of your fucking life in

10    jail.  Who bit her?  And after the rape, he left the room and

11    said, now you are going to sit in here and think about what you

12    did to this fucking girl.

13    Q.  How did that make you feel?

14    A.  I don't even know how to explain it.  I didn't do anything.

15    So I was afraid.  I wanted to talk to my sister.  I just didn't

16    know.  I was confused.  I thought -- I don't know what was

17    going on.  I know nothing like that happened when I was around.

18    Nothing in front of me ever happened.  I just couldn't

19    understand it.

20    Q.  What day was that?

21    A.  That was the 25th of September.

22    Q.  Of what year?

23    A.  2005.

24    Q.  After that incident or discussion with Detective Arbuiso in

25    the precinct, did you get out of jail?

1    A.   No.

2    Q.   After that when was the next time that you were out?

3    A.   Of prison?

4    Q.   Yeah.

5    A.   September 1, 2009.

6    Q.   So you stayed in from that point that you went to that

7    precinct and told them you didn't do it until 2009?

8    A.   Yes.

9    Q.   What is your educational background?

10   A.   I went to school in the Bronx, completed almost the 11th

11   grade, dropped out because my dad was sick at the time.  Didn't

12   go back to school until I was incarcerated.  I obtained my GED

13   at Sing Sing Correctional Facility.

14   Q.   Incarcerated on this rape case?

15   A.   Yes.

16   Q.   So you took your GED exam at Sing Sing?

17   A.   Yeah.  It is part of a mandatory, I guess, rehabilitation.

18   Q.   What is your employment history?

19   A.   I worked off the books my whole life, basically.  '98, I

20   attempted to open up a company, attempted to obtain a d/b/a,

21   home improvement license in Suffolk County.  Basically, I work

22   off the books.  I'm a contractor.

23   Q.   When you say that you worked off the book, does that mean

24   you didn't pay taxes?

25   A.   Yes.

1    Q.  Did you hold any professional licenses or did you obtain

2    any professional licenses?

3    A.  Just a home improvement license in Suffolk County which

4    means that you could work on construction, sheetrock,

5    insulation under subcontractors.

6    Q.  What year was that?

7    A.  1998.

8    Q.  Do you have any children?

9    A.  I have two -- one's biological, one that I raised in the

10   courtroom.  One is going to be 18 this year.  The other one is

11   going to be 16.

12   Q.  Let's talk about your biological son, what is his name?

13   A.  John McCaffrey after my father.

14   Q.  Is he the one who is in the courtroom?

15   A.  No.

16   Q.  Who is the mother of John McCaffrey, your son?

17   A.  Jane.

18   Q.  What is your relationship like now with John?

19   A.  I don't have one since the arrest.  Before the arrest, it

20   was strained, between 2005 and when I was arrested, I made

21   attempts to reach out to him when I was in prison, failed,

22   nobody, no answer to anything -- just at that point it was kind

23   of hopeless to even attempt with a rape case.

24   Q.  So are you saying that your incarceration on the rape

25   frustrated your ability to reconnect with your son?

E4TUMCC4                          McCaffrey - direct

1    A.  It didn't start it, but it absolutely ended it.

2    Q.  So you were trying, but it didn't make things easier?

3    A.  Yes.

4              MR. GARBER:  This would be a good time to break.

5              THE COURT:  It is 1 o'clock, ladies and gentlemen, so

6    why don't we come back at 2.  Don't discuss the case.  Keep an

7    open mind.  If you bump into anybody in the elevators -- the

8    lawyers or witnesses or anybody else -- obviously, don't

9    discuss or speak or even acknowledge -- be stoic, as I told you

10   yesterday.

11             Have a good lunch.

12             Ms. Kimbrough, could you stay behind.

13

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury not present)

 2              (Ms. Kimbrough present)

 3              THE COURT:  Ms. Kimbrough, you had sent me a note.

 4    And so the record is clear, it said is it relevant that I was

 5    an SART volunteer for two years North Central Hospital in the

 6    Bronx around the years 2006 to 2007 and that is a sexual

 7    assault response team.

 8              JUROR:  Yes.

 9              THE COURT:  So you volunteered?

10              JUROR:  Right.

11              THE COURT:  How long did you do that?

12              JUROR:  I was a volunteer for the weekended, they

13    would call me most weekends.

14              THE COURT:  What did you do exactly?

15              JUROR:  If somebody called in for somebody to come to

16    the hospital because somebody was raped, then I was there with

17    that patient or with that victim.

18              THE COURT:  And you would talk to them about what they

19    experienced?

20              JUROR:  I would talk to them.  I would keep them calm

21    when the police was there.  If they didn't have to see the

22    police, the police had to step back until they were ready, that

23    kind of thing.  I was an advocate for the patient.

24              THE COURT:  Did you get any training for?

25              JUROR:  The hospital trained us.
```

1          THE COURT:  What did the training consist of?

2          JURORS:  We had almost a year and a half of somebody

3     already being there that was a professional, teaching us what

4     to look for, what to say, how to say it, whether to touch the

5     people, listen to them.  That kind of thing.

6          THE COURT:  Classes?

7          JUROR:  There were classes at the hospital.

8          THE COURT:  You would also sometimes shadow an actual

9     professional.

10          JURORS:  We learned right there in the hospital and

11     once we graduated, they put us in the hospital.  We were on

12     call on weekends.

13          THE COURT:  Now this case, obviously, has involved a

14     fair amount of testimony about a rape.

15          JURORS:  That's why I wanted to find out from you if

16     it was relevant.

17          THE COURT:  It is not whether it is relevant.  I think

18     that the issue is what I asked you about yesterday:  Do you

19     think that it would affect your ability to be fair and

20     impartial in this case?

21          JURORS:  Not at all.

22          THE COURT:  You think that you could follow my

23     instructions on the law?

24          JUROR:  Yes I could.

25          THE COURT:  And you could consider the testimony of

1     the witnesses and consider the evidence introduced at trial?

2                 JURORS:  Yes.

3                 THE COURT:  And you would limit yourself to just the

4     evidence?

5                 JURORS:  Just what I hear.

6                 THE COURT:  Any questions from counsel?

7                 MR. GARBER:  No.

8                 MR. LARKIN:  No.

9                 THE COURT:  You had a question?

10                MR. LARKIN:  No, your Honor.

11                THE COURT:  So go have lunch.  Don't discuss with any

12    of your fellows jurors what we have talked about in here.  If

13    it turns out that you do actually have some lingering concern

14    that you can be fair and impartial, of course let me know.

15                JURORS:  OK.

16                THE COURT:  It is not a criticism that you feel that

17    way; it is not something that you should be ashamed of, it is

18    something that I think you need to tell me, if your fairness

19    and impartiality is going to be compromised in any way.

20                All rise for Mr. Kimbrough.

21                (Juror exits courtroom)

22                THE COURT:  We are going to resume the direct of

23    Mr. McCaffrey.

24                How long to you have?

25                MR. GARBER:  40 minutes.

1              THE COURT:  The cross?

2              MR. LARKIN:  At least an hour.

3              THE COURT:  I am wondering about Ms. Pujols.  We told

4    her to be here at 2, so she will have to wait a bit.

5              MR. GARBER:  Based on the way things are progressing I

6    was not going to have any witnesses beyond Ms. Pujols for this

7    afternoon.

8              THE COURT:  I don't know how long she is going to

9    take.  Just make sure that you have a witness that is ready to

10   go if and when Pujols stops today.

11             Was there a knock?  Let's see what the knock is for.

12             While we are waiting for the knock, anything else that

13   we need to cover before lunch?

14             Let me see what it is.  Are you all right?

15             DEPUTY CLERK:  Someone needs their bag.

16             THE COURT:  You can give it to her.

17             Be on time at 2.  We want to start right away.

18             Thanks a lot.

19             (Luncheon recess)

20

21             (Continued on next page)

22

23

24

25

E4t0mcc5

```
 1                      AFTERNOON SESSION

 2                          2:00 P.M.

 3             THE DEPUTY CLERK:  All rise.

 4             THE COURT:  Have a seat.  Let's get the jury.

 5             Is there anything we need to discuss before the jury

 6    comes?

 7             MR. GARBER:  No.

 8             THE COURT:  Okay, Mr. McCaffrey, come on back up to

 9    the stand.

10             (Witness resumes the stand)

11             THE COURT:  We are going to go a little bit after

12    five.  I teach, at Columbia, so we'll have to get out a little

13    bit early by 5:20.  So if we finish about 5:10.

14             MR. GARBER:  I teach at Brooklyn Law School, I teach

15    at 6:00, so I have a similar situation, so if we can end at

16    5:15.

17             THE COURT:  That's fine.

18             THE DEPUTY CLERK:  All rise for the jury, please.

19

20

21

22

23

24

25
```

```
 1              (In open court)

 2              (Jury present)

 3          THE COURT:  Okay, have a seat.  Let us know if we can

 4   make you more comfortable, anything you are hankering for let

 5   us know, soft drink, let us know, we'll try to accommodate you

 6   within reason.

 7          We'll probably take a break at about 3:30-ish today.

 8   Hopefully then the cookies and stuff will arrive.  We were

 9   shortchanged yesterday.

10          Today we'll probably finish about 5:15 or so, little

11   earlier.  So we won't be going until 5:30 today, all right.

12          Mr. Garber, let's resume the direct examination of Mr.

13   McCaffrey.

14   DIRECT EXAMINATION (Continued)

15   BY MR. GARBER:

16   Q.  Wil, I believe where we left off, we were talking about

17   your, I think your professional license.

18   A.  Yeah, I obtained the home improvement license in Suffolk

19   County to do interior construction.

20   Q.  Okay.  Now in addition to -- you said Sally being in the

21   audience, who is in the audience for you?

22   A.  My son, brother-in-law, and I guess commonlaw wife.

23   Q.  What is her name?

24   A.  Ida Figueroa.

25   Q.  How long have you been with Ida?
```

E4t0mcc5                              McCaffrey - direct

1    A.  On and off, 14 and a half years.

2    Q.  And she's stuck by you throughout this ordeal?

3    A.  Primary, mostly --

4           THE REPORTER:  I can't hear.

5    Q.  Do you have child with Ida?

6    A.  I raised her son Justin as my own since he has been a year

7    old, so he's mine.

8    Q.  Justin is in the audience?

9    A.  Yeah, he is in the audience.

10   Q.  With the crew cut.

11   A.  Yeah.

12   Q.  You're not a choirboy, are you?

13   A.  Absolutely not.

14   Q.  You have been in trouble before?

15   A.  Frequently.

16   Q.  Okay.  Well, let's start.  Before this wrongful conviction

17   for rape, you were arrested?

18   A.  Couple of times.

19   Q.  Okay.  When you say a couple, you are smiling.  Is it more

20   than a couple of times?

21   A.  Yes.

22   Q.  Okay.  Tell them about your criminal history.

23   A.  It's not extensive, it is -- I have had my scrapes with the

24   law.  I have been arrested maybe eight times, to ten times.  I

25   mean I can go through each arrest with you, if you want.

E4t0mcc5                        McCaffrey - direct

1    Q.  Yeah, tell them.

2    A.  I don't know the dates exactly.

3    Q.  It's okay.  Do the best you can.  Tell them what you were

4    convicted of, okay.  Tell them a little bit about the cases?

5    A.  They are not going to be in order.  I mean there is a

6    situation in 1998.  I had one of my workers, I'm going to give

7    a brief explanation, I'm not saying it justifies or defines

8    what I did or that I was innocent, I pled guilty to the charges

9    that I had done.

10         MR. LARKIN:  Objection, your Honor.  Can we have

11   question and answers.

12         THE COURT:  I'm not sure what the -- I'm not sure --

13   what is the question?  You want him to list all of his prior --

14         MR. GARBER:  I asked him to explain his criminal

15   history, and he's doing it.

16         THE COURT:  I don't want a narrative answer.  You have

17   to do a direct that asks a little more.  Focus him.

18   BY MR. GARBER:

19   Q.  You'll start, and I'll try to followup with questions to

20   keep this a little bit more specific.  1998, you said?

21   A.  Yeah, I was arrested for assault.  I pled guilty to the

22   assault three.  Involved a situation where a man tried to, you

23   know, force his way into my house.  It was like a -- a little

24   small office area during the same time that I first opened that

25   company.  There was a kitchenette, there was a knife there.

E4t0mcc5                          McCaffrey – direct

1    During the struggle, he got hurt with the knife.  It escalated

2    outside of the dwelling.  And then I was arrested.  I turned

3    myself in.  I went through the process.  And I was convicted of

4    assault three, misdemeanor assault, yes.

5    Q.  And did you do any jail time for that?

6    A.  No, I received probation.

7    Q.  Okay.  Did you have to spend like a day in jail or --

8    A.  Yes, 24 hours to 48 hours.

9    Q.  And that's the booking process, right?

10   A.  Yes.

11   Q.  And you go to see a judge, and your case gets resolved

12   then?

13   A.  No, I -- it was bail.  And then I kept going to court while

14   I was working.

15   Q.  So you got out on bail.

16   A.  Yeah.

17   Q.  Next one, or another one.  We are talking before the rape,

18   wrongful conviction for the rape.

19   A.  I was in a cab one time coming home.  I thought I had the

20   money on me, I didn't.  I pull up in front of my building.  My

21   sister lives on the first floor.  I explained to the cab driver

22   let me knock on my sister's apartment.  It happened after that,

23   you know, the cops are coming, I lived right next door to the

24   precinct.  I'm explaining, cop stopped me, said if I had that

25   money.  I told them if I could call her.  He said no.  I got

E4t0mcc5                        McCaffrey - direct

1   arrested.  It was like paying a ticket.  I paid a fine in the

2   court and --

3   Q.  When you say you're not explaining, you are not telling

4   them I didn't do it.

5          MR. LARKIN:  Objection, leading.

6   A.  I'm trying give a little bit of insight.

7          THE COURT:  Watch the leading.

8   Q.  Elaborate on your statement that you said to me about

9   you're not explaining?

10  A.  I'm not trying to justify or explaining, I'm just trying to

11  give a little bit of insight into ran off, as an offense.

12  Q.  How about another one.

13  A.  I got arrested for another situation involving a fight with

14  a police officer on Halloween.  I came outside, they were

15  beating up on my cousin.  And I -- I interjected.  The crowd

16  dispersed.  I lived there.  I'm not going nowhere.  The cops

17  responded.  I resisted arrest, because I was -- I didn't do

18  nothing.  Not the fact that I actually was innocent, I was

19  fighting.  I lived there.  I thought I had some kind of right.

20  And cop went to handcuff me, my family was involved, my sister

21  Sally, everybody was involved was there.  I resisted arrest and

22  I was arrested for assault.  During resisting arrest, I pulled

23  away from the cop, I got charged with assaulting an officer.  I

24  pled out to a misdemeanor assault charge for fighting with the

25  individuals.

1    Q.   What else?

2    A.   I can't recall.  I have had extensive jail.  I spent like

3    two days in jail.  And either result in a fine, or they just --

4    they just don't prosecute.  Trespassing charge, or --

5    Q.   Any DWIs?

6    A.   I got a DUI in New Hartford County.  I was visiting

7    somebody in college.  Pulled me over.  I blue a .09.  I pled

8    out and received 500-dollar fine.

9    Q.   Okay.  Prior to going to maximum security -- well, did you

10   go to maximum security prison on this rape charge.

11   A.   Yes.

12   Q.   We're going to talk about that in a minute.  But prior to

13   getting convicted on this, wrongfully convicted on this rape

14   charge, did you ever serve any time in county jail?

15   A.   From the arrest in 1998, with the situation with the knife,

16   I received three years misdemeanor probation.  I transferred my

17   probation for Suffolk County to the Bronx.  My sister, there

18   was a fire.  And my brother-in-law got hurt.  I came to the

19   City.  I transferred my probation.  During that transition,

20   that situation happened with the Halloween arrest and I

21   violated probation and had to do four and a half months on

22   Rikers Island in C76.

23   Q.   And that was punishment for the violation of probation?

24   A.   Yeah, stemming from the misdemeanor probation.  It was

25   misdemeanor time, but it was, still, I had to go to Rikers

1   Island.

2   Q.  Okay, so we're focusing, right now, on the three wrongful

3   conviction arrests or incarcerations --

4           MR. LARKIN:  Objection to the narrative, your Honor.

5   I mean, really.

6           MR. GARBER:  I'm setting it up, okay.

7           MR. LARKIN:  Objection.

8           THE COURT:  All right, you don't get to do that, okay.

9           You get to make an objection to me, or respond to me.

10  But if you guys want to talk to each other, then we're going to

11  have a problem.

12          So, Mr. Garber, you don't get to do that.  This is not

13  a street corner, this is a courtroom, so I want you to remember

14  that.

15          MR. GARBER:  Okay.

16          THE COURT:  So go ahead.  What is the question.

17          MR. GARBER:  Okay.

18  Q.  We are focusing, right now, on your prewrongful conviction

19  arrests, okay.

20  A.  Yes.

21  Q.  Are there other than the ones that you described, are there

22  other ones that you maybe forget?

23  A.  There was an incident in the store near my neighborhood.  I

24  got into an argument with the owner, exchanged heated argument,

25  a fight broke out.  His son ended up getting hit during the

1    fight.  He was young at the time.  I pled guilty to it.  It

2    was -- it was assault three, resisting arrest.  Like I said, I

3    did these charges, I pled guilty to them for a reason.

4    Q.  Okay.  And in this case, you did not plead guilty, right?

5    A.  No.

6              THE COURT:  In which case?

7              MR. GARBER:  In the wrongful conviction rape case.

8    A.  No, I -- I didn't do anything wrong.

9    Q.  And you asserted your innocence?

10   A.  From the beginning.

11   Q.  And then, as a result of that, you went to trial?

12   A.  Yes.

13   Q.  And got convicted anyway?

14   A.  Yes.

15   Q.  Now, let's go back in time to after your arrest in this

16   case.  You said that you couldn't make bail, right?

17   A.  Yeah, it was $50,000.  It was too much.

18   Q.  Your family couldn't afford it?

19   A.  No.

20   Q.  Okay, what happens.  Tell the jury what happens when you

21   can't make bail prior to a trial.

22   A.  See, in the same situation where they would send me for

23   violation of probation, it is a different part of Rikers

24   Island.  It's C76, City sentence.  If you don't get community

25   service stemming from small fights and situations like that,

1    anything under 8 months or under a City year, you go there to

2    complete your time.  You're separated from the rest of the --

3    the rest of the criminals that are detained there.

4            When you commit rape, you go to a different complete

5    building, maximum security on Rikers Island, where I went.  It

6    is GRVC.  The prior situation, where I went for misdemeanor,

7    was like A dorm situation; no uniforms.  And GRVC, you are, you

8    have your clothes in cells, in-house feeding, no movement.

9    You're not able just to wander around in the jail.  I got to

10   fight for my case, I'm fighting for a rape charge.  You know,

11   it is horrible, you know.  You know, between the law library

12   and everything you can, and trying to proclaim your innocence,

13   it's just a completely different situation than the first time

14   I was in jail.  It's --

15   Q.  Did you ever tell any inmates you were innocent while you

16   were on Rikers Island awaiting trial?

17   A.  I tried.  They didn't believe me.  They -- they believe

18   whatever you are arrested for, you either get around it or

19   plead guilty to it.  You know, you hear rape, and I guess you

20   get singled out.  Like in every other situation, they try to

21   prevent you from either using the phone, or worry about using

22   the shower or, you know, getting -- inmates serve the food.

23   And it's the same situation like, you know, most detention

24   places like that.  In reference to C76, it's a little bit

25   different.  But foodwise, you know, in C76, you go to the mess

1    hall where they are overseen, certainly, of your food.

2              In this situation, they bring the food to where you

3    live at, and they disburse it.  Because you can't, due to my

4    crime, everybody else's crime, I'm with hardened criminals,

5    people facing murder, multiple robbery convictions.  There is

6    nobody there for jaywalking or violation of misdemeanor

7    probation.

8              MR. LARKIN:  Objection to all this, your Honor.

9              THE COURT:  Well, I think it is becoming a narrative

10   answer.  So let's ask the next question.

11   Q.  Well, let's get to the head here, if we can, which is was

12   the experience that you had a Rikers Island, between

13   September 25th, 2005 and the trial, different than the

14   experience you had at Rikers Island for that four and a half

15   months on the violation of probation?

16   A.  I was there for a short bit of time.  I knew when I was

17   going to go home.  I made a mistake.  I tried to own to it.  I

18   knew I was going home in four and a half months.  Now, I'm in

19   GRVC fighting for my life, and trying to tell anybody that

20   would listen to try to prove my innocence.  Something that, you

21   know, I'm facing a lot of time in prison.  The unknown.  Like I

22   don't know what's going to happen.  I think I'm going to go

23   home, because I'm innocent, but then again, you know.

24   Q.  What were you charged with?

25   A.  Rape in the first degree.  Three counts.  I got charged for

E4t0mcc5                         McCaffrey - direct

1   everybody that was in the car.  But nobody else got charged, so

2   I have three counts of rape in the first degree.

3   Q.  Let me stop you for a second.  You said nobody else got

4   charged?

5   A.  No.

6   Q.  So your co-defendants, or other people who were -- that

7   Ms. Peguero claimed raped her, they did not get charged, but

8   you did?

9           MR. LARKIN:  Objection, foundation and knowledge, your

10  Honor.

11  A.  No, she --

12          THE COURT:  Well, overruled.  Do you know whether

13  anyone was charged with you?

14          THE WITNESS:  Yeah.  Nobody was charged, your Honor.

15          THE COURT:  Okay.

16  Q.  You lived through a pretrial situation and up until trial

17  in this case, right?

18  A.  Yes.

19  Q.  You went to Court a number of times on this case before

20  trial?

21          MR. LARKIN:  Objection, leading.  Counsel is

22  testifying now.

23          THE COURT:  Watch the leading.

24          MR. GARBER:  Sure.

25  Q.  Did you appear in Court?

1    A.  Yes, numerous times.  I testified in a grand jury.

2    Declared my innocence.  Everything.  I went pretrial.  I was

3    fighting.  I didn't -- I didn't entertain any offers that they

4    offered me, no matter what the time was.

5            THE COURT:  The question was did you appear in Court.

6            THE WITNESS:  Oh, sorry.

7    A.  Yes.

8            THE COURT:  Next question.

9    Q.  So you learned, you learned about the fact that you were

10   the only one moving forward on that case?

11           MR. LARKIN:  Objection, same thing.

12           THE COURT:  Overruled.

13   A.  Yes.

14   Q.  How did that make you feel?

15   A.  Terrible.  Terrible.  Like I didn't do anything.  But then,

16   again, if they're claiming that three people raped them, or

17   raped her, or whatever that the allegation was, why am I the

18   only one being charged for everybody's crime.

19   Q.  How long were you in pretrial detention prior to your

20   trial?

21   A.  13 months.

22   Q.  Did you get any visits from your family?

23   A.  Yes.

24   Q.  Was your relationship with your family affected in any way

25   during that pretrial incarceration?

1    A.  Of course.  They are coming to visit me, and they're

2    telling me, you know, like don't worry, everything is good.

3    You know, like I know it's not.  My case is in the newspaper,

4    you know, my -- just -- it's public.  They are getting

5    scrutinized probably for standing behind me because I'm

6    innocent.  So my family is getting pressures from the street:

7    How could you support that, after he did that.

8    Q.  You said --

9    A.  You know, it's --

10   Q.  -- you said that your case was in the news.  What

11   newspapers?

12             MR. LARKIN:  Objection to this.

13             THE COURT:  Overruled.  Maybe, if you know.

14             Did you see anything in the newspaper?

15             THE WITNESS:  Yes, your Honor.

16             THE COURT:  Okay.  You can answer.

17   A.  I received them in Rikers Island; Daily News, The Post.  I

18   heard it on 1010 WINS, Hot 97 spoke about it.  It was not -- it

19   was not a secret.

20   Q.  Now, I believe that you said that when you were first

21   brought in and questioned by Detective Arbuiso, he used

22   profanity toward you, and said that you were going to be going

23   to jail for a long time; right, words to that effect?

24   A.  Yes.

25   Q.  Did you learn of any contact that he had with your family

E4t0mcc5                         McCaffrey – direct

1   about this case?

2   A.   Well --

3              MR. LARKIN:  Objection to that.

4              THE COURT:  I mean sustained.

5   Q.   Well, was there anything that happened, or was your family

6   affected at all for communicated to you anything about

7   information they learned from the police?

8              MR. LARKIN:  Objection, objection.

9              THE COURT:  I'm thinking as to why this would be

10  relevant, and whether it is being offered for the truth.

11             MR. GARBER:  It is not.  And I could explain, if you

12  like.

13             THE COURT:  Let's have a sidebar.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  I mean you really are offering this for

3     the truth.  You are offering this to show his family told him

4     what the detectives did.  The jury can take that to the bank as

5     true.  And if it also had an impact on his mental state, that

6     is --

7          MR. GARBER:  That's why I'm bringing it up.

8          THE COURT:  You're offering it, really, for the truth.

9          MR. GARBER:  To show his damages.  I don't know if --

10    if she's lying to him about what was stated.  She came to the

11    precinct to try and get him, and she had no access to him.  And

12    the cops said, words to affect, your fuckin' brother is going

13    away, he is a fucking rapist.  And this was communicated to him

14    by Sally.  And while he was in, he as really suffering --

15         THE COURT:  You can't elicit whether he had visits

16    from his sister and things like that, but --

17         MR. GARBER:  I think it is relevant to damages.  But I

18    think Arbuiso is going to testify, he could deny that he said

19    that to her, if it's not true.  I mean because it's malice,

20    callousness --

21         THE COURT:  But the problem is it's hearsay.  The

22    assertion that the detective said these things, is all from an

23    out-of-court statement by the sister.

24         MR. LARKIN:  Mr. McCaffrey --

25         MR. COHEN:  The statement, itself, is coming in only

1   because the statement is being made, not whether it is true

2   that he's a fuckin' rapist.  It is coming in to show that

3   Arbuiso stated that that's -- whether --

4            THE COURT:  So the argument is because Arbuiso called

5   him a rapist, he was harmed that much more, because he has such

6   a high opinion of Arbuiso?  The fact is, The Daily New says

7   it's bad, but if Arbuiso said it, it makes him psychologically

8   more damaged?

9            MR. COHEN:  Part of the case is the intentional

10  violation of his civil rights.

11           THE COURT:  So you're offering it for the truth.

12           MR. COHEN:  No, no.  No.  No, the intention, violation

13  of civil rights, that would be supported by statements made by

14  Arbuiso.

15           THE COURT:  Seems you are offering for the truth.

16           MR. GARBER:  State of mind.

17           THE COURT:  It is an out-of-court statement.  It is

18  his sister's statement about what Arbuiso said that you are

19  trying to introduce.  Isn't that an out-of-court statement

20  offered for the truth.

21           MR. COHEN:  The factual basis in the statement is not

22  being offered for the truth of what that statement is.  That is

23  that he was a fucking rapist.

24           THE COURT:  The truth that Arbuiso said it.

25           MR. COHEN:  That's it.  Just that it was said.

1                THE COURT:  Okay.  That's being offered for the truth.

2                MR. COHEN:  That Arbuiso said it?

3                THE COURT:  Yeah.

4                MR. LARKIN:  McCaffrey didn't hear him say it.  He

5     didn't hear him say it.  He is going to repeat what somebody

6     else supposedly heard him say.  So I believe your Honor is

7     correct, clearly hearsay.

8                THE COURT:  Arbuiso is going to take the stand.  You

9     can ask him if he said those things.  I don't think it adds to

10    his psychological damage, because Arbuiso said this to his

11    sister.

12               MR. GARBER:  Well, he was damaged by it, okay.  So I

13    mean I know that from my prep.  But I think you're ruling

14    against us.  I don't know if we have to keep going especially

15    if we ask Arbuiso about it.  I'm sort of implying that it might

16    have happened anyway, so I don't want to necessarily --

17               THE COURT:  I think it is being offered for the truth,

18    to the extent -- I'm not going to allow it in, bring out his

19    own damage from the wrongful rape accusation and eventually

20    from the conviction, okay.

21               MR. COHEN:  May I raise two other quick points, since

22    we are up here.

23               Number one that Mr. Garber keeps soliciting testimony

24    about newspaper articles, and the concern with any jury trial

25    is that a jury is going to look up --

1           THE COURT:  I have told them not to look anything up,

2      if they do that they are in big trouble.

3           MR. COHEN:  The second thing is that Mr. Garber keeps

4      referring to it as a wrongful conviction.  And I think, as your

5      Honor raised it, I think more appropriately that the wrongful

6      accusation would be more appropriate than to refer to it as a

7      wrongful conviction.  He is saying as fact --

8           THE COURT:  Well, there is a wrongful accusation which

9      then later blossoms into a wrongful conviction.  You are not

10     disputing that, are you?

11          MR. COHEN:  I don't want the jury to misinterpret

12     anything that Mr. Garber is saying by that.  I mean they are

13     not going to be -- that's -- I mean that's -- this case is not

14     about that.  This case is about right to a fair trial claim.

15          THE COURT:  I get that.  But I'm going to instruct the

16     jury on all of that, so.

17          MR. GARBER:  Just so you know, he is very skittish.

18     And the reason why I keep referring -- when I talk to the rape

19     charge, when I am talking to him outside, he freaks out.  So if

20     I don't say wrongful rape charge, it's not fair to him.  To

21     him, that's what it is, so that's why I'm a phrasing it that

22     way.

23          MS. ZGODNY:  If we could --

24          THE COURT:  I'm not too worried about that.  The jury

25     is going to be very well instructed as to what the issues are

E4t0mcc5                          McCaffrey – direct

1   for this case, and what the claims are for this case.  But

2   there was a wrongful conviction.  He was wrongly convicted,

3   right, no one is disputing that?

4              MR. LARKIN:  Of the rape.

5              THE COURT:  Yeah.

6              MR. LARKIN:  All right, thank you.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1            (In open court)

 2            THE COURT:  Sorry about that.  We don't do too many,

 3    but once in a while it's necessary to make sure we're all on

 4    the same page.  So that's what we just did.

 5            Mr. Garber, you can proceed.

 6            MR. GARBER:  Thanks.

 7    Q.  When you talk about your sister, you are talking about

 8    Sally?

 9    A.  I don't know her as my aunt, I'm raised by my grandmother,

10    but I call her my mother.  And my sister.  I know it's

11    complicated explanation, but --

12    Q.  Out of all your family members, who is the one you are

13    closest to?

14    A.  My sister.

15    Q.  Sally?

16    A.  Yes, right there.

17    Q.  Right.  On the right.

18    A.  Yup.

19    Q.  Okay.  We did a reenactment of your trial here at this

20    trial, okay.  And I think you said earlier on in your

21    examination, that was difficult for you to listen to, right?

22    A.  Extremely.

23    Q.  Okay.  I'm sorry to do this, but can you go back in time to

24    2006, and put yourself back at that trial when was happening in

25    real time.  And tell the ladies and gentlemen of the jury what

1   you were feeling as you were sitting there in that court,

2   dealing with that.

3           MR. LARKIN:  Objection, your Honor.  I think this was

4   asked already.

5           THE COURT:  I think you did ask.

6           MR. GARBER:  I asked in the context of the reenactment

7   here, and the opening statements.

8           MR. LARKIN:  I thought the questions were asked.

9           THE COURT:  I thought so, too.  So I want to take a

10  look.

11          MR. GARBER:  Actually, I could help you.  I think in

12  the beginning, I asked a very general question --

13          THE COURT:  Let me just look at this one second.

14          "Tell this jury what it was like to sit through a

15  criminal trial, accused of a horrible crime like a rape that

16  you did not commit."

17          Asked and answered.  You already asked that.

18          Okay, next question.

19  Q.  How were you treated by the court personnel during your

20  trial?

21          MR. LARKIN:  Objection, your Honor.

22          THE COURT:  Overruled.  You can answer.

23  A.  Well, horrible.  I'm here for rape.  I'm not on bail, so

24  they figure family don't care, they don't understand about

25  financial problems.  You know, it is crazy.  You got to wake up

1    at 3:30 in the morning.  You are sleep deprived by the time you

2    get to Court.  You get to Court little after 4:00.  You are not

3    called into court until opening time, at 9:30, 9:00.  You

4    already wore down, you know.  And then you're mentally

5    exhausted from, let alone I run through things in my mind

6    constantly that I didn't do anything.  You know, I'm concerned

7    about, you know, my family.  And were they treated properly.

8    And how do they feel.  I have to be escorted out in handcuffs,

9    and -- and just -- and just the plain and simple, the whole

10   fight in general, everything, the way they treat you is not

11   nice at all.

12   Q.  Okay.  I'm going to stop you every now and then, okay.

13   During the trial, there was a point where the defense called a

14   witness, remember?

15             THE COURT:  A witness?

16   Q.  A witness, Peguero Delacruz.

17   A.  Yes.

18   Q.  And you listened to that here, today, right?

19   A.  Yes.

20   Q.  While you were listening to his testimony about the fight

21   in the parking garage, what was going through your mind?

22   A.  I'm like, yes, because the only -- I couldn't -- the

23   injuries, my criminal history, her testimony, injuries.  I

24   messed up, fine, I understand.  My criminal history, she's

25   lying.  How did the injuries get there.  And, finally, I had

1   somebody up there testifying, trying to explain that they

2   witnessed what they seen.  And it's like the district attorney

3   sat up there and ripped him apart over a ticket for him selling

4   alcohol in a store that he doesn't even own or insinuating that

5   he took favors.  What, parked the car and didn't put in a

6   ticket in, and making $10?

7                   MR. LARKIN:  Objection.

8                   THE COURT:  Sustained.

9                   THE WITNESS:  This is something I lived with.

10                  THE COURT:  Sustained means --

11                  THE WITNESS:  Sorry, your Honor, I apologize.

12                  THE COURT:  It's okay.  Just stop, that's okay.

13                  Next question.

14  Q.  Is it fare to say your heart rose when you heard him on

15  direct, but it changed when you heard him on cross?

16                  MR. LARKIN:  Objection.

17                  THE COURT:  I'm not sure that the heart's rising is

18  relevant to the case.  Sustained.

19                  Okay, next question.

20  BY MR. GARBER:

21  Q.  Do you remember when the verdict was read?

22  A.  Clearly.

23  Q.  Tell them about it.

24  A.  Came back with a verdict of guilty.  And I just went numb,

25  I couldn't believe it, it was surreal.  I could hear my

1   grandmother crying in the background, my sister.  I didn't do

2   it.  Well, you know, how much evidence do you need, like.

3   Q.  Did you think that the jury was going to believe you when

4   you testified?

5   A.  I was telling the truth.  I would hope that they would

6   believe me.  I mean I was not lying.

7   Q.  How did it make you feel when you heard your family

8   reacting and crying when the verdict was being read?

9          MR. LARKIN:  Objection.

10          THE COURT:  Overruled.  You can answer.

11  A.  Terrible.  I couldn't believe that they had to go through

12  this with me.  If it was me, fine, I'll deal with it.  But

13  knowing that it is going to affect them, and how it -- you

14  know, wondering if they knew I was going to be all right, and

15  that I'm not going to give up, and I'm not going to go and

16  commit suicide because I got convicted of a crime that I didn't

17  do.  Just -- rape?  I didn't do anything.  I didn't touch a

18  female.  I didn't do anything.  I mean I'm fighting through the

19  whole situation.  I thought at the end that, you know, I would

20  win.  That somehow, you know, the lying would come out in the

21  trial.  You know, the justice system would prevail.  And it

22  didn't.  Like I said, I'm not innocent of other things, but I

23  did not do that.  I didn't touch this girl.  I didn't kiss her,

24  I didn't do anything, let alone.

25          THE COURT:  Let me interrupt you for a second, Mr.

1    McCaffrey.  I know it is a very emotional thing.  I want you to

2    just answer the questions that are put to you.

3              The only question was how did it make you feel when

4    you heard your family reacting and crying when the verdict was

5    read.

6              Try to limit yourself.

7    A.  Hopeless.

8    Q.  Okay, let's -- after the verdict, there is something called

9    a sentencing; right?

10   A.  Yes.

11   Q.  Is that the same day as the verdict?

12   A.  No, it's two weeks later.

13   Q.  Okay.  Tell them about your sentencing.

14   A.  You know, well, before I get sentenced, you know, they want

15   to send somebody to my cell at a time and have them ask me

16   questions.  You know, like, do you feel sorry for the rape you

17   committed and --

18             MR. LARKIN:  Objection, objection to --

19             THE COURT:  Wait, wait.  Let me resolve the objection.

20             THE WITNESS:  I'm sorry.

21             THE COURT:  The objection is what.

22             MR. LARKIN:  I think the narrative part of it is

23   hearsay, too.

24             THE WITNESS:  Pretrial.

25             THE COURT:  I don't think it is being offered for the

E4t0mcc5                          McCaffrey - direct

1    truth.  Overruled on hearsay.

2            Let me see.  The question is:  Tell them about your

3    sentencing.

4            I think that's a -- let's focus the question better

5    than that, Mr. Garber.

6            MR. GARBER:  Okay.

7    BY MR. GARBER:

8    Q.  You were discussing the presentence interview?

9    A.  Yes.

10   Q.  Okay.  And this amounted to the discussion you had with the

11   probation officer?

12   A.  I denied it.  I didn't do anything wrong.  I didn't feel

13   like I had to explain myself anymore.

14   Q.  But they wanted you to admit?

15   A.  They wanted me to go there and plead with them, before I

16   went to the sentencing.  That's why I thought it was in

17   reference to this.  Because if I went to them and told them I

18   was sorry for this crime at sentencing --

19           MR. LARKIN:  Objection.

20           THE COURT:  Sustained.  I don't think the witness is

21   in a position to testify about what they wanted, so sustained.

22           Next question.

23   Q.  Did they ask you to be remorseful?

24   A.  They told me, upon what I say in this pretrial interview,

25   is how the judge is going to sentence you.

E4t0mcc5                          McCaffrey - direct

1   Q.  Okay.  What did you tell them?

2   A.  I didn't speak to him.  I denied the interview.

3   Q.  Now, let's now fast forward to sentence two weeks after.

4           Was your family there?

5   A.  Yes, all of them.

6   Q.  And what sentence did the judge pronounce?

7   A.  He found me -- I got found guilty on three counts of rape

8   in the first degree, even though it was one girl; kidnapping, I

9   blew trial on every count that was there.  And I got sentenced.

10  It was 20 years for rape one; 20 years for rape one; 20 years

11  for rape one; seven and a half to 14 for the kidnapping; 15

12  years for the kidnapping.  And then I just stopped counting

13  after 80 years.

14  Q.  What sentence did you think the judge gave you?

15  A.  I thought I had to do all of that time.

16          MR. LARKIN:  Objection.

17          THE COURT:  Overruled.

18          But it turns out you didn't.

19          THE WITNESS:  Yes, your Honor.  I didn't understand

20  everything.  Falls under a 40 years, that was the --

21          THE COURT:  Concurrent.

22          THE WITNESS:  Yes.

23          THE COURT:  So at some point you learned that it was

24  concurrent?

25          THE WITNESS:  Yes.  After I went to Rikers Island.

1   Q.  So, at first, you thought it was more than 20 years, okay.

2   And then you learned it was 20 years?

3   A.  Yes.

4   Q.  Well, was that comforting to know it was only 20 years?

5           MR. LARKIN:  Objection.

6   A.  No.

7           THE COURT:  Overruled.  You can answer.

8   A.  Twenty years?  For something I didn't do.  It couldn't

9   remotely be:  Okay, well, at least I got 20.  I didn't do

10  anything.  I thought I was going to go home.

11  Q.  So where did you go after Rikers Island after you were

12  sentenced?

13  A.  Downstate Correctional Facility.

14  Q.  And then where?

15  A.  Sing Sing Correctional Facility.

16  Q.  Is that a max --

17  A.  Yes that's a Max A.

18  Q.  Tell them what a Max A is?

19  A.  That's where they send all of the real criminals; murderers

20  and robbers.  You have to have, you know, a lot of time to go

21  there.  And it's not just New York City criminals.  It is all

22  New York State.  That's where every murderer went.  That's

23  where the worst of the worst are.

24          MR. LARKIN:  Objection to the -- at this point, the

25  question is what is a max, I think.

1          THE COURT:  Overruled.

2          Okay, next question.

3   Q.  What about -- well, tell them just sort of a litany, okay,

4   of the different facilities, prisons, state prison facilities

5   you went to during that -- what was it, the three years after

6   your verdict?

7   A.  I went from Downstate Correctional Facility, to Sing Sing

8   Correctional facility, between November and May 2007.  I got

9   transferred to Five Point Correctional Facility.  Sing Sing is

10  in Ossining, New York.  It was not too far from New York.  I

11  could get visits.  They sent me six hours upstate to Romulous

12  New York, to Five Point Correctional Facility.  And from there,

13  after I put in a transfer, they moved me to Greenhaven

14  Correctional Facility.  They are all maximum security prisons.

15  With walls.

16  Q.  What about going to those facilities as a rapist, a

17  convicted rapist?

18          MR. LARKIN:  Well, objection.  I mean I think that

19  does call for a narrative.  It is "what about."

20          THE COURT:  Yeah, I think let's ask some more

21  pin-pointed questions than that.

22          Go ahead.

23  Q.  Well, the fact that you went in, not only as someone facing

24  20 years, but facing 20 years for rape, did that designation,

25  rape, did that affect your prison sentence?

E4t0mcc5                          McCaffrey - direct

1    A.  Extremely so.

2    Q.  Tell them.

3    A.  You got to understand, everybody has mothers, sisters that

4    support them in prison, regardless; you know, murderers and the

5    worst of the worst.  Going to jail as a rapist, I don't want to

6    say it gives them some kind of honor or dignity to single

7    somebody out, but that's exactly what happens.  They are not --

8    they are like, you know, I'm here for this, but, you know,

9    you're a fucking rapist.  And labeled for a rape.  The police

10   officers make sure that the inmates know what you are there

11   for, if they don't find out for themselves or read about you in

12   the newspaper.  It's terrible.  You also have to look over your

13   shoulder, something bad happening to you, you know.  People

14   have bad things happen to their family in the street while they

15   are in prison.  And they look for an escape to take that out on

16   you.

17   Q.  How about the guards, how did they treat you?

18   A.  Guards are just as bad.  They don't send like the nice,

19   nice guards to maximum security prison to deal with the worst

20   of the worst.  They are hardened themselves.  They are also

21   doing time, in a different manner.  And in their aspect, those

22   prisons are ran by the guards.  They don't have civilian people

23   that you work for.  You work for the officers themselves.  So

24   while you are working for them, obviously they know your case

25   and they that's why I couldn't get certain jobs and had to work

1    in certain places.

2              MR. LARKIN:  Objection.

3              MR. GARBER:  Okay, well, let's -- I'll stop --

4    Q.  Let's talk about prison jobs.  Tell them about the jobs, if

5    the job opportunities are the same?

6    A.  I was not able to work around any civilians.  I couldn't be

7    around -- I couldn't -- I couldn't clean the -- the cells that

8    they hold inmates in before they see the counselors because of

9    their interaction with the counselors.  Or I couldn't have the

10   job that exposed me to certain people.  Or to certain areas.

11   My classification, even though I was in maximum security prison

12   was more intense than everybody else's.  I had to work in the

13   block, which is equivalent to putting another box inside of

14   Home Depot, and I had to stay inside there.  Even though the

15   jail is immense, I'm limited to different areas.  I couldn't

16   just work anywhere.  And then the jobs that I could get, these

17   different areas, cops wouldn't want to hire me because I'm a

18   rapist.  And then they let everybody else know you are a

19   rapist.  You know, it's bad enough I'm in prison, you know, I'm

20   around other people convicted of doing --

21             MR. LARKIN:  Objection.

22             MR. GARBER:  Okay.

23             THE COURT:  Sustained.  I'm sustaining the objection,

24   just because it is becoming a narrative.

25             So let's make sure we pepper this with questions and

E4t0mcc5                         McCaffrey - direct

1   answers, not just a long narrative.

2             THE WITNESS:  I'm sorry.

3             THE COURT:  That's all right.  You don't have to

4   apologize.

5             Go ahead.

6   Q.  What about conjugal visits, did you get any conjugal

7   visits?

8   A.  I tried to get with -- my sister, I was not married at the

9   time.  You can have something called FRP, Family Reunion

10  Program.  My sister could come.  And grandmother could,

11  situations like that.  I got denied FRP because of my crime.

12  Q.  Let's slow down, okay.  When you say, you said Family

13  Reunion Program.

14  A.  Yeah, they have trailers where you --

15  Q.  Tell them what --

16  A.  You get to stay with your family for a weekend.  They cook

17  food for you.  It's like a household environment, but for

18  important the weekend.  And they come on Friday, and then they

19  leave Sunday.  You get to spend a couple of nights with them,

20  and then you go back to the population after the FRP.  Because

21  of my crimes, I was not suitable to be around my family or to

22  have the same interactions, but murderers and people like

23  that --

24            MR. LARKIN:  Objection.  Objection.

25            MR. GARBER:  Well --

1           Could we close -- there is some noises going on out
2    there.
3           THE COURT:  Go ahead and close it, Chris.
4    BY MR. GARBER:
5    Q.  Were you treated differently than murderers because of the
6    fact you were there on a rape charge?
7    A.  Well, I couldn't do FRP, but the guy from Amityville
8    Horror, which lived on my company.  Ronnie Defeo, people make
9    movies about, he could go in and get passes --
10          MR. LARKIN:  Objection.
11   A.  -- and have something --
12          THE COURT:  Do you know --
13   A.  -- but my family can't go because I got --
14          THE COURT:  -- why you didn't get the family --
15          THE WITNESS:  Because of my crime.
16          THE COURT:  How do you know that.
17          THE WITNESS:  Because FRP wrote me back and told me
18   that.
19          THE COURT:  When you say "they," who is they?
20          THE WITNESS:  Family Reunion Program.
21          THE COURT:  They said what.
22          THE WITNESS:  They said you are denied because the
23   intensity of the crime.  Same reason I couldn't go to college
24   and things like that in jail.
25          THE COURT:  Okay, next question.

E4t0mcc5                          McCaffrey - direct

1    Q.  Were you treated any differently from other convicted

2    rapists who were serving less time in jail?

3    A.  Convicted, how?

4           MR. LARKIN:  Objection.  Calls for speculation about

5    what someone else, somebody else's sentence might have been.

6           THE COURT:  Were you treated any differently from

7    other convicted rapists who were serving time in jail.

8           Well, that's a yes or no.

9           MR. GARBER:  Less time.  Less time in jail.

10          THE COURT:  All right.

11   Q.  It's his --

12          THE COURT:  Less time in jail, right.

13          MR. GARBER:  Twenty years, coupled with the rape.

14          THE COURT:  Right, so that's a yes or no question.

15   Yes or no, were you treated differently than other persons

16   convicted of rape --

17          THE WITNESS:  Yes.

18          THE COURT:  -- who -- were serving less time.

19          THE WITNESS:  Yes.

20          THE COURT:  And how were you treated differently?

21          THE WITNESS:  Because, you know, 80 percent of the

22   rapists, I guess either a certain percentage of the rapists,

23   I'm not sure, plea bargain out and go to medium facility

24   prisons for shorter stints of time, or if they blew the trial.

25          MR. LARKIN:  Objection.  Objection.  The witness is

1   testifying to only maximum security prison.  He was not in

2   medium security prison.  I don't know that he has the

3   foundation to talk about what went on in medium security

4   prison.

5               THE COURT:  Yeah, I mean I just want to know how you

6   were treated differently than rapists who were serving less

7   time.

8               THE WITNESS:  Well, treated differently is if they are

9   guilty, they are going to act guilty.  See, me, being not --

10  not guilty, I didn't act guilty.  I went outside.  I wouldn't

11  allow my pride to get in the way to where I wouldn't accept

12  that I'm a rapist.  I wouldn't accept that the psychologist

13  wanted to tell me to accept my crime that I never committed, so

14  I could seek help and move forward.  Or stay in my cell and not

15  come outside and then have people degrade me because, you know,

16  I'm afraid, or I'm going to act because I don't want to go

17  outside where I'd act like I'm guilty, because I can compare

18  myself to their crimes, in general.

19  Q.  That's okay.

20  A.  I don't want to --

21  Q.  Are you saying you never sought counseling for being a

22  convicted rapist?

23  A.  I had an initial interview in Downstate where the

24  psychologist told me I have to embrace my crime to move

25  forward.  I told her I didn't commit my crime.  She goes, yeah,

1    well, you never --
2    Q.  That's fine, you don't have to tell what other people said.
3          Now, you're a pretty big guy, right?  How tall are
4    you?
5    A.  5'10" and a half.
6    Q.  How much do you weigh?
7    A.  Right now?
8    Q.  Well, let's go back when you were in jail for that rape?
9    A.  Well 225.  I put on a couple of pounds.
10   Q.  Well, didn't they think you were big enough to kind of take
11   care of yourself in a maximum security prison?
12          MR. LARKIN:  Objection.
13   A.  Yeah, well --
14          THE COURT:  Yeah, I'm not -- sustained.  Ask a
15   different question.
16   BY MR. GARBER:
17   Q.  Were you ever preyed on by anybody?
18          MR. LARKIN:  Objection.
19   A.  All of the time.
20          MR. LARKIN:  Objection, I mean --
21          THE COURT:  All right, he has answered the question,
22   I'm going to allow that question.
23          What's the next question.
24   Q.  Did you suffer from any emotional problems as a result of
25   your wrongful conviction in this case?

1  A.  Of course.  I -- I'm -- every time I walk down my cell, I'm
2  worrying about somebody either stabbing me in my back, or
3  kicking me down a flight of steps, or treating me like, you
4  know I'm being threatened.  They are:  I'm going to get you,
5  raper.  I don't want to say the explicit stuff.  It is not
6  nice.  This is not kindergarten.  It's maximum security prison.
7  And with the dudes my size, I'm not no big guy there, you know
8  what I mean.  There's guys, lifers, been there 15/20 years.
9  Only thing they do is eat well and work out.  They make you
10  look like --
11           THE COURT:  Let me interrupt you.  Did you suffer any
12  emotional problems?
13           THE WITNESS:  Oh, I --
14           THE COURT:  While you were in prison.
15           THE WITNESS:  I had sleeping problems.  I -- I think
16  everybody is out to get me.  Of course, nightmares.  Worry
17  about my family constantly.  They come to see me on visits and
18  I'm trying to pretend and make them think everything is okay.
19  On the phone, I gotta do the same thing, when things are not
20  okay, I'm in jail for rape.  And I'm scared.  And I want to
21  fight.  And fight for my innocence.  And I'm trying to keep
22  grip on the fact that, you know, I got 20 years in prison.  My
23  thought process is scrambled, but I'm trying to stay focused.
24  I'm on the phone projecting like everything is okay.  My sister
25  knows that it is not.

1    Q.  Did you ever --

2    A.  I'm sorry.

3    Q.  -- ever have any thoughts of suicide.

4            THE COURT:  Start the question.

5            MR. GARBER:  I'm asking another question.

6    Q.  Any thoughts of suicide.

7    A.  I'm first upstate, I'm in New York City, fighting still.

8    In Rikers, I'm around people still from the City here and

9    there.  I could find people, either a friend of somebody I went

10   to school with that knew me or something, to the effect that

11   they could pedigree you in the real world and understand that

12   you are innocent, or something to that aspect.

13           MR. LARKIN:  Objection, your Honor.

14   Q.  Let me just --

15           MR. LARKIN:  What was the question?

16           THE COURT:  Sustained.  I'm going to strike that part

17   of the answer.  I know it is a very emotional thing, Mr.

18   McCaffrey.  But try to just answer the questions.

19           And so did you have any thoughts about suicide while

20   you were in.

21           THE WITNESS:  All of time.

22           THE COURT:  All of the time.  Next question.

23   Q.  Wil, I'm going to tell you a story, but I'm going to break

24   it up, okay.

25           What about visits from your family, how far away were

```
 1   these prisons?

 2   A.  You know, in the beginning when I was in Sing Sing

 3   Correctional Facility, I was getting frequent visits, three

 4   times a weeks, you know.

 5            THE COURT:  Sing sing is how far away?

 6            THE WITNESS:  Forty-five minutes, your Honor.

 7   Q.  Okay.  What about Five Points?

 8   A.  Five Points is six and a half hours away.

 9   Q.  And how --

10   A.  Sporadic.

11   Q.  -- did this have an impact on your family visits?

12   A.  Of course it did.  It had a tremendous impact on my

13   relationship with Ida.  But my family would, you know, break it

14   up and go see me when they could.  I couldn't see Ida maybe

15   more than once.  It was that far.  And travelling situations

16   was not there.  And my family came when they could.  And my

17   Aunt Rosey came a couple of times.  My mom, I seen her one

18   time.  My sister came once.  They came when they was -- when it

19   was -- it was able.  You know, money situations is hard enough.

20   Q.  Okay.  When did you get out?

21   A.  September 1st, 2009.

22   Q.  Tell the jury what you're emotional state, or what your

23   reaction was to being released from jail?

24   A.  It was kind of, you know, I mean it is surreal, because I'm

25   happy that I'm going home and finally innocent.  You know,
```

1   which I was not -- I was just on bail.  I had to wait months

2   before I was actually innocent in the Court's eyes.  But, you

3   know, I went from being in the yard, in a maximum security

4   prison at 2:00 in the afternoon, to being free at 4:00 with no

5   kind of adjustment period to break back outside.  And I went

6   from having my back on a wall around people that, you know,

7   they have that -- that kind of a time, 20 years, 25 years, to

8   being home in one week.  You know, obviously, I was just so

9   happy just to be home.  But then again, like it is just a hard

10  transition.

11  Q.  Let's stop.  Did you have trouble adjusting once you got

12  out?

13  A.  Extremely.

14  Q.  Do you have an alcohol problem?

15  A.  Yes.

16  Q.  Bad one?

17  A.  I could say that now, yes.

18  Q.  Well, how did you cope when you got out?

19  A.  At first it started slowly, drinking sociably.  And you

20  know, my family is there.  And then as the alcohol progressed,

21  I pushed my family away after time.  It was hard.

22  Q.  Did you drink before you went in?

23  A.  Socially.

24  Q.  Did your drinking get worse after?

25  A.  Yes.

E4t0mcc5                         McCaffrey - direct

1   Q.  Did you ever seek any psychological counseling?

2              MR. LARKIN:  Objection, your Honor.  The Court's

3   ruling on this.

4              MR. GARBER:  It's yes or no.

5              THE COURT:  I'm going to allow.  You can answer yes or

6   no to that question.

7   A.  I was evaluated, yes.

8   Q.  Did you ever seek treatment?

9   A.  No.  I was -- it's hard to admit to strangers that you have

10  a problem or that you are struggling.  I don't really talk to a

11  lot of -- I don't talk to strangers that much.

12  Q.  Did anyone ever encourage you to get treatment?

13  A.  Everyone.  Including you.

14  Q.  You wound up getting into trouble again, didn't you?

15  A.  Yes.

16  Q.  You got convicted of a weapon case?

17  A.  Yes.

18  Q.  An assault?

19  A.  Yes.

20  Q.  An aggravated unlicensed driving?

21  A.  Yes.  And I did all three of those.

22  Q.  Did you plead guilty?

23  A.  Yes.

24  Q.  How long were you out for, before that came up?

25  A.  I was out for four years.  Well, three years and 10 months.

1   Q.  And where are you now?

2   A.  I'm currently incarcerated.

3           THE COURT:  Currently?

4           THE WITNESS:  Currently incarcerated.

5           THE COURT:  Incarcerated.

6   Q.  Are you in a maximum security prison?

7   A.  No.  Classification is low/medium.  I'm a in a medium

8   security prison.

9   Q.  Is that rape charge still on your record?

10  A.  Yeah.  And I have to explain it every day, whether if I'm

11  in the street, or in jail, anywhere.

12  Q.  Do you believe you had lasting psychological damage as a

13  result of your wrongful conviction in the rape case?

14          MR. LARKIN:  Objection.

15          THE COURT:  Sustained.  I am not sure he -- to that

16  question, sustained.

17  Q.  Are you suffering today?

18  A.  I just recently figured out that there is something wrong.

19          MR. LARKIN:  Same.

20          THE COURT:  Overrule the objection, but.

21          All right, next question.

22  Q.  Are you suffering today?

23  A.  Yes.

24  Q.  Did your family, or you, incur any legal expenses as a

25  result of your arrest and trial for that rape charge?

E4t0mcc5                         McCaffrey - direct

1   A.  Yes.

2   Q.  Do you know how much money your family incurred, or you

3   incurred, for those legal costs?

4           MR. LARKIN:  Objection.  I think -- objection.  I

5   think that's got to be proven up by documents, your Honor.

6           THE COURT:  Overruled.  You can answer.

7   A.  Well, my family spent --

8   Q.  Were there legal expenses?

9   A.  They spent probably --

10  Q.  If you know.

11  A.  -- 10 to 15 thousand dollars for my first attorney,

12  attorney for trial purposes, between his fee.  And private

13  investigators, when my family retained you, you know.  Legal

14  fees was between probably like 20 to 25,000, between your fee

15  and private investigators until -- so about 45 grand, 45 to

16  $45,000 until we ran out of money, and until we ran out of

17  financing capabilities.  And you took the case pro bono.

18          MR. GARBER:  I have no further questions.

19          THE COURT:  No further questions.  All right,

20  cross-examination.

21          MR. LARKIN:  I think -- do we need a sidebar, just a

22  short sidebar?

23          THE COURT:  I don't know, are you requesting one?

24          MR. LARKIN:  Yes, I think just to be clear, I think

25  just a very short sidebar.

406

E4t0mcc5                                    McCaffrey – direct

1              THE COURT:  All right.

2              Sorry, ladies and gentlemen.  Very quick.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E4t0mcc5                          McCaffrey – direct

1                    (At the side bar)

2                    THE COURT:  Okay.

3                    MR. LARKIN:  I think it's clear, but I just –– I don't

4        want to run afoul of any of the Court's rulings in limine, but

5        I think the door has been opened to all cross–examination about

6        his entire criminal history, both before and after the

7        incident.

8                    Counsel asked him to describe and to explain his

9        arrests prior to the rape charge.  He had ––

10                   MR. GARBER:  I concur.

11                   MR. LARKIN:  Okay, I just wanted to make sure.

12                   THE COURT:  Want to saying anything?

13                   MR. COHEN:  No.

14                   THE COURT:  Okay, all right.

15                   (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2               THE COURT:  Okay.  We almost ready, Mr. Larkin.

3               MR. LARKIN:  Sorry.

4     CROSS-EXAMINATION

5     BY MR. LARKIN:

6     Q.  Good afternoon, Mr. McCaffrey.

7     A.  Good afternoon, Mr. Larkin.

8     Q.  On July 30, last year, you were convicted of criminal

9     possession of a weapon in the second degree, correct?

10    A.  Yes.

11    Q.  And that's a felony, isn't it?

12    A.  Yes.

13    Q.  And on the same day, you were convicted of assault in the

14    second degree, weren't you?

15    A.  Yes.

16    Q.  That's also a felony, right?

17    A.  Yes.

18    Q.  And on the same day you pleaded guilty, you were convicted

19    of aggravated unlicensed operation of a motor vehicle, correct?

20    A.  Yes.

21    Q.  And that's another felony, right?

22    A.  Yes.

23    Q.  Each of those three felonies arose from three separate,

24    three separate indictments, right?

25    A.  Yes.

E4t0mcc5                          McCaffrey - cross

1    Q.  And you pleaded guilty to three felonies arising out of

2    three separate incidents, right?

3    A.  Yes.

4    Q.  And you were sentenced on those felonies to the three and a

5    half years in state prison, correct.

6    A.  Yes.

7    Q.  And then with three and a half years of supervised release

8    afterward?

9    A.  Yes.

10   Q.  Correct?

11   A.  Yes.

12   Q.  Now, you talked about some of the instances, Mr. McCaffrey,

13   when you had been --

14          THE COURT:  We're having trouble hearing.  Move the

15   microphone closer.  There is one on the table there.

16   Q.  Mr. McCaffrey, in 1998, you were arrested in Suffolk County

17   and charged with assault, correct?

18   A.  Yes.

19   Q.  You stabbed somebody with a knife, isn't that true?

20   A.  I pled guilty to assault three, misdemeanor.

21   Q.  You stabbed somebody with a knife, didn't you, Mr.

22   McCaffrey?

23   A.  Somebody got hurt during the altercation with a knife; yes.

24   Q.  I'm sorry, your answer was?

25   A.  I said yes.

1    Q.  Who did you stab?

2    A.  I can't remember his name right now.

3    Q.  Vincent Celli?  Does that name ring a bell, Mr. McCaffrey?

4    A.  Yes, it does.

5    Q.  And you gave a statement to the police at the time, didn't

6    you?

7    A.  Yes.

8            MR. GARBER:  Objection.

9    BY MR. LARKIN:

10   Q.  You --

11           THE COURT:  Well, I'll allow the yes.  I'm not sure

12   where we're going with this, though.

13   Q.  You had an explanation on your direct examination for

14   happened, right?

15   A.  Yes.

16   Q.  And your explanation was that this person used to work for

17   you, right?

18   A.  Yes.

19   Q.  He came to your home and demanded money?

20   A.  He came to my home, yes.  Demanded money through the door.

21   Q.  And you went outside and you had a knife with you, correct?

22   A.  No.

23   Q.  That's not correct?

24   A.  I did not say that.

25   Q.  Do you recall giving a statement to the police in

E4t0mcc5                          McCaffrey - cross

1    connection with that?

2    A.  It was 1998, I can barely remember.

3    Q.  You don't remember?

4            THE COURT:  He said he can barely remember, so go

5    ahead.

6    Q.  I show you a document, Mr. McCaffrey.

7            MR. LARKIN:  If I may give copy to your counsel,

8    entire file.

9            MR. GARBER:  Objection.

10           THE COURT:  To refresh.

11           MR. LARKIN:  To refresh his recollection.

12           MR. GARBER:  I don't know if he is saying will

13   something refresh your recollection.  He says he has a vague

14   memory.

15           MR. LARKIN:  He has a vague memory, so I have

16   something to --

17           THE COURT:  The objection is overruled.  There is not

18   a question pending at this point.

19           The last answer was "I can barely remember."

20           So what's the question?

21   Q.  The question is, Mr. McCaffrey, I have a document here I

22   would like to show you to see if it refreshes your recollection

23   about a statement that you gave to the police.

24           MR. LARKIN:  Why don't we mark it.

25           THE COURT:  Mark it with a pen, and let's just get

1    going.

2            MR. LARKIN:  Let's mark it as double B.

3            THE COURT:  Is it defense double B?

4            MR. LARKIN:  Double B, I'm sorry, your Honor.  May I

5    approach the witness?

6            THE COURT:  You may, yes.

7    Q.  Mr. McCaffrey, I'm going to show you what's been marked as

8    defendant double B, and ask you to take a look at it and tell

9    me if it refreshes your memory about a statement you gave to

10   the police after you were arrested in 1998 in Suffolk County.

11   A.  I guess so, it was 16 years ago.

12           THE COURT:  The only question is does it refresh your

13   recollection.  As you read this now, does it trigger a memory

14   as to what statement you gave.

15           THE WITNESS:  Yeah.

16   Q.  Yes, you told the police that Mr. Celli had robbed you

17   prior to this incident; is that right?

18   A.  He did.

19   Q.  You told the police that he had stolen property from you,

20   correct?

21   A.  Yes.

22   Q.  Was Mr. Celli charged with a crime in connection with this

23   incident?

24           MR. GARBER:  Objection.

25   A.  No.

E4t0mcc5                          McCaffrey - cross

```
 1              THE COURT:  Objection --
 2    BY MR. LARKIN:
 3    Q.  You were charged with assault?
 4    A.  Are you trying --
 5              THE COURT:  -- overruled.
 6              When I talk, everybody stops.  I don't get to do much
 7    at these trials, but when I talk everybody stops.
 8              So the objection is overruled.  Next question is what?
 9    Q.  Mr. Celli was not charged with a crime, and you were
10    charged with assault, correct, Mr. McCaffrey?
11              MR. GARBER:  I have an objection to that.
12              THE COURT:  Well, that's a compound question,
13    actually, but --
14              MR. LARKIN:  I'm sorry, your Honor.  I'll withdraw
15    that question.
16    Q.  You were charged with a misdemeanor assault; correct?
17    A.  Yes he pled guilty to misdemeanor assault.
18    Q.  Actually, permit me to correct myself.  You were charged
19    with a D felony, weren't you?
20    A.  And I pled guilty to a misdemeanor assault.
21              (Continued on next page)
22
23
24
25
```

1    Q.  And you pled guilty to a misdemeanor assault and your

2    statement to the police about Mr. Chelly stealing property from

3    you was false, wasn't it?

4    A.  It was false?

5              THE COURT:  He is asking you was it false.

6              MR. GARBER:  Objection.

7    A.  It was true in my regards, it might have been unprovable at

8    the moment, but I told him what happened.

9    Q.  You told the police he had previously in another incident

10   stolen property from you, correct?

11   A.  What does this have to do with this case?

12             THE COURT:  He asks the questions and you answer them

13   unless I tell you.

14             THE WITNESS:  I am on trial for this -- I can't even

15   recall.

16             THE COURT:  That is not the point.  Answer the

17   question.  If there is an objection and I sustain it, then you

18   don't have to answer it, otherwise, answer the question put to

19   you.

20   Q.  You reported, as you said to the police, that Mr. Chelly

21   had stolen property from you prior to this incident?

22   A.  Yes.

23   Q.  And Mr. Chelly was never charged --

24             MR. GARBER:  Objection.

25             THE COURT:  Sustained.

1    Q.  Your statement to the police about Mr. Chelly robbing you

2    was false, wasn't it?

3              MR. GARBER:  Objection.  Asked and answered.

4              THE COURT:  I think that the record is not clear as to

5    whether he answered that question.

6              Overruled.  You can answer the question.

7              THE WITNESS:  It was not false.

8              THE COURT:  Next question.

9    Q.  So you pled to a misdemeanor.  You left his house, ran out

10   of the house with a knife, didn't you, Mr. McCaffrey?

11   A.  The struggle proceeded down the driveway, yes.

12   Q.  You had a knife in your possession as you walked down the

13   driveway, correct?

14   A.  I can't recall at the moment.  Got hurt in the house, and I

15   pled guilty for it.

16   Q.  And you had a knife in your possession as you walked down

17   the driveway after?

18   A.  I can't recall.

19   Q.  Can't recall.  Take a look at your statement, if you would,

20   the second page.

21   A.  OK.

22   Q.  Does the statement refresh your memory that you walked down

23   the driveway with a knife, slipped and fell and got up, took a

24   swing at him with the knife and cut him?

25   A.  That's what the statement says, yes.

1    Q.  You have a recollection of doing that?

2    A.  I don't recall.  It was 16 years ago.

3    Q.  You have no memory of the incident beyond what is --

4    A.  I have --

5          THE COURT:  Wait.  Stop.  Let him finish the question

6    before you start answering because the court reporter is going

7    to lose her mind and her fingers will fall off.  It is a hard

8    thing, but everybody has to wait until the other side stops.

9    Wait for the question and wait for the answer to finish, Mr.

10   Larkin, before you ask the next question.

11         MR. GARBER:  Objection.  It is compound, covering two

12   areas what the statement said and what happened, I would ask

13   that the question be focused.

14         Objection to form.

15         THE COURT:  Overruled, but I have forgotten what the

16   question was, so repeat it.

17   Q.  You left your house with a knife, slipped and fell and

18   swung at Mr. Chelly with a knife and you stabbed him?

19   A.  I pled guilty to what I could remember at the moment.  I am

20   not denying anything happened.  This is 16 years ago.  I pled

21   guilty to misdemeanor assault.

22   Q.  Aside from what appears in your statement, Mr. McCaffrey,

23   do you have any independent recollection of this incident?

24   A.  I can't recall.

25   Q.  You were sentenced to probation on the assault conviction,

1   correct?

2   A.  Yes.

3   Q.  Two years' probation?

4   A.  Yes.

5   Q.  The next time that you were arrested was on August 3, 1999,

6   correct?

7   A.  Can you refresh my memory?

8           THE COURT:  You don't know that specific date?

9           THE WITNESS:  No.

10          THE COURT:  All right.

11  Q.  You were charged with possession of marijuana, right?

12  A.  I can't even recall.

13  Q.  Cops arrested you.  You said to the cops:  It's only weed,

14  what's the big deal?

15  A.  I can't recall.

16  Q.  You have no memory at all?

17  A.  If I pled guilty to it, I did it.

18          THE COURT:  The question is if you have a

19  recollection.

20          THE WITNESS:  I can't even recall, your Honor.

21          MR. LARKIN:  Marked this, show a copy to counsel.

22          May I approach?

23          THE COURT:  You don't have to ask.

24  Q.  I am going to show you, Mr. McCaffrey, what we have marked

25  as Defendants' Exhibit CC.  Tell me if it refreshes your memory

1   about being arrested on August 3, 1999.

2   A.  Not at all.  I can't recall.

3   Q.  Your date of birth appears on the court file, right?

4   A.  Yes.

5          MR. GARBER:  Objection.

6   Q.  And that's your NYSSID number on the court file?

7   A.  I don't know what you are saying --

8          THE COURT:  I am not sure that we need to get into all

9   of this, so sustained.

10  Q.  You were arrested in Suffolk County in the year 2000,

11  February 2000 and you were charged with aggravated unlicensed

12  operation of a motor vehicle, weren't you?

13  A.  Probably.

14  Q.  Do you have a memory of being arrested sometime in February

15  of 2000, being charged --

16  A.  I probably --

17         THE COURT:  We are doing this again.  Just be careful

18  not to answer before the question.  In real life, we often talk

19  over each other.  It is common, but in a courtroom we can't.

20  So try to make sure you wait for the answer to finish before

21  you ask the question and wait for the question before the

22  question.

23         Re-ask the question.

24  Q.  Do you have a memory of being charged with aggravated

25  unlicensed operation of a motor vehicle in February of 2000 in

1    Suffolk County?

2    A.   Vaguely.

3    Q.   You pled guilty to that offense, right?

4    A.   I've been arrested a couple of times driving without a

5    license.  Yes, if he says -- I can't pinpoint the exact time.

6    Q.   You were taken in custody and you were held for what,

7    overnight, do you have a memory?

8    A.   Probably.

9    Q.   Probably held overnight?

10   A.   Yes.

11   Q.   And you paid a fine, correct?

12   A.   Yes.

13            THE COURT:  Don't mind what he says.  Do you have a

14   recollection?

15            THE WITNESS:  I paid a bunch of fines, your Honor.

16            THE COURT:  So only talk about what you remember.

17   Q.   If I may, Mr. McCaffrey, I am going to show you what has

18   been marked as Defendants' DD and ask you the same question.

19   Does that document refresh your memory about the plea you

20   entered to the charge of aggravated unlicensed operation of a

21   motor vehicle -- the plea was in 2001, correct?

22   A.   Yes, I pled guilty.

23   Q.   And you paid a fine, right?

24   A.   Yes.

25   Q.   And the sentence was really time served in terms of being

1    put in prison, right?

2    A.  I thought that the sentence was the fine.  That's what it

3    says.  I pled guilty.

4    Q.  Does the document refresh your memory that your

5    imprisonment --

6    A.  Time served, yes.

7    Q.  Do you remember how long the time was --

8    A.  No.

9    Q.  The next time that you were arrested, Mr. McCaffrey, was on

10   June 25 of 2000, correct?

11            THE COURT:  Do you recall that specific date?

12            THE WITNESS:  No.

13   Q.  Don't recall that?

14   A.  It was 14 years ago.

15   Q.  Mr. McCaffrey, I am going to show you what we marked as EE

16   for identification?

17            THE COURT:  Defendants' EE?

18   Q.  I'm going to ask you to take a look at it and ask if it

19   refreshes your memory about being arrested on or about June 25,

20   2000.

21   A.  OK.

22            THE COURT:  Does looking at that trigger an

23   independent memory on your part that, yes, you were charged

24   with that?  That's really the question.

25            THE WITNESS:  Yes.

1    Q.  Did you know somebody at the time named Patrick Collins?

2    A.  No.

3    Q.  Did you ever say to Patrick Collins, in words or in

4    substance, I know where you live, I'm going to kick your ass?

5    A.  No.

6    Q.  Were you charged with misdemeanor assault on this occasion?

7    A.  That's what it he says, yes.

8    Q.  Do you remember being charged with misdemeanor assault?

9    A.  I actually do, yes.

10   Q.  In connection with an incident involving Mr. Patrick

11   Collins?

12   A.  Yes.

13   Q.  What did you do to him?

14   A.  They said I was screeching tires and he came out and

15   smacked the pizza out of my hand.  I pled guilty.  I must have

16   did it.

17   Q.  He smacked the pizza out of your hand?

18   A.  Yeah.

19   Q.  And then you pleaded guilty to assault because he slapped

20   the pizza out of your hand?

21   A.  Yes.  That's what I recall, misdemeanor assault.

22            THE COURT:  Did you say something about --

23            THE WITNESS:  I can't even remember this, vaguely.

24   Q.  Do you remember getting into a fight with Mr. Collins?

25   A.  No.  I didn't get into a fight with anyone.

1   Q.  The court in this case entered an order of protection,

2   isn't that right, Mr. McCaffrey?

3            MR. GARBER:  Objection.

4            THE COURT:  Go ahead.

5   A.  Yes.

6   Q.  And the order of protection was against you, wasn't it?

7   A.  Yes.

8   Q.  And it was in favor of Mr. Collins, right?

9            MR. GARBER:  Objection.

10  A.  Yes.

11  Q.  And the order instructed you to stay away from him, isn't

12  that right?

13           Yes, Mr. McCaffrey, I'm sorry?

14           THE COURT:  Is that correct?

15           THE WITNESS:  I was reading this.

16           What was the question?

17  Q.  The order of protection directed you to stay away from

18  Patrick Collins, isn't that right?

19  A.  Yes.

20  Q.  There was not any order of protection entered against

21  Patrick Collins directing him to stay away from you, was

22  there.?

23           MR. GARBER:  Objection.

24           THE COURT:  Sustained.

25  Q.  To your memory, was there an order of protection --

1          THE COURT:  I sustained that objection.

2          Next question.

3   Q.  You pled guilty to another misdemeanor assault, correct?

4          THE COURT:  When?

5   A.  I have a couple of --

6   Q.  On or about February 13 of 2001, you pleaded guilty to a

7   misdemeanor assault in connection with this arrest?

8   A.  In connection with this arrest?

9   Q.  Yes.

10  A.  I can't say.  I guess I did.

11  Q.  Do you recall what the sentence was?

12  A.  No.

13  Q.  It was time served?

14  A.  I don't recall the sentence.

15  Q.  I'm sorry.  It was a conditional discharge and a one year

16  order of protection, correct?

17  A.  If that's what it says, I really don't remember.

18          THE COURT:  Just say what you remember.

19          Next question.

20  Q.  The next occasion when you were arrested, Mr. McCaffrey,

21  was October 31 of 2000, is that right?

22  A.  Yes.

23  Q.  This involved Mr. Collins again, correct?

24  A.  It involved Mr. Collins again?  I have no idea.

25  Q.  You don't have a recollection of another incident in

1    October of 2000 involving Mr. Collins, Patrick Collins?

2    A.  No.  How would I know?

3    Q.  Permit me then to show you if, I may, and I'm going to mark

4    this FF.  Take a moment.  Look at that document.  Tell me if it

5    refreshes your memory about an arrest in October of 2000

6    arising out of another incident involving Mr. Collins.

7    A.  I didn't even know Mr. Collins.  This is an incident that I

8    explained on Halloween when resisting arrest explained to the

9    jury before.  I didn't even know that involved that officer.

10   Q.  Mr. Collins is not a police officer, right?

11   A.  I don't even know who he is.  I am trying to get a grip on

12   what the last thing, I don't remember --

13   Q.  You recall --

14            THE COURT:  You have to let him finish his answer.

15   A.  You have to understand the last case was.  I am not

16   laughing at the situation.  I just don't understand -- I didn't

17   have a chance to read it.

18            THE COURT:  Do you recall Mr. Collins being involved

19   in this Halloween incident?

20            THE WITNESS:  No.

21            THE COURT:  Do you recall the person in the Halloween

22   incident being the same person being involved in the prior

23   incident?

24            THE WITNESS:  No, your Honor.

25   Q.  In the Halloween incident, Mr. McCaffrey, a police officer

1   ended up going to the hospital, right?

2              THE COURT:  The question --

3   A.  I assume so, yeah.

4   Q.  Police officer had a dislocated shoulder, isn't that right?

5   A.  If that's what he said he had, yes.

6   Q.  You pled guilty to resisting arrest, isn't that right?

7   A.  Yes, misdemeanor, resisting arrest.

8   Q.  The next time that you were arrested, Mr. McCaffrey, was in

9   February -- excuse me -- May of 2001, is that right?

10  A.  Yes.

11  Q.  That was possession of marijuana?

12  A.  Yes.  Probably, yes.

13  Q.  Probably was -- you pled to this disorderly conduct?

14  A.  I don't recall, but I am agreeing, yes.

15             THE COURT:  Just say what you remember.  That's all.

16  Don't worry about what he is asking or why he is asking.  You

17  just answer if you remember.  You don't remember, that's fine

18  to say I don't remember.

19             THE WITNESS:  I just don't want to seem like I am

20  denying.

21             THE COURT:  All that you can do is testify about what

22  you remember.  The question is do you remember, just say you

23  don't remember, OK.

24             THE WITNESS:  Yes.

25             THE COURT:  So what is the question?

1    Q.   Now, we are up to May of 2001.  Sometime in 2002, you

2    violated the terms of your probation, isn't that right?

3    A.   Yes.

4    Q.   That's when you went to Rikers Island for four months?

5    A.   Yes.

6    Q.   That was July until about November of 2002, approximately?

7    A.   Yeah.

8    Q.   Then in or about April of 2003 you were arrested in Oneida

9    County, were you not?

10   A.   Yes.

11   Q.   And that was a DWI that you described earlier?

12   A.   Yes, a DUI.

13   Q.   You said that your blood alcohol was .09?

14   A.   Yes.

15   Q.   Blood alcohol was .15, wasn't it?

16   A.   He said that it was .09.  I remember the case, that's why I

17   remember the number.

18   Q.   Let me show you Defendants' GG, if I may, Mr. McCaffrey.

19   And I am going to ask you to take a look, if you would, to the

20   second page.

21           THE COURT:  Take a look at what he is showing you, the

22   second page.

23           The second page, right?.

24           MR. LARKIN:  Yes, your Honor.

25   Q.   Take a look, if you would, under the heading of Count 2 and

E4TUMCC6                    McCaffrey - cross

1    read that to yourself and let me know if it refreshes your

2    memory that your blood alcohol was .15 at the time.

3              (Pause)

4    A.  This doesn't say I have .15 --

5              THE COURT:  Wait.  I don't care what it say.  This is

6    not in evidence.  You just read it, and if it refreshes your

7    recollection, if reading that makes you say, oh, I remember

8    something, then say so.  If it doesn't, just say it doesn't.

9              THE WITNESS:  Your Honor, he is asking me a question

10   that don't pertain to this.

11             THE COURT:  He is just asking you if this refreshes

12   your recollection about your blood alcohol being higher than --

13             THE WITNESS:  Can I ask a question?

14             THE COURT:  No.  You just have to answer it.

15             Does that refresh your recollection?

16             THE WITNESS:  No.

17             THE COURT:  Next question.

18   Q.  Do you recall pleading guilty to DWI in New Hartford town

19   court?

20   A.  I pled guilty to DUI, yes.

21   Q.  You pled guilty and you paid a fine, right?

22   A.  Yes.

23   Q.  The next time that you were arrested was September 15 of

24   2003, right?

25   A.  I don't recall.

1    Q.   That was when you pled to theft of services, right?

2    A.   Oh, yes.

3    Q.   You refused to pay a cab fare?

4    A.   I explained that to the jury, yes.

5    Q.   You basically hailed a cab and tried to avoid paying the

6    fare, didn't you?

7    A.   Without denying what I did, I explained it, but that's what

8    I pled guilty to.

9    Q.   And that was five days in Bronx House of Detention?

10   A.   I thought I just paid the fine.

11   Q.   I show you what is marked as HH.  Look at it, if you don't

12   mind.  Tell me if it refreshes your memory that you paid a fine

13   and you went to jail for five days for that?

14   A.   Yes.

15   Q.   Now, the next time you got arrested was on November 11th of

16   2003, correct?

17   A.   Yes.

18   Q.   And that was an incident in the store, right?

19   A.   Yes.

20   Q.   And you pled guilty to a misdemeanor assault, isn't that

21   true?

22   A.   Yes.

23   Q.   Punched a minor child in the head, didn't you?

24   A.   He was 17, I was mistaken that he was an adult but, yes,

25   sir, I pled guilty.

E4TUMCC6                         McCaffrey - cross

1   Q.  And the court entered an order of protection against you in

2   favor of the minor child, correct?

3   A.  Yes.

4   Q.  And you pled guilty to that crime because you were guilty,

5   isn't that true?

6   A.  Yes.

7   Q.  You lost some money in a pay phone in the store, isn't that

8   right?

9   A.  Yes.

10  Q.  After that happened, you started trashing the place,

11  pulling stuff off of the shelves?

12  A.  I don't recall what happened, but there was a situation in

13  the store, yes.  The payphone was inside the store, yes.

14  Q.  The store owner called the police, you got arrested and you

15  pled to the misdemeanor assault?

16  A.  Yes.

17          MR. GARBER:  Objection.

18  Q.  You pled to --

19          MR. GARBER:  Is he giving an narrative or ask

20  questioned.

21          THE COURT:  No.  It is cross-examination, so

22  overruled?

23  A.  I pled guilty to everything that you are asking me for.

24  Q.  Resisting arrest?

25  A.  What they arrested me for, I pled guilty.  It was a local

1   store.  I felt bad and wanted to take responsibility, so I pled

2   guilty.

3   Q.  Let me just show you what we have marked as Exhibit II.

4           If you would, sir, look at the first page.

5           Does the first page of this document refresh your

6   memory that you pled guilty to, among other things, resisting

7   arrest and a misdemeanor assault?

8   A.  Yeah.  I pled guilty to everything you said.

9   Q.  The next time that you were arrested was May 14 of 2005,

10  correct?

11  A.  Yes.

12  Q.  And that was just possession of marijuana, right?

13  A.  Yes.

14  Q.  You got a conditional discharge -- you pled, right?

15  A.  Yes.

16  Q.  You pled guilty?

17  A.  Yes.

18  Q.  Did you serve any time in connection with that arrest?

19  A.  Most likely two days.

20  Q.  That is May 2005, and thereafter you were arrested in

21  September in connection with this incident, right?

22  A.  Wrongfully accused of rape, yes.

23  Q.  After you were arrested in June of 2000, in June of 2000,

24  you threatened the complaining witness, didn't you?  You

25  resisted arrest?

1    A.  What case is that?

2    Q.  That is the case involving Mr. Collins.

3    A.  I don't really recall that case.

4    Q.  You remember Mr. Collins, though, right?

5         You remember him knocking a pizza out of your hand,

6    right?

7    A.  I remember somebody knocking it out -- I don't remember it

8    being Mr. Collins.

9    Q.  You remember somebody knocking a pizza out of your hand and

10   you pleaded guilty to assault after that incident?

11   A.  Because after they questioned me about car screeching their

12   tires, seeing me exit the vehicle, I remember they smacked the

13   pizza, and I resisted arrest and I pled guilty.

14   Q.  You didn't go to court on a number of occasions in that

15   case?

16   A.  It is hard for me to come.  So when I was not able to go to

17   court I returned the next day and explained it to the judge and

18   the judge understand.

19   Q.  You know what it means to warrant in a criminal case,

20   right?

21   A.  Yes.

22   Q.  What does it mean?

23   A.  It means you did not go to court.

24   Q.  So when you got a pending case, you got a series of dates

25   when you are supposed to be there to address the charges, isn't

E4TUMCC6                          McCaffrey - cross

1   that right?

2   A.   Yes.

3   Q.   And the courts will tell you to come back in 30 days and we

4   will address your case?

5   A.   Yes.

6   Q.   If the case doesn't get resolved, isn't that right?

7   A.   Yes.

8   Q.   If you don't come back when you are supposed to, they issue

9   a bench warrant for your arrest?

10  A.   Yes.

11  Q.   To warrant, that means when you don't show up your court

12  dates?

13  A.   I said yes, agreed the first time.

14  Q.   You warranted a bunch of times -- you just didn't show up

15  for court?

16          THE COURT:   We have a break for 3:30.  Let's take our

17  afternoon break.

18          Don't discuss the case, ladies and gentlemen.  Keep an

19  open mind.

20          Enjoy whatever treats are back there, if they are not

21  up to your liking, blame Mr. Deluzio.

22          All rise for the jury.

23

24          (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E4TUMCC6                          McCaffrey – cross

1              (Jury not present)

2              THE COURT:  Mr. Larkin, how much more do you think

3    that you have?

4              MR. LARKIN:  At least 45 minutes.

5              THE COURT:  Then some redirect, I imagine?

6              MR. GARBER:  Yes.  I don't think it will be long.

7              THE COURT:  Then we will start Ms. Pujols.

8              MR. GARBER:  I guess that I will tell her, she is out

9    there.

10             THE COURT:  Why don't we take a short break, just five

11   minutes or so.  Try to get as much as we can done today.  I

12   definitely want to start Ms. Pujols.

13             (Recess)

14             Let's get the jury.

15

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  We will resume with the cross-examination

3     of Mr. McCaffrey by Mr. Larkin.

4          Mr. Larkin, you may proceed.

5     BY MR. LARKIN:

6     Q.  We want to go back to January 30, 1998.  This is after the

7     Suffolk County incident where you pled to a misdemeanor

8     assault.  Do you recall being arrested in the Bronx on that

9     date?

10    A.  No.

11    Q.  Do you recall being charged with crimes related to your

12    attempt to break into a 1996 Acura Legend?

13    A.  Yes.

14    Q.  Do you recall that you pled guilty to -- you were permitted

15    to plead guilty to disorderly conduct at that time?

16          MR. GARBER:  Objection.

17          THE COURT:  Overruled.

18    A.  Yes.  I pled guilty to disorderly conduct.

19    Q.  It was conditional discharge and you had to make

20    restitution to the victims, isn't that right?

21    A.  I don't remember the restitution part, but I do remember

22    pleading guilty to disorderly conduct.

23    Q.  I am going to show you what is marked as Defendants' JJ.

24    Take a look at the first page, if you would.

25          Does the first page of Exhibit JJ refresh your memory

1  that you were directed to make restitution to the victims?

2  A.  Yes.

3  Q.  In the amount of $375?

4  A.  Yes.

5  Q.  An order of protection was entered against you in this

6  case, isn't that right?

7  A.  I'm not sure.

8  Q.  Take a look at the third page of the Exhibit JJ if you

9  would.

10          Does the third page refresh your memory that an order

11 of protection was entered against you in favor of two

12 complaining witnesses in or about November of 1998?

13 A.  Yes.

14 Q.  Did you follow the order of protection going forward -- you

15 didn't bother those people again, did you?

16 A.  I didn't even bother the people to begin with, but yes.

17 Q.  You tried to steal their car, didn't you?

18 A.  No.  I was actually riding a motorcycle through the same

19 area that somebody else did.  I pled guilty because I wanted to

20 resolve the case with --

21 Q.  So you didn't plead guilty because you were guilty --

22 somebody else tried to break into their car and you just wanted

23 to get the case over with?

24 A.  In this matter, yes.

25 Q.  In that instance?

1    A.  Yes.

2    Q.  You agreed to the order of protection as part of your

3    guilty plea, right?

4    A.  Yes.

5    Q.  In connection with the other incident that we spoke about

6    earlier, the incident involving the minor child, you recall

7    that, right?

8    A.  Yes.

9    Q.  The order of protection was entered against you and in

10   favor of the minor child, right?

11          That was the bodega owner's son.

12   A.  Yes.

13   Q.  Did you follow that order of protection?

14   A.  Yes.

15   Q.  You left the kid alone after that, right?

16   A.  Yes.

17   Q.  Now, in November of 2009, Mr. McCaffrey, do you recall

18   being arrested and charged with aggravated unlicensed operation

19   of a motor vehicle?

20   A.  Yes.

21   Q.  And you pled to that, right?

22   A.  Yes.

23   Q.  Did you pay a fine?

24   A.  I'm not sure if I did or not, presumably, yeah.

25   Q.  Let me show you Exhibit KK.  Look at the first page.  Tell

1   me if you had to pay a fine on that occasion?

2   A.  Yes.  $200.

3   Q.  Did you pay a fine?

4   A.  I'm not sure.  I must have.

5   Q.  Not sure?

6   A.  I'm not sure.  I may I have.

7   Q.  Do you have any current outstanding fine?

8   A.  I'm not sure.  Possibly.

9   Q.  You don't know?

10  A.  No.

11  Q.  The next time that you were arrested Mr. McCaffrey was

12  November 7th of 2010, correct?

13  A.  Yes.

14  Q.  You were arrested in a public housing project, weren't you?

15  A.  Yes.

16  Q.  You were in a public housing building that you didn't live

17  in, right?

18  A.  Yes.

19  Q.  You refused to answer a police officer's questions about

20  why you were there, isn't that right?

21  A.  I was walking through the project.

22  Q.  Let me try it one more time.

23         You refused to answer a police officer's questions

24  about why you were in that building, isn't that right?

25  A.  I don't remember not answering his questions, I was charged

 1   with trespassing, yes.

 2   Q.  Let me show you what is marked as Exhibit LL.

 3        And I'm going to ask you if you would, sir, to take a

 4   look at the fourth page of that file, of that document.  Read

 5   it to yourself, if you would?

 6   A.  It says that I trespass.

 7   Q.  Does the document refresh your recollection that --

 8   A.  I would, I --

 9   Q.  -- a police officer asked you what you were doing in the

10   building and you refused to provide an answer?

11   A.  I don't remember that part.  I remember being in the

12   building and he arrested me for trespassing because I didn't

13   live there.

14   Q.  Did the police officer ask you any questions when he saw

15   you in the building?

16   A.  He asked if I had ID, did I live here, I said no.

17   Q.  He then arrested you for trespass?

18   A.  Yes.

19   Q.  And that's what happened?

20   A.  Yes.

21   Q.  You didn't refuse to answer any of his questions?

22   A.  I can't recall.  I pled guilty to trespassing.  I can't

23   recall.

24        MR. GARBER:  Objection.  Technically, he doesn't have

25   to answer questions.  I'm not sure that can't be the basis for

1    a charge.

2            THE COURT:  He can't recall the facts.  I think that's

3    the answer.

4            Next question.

5    Q.  Mr. McCaffrey, that is, after the November 2010 arrest, you

6    were arrested in May of 2011.  Isn't that right?

7    A.  Yes.

8    Q.  And that led to your guilty plea to aggravated unlawful

9    operation of a motor vehicle, right?

10   A.  Yes.

11   Q.  You were also arrested on June 6, 2011 in the Bronx,

12   weren't you?

13   A.  I can't recall.

14   Q.  Do you recall giving a deposition in this case?

15   A.  Yes.

16   Q.  You came to our offices and you were asked questions about

17   your claims, right?

18   A.  Yes.

19   Q.  And you were under oath at the time, right?

20   A.  Yes.

21   Q.  And you understood what the oath to tell the truth meant at

22   that time, didn't you?

23   A.  Yes.

24   Q.  You were required to tell the truth, nothing but the truth,

25   correct?

1    A.  Yes.

2    Q.  Reading from your deposition, this is page 22, line 21:

3    "Q   Prior to the first week in March, were you arrested on

4    June 6, 2011 to your recollection?

5    "A   Yes, thereabouts."

6            Were you asked that question and did you give that

7    answer?

8    A.  Yes.

9    Q.  Were you in fact arrested on June 6, 2011?

10   A.  Ye, I was just confused with the date.  I am still not

11   sure.

12   Q.  Were you detained for a period of time after you were

13   arrested?

14   A.  Could you refresh my memory what I was arrested for?

15   Q.  What were you arrested for, I don't know.  In this

16   particular instance, what were you arrested for?

17   A.  I don't recall.

18           MR. GARBER:  I would just object to impeachment on or

19   about -- this line should be restricken.

20           MR. LARKIN:  I will reread the question.

21           THE COURT:  Do you recall this arrest?

22           THE WITNESS:  No, your Honor.

23           THE COURT:  He doesn't recall the arrest.

24   Q.  Well, at the time of your deposition, the case was still

25   pending isn't that right?

E4TUMCC6                           McCaffrey - cross

1   A.  I can't recall.

2   Q.  Reading from your deposition, page 23, line 1:

3   "Q   Is that case still pending" --

4           MR. GARBER:  Judge, if this is a refreshment of

5   recollection, he should show the document.

6           THE COURT:  I don't think it is being offered to

7   refresh.

8           Overruled.

9   Q.  Were you asked that question and did you give that answer?

10          THE COURT:  If you remember.

11          THE WITNESS:  If I could see --

12          THE COURT:  Do you remember saying that at the

13  deposition?

14          THE WITNESS:  Not specifically, no.

15          THE COURT:  Next question.

16  Q.  The next time that you were arrested was on March 6, 2012,

17  isn't that right?

18  A.  Yes.

19  Q.  On that occasion, you were charged with second degree

20  assault?

21  A.  Yes.

22  Q.  You chased somebody into the building, right?

23  A.  I can't recall the specifics but there was a fight and I

24  pled guilty to assault, yes.

25  Q.  Other than there being a fight and you pleading guilty to

E4TUMCC6                       McCaffrey - cross

1  assault, you don't remember any specifics about the incident
2  that happened a little bit more than two years ago that led to
3  your arrest and your plea for second degree assault?
4  A.  There were two sides to the story.  I admitted to what I
5  did, so I pled guilty to it.
6  Q.  You chased somebody into a building and you had a gun,
7  isn't that right?
8  A.  That's what he said.  That wasn't what happened.  I pled
9  guilty to what I did.
10 Q.  You hit him with the gun, right?
11 A.  No.
12 Q.  You fired the gun at him, didn't you?
13 A.  Absolutely not.
14 Q.  You chased him into a building and you hit him with some
15 object?
16 A.  Absolutely not.  I had a fight with him.
17 Q.  Did the other individual who you had this fight with get
18 charged with a crime?
19 A.  No.
20 Q.  You got charged with a crime, right?
21 A.  Yes.
22 Q.  You admitted to assault too, right?
23 A.  Yes.
24 Q.  And that's a D felony, isn't it?
25 A.  Yes.

E4TUMCC6                          McCaffrey – cross

1    Q.  And you were sentenced to one year in prison, right?

2    A.  Yes.

3    Q.  And then the next time you got arrested was in May of 2012

4    on May 1, isn't that true?

5    A.  Yes.

6    Q.  On that occasion you were charged with criminal possession

7    of a weapon, isn't that right?

8    A.  Yes.

9    Q.  You pled to criminal possession of a weapon, right?

10   A.  Yes.

11   Q.  When you were arrested, you made statements to the police,

12   didn't you?

13   A.  No.

14            MR. LARKIN:  Can we have a sidebar briefly, your

15   Honor?

16            THE COURT:  Very briefly.

17

18            (Continued on next page)

19

20

21

22

23

24

25

1           (At the sidebar)

2           MR. LARKIN:  I am want to be sure that we are not

3     overstepping.  We had made a motion in limine and your Honor

4     excluded those statements and I thought that the door was

5     opened when he was examined --

6           THE COURT:  I think that the door was opened because

7     Mr. Garber asked:  Tell everything about your criminal history.

8     And the plaintiff characterized it.  And I think that you can

9     then explore with him whether he undersold it or misstated or

10    mischaracterized what his criminal history is.  So I think that

11    is fair, but I am not sure why his statements following the

12    arrest are impeaching anything or whether they are relevant.

13          MR. LARKIN:  I think it reflects an attitude about law

14    enforcement.

15          THE COURT:  He might be justified in having contempt

16    for law enforcement.

17          MR. GARBER:  Technically, he denied.  He made the

18    statement --

19          THE COURT:  He didn't say that he lacks recollection.

20    He didn't say it, so the issue is he shouldn't be impeached on

21    it.

22          This is really peripheral.  I am not going to revisit

23    my ruling, the fact of the conviction is in and I think that

24    you should probably move on.

25          (Continued on next page)

E4TUMCC6                         McCaffrey – cross

1              (In open court)

2    BY MR. LARKIN:

3    Q.  Mr. McCaffrey, you are currently housed at the Orleans

4    Correctional Facility?

5    A.  Yes.

6    Q.  How far away is that?

7    A.  Nine hours.

8    Q.  And your earliest release date is July 2016, right?

9    A.  Yes.

10   Q.  Now, turning to the day of the incident involving

11   Ms. Peguero, you went out on September 18, 2005 with three

12   other individuals, right?

13   A.  Yes.

14   Q.  And that is Peter Adorno, Raymond Uribe and Carlos Vargas,

15   correct?

16   A.  Yes.

17   Q.  And Mr. Uribe had a nickname, right?

18   A.  Polo.

19   Q.  Like P-O-L-O?

20   A.  Yes.

21   Q.  And you had known Mr. Uribe for a few years, correct?

22   A.  I know them through a mutual friend, yes.

23   Q.  You used to work for him?

24   A.  Work for him?

25   Q.  For Mr. Uribe?

E4TUMCC6                        McCaffrey - cross

1    A.  No.

2    Q.  Do you remember testifying before the grand jury that

3    investigated Ms. Peguero's allegations of rape?

4              MR. GARBER:  Objection.  It is not true -- no, no, I

5    withdraw the objection.

6              THE COURT:  Overruled.

7              Go ahead.

8              Restate the question.

9    Q.  You recall testifying in the grand jury?

10   A.  Yes, I put some carpet in for him a couple of times.

11   That's it.

12   Q.  If I may, Mr. McCaffrey, after you were arrested, there was

13   a grand jury convened to look into the allegations of rape,

14   isn't that true?

15   A.  Yes.

16   Q.  And you testified before that grand jury, correct?

17   A.  Yes.

18   Q.  Reading from page 70, line 7:

19   "Q   How do you know him" -- referring to Mr. Uribe?

20             MR. GARBER:  Objection.

21             THE COURT:  Stop.  What is the objection?

22             MR. GARBER:  He has actually already asked his

23   question.  It is not impeachment anymore.  I believe that he

24   said he worked for him as a contractor.

25             THE WITNESS:  Yes, like work for a company.

1            MR. GARBER:  He has refreshed his recollection,

2     essentially, and the landscape has changed in the last minute.

3            THE COURT:  Maybe 15 seconds.

4            So you do recall working for him?

5            THE WITNESS:  I put some carpet in for him a couple of

6     times.  I don't know if that defined work -- not work for him,

7     payroll or nothing.

8            THE COURT:  He paid you?

9            THE WITNESS:  Yes, in cash on the side, just to put

10    carpet in.

11    Q.  You did some work for him, that's how you knew Mr. Uribe?

12    A.  Yes.

13           THE COURT:  Is that how you knew him or you knew him

14    some other way?

15           THE WITNESS:  I knew through a mutual friend.  I did

16    work for him.

17    Q.  And your nickname is Tank, you told us, right?

18    A.  Yes.

19    Q.  And Carlos Vargas, he had a nickname too?

20    A.  Yes.

21    Q.  That was Cuba?

22    A.  Cupa?

23    Q.  Like C-U-B-A?

24    A.  No, like Cupa.

25    Q.  Cooper?

1   A.  It is my accent.  It sounds weird.

2   Q.  You guys all went to X Bar on Fordham Road that night,

3   right?

4   A.  Yes.

5   Q.  When you went to X Bar, you were driving a Mercedes, is

6   that true?

7   A.  Yes.

8   Q.  Before you went out that night, Mr. Vargas picked you up in

9   a minivan, right?

10  A.  Yes.

11  Q.  Before you went to the X Bar, you changed the minivan for

12  Mr. Uribe's Mercedes, right?

13  A.  Yes.

14  Q.  So you got out of the minivan and everybody got into the

15  Mercedes, right?

16  A.  Yes.

17  Q.  And everybody went to the X Bar?

18  A.  Yes.

19  Q.  And you parked the minivan in a parking garage?

20  A.  Yes.

21  Q.  And you stayed at X Bar until it closed, that was about

22  until about 4 a.m.?

23  A.  Yes.

24  Q.  Then you left and you went to Broadway and Dyckman to that

25  area, right?

1   A.  Yes.  I testified to all of this before.

2              THE COURT:  Just answer the questions, OK.

3              THE WITNESS:  Yes.

4   Q.  You knew that area around Dyckman pretty well, didn't you,

5   at the time?

6   A.  I know the area, yes.

7   Q.  There were a lot of clubs?

8              You knew there were a lot of the clubs in that area,

9   right?

10  A.  Dyckman, it is a lot of everything.

11  Q.  But you knew there were a lot of clubs in that area, right?

12  A.  Not specifically, no.

13  Q.  Do you remember testifying at the criminal trial in this

14  case, right?

15  A.  Yes.

16  Q.  We read some of your testimony earlier, right Mr.

17  McCaffrey?

18  A.  Yes.

19  Q.  And you were here when the testimony was read, right?

20  A.  Yes.

21  Q.  And the testimony, to your knowledge, was accurate, wasn't

22  it?

23  A.  Yes.

24  Q.  You told the truth when you testified at the criminal

25  trial, right?

1          THE COURT:  Did you hear the question?

2    Q.  Did you tell the truth?

3    A.  Yes.

4    Q.  Page 520, line 14:

5    "Q   When you get to the parking lot, I want you to face the

6    jury and tell them everything that you know that occurred that

7    evening which occurrence brought you here.

8    "A   After we dropped the car and we went in the Mercedes to X

9    Bar, it's on the Fordham Road right off the Deegan, we left

10   there about 4:30, 4:45 heading to toward the Dyckman area

11   where, you know, it is an area of clubs over there."

12         Were you asked that question?  Did you given that

13   answer?

14   A.  Yes.  The question was in reference about the clubs you

15   just asked me.

16   Q.  Were you asked that question?

17         THE COURT:  Whoa.

18         MR. GARBER:  I object.  And ask that it be stricken.

19   The purpose of this question is to show that he knows that

20   there are clubs in the area.

21         THE COURT:  The objection is overruled.

22         If you ask me a question about you are on trial, I

23   will start explaining why he is being allowed to ask these

24   questions.  I really don't want to have to do that.  All that I

25   want is any witness just answer the questions put to them and

1    if there is an objection to stop and then I will rule on the

2    objection.

3            THE WITNESS:  All right.

4            THE COURT:  What is the question?

5    Q.  Were you asked that question and did you give that answer?

6    A.  I can't recall.

7    Q.  You recall the rest of your testimony as truthful, but that

8    specific question and answer you can't recall whether you were

9    asked that question and gave that answer?

10            MR. GARBER:  Objection to form.

11            THE COURT:  What is the question again?  I didn't hear

12    the question.

13            Page 520 page 14.

14    "Q   When you get to the parking lot, I want you to face the

15    jury and tell them everything that you know of that occurred

16    that evening which occurrence brought you here now.

17    "A   After we dropped off the car and we went in the Mercedes

18    to X Bar, it's on Fordham Road right off the Deegan, we left

19    there about 4:30, 4:45 heading towards the Dyckman area where,

20    you know, it is an area of clubs over there."

21            Were you asked that question, and did you give that

22    answer?

23    A.  I assume so.  I don't remember the question being asked.

24    Q.  Is it fair to say that you knew that there were clubs in

25    that area on Dyckman?

1   A.  It is Dyckman area, there is everything there.

2   Q.  And you first saw the complaining witnesses, Ms. Peguero

3   between 4 and 430 when you saw her?

4   Q.  And according to you, she was getting into the car when you

5   saw her.

6   A.  Yes.

7   Q.  In point of fact, Mr. McCaffrey, when you first saw her,

8   she was sitting in her car, isn't that right?

9   A.  No.

10  Q.  Do you remember testifying in the grand jury?

11  A.  Yes.

12  Q.  You told the truth in the grand jury, right?

13  A.  Yes.

14

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           MR. LARKIN:  Reading from page 62.  Page 62, line 7.

2     This is the statement that you made:

3     "Q.  Can you just make sure to keep your voice up, so I can

4     hear your answer.

5     "A.  The answer is we were driving up Dyckman, going towards

6     Broadway.  And we seen two girls in a car.  One was sitting in

7     the back, one was in the front.  Were you asked that, did you

8     make that statement.

9           MR. GARBER:  Objection.

10          THE COURT:  What is the objection?

11          MR. GARBER:  The objection is I think what he is

12    trying to do --

13          THE COURT:  I don't care what he is trying to do.

14          MR. GARBER:  He's not impeaching his testimony here,

15    he's --

16          THE COURT:  Overruled, overruled.

17          Finish the question.

18    Q.  We were driving up Dyckman, going toward Broadway, and we

19    seen two girls in the car.  One was sitting in the back, one

20    was in the front.  Did you make that statement in front of the

21    grand jury after you were arrested and charged with rape?

22    A.  I can't recall.

23    Q.  If I show you the minutes of your testimony, would that

24    refresh your memory?

25    A.  I mean I believe you, Mr. Larkin.  What I'm saying is the

E4t0mcc7                          McCaffery - Cross

1    details of the grand jury, it was five days after I was

2    arrested.  It's a little foggy exactly what I said.  But I told

3    the truth, and she told the truth, about what happened in that

4    vehicle.

5            MR. LARKIN:  Move to strike as nonresponsive.

6            THE COURT:  Overruled.  Overruled.

7            Everybody sit down, okay.  So, reading the transcript

8    wouldn't refresh your recollection.

9            THE WITNESS:  No, your Honor.

10           THE COURT:  That's what you are saying, right?

11           Next question.

12           MR. GARBER:  Could we have a brief sidebar on that.

13           THE COURT:  No.

14           MR. GARBER:  Okay.  Then, I just would -- this was

15   covered at the trial, this same impeachment happened at the

16   trial --

17           THE COURT:  Look, now you're giving a speech.  And I

18   just said no --

19           MR. GARBER:  -- it's redundant --

20           THE COURT:  I said no.  So sit down, okay.

21           I'm not used to folks quibbling with me, particularly

22   in front of the jury, so I don't want it to happen again.

23           Next question.

24   Q.  Mr. McCaffrey, she was not outside of the car when you

25   first saw her, was she?

 1   A.  Getting inside of the car.

 2   Q.  She was sitting inside the car?

 3   A.  She was getting inside the car.

 4   Q.  And your car pulls up alongside her, right?

 5   A.  Yes.

 6   Q.  And was your window up or down?

 7   A.  I can't recall at the moment.  I might have put it down at

 8   that moment.

 9   Q.  The windows were closed, right, because the air

10   conditioning was on; isn't that true?

11   A.  The AC might have been on.  I might have put down the

12   window, yes.

13   Q.  And where, in the car, were you sitting, Mr. McCaffrey?

14   A.  As I recall, the passenger's seat.

15   Q.  You were sitting in the front passenger's seat; right?

16   A.  Yes.

17   Q.  And you remember your deposition in this case, don't you?

18   A.  Yes.

19   Q.  April 12th, 2012, at our offices?

20   A.  Yes.

21   Q.  Right.  And you told the truth at your deposition, didn't

22   you?

23   A.  Yes, the best of my knowledge.

24   Q.  And, page 43 line 5:

25   "Q.  Where were you sitting in the car?

1    "A.  Back seat -- I can't recall at the moment."

2            Were you asked that question and did you give that

3    answer at the deposition?

4    A.  I said I can't recall at the moment, yes.

5    Q.  Your answer was you can't recall at the moment; yes?

6    A.  I just said I couldn't recall, I -- at that moment, I

7    just -- I was drinking a lot in the street.  I was hung over

8    probably.  I mean I answered it the best I could.

9    Q.  You were hung over at your deposition, Mr. McCaffrey?

10   A.  Yes.  I'm an alcoholic.  I drink a lot when I am home.

11   Q.  Well --

12   A.  I tried not to be, but.

13   Q.  At your deposition, Mr. McCaffrey, you were able to give

14   truthful testimony, weren't you?

15   A.  The best of my knowledge, yes.

16   Q.  There was no reason why you wouldn't give truthful

17   testimony at your deposition, would you?

18   A.  I was not lying.  There is no reason.

19           THE COURT:  Let him finish.

20   Q.  There is no reason --

21           THE COURT:  Finish, go ahead?

22   A.  I told the truth.  I said exactly what happened.

23   Q.  And you recall, at your deposition, that I asked you if you

24   didn't understand any of my questions, or if any of it was not

25   clear, that you should ask me for clarification, right?

E4t0mcc7                        McCaffery - Cross

1    A.  I understood the question.  I'm pretty sure I wouldn't have

2    had a problem.  My answer is what was clouded.  I was not in

3    the right state of mind at the moment.

4    Q.  So at your deposition, you couldn't remember whether you

5    were sitting in the front seat or the back seat when you first

6    saw Ms. Peguero.  Do I understand you right?

7    A.  I knew I -- I answered it.  Like I said, I answered it I

8    didn't recall.  I did say that to you in that deposition.

9    Q.  So you started a -- you are in the front passenger's seat,

10   right?

11   A.  I just stated that, yes.

12   Q.  And the car pulls up next to the car that Ms. Peguero is

13   in, right?

14   A.  Yes.

15   Q.  And you start talking to her, right; start a conversation

16   with her?

17   A.  Yes.

18   Q.  And it's just normal conversation, hey, hi, how are you

19   doing, what's going on; that kind of thing, right?

20   A.  Something of that kind, yes.

21   Q.  And what else did you say to her?

22   A.  What do you mean, at that moment?  Or when I got out the

23   car, or?

24   Q.  What else did you say to her?

25              THE COURT:  Well, when?

1   Q.  Right at that point.  When you pulled up and she was inside

2   the car?

3   A.  General conversation, hey, what you all guys did tonight,

4   to that, ask like what you doing.

5   Q.  Okay.  So you -- what -- well, after you start the

6   conversation with those pleasantries, what did she say to you?

7   A.  She starting talking back.  She went out, or whatever, I

8   guess, I can't recall exactly what was said.

9   Q.  All right.  What was she wearing?

10  A.  Jeans and a halter top.

11  Q.  You remember your deposition, right, Mr. McCaffrey?

12  A.  Yes.

13  Q.  Page 43, line 20:

14  "Q.  Do you remember what she was wearing?

15  "A.  I can't recall at the moment."

16          Were you asked that question and did you give that

17  answer?

18          MR. GARBER:  Objection.

19          THE COURT:  Overruled.  Do you recall that answer and

20  that question?

21          THE WITNESS:  Not specifically, but if I said it --

22          THE COURT:  Well, just if you don't recall, just say

23  you don't recall.

24          THE WITNESS:  I don't recall.

25          THE COURT:  He doesn't know.

1    Q.  What refreshed your memory about what Ms. Peguero was

2    wearing since the time of your deposition?

3    A.  Maybe I'm not drinking the way I was, and I don't drink the

4    same way, and I have been incarcerated --

5    Q.  When you first saw Ms. Peguero, did it seem as though she

6    had been drinking?

7    A.  Not offhand.  Possibly.

8    Q.  Well, you testified in the grand jury, right, Mr.

9    McCaffrey.  You do recall your testimony in the grand jury,

10   don't you?

11   A.  Yes.

12          THE COURT:  He clearly recalls testifying in the grand

13   jury.

14          MR. LARKIN:  Okay.

15   BY MR. LARKIN:

16   Q.  Page 72, lines 18 to 19:

17   "Q.  She seemed drunk to you, right?

18   "A.  She seemed like she was drinking."

19          Were you asked that question, and did you give that

20   answer?

21   A.  Yes.

22   Q.  And that was truthful; right?

23   A.  Yes.

24   Q.  And it seemed to you like she had been drinking when you

25   first saw her, isn't that true?

1   A.  I testified five days after the incident, yes.

2   Q.  And when you were interviewed by the detectives in the

3   case, you told them that she -- she was drunk; isn't that

4   right?

5   A.  I can't recall at the moment.

6   Q.  You asked her to come -- well, you saw -- you saw she was

7   drunk, right, or appeared to be drunk to you, correct?

8   A.  I just said no.

9   Q.  No?  It didn't appear to you as if she had been drinking?

10  A.  Drunk.  Or drinking.  You just said drunk.  I didn't know.

11  Q.  It appeared to you she had been drinking, correct?

12  A.  Possibly, yes.

13  Q.  And you asked her to come with you and your friends to an

14  after-hours bar right?

15  A.  Yes.

16  Q.  And according to you, she said yes, correct.

17  A.  Yes.

18  Q.  And that's when you got out of your car, the Mercedes, and

19  you got into her car; correct?

20  A.  Around the same time.

21  Q.  And you opened the door to your car, right.  You stepped

22  out, and you opened the door to their car, correct?

23  A.  Yes.

24  Q.  And you got in; right?

25  A.  Yes.

1   Q.  Did you get in the back seat or front seat?

2   A.  The front seat.

3   Q.  The drivers's seat?

4   A.  Yes -- no -- the passenger's side, front.

5   Q.  The front passenger's side?

6   A.  Yes.

7   Q.  Okay.  And one of her friends was sitting, was sitting in

8   the car also, right?

9   A.  Yes.

10  Q.  And you didn't know, you didn't know Ms. Peguero at the

11  time, and you didn't both -- well, you didn't know Ms. Peguero

12  at the time, correct?

13  A.  No.

14  Q.  And you didn't know her friend in the back seat, either,

15  right?

16  A.  No.

17  Q.  And as far as you are aware, Ms. Peguero didn't know any of

18  the other three men that you were with, right?

19  A.  No.

20  Q.  And, no, she didn't know them?

21  A.  Yeah, no, she didn't know them.

22  Q.  And none of your friends knew her or knew her friend,

23  either; right?

24  A.  No.

25  Q.  And according to you, you got in the car and the girl in

1   the back seat didn't say anything, right?

2   A.  That's what I said, yes.

3   Q.  She never said get out of my car or get the F out of my

4   car?

5   A.  No.

6   Q.  So she sat there and she said nothing, right --

7   A.  Yes.

8   Q.  -- to the best of your recollection?

9   A.  She -- yes.

10  Q.  Right.  And while you were sitting in the car, at any

11  point, did you use the expression "mommy?"

12  A.  I possibly did, yes.

13  Q.  And what does that expression mean?

14  A.  I figured it's a term of indearment.  Mommy.  Like.

15  Q.  It's a term of indearment that is used in the Spanish

16  language, right?

17  A.  In urban, not just Spanish.

18  Q.  And men use it for -- to refer to women, typically?

19  A.  Yeah, they having songs about it.

20  Q.  Okay.  You recall testifying thing at your deposition,

21  right?

22  A.  Yes.

23  Q.  Mr. McCaffrey, this is page 46 line 7:

24  "Q.  Did you ever use the expression mommy when you got in the

25  car?

1   "A.  I can't recall at the moment."

2           MR. LARKIN:  Line 10:

3   "Q.  Did's you ever hear that expression referring to a girl as

4   mommy?

5   "A.  Yeah, I have heard it before.

6   "Q.  What context have you heard it?

7   "A.  I don't understand the question.

8   "Q.  Have you ever used that expression before?

9   "A.  Not that I can recall."

10          Were you asked those questions and did you give those

11  answers?

12  A.  Yes.

13  Q.  Did you tell the truth when you testified at the

14  deposition?

15  A.  Yes.

16  Q.  You have heard the expression mommy before though, right?

17  A.  I just explained to you I did, yes.

18  Q.  But you didn't admit that at your deposition, did you?

19          MR. COHEN:  Objection.

20          THE WITNESS:  I said I couldn't recall at the moment.

21          MR. COHEN:  Objection.  I think that's incorrect.

22          THE COURT:  One lawyer for the witness.  Mr. Garber

23  has to carry the ball for your team.  He can answer.  Don't

24  worry about him, Mr. Cohen.

25          Overruled.

1          THE COURT:  Overruled, next question.

2   Q.  So you get in the car, and Ms. Peguero -- when you get in

3   the car, was Ms. Peguero in the front seat or back seat?

4   A.  She was in the front seat.

5   Q.  Was she in the drivers side?

6   A.  Yes.

7   Q.  And you get in the car and she starts driving, right?

8   A.  Yes.

9   Q.  And you saw that she is swerving a little bit --

10  A.  Yes.

11  Q.  -- right?  So you took over the driving, right?

12  A.  After she pulled over, somebody said her lights were off,

13  yes.

14  Q.  And at that point, her friend got out of the car?

15  A.  Yes.

16  Q.  And from the time you got out of the car and her friend got

17  out of the car, you didn't hear her friend say anything; am I

18  correct?

19  A.  Not that I know.  Not that I can recall.  She said I'm out

20  of there, I'm not going.

21  Q.  She didn't say anything else, right?

22  A.  No.

23  Q.  Okay.  And you took over the driving.  And your intent was

24  to go back to the parking garage?

25  A.  That's what I did, yes.

1   Q.  Right?  You wanted to get into the minivan and go to the

2   after-hours party, right?

3   A.  Yes.

4   Q.  And you continued to the parking garage, right?

5   A.  Yes.

6   Q.  And that's the same garage where you had parked the minivan

7   earlier that night?

8   A.  Yes.  And where the Mercedes was parked monthly.

9   Q.  And before you went to X Bar, right.  So -- I'm sorry, so

10  you -- I'm sorry, Mr. McCaffrey.  So you went back to the

11  garage.  And the goal, the idea was you were to pick up the

12  minivan and go to this after-hours bar, right?

13  A.  Yes.

14  Q.  And when you got to the garage, the attendants parked

15  Ms. Peguero's car, right?

16  A.  They parked the Mercedes first.  It was in front of us,

17  yes.

18  Q.  They parked the Mercedes, then they parked her car?

19  A.  Yeah.

20  Q.  And you all got in the minivan, right?

21  A.  Yes.

22  Q.  And this garage, where you parked the cars, it was Ramone's

23  regular garage, wasn't it?

24  A.  Yes.

25  Q.  And who drove the minivan when you left the garage?

1   A.  I'm not sure, offhand.  It could have been either Jay or

2   Kupa.

3   Q.  And when you were in the minivan, according to you, what

4   was the seating arrangement?

5   A.  It is a three seat, so.

6   Q.  Where were you sitting?

7   A.  All of the way in the back, in the third row.

8          THE COURT:  When you say three seats, you mean three

9   rows of seats?

10         THE WITNESS:  Yeah.

11  Q.  And you were in the third seat, right?

12  A.  Yes.

13  Q.  And Ms. Peguero was in the middle seat, right?

14  A.  Yes.

15  Q.  With another gentleman?

16  A.  Yes.

17  Q.  Somebody else.  And Ramone was in the front, right?

18  A.  Yes.

19  Q.  Was Carlos in the middle seat.

20  A.  I'm not sure, offhand.  Either him or Jay.

21  Q.  Was Adorno driving?

22  A.  I just stated it was either one or the other.

23         THE COURT:  Was who driving?

24  Q.  Was Jay Adorno driving?  Mr. Adorno, was he driving?

25  A.  It was either one or the other, I'm not sure which one.

E4t0mcc7                          McCaffery - Cross

1    Q.  And you drove over toward 207 Street or 204 Street to see

2    if the after-hours party was still going on; is that right?

3    A.  Yes.

4    Q.  And that was close to the garage, right?

5    A.  Not too far.

6    Q.  Not far, right; five minute drive?

7    A.  Less than that.

8    Q.  And you had told Ms. Peguero, when you first saw her inside

9    the car, that the after-hours club that you were going to was

10   on either 204th or 207th street; didn't you?

11   A.  I didn't think I specified, just said we're going to

12   after-hours.

13   Q.  Do you remember giving a deposition in another case against

14   State of New York in the Court of Claims?

15   A.  Yes.

16   Q.  You gave that deposition, August 4th, 2011?

17   A.  Yes.

18   Q.  And you told the truth at that deposition, didn't you?

19   A.  Yes.

20   Q.  Page 82, line 22:

21   "Q.  Did you tell her where you were going?

22   "A.  Yes, the after-hours.

23   "Q.  But where, in terms of physical address?

24   "A.  The street address, I said it was on 207th Street.

25   "Q.  You did tell her?

1    "A.  Yeah.  On 204th.  Or 204th, right next to each other.  So

2    you know, there is no 205th, 206th.  It goes 204th, 207th."

3          Were you asked those questions and did you give those

4    answers?

5    A.  Yes, if it is there, I said it.

6          THE COURT:  Again, only if you remember.

7          THE WITNESS:  I don't -- it was awhile ago.  Yes.

8    Q.  And you told the truth at that deposition, obviously,

9    right?

10   A.  Yes.

11   Q.  Fair to say that you told Ms. Peguero, specifically, that

12   the after-hours party you wanted to go to was somewhere in

13   Manhattan on 204 or 207 Street?

14   A.  At this moment, I can't recall exactly what was said.  It

15   was so long ago.  But if I said it there, that's what was said.

16   Q.  And when you drove there, when you drove by the address of

17   the after-hours club, you saw that it was closed; right?

18   A.  Did I see if it was closed?  I --

19   Q.  You saw that?

20   A.  I assume it was closed, I was on the phone in the back,

21   yes.

22   Q.  You were on the phone in the back on your Nextel, right?

23   A.  Yes.

24   Q.  And you drove past the location where the after-hours was;

25   right?

1   A.  Yes.

2   Q.  And you saw that the after-hours was closed; correct?

3   A.  Yes.

4   Q.  And at that point, the group proceeded to drop off Raymond

5   Uribe and Mr. Adorno in the Bronx, right?

6   A.  Yes.

7   Q.  Okay.  And Mr. Uribe lived on Pelham Parkway, right?

8   A.  Yes.

9   Q.  Somewhere between East Chester and Williams Bridge in the

10  Bronx, right?

11  A.  Yes.

12  Q.  And it took about, what, 20 minutes to get there,

13  approximately?

14  A.  Probably 15 minutes.

15  Q.  Fifteen minutes, 20 minutes.  And Mr. Uribe and Mr. Adorno

16  were dropped off in the same area around the same time, right?

17  A.  Yes.

18  Q.  And Mr. Vargas is driving at that point?

19  A.  After they dropped him off.

20  Q.  After they dropped him off.  After Mr. Uribe and Mr. Adorno

21  got out of the car, Carlos Vargas was driving, right?

22  A.  Yes.

23  Q.  It was his minivan, right?

24  A.  Yes.

25  Q.  And you and Miss Peguero were in the back seat, the second

1   seat, right?

2   A.  I sat in the front.

3   Q.  You sat in the front with Mr. Vargas?

4   A.  Yes.

5   Q.  And Ms. Peguero sat in the back seat?

6   A.  Yes.

7   Q.  And after you -- okay.  And then at that point in time, you

8   turned around and you wanted -- your intention was to come back

9   to the parking garage, right?

10  A.  Yes.

11  Q.  And when you went across the bridge it was Ms. Peguero

12  said, in words or in substance, she didn't want to go; isn't

13  that right?

14  A.  When she went across the bridge, when?  When?  On Pelham

15  Parkway?

16  Q.  After you went across the bridge and you got to the

17  Bronx --

18  A.  After --

19  Q.  At some point, according to you, Ms. Peguero said she

20  didn't want to go?

21  A.  After we dropped off Raymond and Jay?

22          THE COURT:  At any point, did she say I don't want to

23  go.

24          THE WITNESS:  I can't -- not that I heard.

25  Q.  Well, after you dropped off Ramone Uribe Mr. Adorno that is

E4t0mcc7                          McCaffery - Cross

1    when Miss Peguero, who is still in the car, starts getting

2    phone calls, right?

3    A.  Yes.

4    Q.  According to you.

5          And according to you, she didn't get any calls during

6    the 25 minutes that she was in the car with you up to that

7    point, right?

8    A.  I couldn't say specifically.  She might have made a call,

9    or got a call.  I was on the phone.

10   Q.  To your knowledge, she didn't get any calls, right?

11   A.  I just answered that.

12         THE COURT:  Well, do you recall any calls that she

13   got?

14         THE WITNESS:  I mean she could have made one, or she

15   could have received one, I --

16         THE COURT:  I'm not asking if she could.  Do you have

17   a distinct recollection?

18         THE WITNESS:  Not offhand right now.  She possibly

19   made a call.

20         THE COURT:  Okay.

21   Q.  Do you remember your deposition in Court of Claims case --

22   A.  Yes.

23   Q.  -- right?  Page 92, line 20:

24   "Q.  So when did the phone calls start?

25   "A.  Right after we dropped off Ramone.

1   "Q.  So to the best of your recollection, she didn't receive

2   any phone calls during the 25 minutes that you were driving to

3   drop him off?

4   "A.  Like I said, I was on and off my phone.  I can't recall at

5   this time."

6           So you were asked those questions and gave those

7   answers, right?

8   A.  Yes.

9   Q.  You couldn't recall.

10  A.  I just answered the same thing.

11          THE COURT:  Doesn't seem like a lot of impeachment.

12          MR. LARKIN:  I'm sorry, your Honor.

13          THE COURT:  But we're not supposed to be getting this

14  in, if it is not impeachment.

15          So let's move on.

16          MR. GARBER:  No objection.

17          MR. LARKIN:  Apology for that.

18  Q.  Now, the first time she said she had to go back to her car,

19  according to you, was after you are dropped off Mr. Uribe and

20  Mr. Adorno; correct?

21  A.  Yes.

22  Q.  Before that, she didn't say any -- according to you, she

23  didn't have any complaints, didn't have any concerns, didn't

24  say take me back, or anything like that, right?

25  A.  She might have mentioned something to who she was sitting

E4t0mcc7                     McCaffery - Cross

1    next to that she had to go back.  But it wasn't -- not that

2    I -- I can't really recall right now.  But after, when she made

3    the phone call, she said she had to go back.  She might have

4    said it right before, right when we were dropping off Polo.

5    Q.  Do you remember your testimony at the criminal trial,

6    right?

7    A.  Yes.  We just read it.

8    Q.  Page 586, line 15:

9    "Q.  You heard him, Mr. Uribe say that she actually asked to be

10   taken back before he was dropped off, right?

11   "A.  Yeah, a couple of minutes right before we pulled up in

12   front of his house."

13           Were you asked that question and give that answer?

14   A.  Yes, I just said the same thing.

15   Q.  Oh, it was actually before they were dropped off that she

16   said, she voiced some concern, some wish to get back to the

17   parking garage; isn't that right?

18   A.  Yes.  Probably immediately right before we dropped them

19   off.

20   Q.  And at that point, according to you, she is not crying,

21   right?

22   A.  No.  Not at all.

23   Q.  She is not hysterical, right?

24   A.  Not at all.

25   Q.  Right?  Right?

1    THE COURT:  He said right.

2    MR. LARKIN:  I'm sorry.

3    Q.  And as you said during this time you are on your Nextel

4    phone, right?

5    A.  Yes.

6    Q.  You saw Ms. Peguero, saw her on the street, or you saw her

7    in her car.  You got out of your car and you got in their car

8    and invited her to an after-hours party, correct?

9    A.  I answered that, yes.

10   Q.  And you drove to the garage, where you knew you had a

11   minivan, right?  Right?

12   A.  Yes, I answered that.

13   Q.  And you got into the minivan.  And you get into the third

14   seat, right?

15   A.  Yes.  I said that, yes.

16   Q.  And does the third seat face forward or back?

17   A.  Forward.

18   Q.  Faces forward.  And Ms. Peguero is, she's in the second

19   seat with Mr. Vargas, right?

20   A.  I -- it was either him or Peter, I don't --

21   Q.  You don't say anything to Ms. Peguero, right?

22   A.  I can't recall, offhand.  I jumped on the phone, started --

23   they started talking amongst themselves.

24   Q.  You picked her up, you got her back to the parking lot, and

25   according to you, you got in the minivan, and then you didn't

1    say a word to her after that.  Is that your testimony?

2              MR. GARBER:  Objection.

3              THE COURT:  Overruled.

4              Is that accurate?

5              THE WITNESS:  I mean -- I guess I didn't say anything

6    to her.  I mean I can't recall.  I didn't have a conversation.

7    If I said one word to her, I don't think.  I might have.

8              THE COURT:  Okay.

9              All right, next question.

10             MR. LARKIN:  Okay.

11   Q.  Now, according to you, she started getting phone calls,

12   either just before or after -- well, withdrawn.  She starts

13   getting phone calls after Mr. Uribe dropped her off, right?

14   A.  Yes.

15   Q.  And she starts crying after she's getting those phone

16   calls, right?

17   A.  It proceeded.  She didn't start crying, she started arguing

18   with them, first.  And slowly --

19   Q.  And then she started --

20   A.  She slowly --

21             THE COURT:  Let him finish.

22   A.  -- but shortly upon, after a couple of calls, yes.

23   Q.  And, to you, it seemed like she was getting more and more

24   upset as a result of the phone calls, right?

25   A.  Yes.

E4t0mcc7                        McCaffery - Cross

1    Q.  And while she is getting these phone calls, in between the

2    calls, she is speaking to Mr. Vargas in Spanish, right?

3    A.  Yes.

4    Q.  And she is -- she is speaking on the phone in Spanish to

5    her friends, right?

6    A.  Yes, arguing.

7    Q.  And you couldn't understand what she was saying, correct?

8    A.  No.

9    Q.  While she is getting these calls, at one point Mr. Vargas

10   gets on the phone to talk to her friends, right?

11   A.  Yes.

12   Q.  He got on the phone once, to your regulation; correct?

13   A.  Might have been once, but that's all that I could recall.

14   Q.  You recall one time?

15   A.  Yes.

16   Q.  Right.  And you heard Carlos, you told Carlos to tell the

17   friends on the phone to tell them the address where you were

18   going, right.

19   A.  Yeah, she was going crazy in the back, so I --

20   Q.  And, according to you, that was the address of the garage,

21   right?

22   A.  Yes.

23   Q.  And Carlos, you told us, owned a mini van; right?

24   A.  It was his mini van, I don't know who owns it.

25   Q.  Right.  But it was a mini van he picked you up with and

1   parked at the same garage, right?

2   A.  Yes.

3   Q.  So Carlos knew the address of the garage, didn't he?

4   A.  I don't know, I assume so.

5   Q.  Well, it's where he parked his mini van, right?

6   A.  Yes.

7   Q.  And that's where he picked up the Mercedes, right?

8   A.  Yes.

9   Q.  He didn't need you to tell him the address of the garage,

10  did he?

11  A.  No.

12  Q.  And he didn't need you to tell him -- withdrawn.

13          You also told him to say on the phone to Ms. Peguero's

14  friends about how much longer it would take to get there,

15  according to you, right?

16  A.  I said we'll be there in like five minutes, five to what

17  shorter period of time, just tell them the address, tell them

18  the address, whoever you are speaking to.

19  Q.  And Carlos knew how long it was going to take, right; he

20  didn't need you to tell him?

21          MR. GARBER:  Objection.

22          THE COURT:  Sustained.

23  Q.  Isn't it true that Carlos gave a wrong address to

24  Ms. Peguero's friends?

25  A.  I don't -- not to my knowledge, no.

1   Q.   Best of your knowledge, Carlos only gave one address to

2   Ms. Peguero's friends?

3            MR. GARBER:  Objection.

4            THE COURT:  I'm not sure I understand the only one

5   address.  Is there more than --

6   Q.   To your knowledge, Carlos Vargas has had one conversation

7   with Ms. Peguero's friends on the phone, correct?

8   A.   Yes.  To my knowledge, he told them where the parking lot

9   was.

10  Q.   And in that conversation, he told them where the parking

11  garage was, right, to your knowledge?

12  A.   To my knowledge, yes.

13  Q.   And he didn't -- he didn't give -- you didn't see him give

14  any other addresses, is what you are saying, over the phone, to

15  Ms. Peguero's friends, right?

16  A.   To my knowledge, he gave them the address.

17  Q.   All right.  And as Ms. Peguero is getting these phone

18  calls, and she's talking to Mr. Vargas, according to you, she

19  is freaking out, right?

20  A.   Yes.

21  Q.   She's screaming, yelling, punching the back of the seat;

22  right?

23  A.   Yes.

24  Q.   She's arguing with whoever she is on the phone with, right?

25  A.   Yes.  With numerous phone calls.

1   Q.  She's crying?

2   A.  Yes.

3   Q.  Punching the car; right?

4   A.  I just said yes.

5   Q.  And so according to what you observed, it was -- it was the

6   phone calls that were making her upset, right, Mr. McCaffrey?

7   A.  Yes.

8   Q.  And from the time you dropped off Mr. Uribe, it took about

9   15 minutes to get back to the garage; correct?

10  A.  Yes.

11  Q.  And by the time you got back there, she was, what, she

12  appeared angry to you, according to you, right?

13  A.  Yes.

14  Q.  Were her clothes askew, at all, or messed up?

15  A.  No.

16  Q.  Was her belt broken?

17  A.  No.

18  Q.  Were her pants open?

19  A.  No.

20  Q.  You don't have any explanation for how it is her friends

21  found her in the garage with her belt broken, do you?

22  A.  Her friends beat her up.

23          MR. GARBER:  Objection.

24          THE WITNESS:  I answered that.  He said what's my

25  assumption.  Her friends beat her up.

1    THE COURT:  No, I don't think -- I don't think he said

2    what was your assumption.  But he asked the question, you

3    answered the question.  And I'm not sustaining the objection.

4    So, go ahead.

5    Q.  And you don't have any explanation for how it is her pants

6    were open when her friends found her in the parking lot; do

7    you?

8    A.  Objection.

9    MR. GARBER:  Objection.

10    THE COURT:  You have no explanation, right?

11    THE WITNESS:  I thought she explained it when she said

12    what happened with her friends, that her friends beat her up

13    when she testified, no?

14    THE COURT:  Okay.  So that's -- this is the

15    explanation.

16    Q.  You were not in the garage when her friends came back,

17    right.

18    A.  No.

19    Q.  And after this night, you got a call at some point to go

20    down to the precinct, correct?

21    A.  Yes.

22    Q.  Right.  And you -- who called you was, it a detective or

23    was it Mr. Uribe?

24    A.  I think Mr. Uribe called me in the beginning.  And then I

25    spoke to the detective afterwards.

1    Q.   And you went down to the precinct and spoke to a detective;

2    right?

3    A.   Yes.

4    Q.   And you made a statement, right?

5    A.   I didn't make a statement, I told them what happened.

6    Q.   You were asked questions about what happened, correct?

7    A.   Yes, but I didn't write anything, I just told them

8    verbally.

9    Q.   You didn't write a statement, but you did have a

10   conversation, and you gave the detective, you told the

11   detective what you said you knew about the incident involving

12   Ms. Peguero, correct?

13   A.   Yes.

14   Q.   And the detective read you your Miranda rights before you

15   gave the statement.

16   A.   I can't recall right now, but possibly, I mean --

17   Q.   And the statement you gave was truthful; right?

18   A.   What do you mean, what I said?

19   Q.   What you said to the detective was truthful, right?

20   A.   Yes.

21   Q.   To your knowledge -- and you were put in a line-up after

22   that; true?

23   A.   Yes.

24   Q.   And after that, Mr. McCaffrey, you went to trial and you

25   were convicted of the charge; right?

E4t0mcc7                        McCaffery - Cross

1   A.  Yes.  Falsely accused, yes.

2   Q.  Okay.

3          MR. LARKIN:  One moment.

4   Q.  Now, your attorneys called witnesses to testify in your

5   behalf at the trial; right?

6   A.  Yes.

7   Q.  Mr. Uribe testified; right?

8   A.  Yes.

9   Q.  What about Mr. Adorno, did he testify?

10  A.  No.

11         MR. GARBER:  Objection.

12  A.  I don't think so.

13         THE COURT:  Just to the fact of the testimony?

14  Overruled.

15  Q.  Mr. Adorno didn't testify, did he?

16  A.  No.

17  Q.  What about Mr. Vargas, did he testify?

18  A.  No.

19  Q.  Isn't it true Mr. Adorno was later arrested and charged

20  with rape in this case --

21         MR. GARBER:  Objection.  Objection and stricken.

22         THE COURT:  Sustained.  Sustained.

23         MR. GARBER:  I'm asking that it be stricken.

24         THE COURT:  Yeah, I'm going to strike that answer.

25  BY MR. LARKIN:

1   Q.  Well, give me one moment.

2          Now, you talked about being in, being in state prison

3   on your direct examination; right, Mr. McCaffrey?

4   A.  Yes.

5   Q.  You were strip searched frequently, right?

6   A.  Numerous times.

7   Q.  And you were housed in a cell or were you in a dorm area?

8   A.  During what occasion?

9   Q.  On any of the -- on any of the -- well, you were

10  at Downstate and Sing Sing and Five Points; right?

11  A.  During this wrongful conviction, right.

12  Q.  Right.  I'm talking about being in state custody?

13  A.  Okay, in state custody.  Because the county custody process

14  is different.  Yes.

15  Q.  You were in Down State; right?

16  A.  Yes.

17  Q.  And went to Sing Sing?

18  A.  Yes.

19  Q.  And then Five Points?

20  A.  Yes.

21  Q.  And then Greenhaven; right?

22  A.  Yes.

23  Q.  And in each of those facilities, you were -- was the strip

24  search, was it every day, or was it --

25  A.  Every time I got a visit, coming back and forth, whenever

1    there was general searches, individual, whatever, the officers

2    just wanted to strip search you.

3    Q.  You were in a cell, or you were in a dorm area?

4    A.  In cells.

5    Q.  During all of those prisons?

6    A.  There are no dorm areas in the prisons.

7    Q.  Okay.  You currently at Orleans, right?

8    A.  Yes, sir.

9    Q.  In a dorm area?

10   A.  Yes, in a dorm area.

11   Q.  Dorm area now?

12   A.  Yes.

13   Q.  Are you strip searched periodically?

14   A.  No.

15   Q.  Never strip searched?

16   A.  Only on visits.  It's not the same situation.

17   Q.  Strip searched --

18           THE COURT:  Let him answer.

19   A.  Coming back from visits.  Yes, I'm strip searched.

20           THE COURT:  Can I just -- can the jury see the

21   witness?

22   Q.  And you have meals at set times; right?

23   A.  Yes.  It is optional and mediums; yes.

24   Q.  And when you were in Sing Sing and Five Points and other

25   maximum security facilities, you had meals at set times; right?

E4t0mcc7                          McCaffery - Cross

1   A.   Yeah, mandatory.

2   Q.   Meals are optional in medium security prisons?

3   A.   Yes.

4   Q.   And in any event, you're obviously, to a degree, you're

5   denied your liberty, currently, when you are in the medium

6   security prison?

7   A.   There is no comparison.

8              THE COURT:  Well, just answer the question.  To a

9   degree --

10             THE WITNESS:  Yes.

11             THE COURT:  Okay.  Next question.

12  Q.   And your release date is July 2016; right?

13  A.   Yes.

14  Q.   Okay.

15             MR. LARKIN:  I don't have any further questions at

16  this time.

17             THE COURT:  Okay, any redirect?

18             MR. GARBER:  Yes.

19  REDIRECT EXAMINATION

20  BY MR. GARBER:

21  Q.   You were just asked by Mr. Larkin about whether your

22  liberty has been obstructed during your current incarceration

23  to an extent.  And you had said there is no comparison.

24             What did you mean by that?

25  A.   How, in maximum security prison, you're in a 6 by 9 cell

1    until controlled movement.  Meaning the whole, there is 60

2    inmates on each company.  They are moved all at once.  Moved

3    once to chow, all together.  Moved to the yard.  You know, you

4    are locked back in your cell after set times.  Everything is

5    calculated out to where medium is, they announce food is being

6    served, you sign out on a booklet and walk to mess hall in

7    another building and to where everything is in-house.

8            In a maximum security prison you're locked in a cell.

9    And in a dorm area, like, you have a cubicle, you have free

10   area to walk around, use the microwave and --

11   Q.  Okay.

12           What is controlled movement?

13   A.  It like cattle.  You walk in two lines, to the mess hall,

14   walk back.  To move, they bang on the wall twice with the

15   stick, to stop it is one hit.  They lock you.  They go back to

16   your company.  You are locked back into your cells until the

17   next controlled movement, meaning the option to either, in the

18   evening to go to recreation, to the yard, or to different --

19   it's just.  It is only three movements per day, otherwise you

20   are locked in and eating food --

21   Q.  Are there any other ways there is a difference between the

22   incarceration with a rape conviction in a maximum security

23   prison, as compared to what you are going through now?

24   A.  I didn't really know I couldn't compare it until actually

25   I'm currently in trouble now.  I go to the medium now.  And it

1   is like there is a lot, six people with those type of cases,

2   and it's -- it's fine for them, because they -- they pled to

3   their charge, they are guilty.  You know, they get to walk

4   around, and have general freedoms that, you know, you are

5   restricted to.  In maximum security prison, let alone, it is

6   like acceptable in the medium to have a messed up case to in

7   the max you are a rapist.  And I'm not out.  I got the scarlet

8   R on me.  Labeled.  To where there is so many in a medium

9   facility, they get to live comfortably.  You know, not -- it's

10  just a big difference, you know, go to the yard when they want.

11  They are not ridiculed by the officers.  It is a different

12  category of officers working in medium.  They are not -- the

13  charges are not pointed out.  And I mean if I -- it's just a --

14  it's a big difference.

15  Q.  You were asked questions on cross-examination about whether

16  or not Ms. Peguero was outside of the car, or inside; outside

17  or inside the car when you approached.  Do you remember those

18  questions?

19  A.  I mean I know that she was getting into the drivers seat.

20          THE COURT:  But just the only question --

21          THE WITNESS:  I'm sorry.

22          THE COURT:  -- was do you remember the questions on

23  cross about that.

24          THE WITNESS:  Oh, yes.

25          THE COURT:  Okay, next question.

E4t0mcc7                          McCaffrey - redirect

1   Q.  Can you explain?

2               THE COURT:  Explain what?

3   Q.  Was she inside or was she outside?

4   A.  Like I said, she was getting into the drivers seat.

5   Q.  Do you remember being asked about this, also, at the trial.

6   And this is page 555.

7               MR. LARKIN:  I object to this.

8               THE COURT:  Overruled.

9               Overruled, you can ask the question.

10  Q.  And specifically being asked at the trial what you

11  testified to at the grand jury on this.  Do you remember that?

12  A.  Yes.

13              MR. LARKIN:  Objection.  Well --

14              THE COURT:  Overruled.

15              MR. LARKIN:  Okay.

16  BY MR. GARBER:

17  Q.  Do you remember being asked this question at the trial.

18  This is page 555, line 19:

19  "Q.  You never told the grand jury that anyone was standing

20  outside of the car; did you?

21  "A.  She was getting into the passenger's seat."

22              do you remember being asked that question and giving

23  that answer?

24  A.  Yes.

25  Q.  Okay.

1              MR. GARBER:  I have no further questions.

2              THE COURT:  Okay, any recross?

3              MR. LARKIN:  Very briefly.

4    RECROSS EXAMINATION

5    BY MR. LARKIN:

6    Q.  I think, Mr. McCaffrey, I thought I heard you say that the

7    inmates in medium security prisons live comfortably; did you

8    say that?

9    A.  More comfortable in comparison to --

10   Q.  Comfortably.

11   A.  More comfortable.  Maybe my vocabulary --

12   Q.  It is not comfortable in prison.

13   A.  Of course it is not, it is prison.

14             MR. LARKIN:  Thank you.  I have no further questions.

15             THE COURT:  Okay.

16             Mr. McCaffrey, you can step down.  Thank you.

17             THE COURT:  Let's get Ms. Pujols in here.

18             Raise your right hand.

19    AURORA PUJOLS,

20        called as a witness by the plaintiff,

21        having been duly sworn, testified as follows.

22             THE COURT:  State your name and spell your last name.

23             THE WITNESS:  Aurora Pujols, A-U-R-O-R-A, P-U-J-O-L-S.

24             THE COURT:  Good afternoon.  Thank you.  Maybe move a

25    little bit closer to that microphone.  Great, okay.  And you

1    can proceed.

2    DIRECT EXAMINATION

3    BY MR. GARBER:

4    Q.   Thank you.  Are you here pursuant to a subpoena?

5    A.   Yes, I am.

6    Q.   Do you want to be here?

7    A.   No, I don't.

8          MR. LARKIN:  Objection, your Honor.

9          THE COURT:  Overruled.

10   Q.   Do you want to be here?

11   A.   No.

12   Q.   You know that I represent William McCaffrey, right?

13   A.   I do.

14   Q.   And there was one other time that you and I met.  It was at

15   a deposition in March of 2012; is that right?

16   A.   Yes.

17   Q.   You and I have never spoken about the substance of your

18   testimony, other than either at a deposition or right now in

19   the courtroom, right?

20         MR. LARKIN:  Objection to the --

21         THE COURT:  Overruled, you can answer.

22   Q.   Have we --

23         THE COURT:  You can answer the question.

24         THE WITNESS:  No, we haven't.

25   Q.   And you have spoken to Mr. Larkin about your testimony

E4t0mcc7                         Pujols - direct

1   before the deposition, right?

2   A.   About today's?

3   Q.   No.   Before your deposition, did you have an opportunity to

4   speak to Mr. Larkin?

5   A.   Yes, I did.

6   Q.   You spoke to him by phone before your deposition, or did

7   you speak to him by phone before your deposition?

8   A.   I don't remember if it was by phone, or by -- or if I went

9   in person.

10   Q.   Do you remember your deposition on March 13 of 2012?

11           MR. LARKIN:   Objection, your Honor, I --

12           THE COURT:   Overruled.

13           You can answer the question.   Do you remember your

14   deposition?

15           THE WITNESS:   I don't remember the date, but I

16   remember going on a deposition.

17   Q.   Do you remember being asked questions at that deposition

18   about whether or not you spoke to Mr. Larkin before that

19   deposition?

20   A.   No, I don't remember.

21           MR. GARBER:   This is page 39.

22   Q.   Do you remember being asked the following questions and

23   giving the following answers:   This is line 3.

24   "Q.   Before you came here today, you had an opportunity to

25   speak to Mr. Larkin?

E4t0mcc7                        Pujols - direct

1    "A.  Yes, I did.

2    "Q.  You spoke to him by phone on Sunday?

3    "A.  Correct."

4            Do you remember being asked those questions and giving

5    those answers?

6    A.  Yes, I do.

7    Q.  Does that refresh your recollection as to whether or not

8    you had an opportunity to speak to Mr. Larkin before your

9    deposition?

10   A.  Yes, it does.

11   Q.  And how long did you speak to him before your deposition?

12   A.  I don't remember.

13   Q.  Do you remember being asked this question and giving this

14   answer.  This is page 40:

15   "Q.  How long did you speak for?

16   "A.  Maybe like 15 minutes."

17           Do you remember being asked that question and giving

18   that answer?

19   A.  I don't remember.

20           MR. GARBER:  I would ask for a stipulation that this

21   is accurate testimony.

22           THE COURT:  We can deal with that later.

23           Let's go ahead with the examination.

24           MR. GARBER:  Okay.

25   Q.  Are you denying that you spoke to Mr. Larkin before the

1   deposition?

2   A.  I'm not denying it, but this was a really long time ago.

3   Q.  We are talking about, by phone, before your deposition.

4   A.  I remember speaking to him on the phone.

5   Q.  Do you also remember that your deposition started late on

6   Tuesday morning?

7           MR. LARKIN:  Objection to that.

8           THE COURT:  Well, do you remember that?

9           THE WITNESS:  I don't remember.

10  Q.  Well, do you remember that before you -- well, did -- where

11  was the deposition?

12  A.  In a courtroom.

13  Q.  Was it at --

14  A.  I know it was here in New York in one of these buildings,

15  but I don't remember which building it was.

16  Q.  Was it Corporation Counsel at 100 Church Street?

17  A.  That's correct.

18  Q.  Mr. Larkin's office?

19  A.  Yes.

20  Q.  And do you remember that prior to coming to the deposition

21  room, you had met with him for about 25 or 30 minutes?

22  A.  I remember sitting in his office, yes.

23  Q.  Do you remember talking to him for about 25 or 30 minutes

24  before your deposition?

25  A.  I don't remember if we spoke.  I know I sat in his office.

1   Q.  Do you remember being asked the following question and

2   giving the following answer.  And this is page 43, line 10:

3   "Q.  How much time did you spend with Mr. Larkin before the

4   deposition started?

5   "A.  Maybe 25 minutes; 25, 30 minutes, probably."

6            Do you remember being asked that question and giving

7   that answer?

8   A.  I don't remember.

9   Q.  Are you denying that you gave those?

10  A.  I'm not denying.  I'm only telling you what I remember.

11  Q.  And you were under oath at that deposition, right?

12  A.  I believe so.

13  Q.  Where is Ms. Peguero now?

14  A.  I believe she is in the Dominican Republic.

15  Q.  She was deported, right?

16  A.  That is correct.

17  Q.  And she was deported after she was convicted of perjury,

18  right?

19            MR. LARKIN:  Objection.

20            THE COURT:  I'm not sure this is the witness for that,

21  so sustained.

22  BY MR. GARBER:

23  Q.  Are you aware, were you aware what happened to her as far

24  as -- did she have a criminal case?

25            MR. LARKIN:  Objection.

E4t0mcc7                     Pujols - direct

1    A.  I know she was deported, that's all I know.

2    Q.  And this was after she served time in jail?

3    A.  I believe so.

4    Q.  Well, do you talk to her?

5    A.  I have not spoken to her in a year.

6    Q.  Okay.  We're going to go through a timeline here.

7           Now, the incident that started all of this was

8    September, the evening of September 18, 2005?

9    A.  That's correct.

10   Q.  And prior to -- well, it was an incident where she claimed

11   she as raped, right?

12   A.  That is correct.

13   Q.  And then you went to the hospital with her, correct.

14   A.  That's correct.

15   Q.  And then you were interviewed by detectives in this case;

16   right?

17   A.  That's correct.

18   Q.  And it was Detective Arbuiso?

19          MR. LARKIN:  Objection to leading, your Honor.  I

20   think the Court did rule on some of this.

21          THE COURT:  Yeah, I mean at this point, I think we

22   could try not to lead.

23          MR. GARBER:  I'll open it up.

24          THE COURT:  Okay.

25   BY MR. GARBER:

E4t0mcc7                      Pujols - direct

1    Q.  Was Detective Arbuiso -- well, what was the name of the

2    detective who you spoke to?

3    A.  I spoke to two detectives.

4    Q.  What were their names?

5    A.  Arbuiso, because you just mentioned him.  But I don't

6    remember the name of the other detective.

7    Q.  Are you saying Mr. Arbuiso because I just mentioned him, or

8    are you saying Arbuiso because I refreshed your memory about

9    what his name was?

10   A.  Because you refreshed my memory of what his name was.

11   Q.  Was it Arbuiso?

12   A.  Yes, it was.

13   Q.  Okay.  And the other one, you don't know his name?

14   A.  I don't recall his name.

15   Q.  Was he Spanish?  Was he Caucasian?

16   A.  He was Hispanic.

17   Q.  And look in the courtroom.  Do you see these two gentlemen

18   sitting over there?

19   A.  Yes, I do.

20   Q.  Do they look familiar?

21   A.  A little bit.

22   Q.  A little bit in regard to who the detectives were?

23   A.  A little bit, but it's been a really long time since I have

24   seen them.

25   Q.  Okay.  Are you saying that it is not Arbuiso, and the

1   Spanish guy?

2   A.  I didn't say that.

3          MR. LARKIN:  Objection, your Honor.

4          THE COURT:  Do you recognize either of the two men at

5   the back table?

6          THE WITNESS:  I kind of remember the one to the right.

7   Q.  Okay.  You could remember the one to the right?

8   A.  I do.

9          THE COURT:  You do, or cannot.

10          THE WITNESS:  I do.

11   Q.  So the one at the far end of the table?

12   A.  Correct.

13   Q.  Is that the Spanish one that you were referring to?

14   A.  They both look Spanish.

15   Q.  So which one would be the Spanish one, or the one to the

16   right.  Was he the Spanish one as you are referring to the

17   Spanish one?

18          THE COURT:  Which one is Arbuiso?

19          THE WITNESS:  I don't know which one Arbuiso is.  I

20   just remember Arbuiso, because he said Arbuiso.  I can't tell

21   you which one is which.

22          THE COURT:  All right, next question.

23   Q.  Now, after you went to the hospital with Ms. Peguero on

24   September 18th of 2005, you had contact with the detectives,

25   or -- did you have contact with the detectives?

E4t0mcc7                          Pujols - direct

1    A.  I did.

2    Q.  And was that in New York, or in New Jersey?

3    A.  In New York.

4    Q.  Was there a detective involved in New Jersey at all?

5    A.  There was, but for a really brief period.

6    Q.  Do you remember the name of that detective?

7    A.  No, I only remember that it was a female.

8    Q.  And when you had contact with the detectives in New York,

9    how did you get to New York?

10   A.  In a car.

11   Q.  Were you driven from New Jersey to New York?

12   A.  Yes.

13   Q.  By who?

14   A.  By the female detective from New Jersey.

15   Q.  And then where did you connect with the detectives from New

16   York?

17   A.  I think they picked us up once we crossed the tunnel and

18   then we drove to the precinct.

19   Q.  Did you drive around before you went to the precinct?

20   A.  Yes, we did.

21   Q.  And who was with you?

22   A.  The detectives, Buirny, and I think Heliana was with us,

23   also, but I'm not sure.

24   Q.  What about Maria Sosa?

25   A.  Probably.  But I don't remember, because I -- I think she

1    had to leave because she had to go to work.  I know one of us

2    had to go, but I don't remember if it was Maria or Heliana that

3    was with us.

4              THE COURT:  Okay let's have another question.

5              MR. GARBER:  Just one moment, your Honor.

6    Q.  So you said you drove around with the detectives?

7    A.  That's correct.

8    Q.  And you get interviewed by them in a precinct?

9    A.  Yes, I did.

10   Q.  And who interviewed you in the precinct?

11   A.  The detectives.

12   Q.  Which ones?

13   A.  The Detective Arbuiso.  And I don't remember the other

14   detective's name.

15   Q.  Did you ever appear in a line-up?

16             THE COURT:  Appear at a line-up.

17             MR. LARKIN:  View a line-up, I think is the question.

18   BY MR. GARBER:

19   Q.  Well, did you ever appear to view a line-up, did you ever

20   appear for a line-up?

21   A.  I went to go see a line-up; yes.

22   Q.  Did you ever testify before a grand jury in regard to the

23   criminal case against Mr. McCaffrey?

24   A.  Yes, I did.

25   Q.  Did you ever testify at a trial in regard to the criminal

1    case against Mr. McCaffrey?

2    A.  I didn't hear the question --

3    Q.  Did you ever --

4    A.  -- sorry.

5    Q.  Did you ever testify at a trial, a criminal trial involving

6    Mr. McCaffrey?

7    A.  I did.

8    Q.  Do you recall being interviewed by a private investigator

9    who worked for Mr. McCaffrey in April of 2009?

10   A.  I remember being interviewed by a private investigator.

11   Q.  And do you remember being questioned about that interview

12   at your deposition?

13   A.  I don't remember being questioned about it, but I remember

14   the interview with the detective.  Or with the private

15   investigator.

16   Q.  Do you remember meeting with Evan Krutoy, a prosecutor who

17   was reinvestigating the criminal case against William

18   McCaffrey.

19   A.  I do.

20   Q.  Do you remember testifying at a grand jury that was focused

21   on perjury charges against Buirny Peguero?

22   A.  I do.

23   Q.  And I believe you said you remember your deposition on

24   March 13 of 2012?

25   A.  I do.

E4t0mcc7                    Pujols - direct

1   Q.  When you spoke to the investigator in April of 2009, he

2   came out to see you in New Jersey; right?

3   A.  That is correct.

4   Q.  And you had a conversation with him, right?

5           MR. LARKIN:  Objection.

6           THE COURT:  The fact of the conversation, I'll allow.

7           MR. LARKIN:  It's the leading.

8           MR. GARBER:  Could I have a little latitude.

9           THE COURT:  I think you have had a lot of latitude.  I

10  don't think there is any nonleading yet, so I'm you a little

11  latitude.

12  Q.  You had a conversation with the investigator?

13  A.  I did.

14  Q.  And he came to New Jersey to see you, right?

15  A.  That is correct.

16  Q.  Did he meet you outside of a salon where you were getting

17  your hair done?

18  A.  That's correct.

19  Q.  And you spoke with him in a car, right?

20          MR. LARKIN:  Objection.  I mean counsel -- counsel's

21  testifying.

22          THE COURT:  Where did you meet him?

23          THE WITNESS:  At a bar.

24  Q.  At a bar.  Did you meet with him in a car first?

25  A.  I think his car was parked in front of the salon, and then

E4t0mcc7                              Pujols - direct

1    we went to a bar.

2    Q.  Okay.  So you had a conversation with him inside the car,

3    and then you went to a bar and continued the conversation?

4    A.  I remember us speaking in the bar.

5    Q.  Are you saying you didn't speak in the car.

6    A.  I am saying I don't remember.

7    Q.  And you later learned that that conversation was

8    tape-recorded, right?

9              THE COURT:  Okay, sustained.

10             We're going to break for today, ladies and gentlemen.

11             We'll pick up tomorrow at 9:30.  Don't discuss the

12   case.  Keep an open mind.  Take your books with you and leave

13   them in the jury room.  And make sure we get here, ready to go,

14   at 9:30 sharp.  Okay, thank you.

15             All rise for the jury.

16             (Jury excused)

17             (Continued on next page)

18

19

20

21

22

23

24

25

E4TUMCC8

```
1              (Jury not present)
2              THE COURT:  Ms. Pujols, you are not finished.  Try to
3    get here at 9:15.
4              THE WITNESS:  I have to have car service.
5              THE COURT:  How did you get here today?
6              THE WITNESS:  I drove in yesterday and today.
7              THE COURT:  Because you don't have access?
8              THE WITNESS:  Right.
9              THE COURT:  Counsel, we will address now or think
10   about it.  I am not sure where you live or the logistics of it.
11   We want you here about 9:15, so that we can start 9:30 sharp so
12   that we can finish you up tomorrow before lunch.  Anything else
13   anybody like me to instruct the witness on?
14             MR. GARBER:  That she shouldn't talk about her
15   testimony.
16             THE COURT:  She is on direct.
17             See you tomorrow.  Thank you very much.  And if you
18   bump into the jurors outside, don't talk to them, don't speak
19   to them, don't look at them.  And I have given them similar
20   instructions.
21             So you are going to make arrangements to connect with
22   each other.
23             THE WITNESS:  He has my home number.
24             (Witness excused)
25             THE COURT:  I am trying to figure out where we are
```

E4TUMCC8

1    going with this direct.  Do you intend to ask her about what

2    the defendants said to her?

3             MR. GARBER:  Absolutely.

4             THE COURT:  It seems like you are trying to start with

5    the investigator.

6             MR. GARBER:  The problem I'm having is that I am

7    actually feeling you out to see how far I can go with direct

8    and where -- I am going to start getting into areas that she is

9    going to be difficult with and I am going to have to start

10   refreshing her recollection and --

11            THE COURT:  I don't know if she is going to be

12   difficult or not.  I just want to make sure that you are not

13   planning to try to introduce the recording before you have

14   asked her about the events of that evening or the aftermath of

15   the investigation.

16            MR. GARBER:  I don't see how I can do that.  Just so

17   you know, I asked the question about the recording.  I am going

18   with the history.  At the deposition, I could not get her to

19   open up and get her to say anything until she made the

20   statement --

21            THE COURT:  At that point maybe she didn't know if she

22   was recorded.  All that I am trying to figure out, if you are

23   trying to introduce the recording, the investigator before you

24   have elicited any investigation about the detectives told her

25   what she told the detectives.

E4TUMCC8

1              MR. GARBER:  My next question was didn't you tell

2      Mr. Dwyer and say --

3              MR. LARKIN:  I would object.

4              THE COURT:  That is an out-of-court statement that you

5      are offering it for the truth.  It seems to me what you have to

6      do first is ask her what the detective said to her and what she

7      said to the detectives and you can impeach her with the

8      statements to Dwyer and then, depending on what is said.

9              MR. GARBER:  You are right.  I am just up one step

10     ahead of myself.  That is the line I'm going down.

11             MR. LARKIN:  Your Honor, I am going to object to

12     leading when we get to that line.  The questions ought to be

13     simple and direct.  Were you interviewed?  What did you say?

14     Were you asked questions?  What did you say in response to

15     those questions?  And what did they say to you?  Did you say

16     anything about a fight?

17             THE COURT:  I get all of that.  I don't think it is

18     going to take much to allow her to be treated as a hostile

19     witness.  She has never agreed to meet with Mr. Garber, only

20     spoken to him in depositions.  She is only here because of a

21     subpoena.  I don't want to push her too hard.  It is not clear

22     to me that she is not going to answer non-leading questions.

23             Anything else that we need to discuss tonight before I

24     rush off to my class?

25             MR. LARKIN:  One thing, that we wanted to tee up.  We

1   mention there is some law concerning the effect of a settlement

2   with the state.

3            THE COURT:  With respect to damages?

4            MR. LARKIN:  With respect to damages only.  We did get

5   a stip about -- either Saturday before the trial and there was

6   a settlement made to Mr. McCaffrey.  And I think we are going

7   to be briefing the issue of the legal effect of that settlement

8   on what damages he can recover.

9            THE COURT:  This goes to the jury?

10           MR. LARKIN:  It goes to the Court.  It will be on a

11  Rule 50 motion.  I expect plaintiff is going to take a very

12  different view of what the effect of this decision.

13           THE COURT:  I will be thinking about it.

14           MR. GARBER:  It is a judge question, not a jury

15  question we will deal with it.  Just quickly, and I know that

16  you have to leave.  On Ms. Zgodny's opening she argued that

17  Ms. Peguero only recanted in a very narrow way that

18  Mr. McCaffrey didn't rape her.  In my opinion that opens the

19  door for us to show that there was DNA evidence that was found

20  on the bite mark on Ms. Peguero's arm that has the profile of

21  Aurora Pujols on it.  I don't think it is fair for the jury to

22  be left with the impression that this is a technical thing that

23  relies on Ms. Peguero's credibility only, because they can

24  attack her credibility and do an injustice to the nature to the

25  sweeping nature of that exoneration.

E4TUMCC8

1          THE COURT:  I don't think that anyone is suggesting

2    that the bite mark is from the defendant.  Are you?

3          MR. LARKIN:  Absolutely not, just the opposite.

4          MS. ZGODNY:  In fact, that Ms. Peguero recanted what

5    happened up in the Bronx in that vehicle.  Everything leading

6    up to that point, she has not recanted.  I was very careful

7    about reading Ms. Peguero's sentencing minutes and the plea

8    allocution and all of that.  I was very precise in what I said.

9    I absolutely did not go out of bounds and saying she has

10   recanted everything, violent acts that happened up in the

11   Bronx.

12         THE COURT:  If I have the sense that the jury is left

13   with the misimpression that Mr. McCaffrey actually bit the

14   victim, then I would have to clear that up or allow Mr. Garber

15   to clear that up.

16         Mr. Garber, take a look at the opening and point to me

17   what it is that you think has left the jury or could leave the

18   jury with such a misimpression, because they shouldn't be left

19   with that kind of misimpression.  If there will be a

20   stipulation, there will be a stipulation.

21         MR. LARKIN:  One of our arguments is going to be that

22   Ms. Peguero herself, by describing the crime the way that she

23   did, she specifically reported that the assailant bit her.  The

24   DNA testing we know now strongly, strongly --

25         THE COURT:  Mr. Garber's concern is that the jury has

E4TUMCC8

1    been asked to believe that everything but a rape happened, and

2    everything else was true, including and bites and hits and

3    other things.  If that is the impression, then I think that he

4    would get to rebut.

5          MR. LARKIN:  I don't think that we intend to

6    communicate that and --

7          MS. ZGODNY:  Mr. Garber can get the minutes and he can

8    read my opening.  I would show him my opening.  That is not

9    what I said.  I was very precise in my opening.  At a point to

10   say, now this part has not been recanted.  It is everything

11   after that --

12         THE COURT:  I am not prepared to rule on this now.

13         Ms. Garber, I take your point.  I am sensitive to it.

14   Point me to the record where you think also there is a

15   misimpression that you think has been left.  And if you think

16   that is the case, we will deal with it later.

17         A couple of other things.  Mr. McCaffrey, there was a

18   couple of times during questioning where you started asking

19   questions.  Am I on trial here?  Why do I have to answer these

20   questions.  A couple of times you said, I already answered

21   that.  I just want to make it clear.  You don't get to do that.

22   I don't think that you take the stand again, and I don't know

23   that you meant any disrespect.  You have to be careful about

24   that kind of thing.  Witnesses have to answer questions, unless

25   they are improper questions.  If they are improper questions

E4TUMCC8

1    then the lawyers object and I rule.

2              If you ask questions like that, it puts me in a tough

3    spot because I am tempted to explain, you are not on trial the

4    way you are on trial in a criminal case.  But the jury is being

5    asked to assess your credibility and the credibility of other

6    witnesses and counsel is free to explore areas of inconsistency

7    and inaccuracy and that is fair game, but I don't want you to

8    leave with the misimpression --

9              PLAINTIFF ATTORNEY:  I certainly apologize, your

10   Honor.

11             THE COURT:  Apology accepted.  I just wanted to

12   explain.

13             Anything else that we need to cover?

14             MR. GARBER:  I have not checked my emails in the last

15   two hours -- from Mr. Dwyer -- I am going to continue my

16   efforts to have him here for late morning because that's when

17   he would testify.  I am just alerting the Court.

18             THE COURT:  Let me know if you need to do something.

19             Tomorrow, the lineup is Ms. Pujols and then --

20             MR. GARBER:  Possibly Mr. Dwyer, then possibly

21   Ms. Sosa.

22             MR. LARKIN:  Can I say one thing?  I had a phone call

23   message from Maria asking what is happening, what is going on.

24   I wanted to wait until the day to see where we are.  Did you

25   want to call her before the officers?

1            MR. GARBER:  I would, because they are here.  It is

2     going to turn on -- we have decision to make after Ms. Pujols

3     testifies.

4            MR. LARKIN:  You talk to her.

5            THE COURT:  She will be here.  She understands that

6     she needs to be here.

7            MR. LARKIN:  I subpoenaed her.  Plaintiffs did not

8     subpoena her.  Should I tell her to be here.

9            MR. GARBER:  We can work it out.

10            THE COURT:  Are you going to call her even if she

11     testifies on Mr. Garber's case?

12            MR. LARKIN:  No.

13            THE COURT:  Ask her to be here tomorrow.  I think that

14     we should have her here tomorrow.  I think there is a strong

15     possibility she will be on tomorrow.

16            You started saying, Ms. Pujols, Ms. Sosa, Dwyer and --

17            MR. GARBER:  Possibly the defendants and then we will

18     be done, other than Strain and Krutoy, but those are question

19     marks, depending on how things go.

20            THE COURT:  That should take us through tomorrow.  Be

21     here by 9:15.  If the jury is here at 9:30, we are going to

22     start on the dime.  I just want to signal to them that we are

23     taking deadlines seriously and they should as well.

24            Have a good night.  See you tomorrow.

25            (Proceedings adjourned until 9:30 a.m., April 30,
      2014)

1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     "BIURNY PEGUERO" . . . . . . . . . . . . . . 183

4     "LISA MISNER" . . . . . . . . . . . . . . . 221

5     "ROBERT ARBUISO" . . . . . . . . . . . . . . 223

6     "JOANNA RAK" . . . . . . . . . . . . . . . . 228

7     "FARKHANDA FAROOQI" . . . . . . . . . . . . 237

8     "PELAGIO DELACRUZ" . . . . . . . . . . . . . 253

9     "WILLIAM MCCAFFREY" . . . . . . . . . . . . 276

10    "DAVID DIAZ" . . . . . . . . . . . . . . . . 331

11    WILLIAM MCCAFFREY

12    Direct By Mr. Garber . . . . . . . . . . . . 344

13    Direct By Mr. Garber . . . . . . . . . . . . 363

14    Cross By Mr. Larkin  . . . . . . . . . . . . 408

15    Redirect By Mr. Garber . . . . . . . . . . . 485

16    Recross By Mr. Larkin  . . . . . . . . . . . 489

17    AURORA PUJOLS

18    Direct By Mr. Garber . . . . . . . . . . . . 490

19

20

21

22

23

24

25